**BLACKWELL LAW OFFICE, PLLC**
818 N. 5th Ave
Phoenix, AZ 85003
Tel: (480) 227-4984
Fax: (602) 865-1527
State Bar No. 023588
Jocquese@azjustice.com
Jocquese L. Blackwell
Attorney for Plaintiff

**UNITED STATES DISTRICT COURT DISTRICT OF ARIZONA**

| | |
|---|---|
| YOLANDA ERICKSON, individually, as personal representative of the ESTATE OF MIGUEL RUIZ and Next Best Friend of minor A.R., and Canon Ruiz; | NO. 2:14-cv-01942-JAT |
| Plaintiffs, | **AMENDED COMPLAINT** |
| vs. | **TORT – NEGLIGENCE, EXCESSIVE USE OF FORCE, WRONGFUL DEATH AND VIOLATION OF CIVIL RIGHTS AND DAMAGES** |
| CITY OF PHOENIX, a public entity; PHOENIX POLICE CHIEF DANIEL GARCIA individually and in his official capacity as Chief of the City of Phoenix Police Department; SERGEANT MIKE WESLEY individually and in his official capacity as a police officer for the City of Phoenix Police Department; OFFICER JUSTIN SCHMIDT individually and in his official capacity as a police officer for Phoenix Police Department; OFFICER ROBERT MATHEWS individually and in his official capacity as a police officer for the City of Phoenix Police Department; OFFICER ABRAHAM CAMARILLO individually and in his official capacity as an officer for the City of Phoenix Police Department; OFFICER KEVIN LINN individually and in his official capacity as an officer for the City of Phoenix Police Department; SERGEANT CHRISTOPHER LEUBKIN individually and in his official capacity as an officer for the City of Phoenix Police | **(JURY TRIAL DEMANDED)** |

BLACKWELL LAW OFFICE, PLLC
818 N. 5th AVE.
PHOENIX, AZ 85003

Department; LIEUTENANT STAN HOOVER individually and in his official capacity as an officer for the City of Phoenix Police Department;

Defendants.

Plaintiffs, for their complaint, allege and state the following:

## INTRODUCTION

This case arises out of the unlawful detention, negligence, and use of excessive force, assault and wrongful death of Miguel Angel Ruiz ("Michael"), a 44-year-old man. His wrongful death was caused by the actions of several City of Phoenix Police Department Officers during the early afternoon hours on Sunday, July 28, 2013.

## COMPLAINT

Plaintiffs for their Complaint against Defendants here by allege as follows:

## JURISDICTION & VENUE

1.     Plaintiffs bring this action pursuant to A.R.S. § 12-611, et seq., DEATH BY WRONGFUL ACT; A.R.S. § 13-3881 et seq., EXCESSIVE FORCE; 42 U.S. C. § 1983; the Fourth, and Fourteenth Amendments of the United States Constitution; and pendent state common law and statutory laws.

2.     Plaintiffs have satisfied the provisions of A.R.S. §12-821.01 by serving upon Defendants a notice of claim. Pursuant to A.R.S. §12-821.01(E), the claim is deemed denied because more than sixty days have elapsed without response since the date of service.

3.     This court has jurisdiction of Plaintiffs' federal law claims pursuant to 28 U.S.C. §1331 and 42 U.S.C. §1988.   Additionally, this court has jurisdiction over Plaintiffs' state and federal claims pursuant to Article 6, §14 of the Arizona Constitution.

4.     Venue is proper in this court pursuant to A.R.S. §12-401, A.R.S. §§ 12-611, 12-612(A), 12-641 and A.R.S. § 14-3110 as the defendants are residents of Maricopa

BLACKWELL LAW OFFICE, PLLC
818 N. 5th AVE
PHOENIX, AZ 85003

County, Arizona and the events underlying this lawsuit occurred in Maricopa County.

## **PARTIES**

5.      Plaintiffs incorporate the allegation in the paragraphs above as if set forth fully herein.

6.      Plaintiff herein, Yolanda Erickson, is and at all time herein mentioned, was a citizen of the United States.  Plaintiff is the surviving mother of decedent Miguel.

7.      Plaintiff Yolanda Erickson survives, and is a statutory beneficiary of, her son Miguel Angel Ruiz.

8.      Plaintiff Yolanda Erickson is the Representative of the Estate of Miguel Angel Ruiz.

9.      Plaintiff herein Yolanda Erickson is acting as a next best friend of A. R., who is the minor surviving daughter of decedent, Miguel Ruiz.

10.     Plaintiff herein, Canon Ruiz, is the son of decedent Miguel Ruiz.

11.     Defendant City of Phoenix ("City") is a public, municipal entity, formed and designated as such pursuant to Title 9 or the Arizona Revised Statues, and, as such, is subject to civil suit and may be held independently liable as an entity or municipality, and vicariously liable for the wrongful conduct of its officers, employees, agents, districts, and divisions/sub-divisions, including the City of Phoenix Police Department, Phoenix Police Department Chief Daniel Garcia ("Chief Garcia), and its officers and employees of their division.

12.      At all times mentioned, Defendant, Chief Garcia, was an employee of the City of Phoenix Police Department.  In such capacity, the Chief Garcia was an officer, agent, and employee of the City and the Phoenix Police Department, with the authority and responsibility to establish policies, practices, customs, procedures, protocols, and training, including hiring and discharging employees.  Defendant Chief Garcia's actions or inactions constitute actions of the City and the Phoenix Police Department. Specifically, Chief Garcia failed to employ any remedial measures against the officers who were involved in Michael's attack and murder.  The Chief was duty bound to place the officers on some type

of light duty and/or administrative leave pending the investigation of Michael's attack and murder. A number of Police Department in the United States have ceased to employ the carotid control technique. However, the Phoenix Police Department continues to utilize this unorthodox technique and based on the department's operations orders, it is not being taught and/or used properly. The City is vicariously and directly liable for the wrongful conduct, as alleged herein. The Chief is named in both his official capacity and individual capacity in this Complaint. The City is vicariously liable for Defendant Chief Garcia's wrongful conduct, as alleged herein.

13. At all times mentioned, Defendant, Sergeant Mike Wesley, was an employee of the City of Phoenix Police Department. He is being sued individually and in his official capacity as a police officer for the City of Phoenix Police Department. Sergeant Wesley is sued both in his official capacity, for purposes of Plaintiffs' state law claims, and in his individual capacity, for purposes of Plaintiffs' claims under 42 U.S.C. § 1983.

14. At all times mentioned, Defendant, Officer Justin Schmidt, was an employee of the City of Phoenix Police Department. He is being sued individually and in his official capacity as a police officer for the City of Phoenix Police Department. Officer Schmidt is sued both in his official capacity, for purposes of Plaintiffs' state law claims, and in his individual capacity, for purposes of Plaintiffs' claims under 42 U.S.C. § 1983.

15. At all times mentioned, Defendant, Officer Robert Mathews, was an employee of the City of Phoenix Police Department. He is being sued individually and in his official capacity as a police officer for the City of Phoenix Police Department. Officer Mathews is sued both in his official capacity, for purposes of Plaintiffs' state law claims, and in his individual capacity, for purposes of Plaintiffs' claims under 42 U.S.C. § 1983.

16. At all times mentioned, Defendant, Officer Abraham Camarillo, was an employee of the City of Phoenix Police Department. He is being sued individually and in his official capacity as a police officer for the City of Phoenix Police Department. Officer Camarillo is sued both in his official capacity, for purposes of Plaintiffs' state law claims, and in his individual capacity, for purposes of Plaintiffs' claims under A.R.S. § 12-611 and 42 U.S.C. § 1983.

17.     At all times mentioned, Defendant, Officer Kevin Linn, was an employee of the City of Phoenix Police Department.  He is being sued individually and in his official capacity as a police officer for the City of Phoenix Police Department.  Officer Linn is sued both in his official capacity, for purposes of Plaintiffs' state law claims, and in his individual capacity, for purposes of Plaintiffs' claims under 42 U.S.C. § 1983.

18.     At all times mentioned, Defendant, Sergeant Christopher Leubkin, was an employee of the City of Phoenix Police Department.  He is being sued individually and in his official capacity as a police officer for the City of Phoenix Police Department. Sergeant Leubkin is sued both in his official capacity, for purposes of Plaintiffs' state law claims, and in his individual capacity, for purposes of Plaintiffs' claims under 42 U.S.C. § 1983.

19.     At all times mentioned, Defendant, Lieutenant Stan Hoover, was an employee of the City of Phoenix Police Department.  He is being sued individually and in his official capacity as a police officer for the City of Phoenix Police Department.  Lieutenant Hoover is sued both in his official capacity, for purposes of Plaintiffs' state law claims, and in his individual capacity, for purposes of Plaintiffs' claims under 42 U.S.C. § 1983.

20.     Plaintiffs ask leave of this Court to amend the Complaint to name any unidentified individuals once the identities; acts, omissions, roles and responsibilities of such Defendants are learned through discovery.

21.     Plaintiffs' Complaint against Defendants, hereby allege as follows:

## GENERAL ALLEGATIONS

22.     Plaintiffs re-allege and incorporate, by reference, their claims, facts, and allegations in the paragraphs above, as set forth fully herein.

23.     At all times material herein, Defendant Officer Abraham Camarillo, (hereinafter "Camarillo") was an agent and employee of the City and the City of Phoenix Police Department who, at all times of the events complained of herein, was acting within the course and scope of his employment and under color of law.  On July 28, 2013 Camarillo alleges he preformed a welfare check at Michael's apartment.  It is important to note that Camarillo was not investigating any crimes while he was in Michael's apartment.

BLACKWELL LAW OFFICE, PLLC
818 N. 5th AVE
PHOENIX, AZ 85003

After leaving Michael's apartment, Camarillo is seen talking with Sgt. Leubkin as he was video taping Michael while he was on top of the roof. As Michael prepares to jump to the second floor landing, Camarillo seemingly tells Sgt. Leubkin that he is going to grab Michael upon his landing. When Camarillo reached Michael he engaged in deliberate policies, customs and practices employed by the City, which resulted in Michael's death. Specifically, Camarillo placed Michael in the Phoenix Police Department sanctioned carotid control technique. This technique may lead to irreparable brain injury and death if performed in the manner as described in the Operations Order 1.5(G) for the carotid control technique. Because Michael was not using any type of aggression towards the officers and no one had authorized the use of deadly force for his arrest, this technique should have never been used during Michael's arrest. Camarillo followed PPD operations order 1.5(G) by using the technique for over four minutes.[1] This can be seen in the numerous videos that memorialized the attack and subsequent death of Michael. Camarillo's engagement in such policies, customs and practices constitute actions of the City. Because Camarillo used the carotid control technique as mentioned in Operations Order 1.5(G) for over four minutes, and this technique is taught by the City of Phoenix Police Department, enforced by the Chief, the City and Chief are directly liable for Michael's wrongful death under *Monell*, and § 1983 respectively.

24.     At all times material herein, Defendants Sergeant Mike Wesley, Sergeant Christopher Leubkin, Lieutenant Stan Hoover, Officer Justin Schmidt, Officer Robert Mathews, and Officer Kevin Linn (collectively referred to as "Officers") were agents and employees of the City and/or the Police who, at the time of the events complained of herein, were acting within the course and scope of their employment by the City and/or Police and under color of law, ordinance, regulation, custom or usage. These individual Defendants engaged in wrongful conduct that allowed, caused, and/or contributed to cause Michael's death. Their actions and/or inactions constitute actions of the City and Chief

---

[1] Phoenix Operations Order 1.5(G) does not state how long an officer should employ the carotid control technique. It only warns that using the technique for four to six minutes may cause irreparable brain damage.

6

BLACKWELL LAW OFFICE, PLLC
818 N. 5th AVE
PHOENIX, AZ 85003

Garcia. The City and Chief Garcia are vicariously and directly liable for their wrongful conduct, as alleged herein.

25. At all times material herein, Defendants Sergeant Mike Wesley, Sergeant Christopher Leubkin, Lieutenant Stan Hoover, Officer Justin Schmidt, Officer Robert Mathews, and Officer Kevin Linn (collectively referred to as "Officers") were agents and employees of the City and/or the Police who, at the time of the events complained of herein, were acting within the course and scope of their employment by the City and/or Police and under color of law, ordinance, regulation, custom or usage. These individual Defendants engaged in wrongful conduct that allowed, caused, and/or contributed to cause Michael's death. Their actions and/or inactions constitute actions of the City and Chief Garcia. The City and Chief Garcia are directly liable for failing to train supervise, re-train, or discipline the Officers in this case. The Chief and the City sanctioned their wrongful conduct and failed to discipline any officer that harmed Michael, as alleged herein.

26. On July 28, 2013, Officers Sgt. Wesley, Schmidt, Mathews, Linn and Hessner entered into a Phoenix Fire Department cherry picker in an attempt to coerce Michael off of a roof.

27. Officer Schmidt violated Phoenix Police Department Operations Orders 1.5(E) M26 Advanced and X26 Taser when he tasered Michael on a rooftop during an attempt to place him under arrest.

28. Sgt. Wesley violated Phoenix Police Department Operations Orders 1.5(E) M26 Advanced and X26 Taser when directed Officer Schmidt to taser Michael on a rooftop during an attempt to place him under arrest.

29. Michael did not pose a threat to the safety of any of the officers involved, the severity and/or violence level of the Michael's actions was extremely low based on the totality of circumstances and there was no history of violent behavior known to the officers at the time of contact with Michael.

30. Officer Schmidt improperly deployed his taser in violation of Operations Orders 1.5(E) when he was ordered by Sgt. Wesley to taser Michael to coerce him off of the roof because he was in grave danger of falling from a significant height. Moreover, the

BLACKWELL LAW OFFICE, PLLC
818 N. 5th AVE
PHOENIX, AZ 85003

operations order states that officers are not supposed to use the taser for escorting or prodding individuals.  In this case Officer Schmidt used the taser in a prodding and/or escorting fashion while trying to remove Michael off of the rooftop.

31.    While on the second floor landing, Officer Mathews improperly tasered Michael several times on or near his groin, his chest, his legs and his abdomen in violation of operations orders 1.5(E).

32.    Because Michael was not participating or displaying active aggression or violently attacking any of the officers at the scene officers violated operations orders 1.5(F) Immediate Control Technique, when they employed closed fist strikes and knee strikes to his body.

33.    Supervisory Officers, Sgt. Leubkin, Sgt. Wesley, and Lt. Hoover, violated Operations Orders 1.5(G) Carotid Control Technique when they allowed Officer Camarillo to improperly apply this control technique against Michael because he was not displaying active aggression, aggravated active aggression, and he was not a threat to the officers or others at the scene.

34.    Supervisory Officers, Sgt. Leubkin and Lt. Hoover, violated operations orders 1.5(F) Immediate Control Technique when they allowed Officer Mathews to improperly apply closed fist strikes and Sgt. Wesley to utilize a knee strike against Michael because he was not displaying active aggression, aggravated active aggression, and he was not a threat to the officers or others at the scene.

35.    Officer Camarillo violated Operations Orders 1.5(G) Carotid Control Technique because he employed the carotid control technique when Michael did not pose a threat to Officer Camarillo, he was not using active aggression, aggravated active aggression, nor was he a threat to himself or others at the scene.

36.    All officers violated Operations Orders 1.5(G) because no one checked Michael for vital signs after they noticed he was unconscious and prior to removing him from the second floor landing nor they instruct the emergency response team to notify hospital staff that Michael was subjected to the carotid control technique when he arrived at the hospital.

37.    Chief Garcia is liable under § 1983 for the actions of all of these officers because he is in charge of ensuring officers are trained properly and informed if approved techniques should be discontinued due to the inherent risk of death or serious bodily injury if techniques such as the Carotid Control Technique is utilized.  This technique has been discontinued by a number of Police Departments across our nation, yet the City of Phoenix and the Chief continues to allow their officers to use this life threatening technique.

38.    The City is vicariously liable for the negligence and gross negligence that was committed by the above named officers for their use of excessive force which led to Michael's death.

39.    The City is liable for all § 1983 claims and *Monell* claims alleged herein due to the City Defendant's lack of training as it pertains to the continued use of the carotid control technique on a subject like Michael for more than ten seconds, the lack of training as it pertains to contemporaneous deployment of multiple taser strikes and drive stuns to an individual who at the same time was being subdued by the use of the carotid control technique.  The lack of training in these areas implicitly shows deliberate indifference to the constitutional rights of citizens such as Michael and the actions of the Officers in this case led to Michael's death.

40.    The City and all of its subdivisions and their agents and employees specifically named herein are collectively referred to herein as the "City" or "Defendants."

41.    Plaintiffs again ask leave of this Court to amend the Complaint to name the unidentified individuals once they have learned, through discovery, the identities and acts, omissions, roles, and/or responsibilities of such Defendants sufficient for Plaintiffs to discover the claims against them.

**FACTUAL BASIS OF CLAIM FOR RELIEF APPLICABLE TO ALL CLAIMS**

**<u>Introduction</u>**

42.    Plaintiffs incorporate the allegations in the paragraphs above as if set forth fully herein.

43.    On July 28, 2013, between the hours of 7:00 am and 8:15 am, Phoenix Police Officer Camarillo and several other officers killed Miguel Angel Ruiz while he was seated

on a second floor landing at his apartment complex. The officers used a number of PPD sanctioned use of force techniques such as the carotid control technique, they applied multiple tasers strikes, drive stun strikes, fist strikes, and a knee strike which prevented the flow of blood to Michaels brain and oxygen to his lungs. After Michael died, he was subsequently resuscitated but he never regained consciousness. Because Michael had no brain activity as a result of the trauma he endured at the hands of the officers, life care was removed.

44. On July 28, 2013, a Mr. Kheylon Cunningham called 911 to report that his neighbor was on top of the roof of the apartment complex he lived at and needed help to get him down. This neighbor was the decedent, Miguel "Michael" Angel Ruiz.

45. Mr. Cunningham stated that Michael was on top of the roof apparently attempting to repair the swamp cooler. A pipe subsequently broke and water began flowing into his apartment below.

46. Mr. Cunningham notified the onsite maintenance man, Mr. Gary Carthen. Mr. Carthen instructed Mr. Cunningham to call 911 to get Michael off of the roof.

47. Officer Hessner was the first City of Phoenix Police Officer to arrive. Officer Hessner claimed he was unsuccessful in communicating with Michael.

48. Sgt. Wesley arrived around the same time as Officer Hessner and devised plan where he, Officer Schmidt, and Officer Hessner would ascend to the roof in the Phoenix Fire Department's elevated work platform "bucket" to cajole Michael off of the roof by force. This plan did not include using the trained Phoenix fire fighters and EMT's who were already on the scene.

49. Prior to entering the bucket, Sgt. Wesley was advised that the roof was extremely compromised and may not maintain any additional weight on it.

50. While all three officers were in the bucket and at the edge of the roof, they convinced Michael to approach their location.

51. As Michael approached, both Officer Hessner and Wesley attempted to grab his arms and pull him into the bucket.

52. In a panic most likely due to the compromised roof and unsteady bucket,

Michael tensed up and moved back away from the bucket.

53. At this time Sgt. Wesley stated that Michael seemed to be mentally compromised. Instead of bringing up an EMT, Sgt. Wesley authorized Officer Schmidt to deploy his taser from his location in the bucket at Michael while he was in an elevated position on the roof.

54. The taser struck Michael in the shoulder, which caused him to stumble and sit down on the roof.

55. In an attempt to avoid being harmed on the roof, Michael chose to drop down to a second floor landing right below his position.

56. Michael jumped to the second floor landing and remained seated on his buttocks.

57. Officers immediately engulfed Michael on the second floor landing and attacked him without provocation.

58. Although Michael was seated on the second floor landing with his hands straight up, Officer Camarillo immediately applied the Carotid Control Technique assumingly as he was trained to do.

59. Officer Lin, Officer Camarillo, and Sgt. Leubkin wrestled with Michael while his hands were up and as he continued to plead that he did not do anything wrong.

60. While Officer Camarillo was applying the carotid control technique, Officer Matthews contemporaneously tasered Michael's body multiple times.

61. During this time, Sgt. Wesley climbed up to the landing where Michael's encounter with the police was taking place and adjusted Officer Camarillo's chokehold.

62. Sgt. Wesley applied a single knee strike to the left side of Michael's body. Sgt. Wesley stated that he would have given more knee strikes but he saw civilians at the scene video taping the attack.

63. During the encounter, Michael made several pleas for the officers to stop beating and choking him. Michael repeatedly stated that the officers "were trying to kill him."

64. Michael did not voluntarily make any movements on the second floor

BLACKWELL LAW OFFICE, PLLC
818 N. 5th AVE
PHOENIX, AZ 85003

landing. A review of the videos shows Michael being pulled up off of the second floor landing by the officers when Camarillo was applying the carotid control technique.

65.     The videos show Michael seated on the second floor landing, surrounded by officers in a subdued fashion, and all of a sudden, Officer Mathews starts to apply his taser to his legs.  Michael again, pleads for help and exclaims, "you are trying to kill me", and an officer yells back, just relax and we'll stop!"

66.     Based on the video footage of the attack, it seemed as if Officer Camarillo was trying to separate Michael's head from his neck.  Michael's face turned blue, then purple, he became unresponsive, his body went limp and he died due to the excessive force.

67.     It is important to note that Officer Camarillo employed the carotid artery technique for over four minutes.

68.     Michael's hands and legs were restrained during the time he was on the second floor landing.

69.     Michael's legs were not released after he was rendered unconscious.

70.     Michael was dragged down from the second floor with his hands handcuffed behind his back pulled up over his head and the officers allowed his head to hit each step on the way down.

71.     An EMT noticed that Michael had coded (died) and informed the individuals at the scene that Michael needed to be revived.

72.     Michael was not breathing on his own, and was experiencing pulse-less electrical activity.

73.     Michael was resuscitated at the scene and transported to St. Joseph's Hospital and Medical Center.

74.     Upon arrival at the hospital, Michael went into pulse-less electrical activity and required emergency resuscitation in the emergency unit and was resuscitated again.

75.     Michael presented with anoxic brain injury due to the carotid control technique, hemorrhage of the right stennocleidomastoid muscle, fracture of the right cornu of the thyroid cartilage with associated hemorrhage.  Michael's brain activity showed

secondary myoclonic seizure activity, rhabdomyolysis, and systemic inflammatory response syndrome.

76.    Michael further presented with mild extracranial soft tissue swelling and hypoxic ischemic encephalopathy.

77.    Michael received multiple blunt force injuries to his head, which left abrasions and a conjunctival hemorrhage.

78.    Michael received blunt force injuries of the torso, which left abrasions and there was also a subcutaneous tissue hemorrhage of the torso.

79.    Michael received blunt force injuries to his extremities, which also left abrasions and contusions as well as subcutaneous hemorrhage.

80.    Michael had to undergo endotracheal intubation during his hospital stay because of the anoxic brain injury.

81.    Michael's condition never improved, doctor's informed the family that his chances of recovery were extremely poor.  As such, Michael's mother, Yolanda Erickson elected to withdraw care.

## DAMAGES

82.    As a consequence of Defendants' violation of Plaintiffs' federal civil rights under 42 U.S.C. § 1983 and the Fourteenth Amendment, Plaintiff Yolanda Erickson was mentally and emotionally injured and as a proximate result of decedent's wrongful death, including but not limited to: Plaintiffs' loss of familial relations, decedent's society, comfort, protection, companionship, love, affection, solace, and moral support.

83.    Plaintiff Yolanda Erickson is entitled to recover wrongful death damages pursuant to A.R.S. § 12-611 and 12-612(A).

84.    Plaintiff Canon Ruiz is entitled to recover wrongful death damages pursuant to A.R.S. § 12-611 and 12-612.

85.    Minor Plaintiff, A. R., is entitled to recover wrongful death damages pursuant to A.R.S. § 12-611 and 12-612(A).

86.    Plaintiff, Yolanda Erickson as representative of Michael's estate is entitled to the reasonable value of funeral and burial expenses pursuant to A.R.S. § 12-613.

13

87.     Plaintiff, Yolanda Erickson, is entitled to recover damages pursuant to his right of survivorship for the pain and suffering he endured as a result of the violation of his civil rights.

88.     Plaintiff, Canon Ruiz, is entitled to recover damages pursuant to his right of survivorship for the pain and suffering he endured as a result of the violation of his civil rights.

89.     Plaintiffs, A.R., is entitled to recover damages pursuant to her right of survivorship for the pain and suffering he endured as a result of the violation of his civil rights.

90.     As a further direct and proximate result of Defendants' intentional and/or negligent conduct, Plaintiff A.R. has been deprived of decedent's support.

91.     Plaintiffs found it necessary to engage the services of private counsel to vindicate the rights of decedent and Plaintiffs' rights under the law.  Plaintiffs are therefore entitled to an award of attorneys' fees and/or costs pursuant to statutes(s) in the event that they are the prevailing parties in this action under 42 U.S.C. §§§§ 1983, 1985 – 86 and 1988.

## FIRST CLAIM FOR RELIEF
### Negligence—The City, Camarillo and Defendants Were Negligent and Caused the Wrongful Death of Michael

92.     Plaintiffs incorporate the allegations in the paragraphs above as set forth as if set forth fully herein.

93.     A claim for simple negligence against a public employee and entity is appropriate if it can be determined that said individuals acted intentionally. A.R.S. § 12-820.02 (A).

94.     Officer's decisions to use potential lethal force are deliberate acts.

95.     Officer's deliberate and intentional use of force was not proportionate nor reasonable because Michael was not trying to flee, nor was he trying to hurt anyone prior to the carotid technique and the deployment of multiple tasers, taser drive stuns, knee strikes, and fist strikes being applied.

96.     Based upon the real time video footage of the officers actions as well as Michael actions, it is unreasonable to believe the Michael was likely to endanger human life or inflict serious bodily injury to another unless he was apprehended without delay.

97.     Upon jumping off the roof, Michael immediately put his hands up over his head and was in a sitting position.

98.     Officer Camarillo failed to give any commands to Michael before applying the carotid artery technique.

99.     Officer Camarillo intentionally used the carotid artery technique on Michael in the manner he was trained pursuant to Phoenix Police Department Operations Orders.

100.    Officer Camarillo states he preformed a "welfare check" inside Michael's home, and was not investigating any crime.

101.    Based upon witness accounts, to include officers on the scene, it was apparent that Michael was emotionally disturbed and in need of medical attention.

102.    Defendants have a statutory and common law duty to assure the safety and wellbeing of persons in their care and custody to include using only necessary and reasonable force.

103.    Officers on the second floor landing breached their duty to Michael by subjecting him to unreasonable and deadly force when they employed multiple tasers, drive stuns, knee strikes and fist strikes to his body.

104.    Officer Camarillo breached his duty as identified by the allegations set forth in the paragraphs above, by subjecting Michael to deadly force, killing Michael by using the carotid control technique when he neither had a weapon nor posed any threat of harm.

105.    Officer Camarillo was at all times material hereto, acting within the course and scope of his employment. The City is vicariously liable for the actions of its officers, to include the actions and failures to act by Officer Camarillo.

106.    All Officers that used their taser weapons and/or who preformed knee strikes and punches to Michael's body added to the pain and suffering that was inflicted on Michael by Officer Camarillo.  The combination of the above use of force led to Michael's death.  At no time where any officers investigating a crime while on the second floor

15

BLACKWELL LAW OFFICE, PLLC
818 N. 5th AVE
PHOENIX, AZ 85003

landing and Michael did not pose an immediate threat.

107.    Defendants City, Chief, and the Officers breached their duties owed to Michael, as identified by the claims, facts, and allegations set forth in the paragraphs above.

108.    Defendants City, Chief, Camarillo and Officers breach of duty caused and/or substantially contributed to cause Michael's death.

109.    As a result of Defendant's negligence, Michael, Yolanda, Canon and Michael's minor child A.R., have been deprived of the continued companionship and familial society of their son and/or father and have suffered and will continue to suffer in the future a loss of love, affection, companionship, care, protection, and guidance, as well as pain, grief, sorrow, anguish, stress, shock, and mental suffering. Additionally, Plaintiffs have and will continue to suffer economic and noneconomic damages in an amount to be proven at trial.

## SECOND CLAIM FOR RELIEF
### (Officer Camarillo and the Defendants Violated Michael's Rights Under the Fourth Amendment and 42 U.S.C. § 1983 to be Free From Unlawful Seizures)

110.    Plaintiffs incorporate the allegations in the paragraphs above as if set forth fully herein.

111.    Michael was not violating any crimes prior to police contact or when he was on the second floor landing.

112.    The maintenance person only called the police to have them help Michael off of the roof.  He did not want him trespassed.

113.    Officers used an improper ruse to coerce Michael off of the roof that placed him of imminent personal injury.

114.    Because the officers freighted Michael, he decided to jump off of the roof.

115.    Michael had not violated any laws when he was attacked on the second floor landing.

116.    The Officer's attacks constituted an illegal seizure under the 4th amendment because Michael had not committed any crimes on the second floor landing and there was

BLACKWELL LAW OFFICE, PLLC
818 N. 5th AVE
PHOENIX, AZ 85003

no desire from anyone at the apartment complex to trespass Michael's from the premises or the second floor landing.

117. Officer Camarillo and the other Defendants violated Michael's Fourth Amendment Right to be free from unreasonable seizures when the officers deployed their tasers against him on the roof, tasered him multiple times on the second floor landing, employed drive stuns, multiple fist and knew strikes, preformed the carotid control technique and/or choked him, tasered him in his groin area and ultimately took his life.

118. Michael is entitled to damages as a result of the officers' actions.

119. The wrongful conduct of the Officers and Officer Camarillo was in reckless disregard of the rights of Michael, Yolanda, Canon and Michael's child A.R., and damages in an amount to be determined by a jury should be awarded to deter and prevent others from acting in a similar manner in the future.

120. As a further actual and proximate result of said defendants' negligence, plaintiffs incurred funeral and burial expenses, in an amount according to proof at trial.

121. As a direct and proximate result of Defendants' wrongful conduct, the Estate of Miguel Angel Ruiz has suffered damages.

### THIRD CLAIM FOR RELIEF
**Gross Negligence—City, Camarillo and Defendant Officers were Grossly Negligent and Caused the Wrongful Death of Michael**
**(A.R.S. §§§ 12-611 - 613)**
**(Plaintiff Yolanda Erickson, against all Defendants)**

122. Plaintiffs re-allege and incorporate by reference the claims, facts and allegations in the paragraphs above as if set forth fully herein.

123. The responding officers acted or failed to act, despite knowing or having reason to know that Michael was or would be inappropriately subjected to an unreasonable risk of serious harm and injury as a result of Officer Camarillo actions when he used the carotid control technique on Michael for over four minutes.

124. Defendants have a statutory and common law duty to assure the safety and wellbeing of persons in their care and custody – a duty that includes using only necessary and reasonable force.

125.   The responding officers were grossly negligent when they subjected Michael to multiple taser strikes, drive stuns, knee strikes, and fist strikes during the time Officer Camarillo was applying the carotid control technique.

126.   Sgt. Leubkin, Lt. Hoover, and Sergeant Wesley condoned the incorrect application of the carotid control technique by Camarillo as well as allowing the subordinate officers mentioned herein to use fist strikes, a knee strike and multiple taser applications against Michael.

127.   Defendant Camarillo subjected Michael to reckless and deadly force after knowing the technique had failed.

128.   Lt. Hoover, Sgt. Leubkin, Sgt. Wesley, Officer Schmidt, Officer Mathews, and Officer Linn, failed to stop Camarillo when his attempts to subdue Michael using the carotid control technique were ineffective.  There actions also constitute gross negligence.

129.   A reasonable police officer with the proper training, acting under similar circumstances, would have known not to use deadly force of this kind against Michael when he was without a weapon and posed no threat of harm to officers or the public or himself.

130.   A reasonable police officer with proper training, acting under similar circumstances, would have known that applying the carotid control technique for a prolonged period of time would cause irreparable brain damage or death.

131.   A reasonable police officer with proper training, acting under similar circumstances, would have known that when Michael was being tasered, drive stunned, punched and kneed contemporaneously with an officer employing the carotid control technique would prevent Michael from being able to breath properly and cause irreparable brain damage or death.

132.   Based on the M.E. report, the combination of taser strikes, knee strikes and punches, along with the utilization of the carotid artery technique led to Michael's death.

133.   Many other Police departments have banned the carotid control technique all together.

134.   Officer Camarillo and the Defendant Officers were reckless and grossly

18

negligent in the handling, treatment, and care of Michael.

135. Defendants subjected Michael to reckless and excessive force, and/or failed to intervene to prevent the use of such force, as alleged above.

136. A reasonable person under the same circumstances would have known that Michael was inappropriately subjected to the use of unreasonable and unjustified force.

137. At all times material hereto, Defendants were acting within the course and scope of their employment, and the City is vicariously liable for their acts.

138. Officer Camarillo and the other defendant officers were reckless and/or grossly negligent in the handling, treatment, and care of Michael.

139. The City, directly and through its employees and agents, were reckless and grossly negligent in the training and supervision of their Officers, because the express policy and practice of the use of the carotid control technique was the proximate cause of Michael's death due to the fact that Camarillo applied this technique for over four minutes.

140. The City, directly and through its employees and agents, were reckless and grossly negligent in the training and supervision of their Officers, because the officers were never trained to not apply multiple taser strikes to individuals who are contemporaneously being subdued by the carotid control technique. The City Defendant's failure to train in this regard exhibits deliberate indifference due to the fact that the combination of multiple taser strikes to include drive stuns coupled with the utilization of the carotid control technique led to Michael's prolonged asphyxiation and subsequently his death on the second floor landing.

141. The City, directly and through its employees and agents, were reckless and grossly negligent in the training and supervision of the Officers involved in this case because none of the officers were disciplined for their use of excessive force. Because the officers were not disciplined or re-trained, as it pertains to the use of force alleged in this matter, we believe the City has implicitly encouraged the alleged abuses described herein.

142. Defendants' breach of duties, as outlined above, constitutes gross negligence, which was the proximate cause of Michael's death.

143. The City breached its duties, as identified by the allegations set forth in the

BLACKWELL LAW OFFICE, PLLC
818 N. 5th AVE
PHOENIX, AZ 85003

paragraphs above, by: failing to properly train, retain, and supervise its employees; ratifying improper conditions, specifically the carotid control technique; customs, policies, procedures, and practices; implementing, utilizing, and permitting unreasonably dangerous policies, practices, protocols, customs, and training with respect to the use of deadly force.

144. As the result of Defendants' gross negligence, Yolanda, Canon and Michael's minor child as Michael's survivors, have been deprived of the continued companionship and society of their son, and have suffered and will continue to suffer in the future a loss of love, affection, companionship, care, protection, guidance, as well as pain, grief, sorrow, anguish, stress, shock, and mental suffering, and have suffered both economic and non-economic damages in an amount to be proven at trial.

145. As an actual and proximate result of said defendants' negligence, and the death of decedent, plaintiff A.R. as sustained pecuniary loss resulting from the loss of comfort, society, attention, services, and support of her father, decedent, in an amount according to proof at trial.

146. Pursuant to A.R.S. §§§ 12-611 - 613, Plaintiffs have brought this action, and claim damages from said defendants for the wrongful death of decedent, and the resulting injuries.

### **FOURTH CLAIM FOR RELIEF**
**Officer Camarillo Violated Plaintiff Yolanda's Rights Pursuant to the Fourteenth Amendment of the United States Constitution 42 US.C. § 1983 To Be Free From Interference With Their Rights To Family Society And Companionship Of Michael**

147. Plaintiff re-alleges and incorporates by reference the claims, facts and allegations in the paragraphs above as if set forth fully herein.

148. The reckless, intentional and/or deliberate acts and omissions of Officer Camarillo were the direct and legal cause of the deprivation of Yolanda, Canon, and A.R.'s constitutionally protected rights under the Fourteenth Amendment to the care, companionship and familial society of Michael.

149. The acts and omissions of Officer Camarillo were taken knowingly, intentionally, and/or maliciously and for the purpose of harassment, oppression, and

20

infliction of injury upon the Plaintiffs Yolanda, Canon and A.R., in reckless, wanton, and callous disregard of their civil rights; and by reason thereof, Yolanda, Canon and A.R. each seek exemplary and punitive damages from Officer Camarillo.

150. Defendants' above-described conduct violated the decedent's right as provided for under the Fourth Amendment to the United States Constitution to be free from unreasonable seizures.

### FIFTH CLAIM FOR RELIEF
**Officer Camarillo and the Other Defendant Officers Violated Michael's Rights Under the Fourth Amendment of the United States Constitution and 42 US.C. § 1983 to be Free From Unreasonable use of Force**

151. Plaintiff re-alleges and incorporates by reference the claims, facts and allegations in the paragraphs above as set forth fully herein.

152. At no time were Officer Camarillo or the other Officers threatened, in any way, by Michael.

153. Instead of allowing the fire department to assist Michael down from the roof Officers Wesley, Hessner and Schmidt ascended in the fire departments bucket to get Michael down.

154. Michael posed no immediate threat and was trying to comply with the officers before being tased several times.

155. Michael was not trespassing.

156. Officers were not investigating a crime.

157. At no point was Michael told he was under arrest.

158. Michael was tasered on top of the roof, which caused him to loose his balance.

159. It is against PPD policy to deploy taser prongs at an individual at an elevated level.

160. Michael decided to jump down to the second floor landing.

161. Upon landing, Michael was swarmed by 5 officers.

162. Officer Camarillo applied a carotid technique. A technique that was taught to him by PPD.

BLACKWELL LAW OFFICE, PLLC
818 N. 5th AVE
PHOENIX, AZ 85003

163.    Officer Camarillo is shown re-adjusting his grip around Michael's neck multiple times, and Sgt. Leubkin and/or Sgt. Wesley is shown helping him re-tighten his grip.

164.    Officer Camarillo holds this chokehold for over four minutes.

165.    While Officer Camarillo is applying the carotid artery technique, Michael was tasered three times and drive stunned 4 times, with a number of these stuns to his groin area when the carotid control technique was being applied.

166.    During this time, Michael continued to plead for his life telling them he could not breathe and that the officers were "killing" him.

167.    Michael turns blue, then purple, looses consciousness then dies.

168.    Officers handcuff Michael's lifeless body then drag it down 10 stairs with his unsupported head hitting many if not all of them on the way down.

169.    Based upon the Medical Examiner's report, Michael had multiple blunt forced injuries of his torso including multiple abrasions consistent with taser prongs and multiple bruising consistent with being beaten.  Based upon the M.E. report Michael died of a combination of knee strikes, drive taser stuns and the use of the carotid artery technique.

170.    Defendants' above-described conduct violated decedent's right as provided for under the Fourth Amendment to the United States Constitution to be free from excessive force and/or the arbitrary and/or unreasonable use of deadly force against him.

171.    The City, through its agents and official policy makers, establishes policy for the City's Police Department, oversees the operations of the City's Police Department and the services provided by its officers, and evaluates, certifies, and maintains the Police Department's compliance with applicable standards.  Such actions, directly or via ratification, constitute official municipal policy, customs, and practices.

172.    The City has oversight and supervisory responsibility over its officers, employees, and agents with respect to police matters.

173.    The wrongful conduct of the City, as described herein, constitutes violations of 42 U.S.C. § 1983, in that with deliberate and callous indifference, the City deprived

22

Yolanda, A.R., and Canon of rights secured to them by the Constitution and laws of the United States, including the right to be free from law enforcement's excessive force, and the right to the continued familial and societal relationship, as guaranteed by the Fourth and Fourteenth Amendments.

174.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages.

175.    The wrongful conduct of the Officers Schmidt, Mathews, and Sgt. Wesley who used tasers, drive stuns, fist strikes and a knee strike as well as Officer Camarillo's use of the carotid control technique was in reckless disregard of the rights of Michael, Yolanda, Canon and Michael's child A.R.  The nature of these actions are so extreme and outrageous and in a reckless disregard of the rights of Yolanda, A.R., and Canon that an award of punitive damages is warranted and should be determined by a Jury to deter and prevent others from acting in a similar manner in the future.

**SIXTH CAUSE OF ACTION**
**_MONELL_**
**(The City of Phoenix Violated 42 U.S.C. § 1983 for Its Unconstitutional Policies, Customs, and Failure to Properly Train, Retrain, and Supervise its Officers)**

176.    Plaintiffs incorporate the allegations in the paragraphs above as if set forth fully herein.

177.    Chief Garcia is a policy maker of the City and the Phoenix Police Department.  In his official capacity, Chief Garcia has the authority and responsibility to establish policy for the City's Police, to oversee operations of the Police and the services provided by them, to evaluate, certify, and maintain the Police Department's compliance with applicable standards, and is ultimately responsible for everything that happens as it pertains to the City of Phoenix Police Department.  He also has parallel duties in his individual capacity.  The Chief's actions are the actions of the City, the City Council, and the Phoenix Police Department.

178.    Chief Garcia and the other officers were acting under color of law at all times material hereto and within the normal course and scope of their employment.

179.    Chief Garcia is named in his official capacity, as well as his individual capacity, pursuant to 42 U.S.C. § 1983 for his conduct alleged herein.

180.    Upon information and belief, the City and the Chief have long been on notice and had knowledge of the dangerous unconstitutional conditions that led to Michael's death.

181.    The City, and Chief Garcia through its agents and official policymakers, establishes policy for the City's Police Department, oversees the operations of the City's Police Department and the services provided by its officers, and evaluates, certifies, and maintains the Police Department's compliance with applicable standards. Such actions, directly or via ratification, constitute official municipal policy, customs, and practices.

182.    The City and Chief Garcia have oversight and supervisory responsibility over its officers, employees, and agents with respect to police matters and are directly liable under 42 U.S.C. § 1985.

183.    Upon information and belief, the City and Chief have long been on notice and had knowledge of the dangerous and unconstitutional conditions that led to Michael's death.

184.    Upon information and belief despite its knowledge and notice, the City and Chief were deliberately and callously indifferent to the constitutional rights of those that they serve in training (and/or failing to adequately train) its police personnel in (among other things) the appropriate, lawful and constitutional policies, procedures, practices, protocols, and customs for the use of force as it pertain to the carotid artery technique and

BLACKWELL LAW OFFICE, PLLC
818 N. 5th AVE
PHOENIX, AZ 85003

the use of tasers, as alleged herein.

185.   Upon information and belief, despite their knowledge and notice, the City and Chief were deliberately and callously indifferent to the care and safety of citizens, through fostering, encouraging, and knowingly accepting formal and informal Police policies or customs condoning indifference to medical conditions and care, the use of excessive force, the use of the carotid control technique as promulgated in Phoenix Police Department Operation Orders, and improper restraint of and failure to monitor citizens in their custody, such that death and/or bodily harm to citizens was likely to occur in a manner similar to that of Michael Ruiz.

186.   Upon information and belief, despite their knowledge and notice, the City and Chief either knew or should have known that unconstitutional policies, procedures practices, protocols, customs, and training (or lack thereof) existed within the Phoenix Police Department and they failed to address these issues, ratified them by inaction, and/or failed to establish and implement appropriate policies, procedures, practices, protocols, customs and training for the carotid control technique, using force and restraints, and assessing, processing, evaluating, handling, managing, and monitoring citizens in the care, custody, and control of the City in a manner that conformed to federal, state, and applicable standards.

187.   Upon information and belief, despite their knowledge and notice, Defendants permitted and/or ratified the implementation of inappropriate, unconstitutional, functionally obsolete, de facto policies which authorized, approved, condoned, and failed to provide appropriate medical evaluation and care to citizens, failed to provide appropriate use of force and restraint standards, failed to provide appropriate assessment and

monitoring requirements and failed to adequately train and supervise Police personnel in these and other areas (without limitation).

188. The officer(s) that initially tasered Michael were told to do so by a supervising officer.

189. The officers who tasered Michael on the roof were not disciplined by the City of Phoenix for improperly using the Taser device and failing to follow police department operations orders. As such the City has ratified the officer's conduct as described herein.

190. City of Phoenix Police Department Operations Orders 1.5(E) clearly states that if the officer determines an extended cycle is necessary to control a combative suspect, the circumstances regarding the decision will be explained in the Departmental Report (DR) and Supervisor's Use of Force report… although there is no predetermined limit to the number of cycles that can be administered to a subject, officers should only apply the number of cycles reasonable necessary to safely approach and restrain a subject.

191. The officers that tasered Michael unreasonably extended taser cycles while they attacked him on the second floor landing because he was not trying to resist arrest and he was not combative; Michael was only trying to live as he plead with the officers that he could not breathe.

192. City of Phoenix Operations Orders 1.5(E) clearly states that the "groin" is a non-target area for Taser deployment.

193. Officer Mathews tasered Michael in his groin area multiple times in violation of operations order 1.5(E).

194. The City of Phoenix failed to discipline the officer who tasered Michael in his groin area. As such the City has ratified the improper application of the Taser device

by Officer Mathews.

195.    The Phoenix Police Department Operations Order 1.5(G) Carotid Control Technique fails to inform police officers how long the technique should be utilized. Guidelines for this technique only state that the carotid control technique is designed to reduce the flow of oxygenated blood to the brain and if oxygenated blood flow to the brain is cut off for **four to six minutes** irreparable brain damage will occur.

196.    Despite its knowledge and notice that a number of other police departments in the United States have completely banned the use of this technique, the City never banned the use of this technique by police officers at the PPD.

197.    As such the City and Chief were deliberately and callously indifferent to the constitutional rights of those that they serve in the screening, hiring, retention and/or supervision of police personnel, employees, and agents when it failed to update its Operational orders to the correct method of applying the carotid artery technique.

198.    Studies have shown that a correct application of the technique will render the subject unconscious within 7-10 seconds.  However, PPD Operation Orders do not warn their officers not to utilize this technique for more than several seconds.  Again, PPD Operation orders only states that applying this technique for over four minutes could cause irreparable brain damage, however it is known that any prolonged use of this technique for any prolonged period of time can cause brain damage and even death.

199.    The Operations Order states that the carotid control technique should only be used against subjects who are using active aggression, aggravated aggression, or who are a threat to themselves or others.  As stated above, Michael was not using active aggression, aggravated aggression and he was not a threat to himself or others during the time Officer

Camarillo used the carotid control technique.

200.    Officer Camarillo applied this technique for over four minutes and none of the other officers to include the supervisors asked Officer Camarillo to stop using the carotid control technique or checked Michael's vital signs.

201.    Phoenix operations order 1.5(G) states that after the technique is used and the subject is rendered unconscious, officers are to immediately roll the suspect onto their side and check for vital signs.  As stated above, none of the officers checked for Michael's vital signs on the second floor landing.

202.    Because the officers never checked for Michael's vital signs on the second floor landing, they prevented the on-site paramedics from being able to render life saving aid.

203.    Because officers were applying knee strikes, fist strikes, drive stuns, and taser stuns to Michael contemporaneously with Officer Camarillo's application of the carotid control technique, Michael could not breathe and was never able to regain consciousness.

204.    But for all of the officers' actions, Michael would have never died on the second floor landing.

205.    Again, Officer Camarillo and the other officers were never disciplined for any of their actions.

206.    The City and Chief's deliberate, reckless, and callous actions, as described above, substantially contributed to and/or were the moving force behind Michael's treatment and the PPD officers' use of excessive force in this case.

207.    The wrongful conduct of the City and Chief, as described herein, constitutes

BLACKWELL LAW OFFICE, PLLC
818 N. 5th AVE
PHOENIX, AZ 85003

violations of 42 U.S.C. § 1983, in that with deliberate and callous indifference, the City and Chief deprived Michael, Yolanda, Canon and A.R. of rights secured to them by the Constitution and laws of the United States, including (among others and without limitation) the right to be free from law enforcement's excessive force, and the right to the continued familial and societal relationship, as guaranteed by the Fourth and Fourteenth Amendments.

208. The wrongful conduct of Defendants constitute violations of under the Fourth and Fourteenth Amendments of the U.S. Constitution, in that Michael was deprived of the privileges and immunities guaranteed to all citizens of the United States; was deprived of his life and liberty without due process of law; was denied equal protection of the law; and denied his right to be free from unreasonable excessive force.

209. Plaintiffs are informed and believe and thereon allege that the acts and/or omissions alleged herein are the proximate result of a custom, policy, pattern, ratification or practice of deliberate indifference by the City, the Chief and the individually-named Defendants.

210. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs have suffered damages.

211. The wrongful conduct of the City and Chief (acting in his individual capacity) and the other individually-named Defendants were in reckless disregard of the rights of Michael, Yolanda, Canon and A.R., and punitive damages in an amount to be determined by a jury should be awarded to deter and prevent others from acting in a similar manner in the future.

WHEREFORE, plaintiffs pray for relief as hereinafter set forth.

## JURY DEMAND

Plaintiffs hereby request and demand a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for damages for judgment against Defendants as follows:

a) General damages in an amount to be proven at trial, as to the causes of action, claims, and theories of relief alleged herein;

b) For special damages, including but not limited to, past, present and/or future wage loss, income and support, medical expenses and other special damages in a sum to be determined according to proof;

c) For funeral and burial expenses according to proof;

c) Punitive damages in an amount deemed just and reasonable against the individual Defendants, as to the causes of action, claims, and theories of relief alleged herein;

d) Costs and attorneys' fees against all Defendants as to the causes of action, claims, and theories of relief alleged herein under the Constitution and laws of the United States, pursuant to 42 U.S.C. §1988;

e) Pre-death pain and suffering and the loss of enjoyment of life damages for Cody Criner's Estate, pursuant to 42 U.S.C. § 1983;

g) Fore reasonable attorney's fees pursuant to 42 U.S.C. §1988;

f) For the cost of suit herein incurred;

g) All remedies provided by 42 U.S.C. § 1983; and

h) Such other and further relief, which may seem just and reasonable under the circumstances.

RESPECTFULLY SUBMITTED this 26th day of September, 2014.

BLACKWELL LAW OFFICE, PLLC

By: /s/*Jocquese L. Blackwell*
    JOCQUESE L. BLACKWELL
    818 N. 5th Ave.
    Phoenix, AZ  85003
    Attorney for Plaintiffs

BLACKWELL LAW OFFICE, PLLC
818 N. 5th AVE
PHOENIX, AZ 85003

**CERTIFICATE OF SERVICE**

I hereby certify that on the 26th day of September, 2014, I caused the foregoing to be filed electronically with the Clerk of Court using the CM/ECF System for filing; and served on Counsel of record via the Court's CM/ECF system.

| | |
|---|---|
| Kathleen L. Wieneke | kwieneke@swlfirm.com |
| Christina Retts | cretts@swlfirm.com |
| John T. Masterson | jmasterson@jshfirm.com |

I hereby certify that on the 15th day of September, 2014, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System.

N/A