John T. Masterson, Bar #007447
Justin M. Ackerman, Bar #030726
JONES, SKELTON & HOCHULI, P.L.C.
40 North Central Avenue, Suite 2700
Phoenix, Arizona  85004
Telephone:  (602) 263-1700
Fax:  (602) 200-7846
jmasterson@jshfirm.com
jackerman@jshfirm.com

Attorneys for Defendant Officer Abraham Camarillo

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Yolanda Ericson, individually and as personal representative of the Estate of Miguel Ruiz, Canon Ruiz and minor A.R.,<br><br>Plaintiffs,<br><br>v.<br><br>City of Phoenix, et al.,<br><br>Defendants. | NO. 2:14-cv-01942-JAT<br><br>**OFFICER CAMARILLO'S MOTION FOR SUMMARY JUDGMENT**<br><br>(Assigned to the Honorable James A. Teilborg) |

Pursuant to Rule 56, Fed. R. Civ. P., Defendant Officer Abraham Camarillo ("Officer Camarillo") moves for summary judgment on all counts of Plaintiffs' Amended Complaint.  Summary judgment is appropriate because: (1) Officer Camarillo did not violate Miguel Ruiz's Fourth Amendment rights by virtue of an unreasonable seizure or excessive force; (2) Officer Camarillo did not violate Plaintiffs' Fourteenth Amendment rights to Familial Association; (3) Officer Camarillo is entitled to qualified immunity against Plaintiffs' federal claims; (4) Plaintiffs' state law claims fail because Officer Camarillo had probable cause to make the arrest and his use of force was justified under the circumstances; (5) There is no evidence that Officer Camarillo caused Michael Ruiz's death; and (6) Punitive damages are inappropriate.

# MEMORANDUM OF POINTS AND AUTHORITIES

## I. FACTUAL BACKGROUND[1]

### A. Michael Ruiz was an athletically fit individual who had a history of methamphetamine abuse leading up to the events of July 28, 2013.

In late July 2013, Miguel 'Michael' Cannon Ruiz ("Ruiz"), lived alone at 4241 N. 23rd Avenue, Apt. No. 7. [DSOF ¶ 1]. Ruiz had a history of being physically active and was a personal trainer at various points in his life. [DSOF ¶ 2]. Ruiz also had a history of substance abuse involving Methamphetamine. [DSOF ¶ 3]. Around 4:00 a.m. on the morning of July 28, 2013, Ruiz's mother left his apartment after having a dispute with Ruiz about whether he was using drugs. [DSOF ¶ 4] Since Ruiz was on conditional release for a 2011 incident (assault on a police officer and resisting arrest), Ruiz's mother reported the violation to Ruiz's probation officer, in hope of getting her 44-year-old son off the street and, possibly, treatment for his substance abuse. [DSOF ¶ 5].

### B. There was probable cause to arrest Ruiz.

A few hours later, around 7:00 a.m., Phoenix Police officers were dispatched to Ruiz's apartment complex following reports that Ruiz was causing water damage to the apartment complex by tampering with an AC unit on the top of the apartment roof. [DSOF ¶ 6]. One of the responding officers was Officer Abraham Camarillo. [DSOF ¶ 7]. Upon arrival, Officer Camarillo spoke to the complex manager who told him that Ruiz tore apart his own apartment, may have intentionally flooded his own and other units, was trespassing, and damaged the AC unit on the roof of the apartment. [DSOF ¶ 8]. The property manager then directed Officer Camarillo toward Ruiz's apartment. [DSOF ¶ 9].

As Officer Camarillo approached the apartment, he noticed the door to the apartment was open, the sound of running water was coming from inside, there was an odor of something actively burning or recently burnt, water was flowing out of the opened

---

[1] The following undisputed material facts are more fully explained in Defendants' concurrently-filed Separate Statement of Facts ("DSOF").

door, and there was no answer when he knocked on the door. [DSOF ¶ 10]. Officer Camarillo, under the belief that there were exigent circumstances, entered the apartment and found that the water was coming from the bathroom. [DSOF ¶ 11]. Officer Camarillo observed that the bathroom tub was running, the toilet had been ripped off, and the pipe connected to the toilet was exposed and water was shooting up. [DSOF ¶ 12]. Officer Camarillo also noticed that the burning smell was coming from the kitchen and that something was burnt on the floor. [DSOF ¶ 13]. Officer Camarillo then left the apartment. At this time, other officers were attempting to negotiate with Ruiz to get him off of the roof. [DSOF ¶ 14].

### C. Ruiz refused to come down from the roof of the apartment.

The Phoenix Fire Department responded on scene after numerous attempts to establish a dialogue with Ruiz proved futile. [DSOF ¶ 15]. An aerial ladder bucket was raised over the roof, where the officers announced to Ruiz that they were there to get him down.[2] [DSOF ¶ 16]. After several minutes of persuasion, Ruiz stood up and approached the waiting officers. [DSOF ¶ 18]. Once in front of the aerial bucket, Ruiz reached out with both hands and officers each gripped one of his arms. [DSOF ¶ 19]. Ruiz then grabbed one of the officer's fingers really tight and stiffened up. [DSOF ¶ 20]. Ruiz briefly remained in that position as the officers explained that for everyone's safety Ruiz was going to be handcuffed. [DSOF ¶ 22]. At that point, Ruiz tensed, then pulled his arms from the officers' grasp and turned to leave the bucket. [DSOF ¶ 23]. An officer then deployed his Taser (in dart mode) at Ruiz. [DSOF ¶ 24]. Both probes were thought to have struck Ruiz, but had no incapacitating effect. [DSOF ¶ 25]. Ruiz retreated back up to the peak of the sloped roof and could not be persuaded to return to the officers in the aerial ladder bucket. [DSOF ¶¶ 26-27]. Ruiz then scooted down the roof to a point above

---

[2] Officers were informed that the structural integrity of the roof was compromised and might not support additional weight. This information, coupled with the height/slope of the roof and a subject presumed to be under the influence of narcotics prompted the tactical decision that no officers would set foot on the roof. [DSOF ¶ 17]. Officers were also aware that Ruiz had a prior conviction for aggravated assault against a police officer and for resisting arrest. [DSOF ¶ 21].

an uncovered porch at the top of the exterior stairway. [DSOF ¶ 28]. He then jumped almost ten feet to the porch of the second floor upstairs apartment.[3] [DSOF ¶ 29].

### D. Officer Camarillo utilized force reasonably necessary to control Ruiz.

#### 1. Officer Camarillo engaged Ruiz as soon as he jumped down.

Prior to Ruiz jumping down to the stairwell porch, Officer Camarillo saw that the interior door of the upstairs apartment was open behind a closed screen door and, from his prior investigation of Ruiz's apartment, knew that Ruiz did not live there. [DSOF ¶ 31]. Officer Camarillo also did not know if anyone was in the apartment or if Ruiz would be able to access weapons if he got into the apartment. [DSOF ¶ 32]. Out of fear that Ruiz would harm someone in the nearby apartment or further evade arrest, Officer Camarillo engaged Ruiz after he jumped down from the roof. [DSOF ¶ 34].[4]

#### 2. Officer Camarillo put his arms around Ruiz's neck/shoulder area to prevent him from standing up.

After landing on the porch, Ruiz wound up in a sitting position, with his back to the stairs. [DSOF ¶ 35]. The porch was roughly four by four feet and had a railing around it. [DSOF ¶ 36]. As soon as Ruiz jumped down, Officer Camarillo reached out to gain control of Ruiz by putting his arms around Ruiz and applying downward pressure in a "bear hug" type manner on his chest and shoulder to prevent him from getting up. [DSOF ¶ 37]. Officer Camarillo could not use his Taser against Ruiz because Ruiz's back was facing him as he went up the stairs. [DSOF ¶ 38].[5]

#### 3. Ruiz resisted Officer Camarillo's initial attempt to control him.

As soon as Officer Camarillo put his arms around Ruiz, Ruiz tensed up and swiveled his upper body and started pushing with his legs against the stairway railing, pinning Officer Camarillo underneath him with his back to the stairwell. [DSOF ¶ 40].

---

[3] Officer Camarillo observed all of these events transpire on the roof, including the ineffective Taser against Ruiz. [DSOF ¶ 30].

[4] Officer Camarillo's supervisor, who was on scene, subsequently testified that it was necessary to confront Ruiz on the landing for the same reasons. [DSOF ¶ 33].

[5] Officer Camarillo did not apply a carotid control technique when he initially gained control of Ruiz after he jumped down from the roof. [DSOF ¶ 39].

Other officers then came to Camarillo's assistance, however, despite Officer Camarillo's and the other officer's joint exertions, they could not pull Ruiz's arms behind his back to be handcuffed. [DSOF ¶ 41]. Ruiz then reached out to grab the railing, cocked his legs and, in a backward arch, started to stand up. [DSOF ¶ 42].

### 4. Subsequent Taser deployment had no effect on Ruiz.

As Ruiz fought to stand, another officer drew his Taser and deployed it toward Ruiz's exposed torso. [DSOF ¶ 43]. The Taser had no effect and Ruiz quickly resumed resistance by rigidly tensing his arms and pushing off the stair rail with his feet, which pressed him back against Officer Camarillo and toward the wall. [DSOF ¶ 44]. Officers then managed to place a separate handcuff on each of Ruiz's wrists, but they were unable to link the handcuffs behind Ruiz's back. [DSOF ¶ 45]. Officer Camarillo felt that Ruiz had "superhuman pain tolerance and strength" and that it took "100%" of his strength to hold Ruiz during this encounter. [DSOF ¶ 46]. Officers were also concerned that the railing on the stairs would not hold up because of Ruiz's strength. [DSOF ¶ 47]. In fact, Ruiz exerted so much strength that one of the bolts from the stairway railing came off during the struggle. [DSOF ¶ 48].

### 5. Officer Camarillo did not ever apply a "choke hold" to Ruiz.

There is no evidence that Officer Camarillo ever applied a "choke hold" or otherwise blocked Ruiz's ability to breath during their struggle. Plaintiffs admitted that Officer Camarillo did not apply a "choke hold" during his struggle with Ruiz. [DSOF ¶ 69]. In addition, Defendants' expert, Dr. Gary Vilke, opined that there was no medical evidence of any airway obstruction that caused the decedent's death, that the "history, video, and autopsy do not reflect that any ongoing inappropriate placement of the [CCT] occurred", and that "[t]he use of the carotid restraint ***did not contribute to*** the death of Mr. Ruiz." [DSOF ¶¶ 64, 66]. The Medical Examiner's Report corroborates this finding by noting that the "upper airway is patent."[6] [*See* DSOF ¶ 65].

---

[6] A patent airway is one that is "open and unobstructed." [DSOF ¶ 70].

Finally, the record is uncontradicted that during the struggle between Officer Camarillo and Ruiz, Ruiz was told to relax but continued shouting and making "all kinds of animalistic noises", demonstrating that his airway was not obstructed. [DSOF ¶¶ 49-51, 67]. In addition, after subsequent Taser deployments by the other officers on the stairs, Officer Camarillo's supervisor told him to "let up" on his grip of Ruiz. [DSOF ¶ 52]. Officer Camarillo then moved his arm. As soon as he did, Ruiz continued to resist his control, forcing him to try to reestablish his control over Ruiz's upper body. [DSOF ¶ 53]. Officer Camarillo then continued to apply downward pressure to Ruiz's upper body in order to maintain control over Ruiz. [DSOF ¶ 54].

### 6. Officer Camarillo finally used the Carotid Control Technique only when Ruiz posed a threat of serious injury or death.

Several minutes into the prolonged struggle with at least **seven officers** and after several Taser deployments, Officer Camarillo sensed that Ruiz had "superhuman" pain tolerance and was not tiring. [DSOF ¶ 55]. Officer Camarillo also felt there was a strong potential that he and/or officers might be "steamboat[ed]" down the stairs putting them in serious danger if Ruiz succeeded in getting free from his grasp. [DSOF ¶ 56]. Consequently, for the first and only time since physically contacting Ruiz, Officer Camarillo attempted to apply the carotid control technique ("CCT") on Ruiz after nothing else worked to subdue him. [DSOF ¶ 57]. Officer Camarillo only applied the CCT after several minutes of trying to get Ruiz into custody, other officers were unable to get Ruiz into handcuffs, several Taser deployments were ineffective, and Ruiz was going to escape Camarillo's control. [DSOF ¶ 59].[7] After applying the CCT, Officer Camarillo had difficulty getting the appropriate angle and grip due to Ruiz's resistance and the small, confined space of the stairwell. [DSOF ¶ 61]. Regardless, Officer Camarillo stopped using the CCT when it failed and reverted to holding onto Ruiz for control. [DSOF ¶ 63].

---

[7] City of Phoenix's expert on police procedures opined that "Officer Camarillo's only deliberate attempt to apply a [CCT] was reasonable given the totality of circumstances, and any reasonable officer would have done the same thing." [DSOF ¶ 60].

### E. **Ruiz's resistance ceases.**

Approximately five minutes after the initial physical contact by Officer Camarillo, Ruiz ceased resistance and became passive. [DSOF ¶ 71]. When Ruiz became passive, Officer Camarillo was not applying the CCT and was just trying to hold onto Ruiz.[8] [DSOF ¶ 72]. The exhausted officers were then finally able to handcuff Ruiz. [DSOF ¶ 73]. Ruiz was carried down the stairs to EMS personnel. [DSOF ¶¶ 74-75]. EMS soon determined that Ruiz was not breathing and was pulseless. [DSOF ¶ 77]. The handcuffs were removed from Ruiz to facilitate treatment, and EMS resuscitated Ruiz prior to arrival at St. Joseph's Hospital. [DSOF ¶ 78]. Ruiz was then admitted in critical condition, but died five days later on August 2, 2013. [DSOF ¶ 79].

Ruiz's toxicology report following his death noted that his blood contained .40 mg/L of Methamphetamine. [DSOF ¶ 80]. Moreover, this Court has subsequently determined that it is undisputed that Ruiz was on Methamphetamine during his encounter with police on July 28, 2013. [DSOF ¶ 81]. On August 5, 2013, Maricopa County Medical Examiner Dr. C. Poulos performed the autopsy and later ascribed the cause of Ruiz's death to "Anoxic Brain Injury in the Setting of Methamphetamine Intoxication and Altercation with Police." [DSOF ¶ 82]. The manner of death was listed as "Undetermined." [DSOF ¶ 83].

### II. **OFFICER CAMARILLO DID NOT USE UNREASONABLE FORCE.**

Plaintiffs' claims in Counts 2 and 5 both stem from Officer Camarillo's use of force against Ruiz. [*Compare* Doc. 7 at ¶ 117 ("Officer Camarillo … violated Michael's Fourth Amendment Right to be free from unreasonable seizure when … [he] performed the carotid control technique and/or choked him") *with* ¶ 162 (Officer Camarillo violated Ruiz's Fourth Amendment right to be free from unreasonable use of force because he applied a carotid technique to Mr. Ruiz)]. Officer Camarillo is entitled to summary judgment on both of these counts because his use of the CCT was objectively

---

[8] Officer Camarillo did not let go of Ruiz even after he became passive because he was not sure if Ruiz was "playing possum" once he stopped resisting arrest. [DSOF ¶ 62].

reasonable under the circumstances.[9]

"Fourth Amendment claims of excessive or deadly force are analyzed under an objective reasonableness standard." *Espinosa v. City & Cnty. of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010). When evaluating a Fourth Amendment claim of excessive force, a court must ask "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them" based on the totality of the circumstances. *Glenn v. Washington Cnty.*, 673 F.3d 864, 871 (9th Cir. 2011) (quoting *Graham v. Connor*, 490 U.S. 386 (1989)). The inquiry "requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interest at stake." *Id.* at 871. The balancing of interests must also take into account the realities of policing. *Id.* at 871 (quoting *Graham*, 490 U.S. at 396–97) ("[P]olice officers are often forced to make split-second judgments— in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation."). The Court must therefore adopt "the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Glenn*, 673 F.3d at 871 (quoting *Graham*, 490 U.S. at 396).

An excessive force analysis is done in three steps. First, the Court "must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted." *Espinosa*, 598 F.3d at 537. Second, the Court must evaluate the government's interest by assessing factors identified by the Supreme Court in *Graham*: "(1) the severity of the crime; (2) whether the suspect posed

---

[9] Plaintiffs' unreasonable seizure claim is duplicative of their unreasonable force claim. Plaintiffs do not allege that Camarillo lacked reasonable suspicion and/or probable cause to arrest Ruiz, rather they allege that Camarillo unlawfully seized Ruiz by applying a CCT. [Doc. 7 at ¶ 117]. As such, both claims are analyzed under the *Graham* "reasonableness" standard. *See Graham,* 490 U.S. at 395 ("all claims that law enforcement officers have used excessive force—deadly or not—in the course of an arrest, investigatory stop, or other "seizure" of a free citizen should be analyzed under the Fourth Amendment and its "reasonableness" standard"); *Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1156 (N.D. Cal. 2009) ("A claim that law enforcement officials used excessive force in the course of making an arrest, investigatory stop, or other 'seizure' is properly analyzed under the Fourth Amendment's "objective reasonableness" standard.").

an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." *Id.* Third, the court "balance[s] the gravity of the intrusion on the individual against the government's need for that intrusion." *Id.* (quotations omitted). Ultimately, the court "must balance the force that was used by the officers against the need for such force to determine whether the force used was greater than is reasonable under the circumstances." *Id*. (quotations omitted).

### A. Officer Camarillo's use of a CCT was not deadly force.

No Ninth Circuit or Supreme Court case has held that the use of a carotid hold constitutes deadly force. The use of force by law enforcement constitutes "deadly force" only when the force "creates a substantial risk of causing death or serious bodily harm." *Fikes v. Cleghorn*, 47 F.3d 1011, 1014 (9th Cir. 1995). The record is devoid of any evidence or expert testimony demonstrating that the use of a CCT creates a substantial risk of death or serious bodily harm, let alone that the CCT used in this circumstance actually caused Ruiz's death. In fact, the record is to the contrary. [*See* DSOF ¶ 66 (Gary Vilke's expert opinion that "[t]he use of the carotid restraint ***did not contribute to*** the death of Mr. Ruiz.")]. Even the City of Phoenix's training describes the use of a CCT as below the threshold of deadly force. [DSOF ¶ 84].

### B. The *Graham* factors balance in favor of using a CCT in this action.

#### 1. Officer Camarillo had probable cause to believe that Ruiz had committed several serious crimes.

When Officer Camarillo arrived on scene, he was informed by the apartment manager that Ruiz had destroyed his apartment and was tampering with the AC unit on the roof of the apartment. [DSOF ¶¶ 6, 8]. Officer Camarillo verified that Ruiz's apartment was flooded and that there had been a fire in the kitchen. [DSOF ¶¶ 12-13]. Officer Camarillo also observed Ruiz on top of the roof where an AC unit was damaged. [DSOF ¶ 14]. In addition, Ruiz actively resisted directions of the officers to come down from the roof, did not submit to their attempts at control, evaded arrest by jumping down to the porch of the second floor apartment, and resisted arrest involving at least seven

officers for five minutes. [DSOF ¶¶ 15-63, 71]. Officer Camarillo, therefore, had more than sufficient probable cause to believe that Ruiz committed several felonies, *see e.g.,* A.R.S. § 13-1504 ("A person commits criminal trespass … by knowingly … [e]ntering or remaining unlawfully in or on a residential structure."); A.R.S. § 13-1602 ("A person commits criminal damage by … [i]ntentionally tampering with utility property"); A.R.S. § 13-2508 ("A person commits resisting arrest by intentionally preventing … a peace officer … from effecting an arrest by [u]sing any other means creating a substantial risk of causing physical injury to the peace officer or another"), and that these were serious crimes. *See Miller v. Clark Cnty.,* 340 F.3d 959, 964 (9th Cir. 2003) (a felony "is by definition a crime deemed *serious* by the state.") (emphasis added).

### 2. Ruiz was an immediate threat to the officers' and public's safety.

This factor also favors Officer Camarillo because the circumstances show that his safety concerns were more than reasonable. From Officer Camarillo's perspective, Ruiz jumped down right next to an apartment that had an open door with only a screen door preventing entry. [DSOF ¶¶ 31]. Camarillo did not know if anyone was present in the apartment and whether Ruiz would become armed if he went in. [DSOF ¶¶ 32-33]. After Camarillo grabbed Ruiz, Ruiz was able to prevent seven officers from controlling him for five minutes. [DSOF ¶¶ 37-63, 71]. Given Ruiz's physical statute and his history of Methamphetamine use, he posed a serious threat to the officers. [DSOF ¶¶ 2-3]. Moreover, Ruiz' prolonged physical exertions demonstrated he retained the ability to offer serious resistance and that, until subdued/handcuffed, Ruiz continued to have the opportunity to place the officers in danger of serious injury or death during the struggle on the apartment stairway because he could have "steamboated" the officers down the stairs if he were able to stand. [DSOF ¶ 56]. Finally, Officer Camarillo and the other officers feared that the railing was going to break during the struggle and the officers would fall to the ground, which was a real concern given that the structural integrity of the stairs was compromised (at least one bolt came loose) during the struggle to control Ruiz. [DSOF ¶¶ 47-48].

### 3. Ruiz was resisting arrest and attempting to escape.

As stated above, Ruiz attempted to flee from the officers on the roof by jumping down to the second floor of the apartment and then engaged with seven officers, strenuously resisting arrest for roughly five minutes. [DSOF ¶¶ 15-63, 71].

### C. <u>The use of force was proportionate under the circumstances.</u>

Courts must "balance the force that was used by the officers against the need for such force to determine whether the force used was 'greater than is reasonable under the circumstances.'" *Espinosa*, 598 F.3d at 537. There is no question that Officer Camarillo's use of a CCT under the particular facts of this case was reasonable. From Officer Camarillo's first contact at the top of the stairs with Ruiz, he attempted to keep his arms around Ruiz' neck/head in an effort to hold Ruiz down and prevent Ruiz from standing up. [DSOF ¶ 37]. Despite Camarillo's and seven other officers' efforts, Ruiz, while high on Meth, exhibited "superhuman" strength and managed to twist around and almost stand, before sinking to a seated position (with legs braced against the railing) and pressing Officer Camarillo's back against the building wall. [DSOF ¶¶ 2-3, 37-42, 45-46]. Aware that several Taser deployments had proven ineffective at subduing Ruiz, Officer Camarillo felt there was a strong potential that Ruiz and/or the officers might be pushed down the stairs and injured. [DSOF ¶¶ 24-25, 30, 43-44, 55-56]. Consequently, Officer Camarillo, out of fear for his safety and the safety of his fellow officers, attempted to apply a CCT.[10] [DSOF ¶ 56, 59]. When it was ineffective, Officer Camarillo released the pressure and just held on to try and control Ruiz.[11] [DSOF ¶ 61].

Under these undisputed material facts, Officer Camarillo's conduct was objectively reasonable, making summary judgment on Plaintiffs' excessive force claim appropriate. *See Alexander v. Cnty. of Los Angeles*, 64 F.3d 1315, 1322 (9th Cir. 1995)

---

[10] Even if a CCT is considered deadly force (despite any controlling precedent or evidentiary record to show that it is), it was justified in this circumstance because Ruiz put Officer Camarillo and his fellow officers at risk of serious bodily harm or death.

[11] Although there is video of this incident, the video is incapable of showing what kind of pressure Officer Camarillo applied during his struggle with Ruiz. [DSOF ¶ 86].

(A finding of objective reasonableness requires summary judgment).

## III. OFFICER CAMARILLO IS ENTITLED TO QUALIFIED IMMUNITY FOR PLAINTIFFS' EXCESSIVE FORCE CLAIM.

Assuming Plaintiffs can somehow demonstrate that Officer Camarillo violated constitutional rights (which they cannot), Officer Camarillo is entitled to qualified immunity because at least one reasonable officer out of the world of reasonable officers could find that he acted reasonably under the circumstances. *See Brewster v. Bd. of Educ. of Lynwood Unified Sch. Dist.*, 149 F.3d 971, 977 (9th Cir. 1998) ("if officers of reasonable competence could disagree on the issue whether a chosen course of action is constitutional, immunity should be recognized"). Qualified immunity "bars civil liability damages insofar as the official's conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Butler v. Elle*, 281 F.3d 1014, 1021 (9th Cir. 2002). "The qualified immunity standard 'gives ample room for mistaken judgments' by protecting all but the plainly incompetent or those who knowingly violate the law." *Hunter v. Bryant*, 502 U.S. 224, 229 (1991).

Officer Camarillo is entitled to qualified immunity from Plaintiffs' excessive force claim because a reasonable officer could have believed the use of force was reasonable under the circumstances. *See Act Up!/Portland v. Bagley*, 988 F.2d 868, 871 (9th Cir. 1993). Qualified immunity is meant "to protect officers from the sometimes hazy border between excessive and acceptable force." *Saucier v. Katz*, 533 U.S. 194, 205 (2001). This is because "holding officials liable for reasonable mistakes might unnecessarily paralyze their ability to make difficult decisions in challenging situations." *Mueller v. Auker*, 576 F.3d 979, 993 (9th Cir. 2009).

### 1. Any objectively reasonable officer could have believed the use of a CCT on Ruiz was appropriate.

The uncontradicted record establishes that the actions taken by Officer Camarillo, including the use of a CCT, was reasonable given the severity of Ruiz's resistance and the substantial danger of serious injury that he posed to the arresting officers and others. Defendants' ***uncontroverted*** expert on police procedures opined that

"Officer Camarillo's only deliberate attempt to apply a [CCT] was reasonable given the totality of circumstances, and any reasonable officer would have done the same thing." [DSOF ¶ 60]. Accordingly, a reasonable officer could have believed the use of force was appropriate under the circumstances.

### 2. No applicable authority prohibited using a CCT or established a length of time a CCT could be used.

Plaintiffs cannot cite any Ninth Circuit or Supreme Court precedent at the time of the July 28, 2013 arrest that would have put Officer Camarillo on notice that his use of the CCT violated clearly established law that was "beyond all debate." *See Brewster*, 149 F.3d at 977 ("The plaintiff shoulders the burden of proving that the rights he claims are clearly established."). Plaintiffs certainly cannot identify a case that addresses this issue in the "particularized" sense that the qualified immunity analysis requires. "In assessing claims of qualified immunity, reviewing courts must not view constitutional rights in the abstract, but rather in a more particularized, and hence more relevant, sense." *Id.*; *see generally Mullenix v. Luna*, 136 S.Ct. 305 (2015). Qualified immunity thus applies unless existing precedent "placed the statutory or constitutional question beyond debate." *Mattos v. Agarano*, 661 F.3d 433, 442 (9th Cir. 2011).

No case published by July 28, 2013 would have put Officer Camarillo on notice that his conduct was prohibited in this case. In fact, applicable legal authority validates the use of a carotid control technique when an officer's safety is at issue. *See e.g. Gregory v. County of Maui*, 523 F.3d 1103, 1105 (9th Cir. 2008) (summary judgment appropriate on use of force claim for officers when suspect died due to a heart attack during arrest because suspect repeatedly refused to comply with officers' requests to drop a pen and then resisted arrest when they sought to restrain him by "using a hold around Gregory's head and neck to restrain him."); *Barnes v. McLellan*, 54 Fed. Appx. 283, 284 (9th Cir. 2003) ("Because Barnes presented no evidence showing that Officer McLellan's use of a carotid hold to restrain him was objectively unreasonable under the circumstances, the facts taken in the light most favorable to Barnes do not establish a

Fourth Amendment violation."); *Elkins v. Washington County*, 2007 WL 1342155, at *10 (D. Oregon 2007) ("[w]hen a person attempts to pull away from the arresting officer, even if only to shift to a more comfortable position, he is resisting arrest which justifies the use of force and/or a [pre-carotid hold] to subdue the arrestee and effectuate the arrest.").

Finally, Officer Camarillo's actions were also found to have conformed with Phoenix's policies and procedures [DSOF ¶ 85], which courts have considered when deciding application of both excessive force and qualified immunity defenses. *See Drummond v. City of Anaheim*, 343 F.3d 1052, 1062 (9th Cir. 2003) (a police department's "training materials are relevant not only to whether the force employed in this case was objectively unreasonable ... but also to whether reasonable officers would have been on notice that the force employed was objectively unreasonable").

Accordingly, Officer Camarillo is entitled to qualified immunity from Plaintiffs' excessive force claim because a reasonable officer could have believed Officer Camarillo's use of force against Ruiz in this action was appropriate under the circumstances. *Bagley*, 988 F.2d at 871.

### IV. **RUIZ WAS NOT UNREASONABLY SEIZED.**

Assuming this Court does not find that Plaintiffs' unreasonable seizure claim is a disguised excessive force claim, Officer Camarillo is entitled to summary judgment on that claim as well. Probable cause to arrest or detain is an absolute defense to any § 1983 claim against police officers for wrongful seizure. *Hutchinson v. Grant*, 796 F.2d 288, 290 (9th Cir. 1986); *Cabrera v. City of Huntington Park*, 159 F.3d 374, 380 (9th Cir. 1998); *see also Hart v. Parks*, 450 F.3d 1059, 1065-66 (9th Cir. 2006) ("Probable cause exists when the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the plaintiff had committed or was committing an offense."). As stated above, Officer Camarillo had probable cause to arrest Ruiz for the felonies of criminal damage, trespass, and resisting arrest. Accordingly, under

*Hutchinson*, Plaintiffs cannot maintain their § 1983 claim for an unreasonable seizure.[12]

## V. OFFICER CAMARILLO DID NOT VIOLATE PLAINTIFFS' RIGHT TO FAMILIAL ASSOCIATION.

In order to state a due process violation involving interference with familial association, Plaintiffs must show that the Defendant's conduct "shocks the conscience." *See County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998); *Wilkinson v. Torres,* 610 F.3d 546, 554 (9th Cir. 2010). "[W]here a law enforcement officer makes a snap judgment because of an escalating situation, his conduct may only be found to shock the conscience if he acts with a purpose to harm unrelated to legitimate law enforcement objectives." *Wilkinson*, 610 F.3d at 554; *see also Porter v. Osborn*, 546 F.3d 1131, 1137-40 (9th Cir. 2008) (a "five-minute altercation" between police and the suspect that ended in a shooting compelled the court to conclude that the purpose to harm standard applied because the police officer "faced an evolving set of circumstances that took place over a short time period necessitating 'fast action' and presenting obligations that tend to tug against each other.") (quotations omitted).

As in *Porter,* Officer Camarillo lacked the opportunity for actual deliberation, and the force he used was plainly pursuant to a legitimate law enforcement purpose – the safety of himself, his fellow officers, and anyone else in or near the apartment complex. [DSOF ¶¶ 31-34, 59]. The fast evolving nature of the five minute struggle between Camarillo and Ruiz, like that in *Porter,* did not leave time for considered deliberation. *Porter*, 546 F.3d at 1139 ("'deliberation' for purposes of the shocks the conscience test is not so literal a concept."). Moreover, Camarillo's conduct did not violate Plaintiffs' due process rights because the record does not demonstrate that Officer Camarillo's conduct was meant to "teach [Ruiz] a lesson" or to "get even" with him. *See*

---

[12] In addition, no evidence in the record demonstrates that an objectively reasonable officer would have felt there was not probable cause to arrest Ruiz when they were told by the apartment manager that he flooded his apartment, was trespassing on the roof, tampered with the AC unit on the roof, and observed him resisting arrest. Moreover, no case at the time of Ruiz's arrest would have put Officer Camarillo on notice that he lacked probable cause to arrest Ruiz. Therefore, Camarillo is entitled to qualified immunity from Plaintiffs' unlawful seizure claims.

*Porter*, 546 F.3d at 1140 ("where force against a suspect is meant only to 'teach him a lesson' or to 'get even' then *Lewis* would not shield the officers from liability even though they were ultimately effectuating an arrest."). Accordingly, because no evidence in the record exists to show that Officer Camarillo's actions were unrelated to legitimate law enforcement objectives, Officer Camarillo is entitled to summary judgment.[13]

## VI. PLAINTIFFS' NEGLIGENCE CLAIMS FAIL.

Plaintiffs' negligence claims fail for the same reasons that their excessive force claim fails – Officer Camarillo's use of force was justified under the circumstances. *See Miller v. Clark Cnty.*, 340 F.3d 959, 968 n.14 (9th Cir. 2003) (affirming the district court's judgment for the defendants on plaintiffs' state tort claims because they fell "along with [plaintiff]'s rejected federal Fourth Amendment claim.").

In addition, Arizona's justification statutes preclude civil liability for "engaging in conduct otherwise justified" under Arizona law, A.R.S. § 13-413, which immunizes officers for using physical force during an arrest or detention. *See* A.R.S. § 13-409, -410; *Marquez v. City of Phoenix,* 693 F.3d 1167, 1176 (9th Cir. 2013) (describing A.R.S. § 13-409 as "providing law enforcement officers with immunity for all reasonable uses of non-deadly force" and A.R.S. § 13-410 "immuniz[ing] the use of deadly force"); and *Smith v. City of Chandler*, 2014 WL 1493004, at *5 (D.Ariz. April 16, 2014) (characterizing Arizona statutes as providing "immunity" for law enforcement officers charged with negligence). Because Officer Camarillo reasonably believed that his use of force was necessary to effect a lawful arrest, as explained *supra*, and Plaintiff refused to stop resisting arrest when he was repeatedly ordered to do so, placing Officer Camarillo and all officers and others on the scene at risk of imminent serious bodily harm or death, Officer Camarillo is immune from Plaintiffs' negligence claims.

---

[13] Officer Camarillo is also entitled to qualified immunity from Plaintiffs' familial association claim because the record demonstrates that an objectively reasonable officer would believe that Officer Camarillo's actions served a legitimate law enforcement purpose. Moreover, no case at the time of Ruiz's arrest would have put Officer Camarillo on notice that his conduct violated Plaintiffs' due process rights.

## VII. PLAINTIFFS' FEDERAL AND STATE CLAIMS FAIL BECAUSE NO EVIDENCE DEMONSTRATES THAT OFFICER CAMARILLO'S USE OF THE CCT *CAUSED* RUIZ'S DEATH.

To the extent Ruiz suffered any pain due to the actions of Officer Camarillo before his death, and to the extent such actions are construed as unlawful under Section 1983, or unjustified under Arizona law, the absence of proof of causation between such force and Ruiz's death precludes Plaintiffs from recovering against Officer Camarillo under both federal and state law theories. *See Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 922 (9th Cir. 2001) (granting summary judgment on excessive force claim because Plaintiff failed to "provide any medical records to support her claim that she suffered injury as a result of being handcuffed."); *see also* A.R.S. § 14-3110 (precluding the recovery of damages for pre-death pain and suffering in a wrongful death action); *Butler v. Wong,* 117 Ariz, 395, 396, 573 P.2d 86, 87 (App. 1977) ("[t]o establish the causal connection between an accident and injury, a sine qua non of liability, medical testimony as to the possibility of such causal connection, without more, is insufficient.").

There is no evidence in the record to demonstrate that Officer Camarillo's use of the carotid hold *caused* Ruiz's death. Dr. C. Poulos did not offer any opinion that the carotid hold was related to or caused Ruiz's death. [DSOF ¶ 82]. In addition, Mr. Vilke provided uncontroverted expert testimony that "the findings of the [Ruiz] autopsy report support that the [CCT] was appropriately placed with an appropriate use of pressure as the hyoid bone was intact as were the laryngeal cartilages." [DSOF ¶ 66]. Concluding, Mr. Vilke stated that "[t]he use of the carotid restraint ***did not contribute to*** the death of Mr. Ruiz." [*Id.*]. Plaintiffs cannot provide any admissible evidence to refute this testimony.[14] Accordingly, because Plaintiffs have entirely failed to articulate any

---

[14] Although Plaintiffs may refer to the medical examiner's opinion that Ruiz's death was due to "Anoxic Brain Injury in the Setting of Methamphetamine Intoxication and Altercation with Police," this does not prove that Officer Camarillo *caused* Ruiz's death. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("mere allegation and speculation do not create a factual dispute for purposes of summary judgment"). In addition, Plaintiffs' expert, Ruth Downing, is subject to a concurrently filed motion to exclude. Moreover, Ms. Downing speculates that a "choke hold" "could potentially result in the anoxic brain injury as described in the medical examiner's report."

causation argument against Officer Camarillo, the Court must enter summary judgment in his favor on Plaintiffs' federal and state claims.

## VIII. PLAINTIFFS ARE NOT ENTITLED TO PUNITIVE DAMAGES AGAINST OFFICER CAMARILLO.

Punitive damages are unavailable against Officer Camarillo under federal law because Plaintiffs' § 1983 claims fail, as explained *supra*. Moreover, this record is utterly devoid of any evidence that Officer Camarillo acted with the requisite "evil motive" or "callous indifference" to warrant punitive damages under § 1983. *Smith v. Wade*, 461 U.S. 30, 56 (1983). Finally, punitive damages are unavailable under state law because Officer Camarillo was acting within the scope of his employment during his encounter with Ruiz. *See* A.R.S. § 12-820.04.

## IX. CONCLUSION.

Based on the foregoing, Officer Camarillo requests this Court grant him summary judgment on all of Plaintiffs' claims.

DATED this 1st day of April, 2016.

JONES, SKELTON & HOCHULI, P.L.C.


By s/ John T. Masterson
　　John T. Masterson
　　Justin M. Ackerman
　　40 North Central Avenue, Suite 2700
　　Phoenix, Arizona 85004
　　Attorneys for Defendant Officer Abraham Camarillo

---

However, this does not prove that Officer Camarillo *caused* Ruiz's death. In addition, Plaintiffs have admitted that Officer Camarillo did not apply a "choke hold" to Ruiz, ***contradicting their own expert's report***. [DSOF ¶¶ 68-69]. Finally, Plaintiffs' rebuttal experts (Dr. Poulos and Mr. Wade) are also subject to a separately filed Motion to Exclude. [Doc. 89].

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of April, 2016, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system and U.S Mail to:

Jocquese L. Blackwell
Blackwell Law Office, PLLC
420 W. Roosevelt Street, Suite 106
Phoenix, AZ 85003

*Courtesy Copy* mailed this same date to:
The Honorable James A. Teilborg


/s/ *Mary M. Soto*