John T. Masterson, Bar #007447
Justin M. Ackerman, Bar #030726
JONES, SKELTON & HOCHULI, P.L.C.
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004
Telephone: (602) 263-1700
Fax: (602) 200-7846
jmasterson@jshfirm.com
jackerman@jshfirm.com

Attorneys for Defendant Officer Abraham Camarillo

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Yolanda Ericson, individually and as personal representative of the Estate of Miguel Ruiz, Canon Ruiz and minor A.R., <br><br> Plaintiffs, <br><br> v. <br><br> City of Phoenix, et al., <br><br> Defendants. | NO. 2:14-cv-01942-JAT <br><br> **STATEMENT OF FACTS IN SUPPORT OF OFFICER CAMARILLO'S MOTION FOR SUMMARY JUDGMENT** |

Defendant Abraham Camarillo submits the following Statement of Facts and Exhibits in support of his Motion for Summary Judgment:

1. In late July 2013, Miguel 'Michael' Cannon Ruiz ("Ruiz"), lived alone at 4241 N. 23rd Avenue, Apt No. 7. [COP_ERI000051-000054, attached as **Exhibit 1**].

2. Ruiz had a history of being physically active and was a personal trainer at various points in his life. [Erickson Depo. at 35:14-22; 39:21-24, attached as **Exhibit 2**; COP_ERI004598-4649, attached as **Exhibit 3**; COP_ERI003531-3593, attached as **Exhibit 4**].

3. Ruiz had a history of Methamphetamine addiction, including numerous arrests for possession of Methamphetamine. [Mace Beckson, M.D.'s Report at

| | |
|---|---|
| 1 | 61, attached as **Exhibit 12;** Erickson Depo. at 54:10-13, 60:2-9 attached as **Exhibit 2**]; |
| 2 | Ruiz's arrests re: Methamphetamine [COP_ERI002803-2819, attached as **Exhibit 5**; |
| 3 | COP_ERI002848-2853, attached as **Exhibit 6**; COP_ERI002854-2879, attached as |
| 4 | **Exhibit 7**; COP_ERI002880-2888, attached as **Exhibit 8**; COP_ERI002889-2893, |
| 5 | attached as **Exhibit 9**; COP_ERI002894-2898, attached as **Exhibit 10**]. |

6.     In the early morning of July 28, 2013, Ms. Erickson left Ruiz's apartment after having a dispute with Ruiz on whether he was using drugs. [Erickson Depo. at 63:9-64:8, 66:7-67:15, attached as **Exhibit 2**].

5.     Since Ruiz was on conditional release for a 2011 incident (assault on a police officer and resisting arrest), Ms. Erickson reported the violation to Ruiz's probation officer, in hope of getting her 44-year-old son off the street and possible treatment for his substance abuse. [Assault Conviction (COP_ERI002907-2933, attached as **Exhibit 11**; COP_ERI002962-3297, Erickson Depo. Testimony at 64:3-8, attached as **Exhibit 2**].

6.     On July 28, 2013, Phoenix Police officers were dispatched to an apartment complex following reports that there was water damage to the apartment complex caused by Ruiz tampering with an AC unit on the top of the apartment. [Camarillo Depo. at 61:20-25, attached as **Exhibit 13**; Kheylon Cunningham Interview, attached as **Exhibit 14**; Doc. 7 at ¶¶ 44, 46, attached as **Exhibit 15**].

7.     One of the responding officers was Officer Abraham Camarillo. [Doc. 7 at ¶ 23, attached as **Exhibit 15**].

8.     Upon arrival, Officer Camarillo spoke to the complex manager who told Camarillo that Ruiz tore apart his own apartment, may have intentionally flooded his own and other units, was trespassing, and damaged the swamp cooler on the roof of the apartment. [Camarillo Depo. at 55:4-7, 158:16-159:11, attached as **Exhibit 13**; PSB Wesley Interview at p. 8:24-9:5, attached as **Exhibit 16**].

9.     The property manager then directed Officer Camarillo toward Ruiz's apartment. [Camarillo Depo. at 56:4-13, attached as **Exhibit 13**].

10. As Officer Camarillo approached the apartment he noticed the door to the apartment was open, the sound of running water was coming from inside, there was an odor of something actively or recently burnt, water flowing out of the opened door onto the pavement below, and no answer when he knocked on the door. [Camarillo Depo. at 56:18-23, attached as **Exhibit 13**].

11. Officer Camarillo, under the belief that there was exigent circumstances, entered the apartment and found that the water was coming from the apartment bathroom. [Camarillo Depo. at 57:13-21, attached as **Exhibit 13**].

12. Officer Camarillo observed that the bathroom tub was running, the toilet seat had been ripped off, and the pipe connected to the toilet was exposed and water was shooting up from it. [Camarillo Depo. at 57:24-58:2, attached as **Exhibit 13**].

13. Officer Camarillo also noticed the burning smell was coming from the kitchen in the apartment. [Camarillo Depo. at 58:7-10, attached as **Exhibit 13**; Camarillo Affidavit at ¶ 16, attached as **Exhibit 17**].

14. Officer Camarillo then left the apartment and returned to the perimeter of the apartment building Ruiz was on top of where the other officers were attempting to negotiate with Ruiz to come off of the roof. [Camarillo Depo. at 58:15-22, attached as **Exhibit 13**].

15. After additional attempts to establish a dialogue with Ruiz proved futile, the Phoenix Fire Department was requested to respond. [PSB Wesley Interview at p. 12:15-27, attached as **Exhibit 16**].

16. An aerial ladder bucket was raised over the north edge of the roof, where the officers announced to the suspect that they were there to get him down off the roof and requested he get up and come to the bucket. [PSB Wesley Interview at p. 13:8-16, attached as **Exhibit 16**].

17. Officers were informed that the structural integrity of the roof was possibly comprised and might not support additional weight. The information, coupled with the height/slope of the roof and a subject presumed to be under the influence of

narcotics prompted the tactical decision that no officers would set foot on the roof. [PSB Wesley Interview at p. 13:18-26, attached as **Exhibit 16**].

18. After several minutes of persuasion, Ruiz stood up, adjusted the shirt draped over his head, and approached the waiting officers. [PSB Wesley Interview at p. 14:19-24, attached as **Exhibit 16**].

19. Once in front of the aerial bucket, Ruiz hesitated briefly before reaching out with both hands; officers each gripped one of his arms. [PSB Wesley Interview at p. 14:24-26, attached as **Exhibit 16**].

20. Ruiz then grabbed one of the officer's fingers really tight and stiffened up. [PSB Wesley Interview at p. 14:26-28, attached as **Exhibit 16**].

21. Officers were aware that Ruiz had a prior conviction for aggravated assault and for resisting arrest. [PSB Wesley Interview at 14:30-15:1, attached as **Exhibit 16**].

22. Ruiz briefly remained in that position as the officers explained that for everyone's safety Ruiz was going to be handcuffed. [PSB Wesley Interview at p. 15:5-6, attached as **Exhibit 16**].

23. Unwilling to submit to handcuffing, Ruiz tensed, then pulled his arms from the officers' grasp and turned to leave the bucket. [PSB Wesley Interview at p. 15:6-9, attached as **Exhibit 16**].

24. At this point an officer deployed his TASER (in dart mode) at Ruiz. [PSB Wesley Interview at p. 15:9-11, attached as **Exhibit 16**].

25. Both probes were thought to have struck Ruiz, but had no incapacitating effect. [PSB Wesley Interview at p. 15:13-20, attached as **Exhibit 16**].

26. Ruiz retreated back up to the peak of the sloped roof and sat down. [PSB Wesley Interview at p. 15:23-16:1, attached as **Exhibit 16**].

27. Ruiz remained at the east end of the roof peak and could not be persuaded to return to the officers in the aerial ladder bucket. [PSB Wesley Interview at p. 17:16-23, attached as **Exhibit 16**].

28. After looking over the east roof edge, Ruiz scooted down to a point above an uncovered landing/porch at the top of the exterior stairway. [PSB Wesley Interview at p. 17:25-18:4, attached as **Exhibit 16**].

29. From there, Ruiz jumped almost 10 feet to the porch of the upstairs apartment. [Camarillo Depo. at 63:12-14, attached as **Exhibit 13**].

30. Officer Camarillo observed all of these events transpire on the roof, including the ineffective Taser against Ruiz. [Camarillo Depo. at 59:4-60:15, attached as **Exhibit 13**].

31. Prior to Ruiz jumping down to the stairwell porch, Officer Camarillo saw that the interior door of the upstairs apartment was open behind its closed screen door and, from his prior investigation of Ruiz's apartment, knew that Ruiz did not live there. [Camarillo Affidavit at ¶ 4, attached as **Exhibit 17**].

32. Officer Camarillo also did not know if anyone was in the apartment or whether Ruiz would have access to weapons if he got into the apartment. [Camarillo Affidavit at ¶¶ 5-6, attached as **Exhibit 17**].

33. Officer Camarillo's supervisor subsequently testified that it was necessary to confront Ruiz on the landing because he was right by the second floor apartment door and the officers did not know whether it was occupied and could not risk giving Ruiz the opportunity to run in there and create a barricade or hostage situation. [PSB Wesley Interview at p. 24:19-24, attached as **Exhibit 16**].

34. Anticipating Ruiz was about to jump down to the porch, Officer Camarillo started up the stairs to both effect an arrest and prevent Ruiz from entering the apartment or otherwise further evading the police. [Camarillo Depo. at 64:21-24, attached as **Exhibit 13**].

35. After landing on the porch, Ruiz wound up in a sitting position, with his back to the stairs. [Camarillo Depo. at 63:12-14, attached as **Exhibit 13**].

36. The porch was roughly four by four feet and had a railing around it. [PSB Wesley Interview at p. 21:15-16, attached as **Exhibit 16**].

37. As soon as Ruiz jumped down, Officer Camarillo reached out to gain control of Ruiz by putting his arms around Ruiz and applying downward pressure in a "bear hug" type manner on his chest and shoulder to keep him in a seated position so he could not get up. [Camarillo Depo. at 64:8-16, attached as **Exhibit 13**].

38. Officer Camarillo could not use his Taser against Ruiz after he jumped down because his back was facing Officer Camarillo as he was going up the stairs. [Camarillo Depo. at 78:20-79:7, attached as **Exhibit 13**].

39. Officer Camarillo did not apply a carotid artery technique ("CCT") when he initially gained control of Ruiz after he jumped down from the roof. [Camarillo Depo. at 63:23-64:4; 73:1-3, attached as **Exhibit 13**].

40. As soon as Officer Camarillo put his arms around Ruiz, Ruiz tensed up and swiveled his upper body and started pushing with his legs against the stairway railing, pinning Officer Camarillo underneath him with his back to the stairwell. [Camarillo Depo. at 66:4-8; 68:12-18, attached as **Exhibit 13**].

41. Other officers then came to Camarillo's assistance, however, despite Officer Camarillo's and the other officer's joint exertions, they could not pull Ruiz's arms behind his back to be handcuffed. [Camarillo Affidavit at ¶ 10, attached as **Exhibit 17**].

42. Ruiz then reached out to grab the railing, cocked his legs and, in a backward arch, and started to stand up. [Camarillo Affidavit at ¶ 8, attached as **Exhibit 17**].

43. As Ruiz fought to stand, another officer drew his Taser and deployed it toward Ruiz's exposed torso. [Wesley PSB Interview at 27:3-12, attached as **Exhibit 16**].

44. The Taser had no effect and Ruiz quickly resumed resistance by rigidly tensing his arms and pushing off the east stair rail with his feet, which pressed him back against Officer Camarillo and toward the wall. [Camarillo Depo. at 176: 9-12, 176:20-177:2, attached as **Exhibit 13**].

45. Officers then managed to place a separate handcuff on each of Ruiz's wrists, but they were unable to link their respective pairs of handcuffs behind Ruiz's back. [Camarillo Affidavit at ¶¶ 10, 15, attached as **Exhibit 17**].

46. Officer Camarillo felt that Ruiz had "superhuman pain tolerance and strength" and that it took "100%" of his strength to hold Ruiz during this encounter. [Camarillo Affidavit at ¶ 10, attached as **Exhibit 17**; Camarillo Depo. at 99:23-100:1, 175:19-24, attached as **Exhibit 13**].

47. Officers were then concerned that the railing on the stairs would not hold up because of Ruiz's strength. [Camarillo Depo. at 177:4-9, attached as **Exhibit 13**].

48. One of the bolts from the stairway railing came off during the struggle. [PSB Wesley Interview at p. 21:24-22:5, attached as **Exhibit 16**].

49. During the struggle, officers told Ruiz to quit fighting and to relax. [PSB Wesley Interview at p. 19:26-28, attached as **Exhibit 16**].

50. Despite the officers' warnings, Ruiz persisted in his fight against the officers' control efforts by rolling, growling, and making "all kinds of animalistic noises." [PSB Wesley Interview at p. 19:28-20:2, attached as **Exhibit 16**].

51. At one point during the struggle, Ruiz also shouted that "they're killing me." [Camarillo Depo. at p. 97:15-17, attached as **Exhibit 13**].

52. In addition, after subsequent Taser deployment was used by the other officers on the stairs, Officer Camarillo's supervisor told him to "let up" on his grip of Ruiz. [Camarillo Depo. at p. 106:23-25, attached as **Exhibit 13**].

53. Officer Camarillo then moved his arm. As soon as he did Ruiz continued to resist his control, forcing him to try to reestablish his control over Ruiz's upper body. [Camarillo Depo at p. 107:1-7, attached as **Exhibit 13**].

54. Officer Camarillo then continued to apply downward pressure to Ruiz's upper body in order to maintain control over Ruiz. [Camarillo Depo. at p. 111:1-10, 115:12-16, 118:3-16, 124:6-7, attached as **Exhibit 13**].

55. Several minutes into the prolonged struggle with at least seven officers and after a several Taser deployments, Officer Camarillo sensed that Ruiz had "superhuman" pain tolerance and was not tiring. [Camarillo Affidavit at ¶¶ 9, 11, attached as **Exhibit 17**].

56. Officer Camarillo assessed a strong potential that he and/or officers might be "steamboat[ed]" down the stairs putting them in serious danger if Ruiz succeeded in getting free from his grasp. [Camarillo Depo. at p. 111:8-12, 125:4-6, attached as **Exhibit 13**].

57. Consequently, for the first and only time since physically contacting Ruiz, Officer Camarillo attempted to apply the carotid control technique on Ruiz after nothing else worked to subdue him. [Camarillo Depo at 69:6-12, attached as **Exhibit 13**; Camarillo Affidavit at ¶ 11, attached as **Exhibit 17**].

58. Officer Camarillo was never told that there was a limitation on the amount of time a CCT could be applied. [Camarillo Depo. at p. 31:11-16, attached as **Exhibit 13**; Carotid Control Technique Lesson Plan (COP_ERI001402-001414), attached as **Exhibit 18**]. In addition, Officer Camarillo was taught that use of the CCT was just below the threshold of lethal force and should only be used when himself or someone else "is in danger of being seriously injured or killed." [Camarillo Depo. at p. 20:16-22, 34:7-14, attached as **Exhibit 13**].

59. Officer Camarillo decided to apply the CCT only after several minutes of trying to get Ruiz into custody, seven officers were unable to get Ruiz into handcuffs, several Taser deployments were ineffective, and Ruiz was going to escape Camarillo's control. [Camarillo Depo. at p. 69:6-12, 125:4-6, 140:15-20, attached as **Exhibit 13**].

60. Greg Meyer, City of Phoenix's expert on police procedures, opined that after full review of the record, "Officer Camarillo's only deliberate attempt to apply a Carotid Control Technique ("CCT") was reasonable given the totality of circumstances,

1 | and any reasonable officer would have done the same thing." [Greg Meyer's Report at
2 | 18, attached as **Exhibit 19**].

3 | 61. After Officer Camarillo applied the CCT, it was not effective.
4 | Camarillo later testified that he had difficult applying the CCT due to the struggle with
5 | Ruiz and the small space of the stairwell. [Camarillo Depo. at 161:9-162:3, attached as
6 | **Exhibit 13**].

7 | 62. Officer Camarillo did not let go of Ruiz because he was not sure if
8 | Ruiz was "playing possum" once he stopped resisting arrest. [Camarillo Depo. at 128:1-4,
9 | attached as **Exhibit 13**].

10 | 63. Regardless, Camarillo stopped using the CCT as soon as he realized
11 | it did not have any effect on Ruiz and reverted to holding onto Ruiz while the other
12 | officers attempted to control him. [Camarillo Affidavit at ¶ 12, attached as **Exhibit 17**].

13 | 64. Defendants' expert, Dr. Gary Vilke, opined that there was no medical
14 | evidence of any airway obstruction that caused the decedent's death and that the "history,
15 | video, and autopsy do not reflect that any ongoing inappropriate placement of the [CCT]
16 | occurred." [Gary Vilke Expert Report at 11, attached as **Exhibit 20**].

17 | 65. The Medical Examiner's Report noted that the "upper airway is
18 | patent." *See* [Medical Examiner Report at 6, attached as **Exhibit 21**].

19 | 66. Mr. Vilke opined that "the findings of the autopsy report support that
20 | the [CCT] was appropriately placed with an appropriate use of pressure as the hyoid bone
21 | was intake as were the laryngeal cartilages. There was minor soft tissue injury to one of
22 | the neck muscles, the right sternocleidomastoid, but this is not out of the ordinary for the
23 | pressure hold to the neck as well as struggling and moving the neck around when being
24 | held." Concluding, Mr. Vilke states that "[t]he use of the carotid restraint did not
25 | contribute to the death of Mr. Ruiz." [Gary Vilke Expert Report at 12, attached as
26 | **Exhibit 20**].

67. During the struggle between Officer Camarillo and Ruiz, Ruiz was speaking and shouting. [PSB Wesley Interview at p. 19:28-20:2, attached as **Exhibit 16**; Camarillo Depo. at p. 97:15-17, attached as **Exhibit 13**].

68. Ruth Downing opines several times in her report that Ruiz experienced a "choke hold" that lasted 4 minutes. [Report and Curriculum Vitae of Ruth Downing, attached as **Exhibit 22**].

69. Plaintiffs have admitted that Officer Camarillo did not apply a "choke hold" during his struggle with Ruiz in this case. [*See* Plaintiff's Response to Phoenix's Requests for Admission Nos. 16-17, attached as **Exhibit 23**].

70. A patent airway is one that is "open and unobstructed." *See* c.merriam-webster.com/medlineplus/patent; last accessed February 16, 2016.

71. Approximately five minutes after the initial physical contact by Officer Camarillo, Ruiz ceased resistance and became passive. [Camarillo Affidavit at ¶ 13, attached as **Exhibit 17**].

72. When Ruiz became passive Officer Camarillo was not applying the CCT and was just trying to hold onto Ruiz. [Camarillo Affidavit at ¶ 14, attached as **Exhibit 17**; Camarillo Depo at 127:7-15, attached as **Exhibit 13**].

73. Officers were able to handcuff Ruiz only after he stopped struggling. [Camarillo Affidavit at ¶ 15; attached as **Exhibit 17**; Camarillo Depo. at 129:15-16, attached as **Exhibit 13**].

74. Officer Camarillo testified that he did not check Ruiz's pulse after he stopped resisting because EMS were right at the bottom of the stairs and doing that would have delayed medical assistance to Ruiz. [Camarillo Depo. at 144:6-8, 165:20-166:9, attached as **Exhibit 13**].

75. Ruiz was then carried down the stairs to EMS personnel, who were waiting at the bottom of the stairway. [Camarillo Depo. at 165:20-166:9, attached as **Exhibit 13**].

76. While Ruiz's head made contact with the stairway while the officers carried him. Officer Camarillo testified that the officers were exhausted from the five minute struggle with Ruiz and that they made every attempt to avoid Ruiz's head contacting the stairs but due to the angle of the stairs it was very difficult to avoid. [Camarillo Depo. at 138:1-8, 139:4-7, 145:12-23, attached as **Exhibit 13**].

77. EMS soon determined that Ruiz was not breathing and was pulseless. [COP_ERI000023, COP_ERI002435, attached as **Exhibit 24**].

78. During transport to the hospital, Ruiz's handcuffs were removed to facilitate treatment, and EMS resuscitated Ruiz prior to arrival at St. Joseph's Hospital. [COP_ERI000023, COP_ERI000041, attached as **Exhibit 25**

79. Ruiz was then admitted in critical condition, but died five days later on August 2, 2013. [COP_ERI000018-000021, attached as **Exhibit 26**; COP_ERI000033-000035, attached as **Exhibit 27**; COP_ERI001835-001836, attached as **Exhibit 28**].

80. Ruiz's toxicology report following his death noted that he was positive for .40 mg/L of Methamphetamine. [Report of Toxicological Examination, attached as **Exhibit 28**].

81. This Court has subsequently determined that Ruiz was on Methamphetamine during his encounter with police of July 28, 2013. [*See* Doc. 77 (holding that City of Phoenix's Request for Admission # 23 is deemed admitted), City of Phoenix's Second Set of Requests for Admission, attached as **Exhibit 23**].

82. On August 5, 2013, Maricopa County Medical Examiner Dr. C. Poulos performed the autopsy and later ascribed the cause of death to "Anoxic Brain Injury in the Setting of Methamphetamine Intoxication and Altercation with Police." [Medical Examiner's Report, attached as **Exhibit 21**].

83. The manner of death was listed as "Undetermined." [Medical Examiner's Report, attached as **Exhibit 21**].

84. Phoenix Police Training on the CCT establishes that the CCT is just below the threshold of deadly force and should only be performed where "death or serious

4853706.1
4/1/16
11

bodily harm will result to the officer." [CCT Training Lesson Plan – COP_ERI001402-1414, attached as **Exhibit 18**].

85. Officer Camarillo's actions were found to have conformed with Phoenix's policies and procedures by Phoenix's Force Review Board. [Use of Force Review Board Incident Results – COP_ERI000311, attached as **Exhibit 30**].

86. Although there is video of this incident, Defendant City of Phoenix expert Greg Meyer opined that the video is incapable of showing what kind of pressure Officer Camarillo applied during his struggle with Ruiz. [Meyer Expert Report at 23, attached as **Exhibit 19**].

DATED this 1st day of April, 2016.

JONES, SKELTON & HOCHULI, P.L.C.

By s/ John T. Masterson
John T. Masterson
Justin M. Ackerman
40 North Central Avenue, Suite 2700
Phoenix, Arizona 85004
Attorneys for Defendant Officer Abraham Camarillo

**CERTIFICATE OF SERVICE**

I hereby certify that on this 1st day of April, 2016, I caused the foregoing document to be filed electronically with the Clerk of Court through the CM/ECF System for filing; and served on counsel of record via the Court's CM/ECF system.

Jocquese L. Blackwell
Blackwell Law Office, PLLC
420 W. Roosevelt Street, Suite 106
Phoenix, AZ 85003

*Courtesy Copy* mailed this same date to:
The Honorable James A. Teilborg

/s/*Mary M. Soto*

4853706.1
4/1/16

12