BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
Phoenix, AZ 85003
Tel: (602) 441-2725
Fax: (602) 865-1527
Jocquese L. Blackwell SBN 023588
Jocquese@azjustice.com
Gillmore Bernard SBN 032306
Gill@azjustice.com
Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# DISTRICT OF ARIZONA

| | |
|---|---|
| Yolanda Erickson, individually and as personal representative of the Estate of Miguel Ruiz, Canon Ruiz,<br><br>Plaintiff,<br><br>vs.<br><br>City of Phoenix, a public entity, et al.<br><br>Defendants. | NO. 2:14-cv-01942-JAT<br><br>**PLAINTIFFS' RESPONSE RE: DEFENDANTS CITY OF PHOENIX AND DANIEL GARCIA'S STATEMENT OF FACTS IS SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**<br><br>(Oral Argument Requested) |

Pursuant to LRCiv 56.1, Plaintiffs respond to Defendants City of Phoenix and Phoenix Police Chief Daniel Garcia's Statement of Facts ("DSOF") in support of their Motion for Summary Judgment.

## I.   THE 911 CALL REGARDING CRIMINAL TRESPASS AND DAMAGE

1.      On July 28, 2013, at approximately 7:39 a.m., police officers were dispatched to an apartment complex at 4241 N. 23rd Avenue regarding a suspicious subject on the roof who had no shirt on and was potentially damaging the A/C unit. (DSOF, Exhibit 1, Schmidt Audio Int. at 2:1-16; DSOF Exhibit 2, 911 Call Audio Rec. at 00:08-00:41 & 2:10-2:15; DSOF Exhibit 3, Dispatch Audio Rec. at 00:02-27.)

**DISPUTED WITH OBJECTIONS.**   Violates LRCiv 56.1(a).   Defendant's

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

"Statement of Fact" (hereinafter, "DSOF") is inadmissible hearsay asserted as fact. Officers were not dispatched to "a hot call" or a call that a crime was in progress. The 911 caller, Kheylon Cunningham (hereinafter, "Cunningham") knew Mr. Ruiz, personally and knew Mr. Ruiz was on the roof and just wanted him to get down. Moreover, Officer Camarillo was told by Gary Carthen (hereinafter, "Carthen") that Mr. Ruiz lived at the apartment complex. [DSOF Exhibit 2, 911 Call Audio Rec. at 00:08-00:41 & 2:10-2:15; Plaintiffs' Statement of Fact (hereinafter, "PSOF") Exhibit B, Camarillo Depo. at 03:32-40)

    2.    The apartment complex has four (4) two-story buildings, each with a peaked roof and containing two apartment units: one unit on the bottom floor, and a second unit on the top floor. The top unit was accessed by a narrow staircase on the east side with a metal railing and small (4 feet x 4 feet) wooden landing outside the entrance door. (DSOF Exhibit 4, Scene Photos at COP_000318, -321, -336.)

**UNDISPUTED.**

    3.    At the Northeast building, the north side of the roof contained an A/C unit, and the south side of the roof contained a large swamp cooler. (DSOF Exhibit 4 at COP_ERI000336.)

**UNDISPUTED.**

    4.    The 911 caller, Cunningham ("Cunningham") resided in Unit 6 on the top floor of the Northeast building of the apartment complex. (DSOF Exhibit 2 at 00:12-01:00.)

**DISPUTED WITH QUALIFICATIONS.** There has been no evidence submitted that proves Cunningham resided in Unit 6 on the top floor of the Northeast building of the apartment complex. Moreover, during Cunningham's taping of the event he states that "they are going to think that I live there" when the police were about to bring Mr. Ruiz downstairs. (DSOF Exhibit 11, Cunningham video at 15:15)

    5.    Cunningham reported to police that water was flowing through his

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

apartment from the ceiling, apparently because the suspect was trying to take the A/C unit off of the roof. (DSOF Exhibit 2 at 00:12-01:18 & 2:10-3:11; DSOF Doc. 99-4, Exhibit 13, DSOF Camarillo Depo. At 56:4-13 & 61:17-62:4.)

**DISPUTED WITH OBJECTION AND QUALIFICATION,** violates LRCiv 56.1(a). Defendant's "Statement of Fact" is inadmissible hearsay asserted as a fact**.** Moreover, as mentioned above, there is no proof that Cunningham lived at the apartment complex or that his apartment actually had water damage.

6.      Cunningham further reported that the suspect was a known drug user of "crystal" methamphetamine and had been running around the night before "burning" things. (DSOF Exhibit 2 at 00:12-00:43 & 2:10-3:11).

**DISPUTED WITH AN OBJECTION AND QUALIFICATION,** violates LRCiv 56.1(a), Defendant's "Statement of Fact" is inadmissible hearsay asserted as fact**.** Furthermore, there has been no sworn testimony that Mr. Ruiz was an active drug user. To the contrary, Mrs. Erickson testified that he was in good standing with his probation officer and his probation officer reported that Mr. Ruiz was drug free.

7.      Plaintiff Erickson, Michael's mother, testified that she suspected that Michael was abusing methamphetamine, because of his strange behavior and even reported to his probation officer that he was binge using methamphetamines. (DSOF Doc. 99-1, Exhibit 2, DSOF Yolanda Erickson Depo. at 54:6-19; at 62:15-22.)

**DISPUTED WITH QUALIFICATION.** Mrs. Erickson described Mr. Ruiz's behavior as "quirky".  However still concerned she contacted his probation officer to report his quirky behavior.  Upon speaking to the Officer she admitted she had searched his house and his person and found no drugs.  Mrs. Erickson was then informed by Mr. Ruiz' probation officer that Mr. Ruiz had been complying with all probation terms and was drug free. [PSOF Exhibit A, Erickson Depo. at 64: 16-25, 65:1-10.]

8.      Officers Hessner, Schmidt, Camarillo, and Matthews were the first police officers to arrive on the scene. (DSOF Doc. 99-4, Exhibit 17, Camarillo Affidavit at

COP_ERI001029-1030.)

**UNDISPUTED.**

9.    Upon arrival, the officers observed a large, muscular and well-built suspect (218 pounds) on the roof; the suspect's shirt was off and draped around his head. (DSOF Doc. 99-4, Exhibit 17 at COP_ERI001029-1031; DSOF Doc 99-4, Exhibit 16 at COP_ERI000973; Exhibit 5, DSOF Mathews Affidavit at COP_001089.)

**OBJECTION,** violates LRCiv 56.1(a). This "statement of fact" does not state a fact but is an argument and opinion about Mr. Ruiz' physique.

10.    When the officers tried to make contact with the suspect, he did not respond and laid back down on the roof. (DSOF Exhibit 1 at COP_001107-1108.)

**DISPUTED WITH QUALIFICATION.** Mr. Ruiz did communicate with officers. He told them he could not hear them from his position and that he could not see them because of the sun. (DSOF Exhibit 10, Cunningham video 2:13)

11.    The officers had no idea how Michael climbed onto the roof. (DSOF Doc. 99-4, Exhibit 17 at COP_ERI001033; DSOF Doc 99-4, Exhibit 16 at COP_ERI000975.)

**UNDISPUTED**.

12.    The officers contacted Gary "Mike" Carthen, who identified the suspect as decedent Miguel Ruiz ("Michael"), and told him that Michael lived in Unit 7 (on the bottom floor of the next building). (DSOF Doc. 99-4, Exhibit 13, DSOF Camarillo Depo. at 55:4-7; DSOF Doc. 99-4, Exhibit 17 at COP_ERI001030; DSOF Doc. 99-4, Exhibit 16 at COP_ERI000971-972.)

**OBJECTION,** violates LRCiv 56.1(a). Defendant's "Statement of Fact" is inadmissible hearsay asserted as fact**.**

13.    Carthen told the officers that the owner wanted the suspect prosecuted for criminal trespass and criminal damage to the suspect's apartment and to the air conditioning equipment on the roof. (DSOF Doc. 99-4, Exhibit 16 at COP_ERI000972; Exhibit 6, DSOF Linn Affidavit at COP_ERI0001071; DSOF Doc. 99-4, Exhibit 13, DSOF

Camarillo Depo. at 158:16-159:11.)

**OBJECTION,** violates LRCiv 56(a)**.** Defendant's "Statement of Fact" is inadmissible hearsay asserted as fact**.**

14.     Michael did not respond to the officers, but just continued to lay down on his back or side on the roof. (DSOF Exhibit 1 at COP_ERI001108.)

**DISPUTED WITH QUALIFICATION.** See ¶10 above

**II.     WELFARE CHECK OF MICHAEL'S APARTMENT SHOWING CRIMINAL DAMAGE AND ARSON**

15.     The property manager told the officers that Michael lived in Unit 7 and had damaged his apartment by removing a toilet from the floor. (DSOF Doc. 99-4, Exhibit 17 at COP_ERI001030-1032; DSOF Doc. 99-4, Exhibit 13, DSOF Camarillo Depo. at 56:4-13.)

**OBJECTION WITH QUALIFICATION,** violates LRCiv 56.1(a).  Defendant's "Statement of Fact" is inadmissible hearsay asserted as fact**.**  In this case, there is no evidence that Mr. Ruiz damaged his apartment by removing a toilet from the floor.

16.     Water was flowing out from the open door of Michael's apartment. (DSOF Doc. 99-4, Exhibit 16 at COP_ERI0009796-977; DSOF Doc. 99-4, Exhibit 17 at COP_ERI001030; Doc. 99-4, Exhibit 13, DSOF Camarillo Depo. at 56:17-23.)

**UNDISPUTED.**

17.     Officers Camarillo and Matthews went to Michael's apartment to perform a welfare check. (DSOF Doc. 99-4, Exhibit 17 at COP_001030-1032.)

**UNDISPUTED.**

18.     Officer Camarillo noticed that Michael's apartment door was open, so he knocked on it and announced the presence of police; but no one responded, so he looked inside and saw that the floor was completely flooded. (DSOF Doc. 99-4, Exhibit 13, DSOF Camarillo Depo. 56:17-23; Exhibit 4 at COP_000532-537.)

**UNDISPUTED.**

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St.., Suite 106
PHOENIX, AZ 85003

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

19.    Officer Camarillo heard the sound of running water inside and detected the odor of something burning or recently burnt. (DSOF Doc. 99-4, Exhibit 13, DSOF Camarillo Depo. 56:17-23; Exhibit 4 at COP_000532-537.)

**UNDISPUTED WITH QUALIFICATION.** Officer Camarillo was brought to Mr. Ruiz' apartment by who he believed to be the property manager and stated he saw water coming from underneath a partially open door.  Officer Camarillo pushed open the door and smelled a faint order of something burning and saw something that look as if it had been burnt on the floor.  Officer Camarillo said that the toilet looked as if it was ripped out of the floor.  Officer Camarillo said he did not know if Mr.  Ruiz ripped the toilet out but someone did. (PSOF Camarillo PSB Interview, 15:53 – 16:45 attached as Exhibit P)

20.    Concerned that there were exigent circumstances, because of a fire inside that "could cause the whole building to go up," Officer Camarillo decided to enter the apartment and clear it of anyone inside. (DSOF Doc 99-4, Exhibit 13, DSOF Camarillo Depo. at 57:3-10.)

**DISPUTED WITH AN OBJECTION AND QUALIFICATION,** violates LRCiv 56.1(a). Officer Camarillo's concerns are immaterial. As set forth in Plaintiffs' response to Camarillo's motion for summary judgment, his conduct was objectively unreasonable.  During Officer Camarillo's PSB interview that was held shortly after the incident, he did not state there were exigent circumstances that warranted his access to the apartment.  (See ¶ 19; PSOF Camarillo PSB Interview, 15:53 – 16:45 attached as Exhibit P)

21.    Inside Michael's apartment, Officer Camarillo observed residue from small fires on the floor and in the kitchen. (DSOF Doc. 99-4, Exhibit 17 at COP_ERI001030-1031; Exhibit 4 at COP_000532-537.)

**UNDISPUTED.**

22.    In the bathroom, Officer Camarillo saw that the toilet was pulled up,

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

causing water to shoot out from the broken pipes; the bathtub contained a floating wooden guitar and was overflowing, so Officer Camarillo turned the faucet off. (Doc. 99-4, Exhibit 13, Camarillo Depo. at 57:16-58:2; Exhibit 4 at COP_000544 - 558.)

**UNDISPUTED.**

23.     Photographs of Michael's apartment taken during a warranted search after the incident revealed a more bizarre and chaotic scene than what the officers reported: (1) in the living room, there was blood on the wall behind the door, blood on a small white pope that had been exposed because a light switch had been ripped out of the wall, blood on the wall surrounding the switch plate, blood on a nearby garbage pail, and blood smeared on a plastic shower curtain that had been poked with holes and draped over a large television in the living room; (2) in the kitchen there was evidence of arson, including a burned plastic bag of coins; burnt ash on the kitchen chair (which appeared to also have blood on it); burnt items on the shelf of a wicker credenza in the kitchen burnt items in front of that credenza; and burnt ash and items on the kitchen floor; (3) the floors of the bathroom and bedrooms were flooded (as high as one inch of water at some points); and (4) in the bathroom, a broken kitchen chair lied on its side with blood on it and the seat had been burned; the shower head was lying on the floor next to the sink cabinet and the shower rod was ripped out of the wall; the toilet had been ripped out of the floor and the porcelain tank was in pieces on the floor; a container of Q-Tips was in the toilet bowl; and a wooden guitar floated in the bathtub. (DSOF Exhibit 4 at COP_000515, COP_00517-519; COP_0005992-593; COP_000595-598; COP_000600; COP_000603; COP_000526-528; COP_000532-537; COP_000540-543; COP_000544-548; COP_000546-558; COP_000560; COP_000615-616.)

**UNDISPUTED WITH QUALIFICATION.**   There is no evidence that Mr. Ruiz damaged any property or structures within his home. There is no evidence that blood was on the walls or any other surface in the apartment Camarillo searched.  Camarillo had no inclination of who damaged Mr. Ruiz' apartment. (PSOF Exhibit B, Camarillo

Depo. At 58:03-06)

## III. THE PLAN TO BRING MICHAEL DOWN SAFELY IN A FIRE LADDER AND BUCKET

24.     Carthen informed the officers that the roof had been structurally damaged from the monsoon rains, and that Michael had damaged a swamp cooler on the south side of the roof, causing water to cascade down the side of the building like a "waterfall"; the broken A/C unit on the north side of the roof was also damaged and leaking water into Cunningham's apartment. (DSOF Doc. 99-4, Exhibit 16 at COP_ERI000976-977; Exhibit 2 at 00:12-01:18 & 2:10-3:11.)

**DISPUTED WITH OBJECTION,** violates LRCiv 56.1(a).  Defendant's "Statement of Fact" is inadmissible hearsay asserted as fact**.**  Furthermore, it is unknown how the swamp cooler was damaged without foundation, Defendants assert witnesses out of court statement as fact.  However, Mr. Ruiz was often employed to repair and preform maintenance around the apartment complex.   (See Camarillo Depo, 158:21 – 158:24, attached as Exhibit B).

25.     An inspection after the incident revealed the apartment complex suffered extensive water and structural damage to the roof, and to Unit 6: (1) on the roof, there were broken pieces of pipe, stained underwear, a fragmented wooden object with blood on it, and a knife (2) on the landings, one of the screws that attached the railing to the staircase was missing and another screw was "very loose"; (3) water had pooled on the floor of Unit 6 and leaked into Unit 5 below it; and (4) both apartments had to be evacuated in case the entire building collapsed. (DSOF Exhibit 4 at COP_00324-337 & -498.);  COP_000397;  COP_000402-405;  COP_000407-410 & -421;  COP_00433; COP_000439;  COP_00444;  COP_000407-410 & -421;  COP_000433;  COP_000439; COP_000444;  COP_000447;  COP_000449; and COP_000461.)

**OBJECTION,** violates LRCiv 56.1(a). Defendant mischaracterizes the evidence. City's exhibit 4 does not depict a knife in any of the pictures.  Furthermore, Defendants'

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

"statement of fact" is argument as it posits that all noted damages were a result of Mr. Ruiz' actions when these facts have not been established.

26.     Because Michael was not responding and would not come off the roof, the officers called the fire department to bring a ladder so they could bring Michael safely off the roof. (DSOF Doc. 99-4, DSOF Exhibit 17 at COP_ERI001033.)

**DISPUTED.** See ¶10

27.     Sergeant Wesley arrived at approximately the same time as the fire department and developed a plan to bring Michael down from the roof using a ladder and bucket from the fire truck, because Michael appeared to be impaired by drugs and was not making sense or responsive to the officers. (DSOF Exhibit 1 at COP_ERI001108; Doc. 99-4, Exhibit 16 at COP_ERI000974-977.)

**OBJECTION,** Violates LRCiv 56.1(a).     Sergeant Wesley's opinions and assumptions as it pertains to Mr. Ruiz appearing to be under the influence of drugs are not fact nor are they based upon any facts known to him.  Sergeant Wesley lacks the foundation to make such any assumptions and thus his opinions are immaterial.

28.     Sergeant Wesley believed that Michael was a danger to himself and others, and that the officers could not just leave him on the roof. (DSOF Doc. 99-4, Exhibit 16 at COP_ERI000989.)

**DISPUTED WITH AN OBJECTION AND QUALIFICATION,** Violates LRCiv 56.1(a). See ¶27

29.     Because the fire-ladder bucket could only hold four people, Sergeant Wesley boarded the bucket with two other officers, one of whom was Officer Schmidt because he was "skinny," leaving room for Michael. (DSOF Exhibit 1 at COP_ERI001108; Doc. 99-4, DSOP Exhibit 16 at COP_ERI000975).

**UNDISPUTED.**

30.     The plan was for Sergeant Wesley – who was a skilled and experienced negotiator – to convince Michael to get into the bucket, but if Michael resisted, for

Officer Schmidt to momentarily stun him with a Taser so that the other officers could not pull him into the bucket and lower him safely to the ground. (DSOF Exhibit 7, Sgt. Luebkin Affidavit at COP_ERI00108; Doc. 99-4,DSOF Exhibit 16 at COP_ERI000975.)

**UNDISPUTED WITH QUALIFICATION.** Sergeant Wesley's plan to tase Mr. Ruiz while he is on the roof was in violation of Phoenix Police Operation Orders. [Phoenix Operation orders at pg 5, attached as Exhibit H]

31.     The fire crew raised the ladder and bucket to the north end of the roof, where Michael was lying on his back in the center of the north side of the roof with his shirt over his face. (DSOF Doc. 99-4, Exhibit 16 at COP_ERI000976-977; DSOF Exhibit 1 at COP_ERI001108.)

**UNDISPUTED.**

32.     Sergeant Wesley and the officers tried to communicate with Michael and encourage him to get inside the bucket so they can bring him to the ground. (Exhibit 1 at COP_ERI001108.)

**UNDISPUTED WITH QUALIFICATION.** As depicted in the video taken by officer Luebkin, Mr. Ruiz is lucid and actively communicating with the Officers in the aerial ladder.  At one point Mr. Ruiz is asked to stand and show the officers that he did not have any weapons.  Mr. Ruiz complied by standing, raising his hands and turning his body to show the officers he was not a threat.  Clad in only shorts, Mr. Ruiz approached the aerial ladder.  A short discussion ensued where officers forcibly grabbed Mr. Ruiz' arms in an attempt to subdue him.   When Mr. Ruiz attempted to back away from the ladder an officer drew his taser and pointed it at Mr. Ruiz.  Then in violation with Phoenix Operation Orders forbidding deployment at a fleeing subject or a subject in danger of falling from a significant height, Officers deployed one taser in dart mode.  One prong struck Mr. Ruiz while the other missed.  Thus, its incapacitating effect was ineffective.  Not wanting to approach the officers who had just assaulted him, Mr. Ruiz sat on the edge of the building.  While there he asked why the Officers were attacking

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

him. Not wanting to engage the officers again he scooted off the ledge, falling on the second floor landing, landing in a seated position. (PSOF Luebkin video 1-2, attached as Exhibits C and O; PSOF Phoenix Operation Orders at Pg. 5, attached as Exhibit H; Camarillo Depo, 59:17 – 59:25, attached as Exhibit B.)

33.     The officers described the conversation they had with Michael on the roof as "circular," saying he could not see and was paranoid about coming off the roof because "they" (not the officers) were trying to kill him, even though the officers assured him "they" were gone. (DSOF Doc. 99-4, Exhibit 16 at COP_ERI000977; Exhibit 1 at COP_ERI001110-1111; Doc. 99-4, Exhibit 17 at COP_ERI001036-1037.)

**OBJECTION WITH QUALIFICATION,** violates LRCiv 56(a).    Defendant's "Statement of Fact" is inadmissible hearsay asserted as fact and they have no foundation to say Mr. Ruiz was paranoid**.**  Moreover, based on the video, it is apparent that the officer's great idea to tase Mr. Ruiz on top of the roof had the potential to place his life in jeopardy.  As such, Mr. Ruiz statements that the officers were trying to kill him was credible.

34.     Michael did not want to move at first, because he was incoherent and had a shirt over his face, so Officer Schmidt told him he was on the center of the roof and it was safe for him to stand up and come over to the bucket. (Exhibit 1 at COP_ERI001108-1109.)

**OBJECTION WITH QUALIFICATION,** violates LRCiv 56(a).    Defendant's "Statement of Fact" avers that Mr. Ruiz did not want to move and was incoherent, this is argument cast as fact.  The officer cannot know what Mr. Ruiz was thinking about at the time they initially contacted him on the roof.

35.     Based on Michael's actions, appearance and demeanor, Sergeant Wesley believed Michael was mentally or chemically impaired. (DSOF Doc. 99-4, Exhibit 16 at COP_ERI000972, -977.)

**OBJECTION WITH QUALIFICATION,** Violates LRCiv 56.1(a). See ¶27 Moreover,

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

1 if Sgt. Wesley thought Mr. Ruiz was mentally or chemically impaired then why would

2 they attempt to deploy a taser on Mr. Ruiz when he was on the roof.

3     36.    Eventually, Michael took off his shirt and gets to his feet and comes over

4 to the front of bucket, where Sergeant Wesley and another officer grabbed Michael's

5 arms to assist him step onto the platform of the bucket. (DSOF Doc. 99-4, Exhibit 16 at

6 COP_ERI000977; Exhibit 1 at COP_ERI001109.)

7     **UNDISPUTED WITH QUALIFICATION** See ¶ 32

8     37.    As soon as Sergeant Wesley grabbed Michael's arm, Michael gripped a

9 couple of Sergeant Wesley's fingers tightly for control, which concerned the sergeant,

10 because he knew from a records check that Michael had prior arrests for resisting

11 arrest and aggravated assault on an officer. (DSOF Doc. 99-4, Exhibit 16 at

12 COP_ERI000977-978, COP_ERI000989.)

13     **DISPUTED WITH QUALIFICATION.** Mr. Ruiz could not grip any officers' hands

14 as the officers grabbed both of his wrists. Sergeant Wesley couldn't have been

15 concerned about Mr. Ruiz' prior arrests for resisting arrest and aggravated assault on

16 an officer because they were more than 10 years old at the time they were aloft on the

17 roof. (PSOF Luebkin video at 00:11, attached as Exhibit C; PSOF Officer Hessner audio

18 interview at 11:48-12:00 Attached as Exhibit D; DSOF Doc. 99-4, Exhibit 16 at

19 COP_ERI000977-978, COP_ERI000989)

20     38.    Sergeant Wesley calmed Michael down by assuring him that the officers

21 were just trying to get him inside the bucket and down to the ground safely. (DSOF Id.

22 at COP_ERI000978.)

23     **DISPUTED WITH QUALIFICATION.** Although Mr. Ruiz was on the roof, there is

24 no evidence that he was upset and there was no need to calm him down. Moreover, the

25 911 caller only stated that someone was on the roof and he wanted fire to come and

26 help him down.

27     39.    There was a bar at the front of the bucket that prevented the officers from

28

just pulling Michael into the bucket, so for safety reasons, Michael had to be handcuffed and lowered underneath the bar and into the bucket. (DSOF Id. at COP_ERI000979-980.)

**UNDISPUTED**

40.    Sergeant Wesley asked Michael to turn around so that he could be handcuffed and taken off the roof safely. (DSOF Id. at COP_ERI000978.)

**DISPUTED.** See ¶32

41.    Michael refused and pulled away from the officers; as he stepped off the platform, Sergeant Wesley ordered Officer Schmidt to deploy his Taser, as Michael had committed an aggravated assault against Sergeant Wesley. (Id. at COP_ERI000968, COP_ERI000978.)

**DISPUTED WITH QUALIFICATION.** Mr. Ruiz refused to come all the way into the bucket after Officer Schmidt deployed his taser and not before. Moreover, there is no objective and/or tangible evidence that Mr. Ruiz committed an aggravated assault against Sergeant Wesley because he never entered the platform of the bucket. (See Camarillo Depo, 59:17 – 59:25, attached as Exhibit B.)

42.    The Taser struck Michael in the chest/shoulder and finger; but it was completely ineffective, as Michael simply ripped off the prongs from his body and backed away. (DSOF Id. at COP_ERI000978.)

**DISPUTED WITH QUALIFICATION.** Officers do not believe both probes struck Mr. Ruiz. Furthermore, it is confirmed that both probes need to make contact with the subject in order for the taser to be effective. [PSOF Officer Hessner audio interview at 12:55-13:10 Attached as Exhibit D; PSOF Taser x2 Operator instructions at 7 attached as Exhibit E].

43.    Michael moved away from the officers and sat down at the apex of the roof near the east edge, where he remained for approximately 4 ½ minutes peering over the edge, as Sergeant Wesley continued negotiating with him, afraid he might fall

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

off. (DSOF Exhibit 8, Segundo Video, COP_ERI0008887 at 00:01-04:25; Doc. 99-4, Exhibit 16 at COP_ERI000978-979.)

**UNDISPUTED WITH QUALIFICATION.** Although Plaintiff does not dispute that Mr. Ruiz moved away from the officers in the bucket and sat down on the roof. There is no way to know if Sergeant Wesley was actually afraid Mr. Ruiz may fall of the roof because he had just given an order to another officer to tase him. (See Camarillo Depo, 59:17 – 59:25, attached as Exhibit B.)

44.     Sergeant Wesley and the other officers tried to encourage Michael to come back to the bucket, but Michael refused, complaining that they had shot him with the Taser and repeating the paranoid remarks that "they" were trying to get him down there. (DSOF Doc. 99-4., Exhibit 16 at COP_ERI000980-981.)

**DISPUTED WITH QUALIFICATION.** There is no evidence that Mr. Ruiz was paranoid or made "so-called" paranoid remarks after he was tased by Officer Schmidt. See also ¶32 above.

45.     Because of the dangerous condition of the roof, and Michael's proximity to the edge, the officers decided not to get onto the roof or try to deploy the Taser on him a second time. (DSOF Id. At COP_ERI000988.)

**UNDISPUTED**

**IV.   MICHAEL JUMPS OFF THE ROOF TO EVADE ARREST, RESULTING IN A PHYSICAL STRUGGLE WITH POLICE OFFICERS**

**A.  Michael Jumps onto the Second-Floor Landing Outside Unit 6.**

46.     Meanwhile, because Michael was not complying and had refused to come down, Officers Linn, Sergeant Luebkin, and Lieutenant Hoover also had responded to the call. (DSOF Doc. 99-4, Exhibit 16 at COP_ERI000973.)

**DISPUTED WITH QUALIFCATION.**  Mr. Ruiz was compliant with the officers when he was on the roof because when they asked him to come over to the bucket, he did so.  However, by utilizing a taser to subdue Mr. Ruiz as he calmly approached the

14

bucket caused Mr. Ruiz to back away in order to save his life. It wasn't until the officers placed him in a dangerous position by tasing him while aloft near the bucket that he backed away from them. (See Camarillo Depo, 59:17 – 59:25, attached as Exhibit B; ¶32.)

47. Michael then began scooting down toward the second-floor landing outside Unit 6. (DSOF Exhibit 8 at 4:34-4:41.)

**UNDISPUTED WITH QUALIFICATION.** See ¶32

48. Officer Camarillo noticed that Unit 6 had a screen door, but the front door of the apartment was open. (DSOF Doc. 99-4, Exhibit 17 at ¶ 5.)

**UNDISPUTED WITH QUALIFICATION.** Although Officer Camarillo states the apartment had a screen door, there is no evidence that the front door to the apartment was ajar.

49. Because Unit 6 had not been secured and he knew Michael did not live there, Officer Camarillo was concerned that the apartment might have had occupants, or a kitchen knife or other weapon that Michael could retrieve and/or Michael could barricade himself inside and escalate the situation. (Doc. 99-4, Exhibit 17 at ¶¶ 6 and 7 and COP_ERI0001027; Doc. 99-4, Exhibit 16 at COP_ERI000987.)

**OBJECTION**, violates LRCiv 56.1(a). This "statement of fact" is an argument and legal conclusion. As set forth in response to Officer Camarillo's motion for summary judgment, his actions were objectively unreasonable.

50. Officers Camarillo and Linn positioned themselves near the stairwell anticipating that Michael would jump onto the landing and enter Unit 6. (Doc. 99-4, Exhibit 17 at COP_ERI001034.)

**UNDISPUTED.**

51. Michael stopped above the second-floor landing and jumped onto it, but he slipped and fell on his bottom with his back toward the officers in the stairwell. (DSOF Id. at COP_ERI001035-1036.)

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

**1**     **DISPUTED.** Mr. Ruiz did not slip and fall from the roof. He scooted from a seated

**2** position from the roof and then landed in a seated position. [ See ¶32; DSOF Id. at

**3** COP_ERI001035-1036]

**4**     52.     When Michael jumped, Sergeant Wesley was afraid that Michael might

**5** have fallen all the way down to the ground, because he had forgotten about the second-

**6** floor landing. (DSOF Doc. 99-4, Exhibit 16 at COP_ERI000981.)

**7**     53.   **OBJECTION.**   Violates LRCiv 56.1(a). Sergeant Wesley's beliefs are

**8** immaterial and are speculative at best. Officers Camarillo and Linn ran up the stairwell

**9** to stop Michael from entering Unit 6 and escalating the situation. (Doc. 99-4, Exhibit 17

**10** at COP_ERI001027 and COP_ERI001035.)

**11**     **DISPUTED WITH AN OBJECTION AND QUALIFICATION.**   Violates LRCiv

**12** 56.1(a). The officer's beliefs as to Mr. Ruiz' intentions are immaterial and argument. As

**13** set forth in Plaintiffs' response to Officer Camarillo motion for summary judgment, his

**14** conduct was objectively unreasonable. Moreover, it is evident in the video that Mr. Ruiz

**15** had his hands raised and never attempted to get out of his seated position prior to

**16** police contact, and when given the command "do not move" Mr. Ruiz replied "OK".

**17** (PSOF, Camarillo's Response to RFA No. 12, page 4, attached as Exhibit F; PSOF Segundo

**18** Video at 4:41 – 9:06, attached as Exhibit G.)

**19**     **B. Seven Officers Struggle to Restrain Michael.**

**20**     54.     Without much room for Officer Camarillo to maneuver, he immediately

**21** grabbed Michael near the neck and shoulder area, and applied downward pressure on

**22** Michael's upper body so the he could hold Michael down and allow the other officers to

**23** handcuff Michael. (DSOF Doc. 99-4, Exhibit 13, Camarillo Depo at 61:17-62:4.)

**24**     **DISPUTED WITH QUALIFICATION.**   When Officer Camarillo ran up the stairs

**25** he encountered Mr. Ruiz, unarmed, in a seated position, with his hands up and away

**26** from his person. Officer Camarillo immediately placed his left forearm across Mr. Ruiz'

**27** neck and starts to apply full pressure using his left forearm and bicep. At 4:44, Officer

**28**

Camarillo grabs his left hand with his right hand, securing the Carotid Artery Control Technique (hereinafter, "CCT") around Mr. Ruiz' neck and starts to tighten his grip in an attempt to render him unconscious.

At 4:46, Mr. Ruiz raises his hands higher as if confused by Officer Camarillo's unreasonable use of force. During this time Mr. Ruiz is still in a seated position with his legs straight in front of him. At 4:47 Officer Camarillo pulls Mr. Ruiz by the neck and leans downwards towards the stairwell, which causes Mr. Ruiz to grab for the railing in an attempt prevent the officer from throwing him down the flight of stairs. At 4:48, with continued pressure of the CCT around Mr. Ruiz' neck, Officer Camarillo uses his right hand to force Mr. Ruiz to release the railing.

At 4:52, Officer Camarillo in an upright positon, leans his body into Mr. Ruiz while still maintaining his hold around Mr. Ruiz neck with his left arm. While doing this maneuver, Officer Camarillo gains control of Mr. Ruiz's right hand with his right hand. At 4:56, another officer establishes control over Mr. Ruiz' right hand. At 5:01, with his right hand again free, Officer Camarillo adjusts his left forearm to secure it around Mr. Ruiz's neck. After this adjustment, with his right hand he grabs his left hand in an attempt to apply the CCT. Between 5:02 to 5:15 Officer Camarillo while employing a fully engaged CCT around Mr. Ruiz' neck, leans back towards the bottom of the stairs while the other two officers are trying to gain control of Mr. Ruiz' arms. Between 5:16 and 5:25 Officer Camarillo continues to lean backwards down the stairs, he still has the CCT fully engaged around Mr. Ruiz' neck, the other two officers have control of Mr. Ruiz' arms and the backward force of Officer Camarillo's weight causes Mr. Ruiz' lower torso to arc upwards off of the floor.

As he arcs upward, Mr. Ruiz' body is turned exposing his stomach and legs which are bent towards the officers on the stairway. At 5:26 an Officer deploys his taser to Mr. Ruiz' stomach. Mr. Ruiz falls backward onto the second floor landing, while at the same time Officer Camarillo continues to lean backward while applying the CCT around

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

Mr. Ruiz' neck. The shock causes Mr. Ruiz to fall onto Officer Camarillo and onto the floor of the second floor landing once again. Between 5:26 and 5:34, the officer reactivates the taser for a six (6) second burst, while Officer Camarillo has the CCT fully applied around Mr. Ruiz' neck.

It is important to note that Officer Camarillo had not received training on how the utilization of a taser device on a suspect contemporaneously with application of a CCT could prevent him from knowing if the suspect was properly reacting to the correct application of a CCT. Moreover, Officer Camarillo did not remember if he was trained as to the types of injuries that could be caused by an incorrect application of the CCT.

Between 5:40 and 5:55 the officer uses a drive stun taser technique while Officer Camarillo continues to fully employ the CCT around Mr. Ruiz' neck. At 5:40, the video shows Officer Camarillo's forearm completely covering Mr. Ruiz' neck and not on his chest. At this time Mr. Ruiz' face is pale. At 5:42 an officer gains control of Mr. Ruiz's left hand but cannot handcuff Mr. Ruiz because Officer Camarillo is in the way. At 5:43, Mr. Ruiz is tased again while Officer Camarillo continues to improperly apply a CCT on Mr. Ruiz' neck. Mr. Ruiz yells out "they are killing me" to the crowd of people below, some of which are video tapping the incident. Officer Camarillo does not realize that the tasing is causing Mr. Ruiz' body to stiffen and tense up, and therefore cannot determine if his application of the CCT is effective so he continues to apply force around Mr. Ruiz' neck. At 5:46 Mr. Ruiz' face shows signs of oxygen loss.

At 5:48, Officer Camarillo leans back so an officer can tase Mr. Ruiz again. Again, Officer Camarillo does not realize that the tasing is causing Mr. Ruiz' body to stiffen and tense up, and therefore cannot determine if his application of the CCT is effective so he continues to apply force around Mr. Ruiz' neck. At 5:50 Mr. Ruiz's chin and nose are pointed up and his head is cocked back unequivocally showing that Officer Camarillo can not be applying pressure to Mr. Ruiz' chest and the pressure applied is from his left forearm and bicep to Mr. Ruiz' neck.

Between 5:56: and 6:31 Officer Camarillo continues to lean back, with the CCT fully employed around Mr. Ruiz' neck while an officer employs a taser to Mr. Ruiz' body. At 5:57 Officer Camarillo is seen applying pressure to Mr. Ruiz' neck and Officer Camarillo can be seen adjusting his arm around Mr. Ruiz' neck. Thus proving that all the pressure and unreasonable force Officer Camarillo was using to subdue Mr. Ruiz was on his neck, not his chest. At 6:13 eight (8) officers are now within five (5) feet of Mr. Ruiz. Between 6:32 and 7:27 an officer continues to employ a dry stun taser technique as Officer Camarillo continues to employ a fully engaged CCT around Mr. Ruiz' neck.

It is important to note that Officer Camarillo is pulling back with his upper torso and squeezing Mr. Ruiz' neck with all of his force using his left forearm and bicep while pulling his left hand with his right hand to ensure he does not lose his grip. At one-point during the incident, Officer Camarillo places his right hand over his left elbow in an attempt to obtain even more leverage to fully squeeze Mr. Ruiz' neck using the CCT. At 6:56, Mr. Ruiz' face shows further signs of oxygen loss. At 7:05, with his left arm still around and squeezing Mr. Ruiz' neck, Officer Camarillo places his right hand over Mr. Ruiz mouth tilting his head back.

Officer Camarillo then slides his right hand to his left elbow and leans back while pulling his left elbow towards his body. While doing this he grimaces. Between 7:14 and 7:20 another officer uses two attempts to correct Officer Camarillo's CCT application. Between 7:28 and 8:38 Officer Camarillo continued applying the CCT around Mr. Ruiz' neck while the other officers used a type of band restraint around Mr. Ruiz' legs and handcuffed him.

It is important to note that during the entire time on the second floor landing, Officer Camarillo employed the CCT around Mr. Ruiz' neck by using as much force as he was physically able and continued to lean backwards with his upper torso fully engaged, in a setting of multiple taser deployments until Mr. Ruiz died. Based on Officer

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

Camarillo's statements during his PSB interview, he fully utilized the CCT with his left forearm and bicep around Mr. Ruiz' neck with 100% of his force from the first or second time he heard the taser until Mr. Ruiz stopped moving.   During entire time Officer Camarillo used the CCT, he did not know if his application of the CCT was done properly. At 8:41, the video shows Mr. Ruiz' legs stiffening up.   At 9:00 Mr. Ruiz is lifeless. Throughout the attack, Mr. Ruiz never intentionally punched, kicked, spat on or injured any of the officers.  [PSOF Camarillo Depo. at 34:24 – 35:19, 46:13 – 44:11, 66:1-66:2, 91:23- 92:03, 99:23- 99:25, 100:1 – 100:2, 106:20 – 106:25, 110:12 -110:24, 111:1 – 111:3, 129:17 – 129:23, 141:08 – 141:12, 141:16 – 141:24, 141:10 – 141:16, 162:4 – 162:25, 163:1- 163:25, 164:1 – 164:9, 165:1 – 165:6, 174:15 – 175:01; PSOF Segundo Video at 4:41 – 9:06, attached as Exhibit G; PSOF PSB Interview of Officer Camarillo at 6:45 – 7:40; 7:41 – 12:00, 27:54 -28:00, 28:50 – 29:00, 30:00 – 34:50, 36:00 – 39:30, 39:35 – 40:40, 42:45 – 44:00, attached as Exhibit P]

55.     Officer Linn grabbed Michael's left arm, but Michael tensed his arm and grabbed the railing, making it difficult for Officer Linn to gain control because he kept having to pry Michael's hands off the rail, and because Michael had pinned Officer Camarillo and Officer Linn against the wall. (DSOF Doc. 99-4, Exhibit 13, Camarillo Depo. at 66:4-12.)

**DISPUTED WITH QUALIFICATION.** Officers were unable to place Mr. Ruiz' hands behind his back because Officer Camarillo was in the way. [ Hessner interview at 20:45, attached as Exhibit D; Camarillo Depo. At 176:09-176:12, attached as Exhibit B; Segundo video at 4:38, attached as Exhibit G; PSOF PSB Interview of Officer Camarillo, 34:46 - 36:00, attached as Exhibit P]

56.     At some point, Officer Linn was able to get a handcuff onto Michael's left wrist and pulled on the handcuff, because Michael's arm was sweaty and Officer Linn's hands kept slipping. (Exhibit 6 at COP_ERI001073.)

**UNDISPUTED**

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

57.     Sergeant Luebkin followed Officers Linn and Camarillo up the stairs and grabbed Michael's right arm, but was also unable to move it behind Michael to apply handcuffs, because Michael tensed. (Exhibit 1 at COP_ERI001072; Exhibit 7 at COP_ERI001003-1004).

**DISPUTED.** See ¶ 55

58.     Sergeant Luebkin continued having difficulty moving Michael's right arm behind his back, because of the confined space and also because Michaels arm was slippery, so he placed a handcuff on Michael's wrist and used that to try and pull Michael's arm back behind his back, hoping for some pain compliance – but nothing was affecting Michael, who "was unbelievably strong" and "super strong." (Exhibit 7 at COP_ERI0000104 and COP_ERI00107.)

**DISPUTED WITH OBJECTION AND QUALIFICATION.**  Violates LRCiv 56.1(a). Officer's opinions regarding Mr. Ruiz strength is argument.  Furthermore, officers were unable to place Mr. Ruiz' hands behind his back because Officer Camarillo was in the way. [PSOF See ¶54; Hessner interview at 20:45, attached as Exhibit D; PSOF Camarillo Depo. At 176:09-176:12, attached as Exhibit B; PSOF Segundo video at 4:38, attached as Exhibit G]

59.     Officer Camarillo continued trying to hold Michael down, fearing that Michael would get up and escalate the situation by entering Unit 6, or push him and the officers down the stairs or over the railing, but Michael's movements made it difficult to do so. (Doc. 99-4, Exhibit 13, Camarillo Depo. at 81:19-21; 114:4-12, 140:5-14; Doc. 99-4, Exhibit 17 at COP_ERI001027, COP_ERI001038 and COP_ERI001045-1046.

**DISPUTED WITH OBJECTION AND QUALIFICATION.**  Violates LRCiv 56.1(a). Officer Camarillo's Supervisor's beliefs are immaterial and argument. As set forth in Plaintiffs' response to Officer Camarillo motion for summary judgment, his conduct was objectively unreasonable. [See ¶54]

60.     Sergeant Luebkin also did not want Michael standing up and pushing the

21

officers down the stairwell, which was concrete, so he directed Officer Camarillo to continue holding onto Michael until they could handcuff him. (Exhibit 7 at COP_ERI001004 and COP_ERI001009-1010.)

**OBJECTION.** Violates LRCiv 56.1(a). Officers subjective beliefs are argument positioned as facts by Defendant. The Officer's beliefs are immaterial.

61. Officer Matthews followed Sergeant Luebkin up the stairs. (Exhibit 5 at COP_ERI001092.) and placed his hand on Sergeant Luebkin's back to prevent him from falling backwards. (Exhibit 8 at 4:54-5:00.)

**UNDISPUTED**

62. Officers Camarillo and Linn, and Sergeant Luebkin continued struggling to restrain Michael, who tensed his arms, physically resisted, groaned and yelled, grabbed the railing, pushed off the railing, and even overpowered the officers at one point by standing up and twisting his body (with the officers) around. (Exhibit 8 at 04:53-8:56.)

**DISPUTED WITH QUALIFICATION.** See ¶ 54

63. The officers directed Michael to stop resisting, to put his hands behind his back, and to calm down so they can stop and get him help, but Michael refused and continued to actively resist. (Exhibit 5 at COP_ERI001093-1094.)

**DISPUTED.** After officers told Ruiz to stop fighting he responded with "ok". [PSOF RFA at No. 12, attached as Exhibit F]

64. Sergeant Luebkin feared that the officers would get seriously hurt by falling down the staircase, so he ordered Matthews to deploy his Taser. (Exhibit 7 at COP_ERI001004 and COP_ERI001013.)

**OBJECTION**, violates LRCiv 56.1(a). Sgt. Luebkin's fears are immaterial and argument.

65. Officer Matthews deployed his Taser, which struck Michael in the chest but had no apparent effect on Michael – who simply reached up with his left arm and

pulled the prongs from his chest, easily moving Officer Linn's body with it. (Exhibit 6 at COP_ERI001073-1074; Exhibit 5 at COP_ERI001087 and COP_ERI001093-1094; Exhibit 7 at COP_ERI001004-1005; COP_ERI001013-1014.)

**DISPUTED WITH QUALIFICATION.** Video of the incident shows Mr. Ruiz falling back onto Officer Camarillo immediately after being tased by Officer Matthews. Upon a close review of the video, one can clearly see the two taser wires dangling from Mr. Ruiz' chest. Because of the improperly applied CCT did not render Mr. Ruiz unconscious, he could not breathe, forcing him into a state of fight or flight. After feeling the effects of the tase Mr. Ruiz motions to his chest. [ See ¶54; Segundo video at. 5:13, attached as Exhibit G]

66.    Officer Matthews deployed a second Taser, but it missed. (Exhibit 5 at COP_ERI001087-1088.)

**DISPUTED.** See ¶54

67.    When Officer Schmidt arrived, there was not much room on the stairwell, so he placed his hand on Officer Matthews' back to brace him and prevent him from falling backward. (Exhibit 1 at COP_ERI001111.)

**UNDISPUTED.**

68.    Officer Hessner arrives and assists Officers Schmidt and Matthews to restrain Michael's legs, which Michael kept pushing off and/or in between the railings to prevent the officers from securing his feet. (Exhibit 1 at COP_ERI001111-1112; Exhibit 5 at COP_ERI001094-1095; Exhibit 7 at COP_ERI001005.)

**DISPUTED.** See ¶54

69.    Officer Matthews tried to pull Michael's feet off the railing, because he feared that the officers would fall down or off the stairs, as the railing was unstable and Michael kept pushing off of it and kicking his feet. (COP_ERI001095.)

**DISPUTED WITH OBJECTION**. Violates LRCiv 56.1(a) Matthew's fears are argument positioned as fact. See ¶54

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

70.     Michael braced his leg on the railing and used it as leverage to push back against Officer Camarillo, causing Officer Camarillo to fear that the railing, which was rickety, would not hold up. (Doc. 99-4, Exhibit 13, Camarillo Depo. at 176:13-177:9; Exhibit 1 at COP_ERI001111-1112.)

**OBJECTION**. Violates LRCiv 56.1(a) Camarillo's fears are argument positioned as fact.

71.     At Sergeant Luebkin's direction, Officer Matthews used the Taser in drive-stun mode a couple of times on Michael's thigh, but it had no effect as Michael was kicking his legs and pushing against the railing for leverage, making it difficult for Officer Matthews to hold the Taser on Michael's skin. (Exhibit 5 at COP_ERI001088 and COP_ERI001094-1095; Exhibit 7 at COP_ERI001005 and COP_ER001014.)

**DISPUTED**. See ¶54

72.     During the approximately four-minute struggle, Officer Camarillo had his arm around Michael's neck area, but was just applying downward pressure on Michael's upper body to hold him down. (Doc. 99-4, Exhibit 13, Camarillo Depo. at 96:3-18; at 110:15-111:1-12 & 115:12-15; Doc. 99-4, Exhibit 17 at COP_ERI001027-1028.)

**DISPUTED** See ¶54

73.     Officer Camarillo explained that he was just trying to prevent Michael from standing up and escalating the situation by entering the apartment, or harming himself and the officers. (Doc. 99-4, Exhibit 13, Camarillo Depo. at 124:6-125:6; Doc. 99-4, Exhibit 17 at COP_ERI001027 and COP_ERI001038.)

**OBJECTION WITH QUALIFICATION.** Violates LRCiv 56.1 (a) Officer Camarillo's intentions are immaterial.  As set forth in Plaintiffs' response to Defendants' motion for summary judgement, his conduct was objectively unreasonable.  City of Phoenix and Chief Garcia's Statement of facts mischaracterize the evidence as it pertains to Officer Camarillo's deposition.  (See Exhibit B, Camarillo's Depo, 124:6 – 125:6.)

74.     Officer Camarillo testified that Michael had "an excessive amount of

strength," and was "very sweaty," which made his grip on Michael slide around during the struggle. (Doc. 99-4, Exhibit 13, Camarillo Depo. at 175:19-176:8.)

**OBJECTION.** Violates LRCiv 56.1(a). Camarillo's subjective opinion about Mr. Ruiz' strength is argument and immaterial. As set forth in Plaintiffs' response to Defendants' motion for summary judgement, his conduct was objectively unreasonable.

75. Officer Camarillo also described Michael as exhibiting "superhuman pain tolerance and strength during the struggle." (Doc. 99-4, Exhibit 17 at ¶ 10.)

**OBJECTION.** See ¶74

76. Officer Linn also had difficulty holding onto Michael's arm, because of all the sweat and blood, which made Michael's skin slippery; the staircase was also narrow; and Michael had pinned Officer Linn against the wall. (Exhibit 6 at COP_ERI001072; Doc. 99-4, Exhibit 13, Camarillo Depo. at 66:4-12 & 68:12-22.)

**DISPUTED.** Officer Camarillo was employing the CCT around Mr. Ruiz' neck and leaning back with his upper torso, he had Officer Linn pinned against the wall. See ¶54 and ¶55.

77. Officer Matthews described Michael as being difficult to control, because he had no shirt on and was sweaty. (Exhibit 5 at COP_ERI001093.)

**UNDISPUTED.**

78. When Sergeant Wesley arrived, he saw that Officers Camarillo and Linn and Sergeant Luebkin were unable to restrain Michael, so Sergeant Wesley used a chair to climb up onto the second-floor landing behind Officer Linn. (Doc. 99-4, Exhibit 16 at COP_ERI000981-982.)

**DISPUTED WITH OBJECTION.** Violates LRCiv 56.1(a). Sergeant Wesley's opinions regarding the struggle with Mr. Ruiz is argument. See ¶54.

79. Sergeant Wesley saw Officer Linn struggling to control Michael's left wrist, Sergeant Luebkin struggling to control Michael's right wrist, and Officer

Camarillo appeared to have been struggling to get into a position to apply the carotid control. (Id. at COP_ERI0000982.)

**DISPUTED WITH OBJECTION.** See ¶78

80.     Sergeant Wesley could see that Officer Camarillo was unable to apply the carotid hold technique, because Michael was lying on top of Officer Camarillo, and Officer Camarillo was just trying to hold him down. (Id. at COP_ERI000982.)

**DISPUTED WITH OBJECTION.** Violates LRCiv 56.1(a).    Sergeant Wesley's opinions regarding the application of Camarillo's CCT upon Mr. Ruiz is argument. Moreover, Sergeant Wesley did not state Officer Camarillo was unable to apply the CCT because Mr. Ruiz was laying on top of him.  Sergeant Wesley stated Officer Camarillo was behind Mr. Ruiz trying to apply the CCT with his arm around his neck and Officer Linn is behind Officer Camarillo holding onto his left arm. (See ¶54; Camarillo Exhibit 16, at COP_ERI000982, Ln 18-21; City Exhibit 07 at COP_ERI001003, Ln. 15-19; City Exhibit 6 at COP_ERI001072 Ln. 6-7; City Exhibit 5 at COP_ERI001093 Ln 14.)

81.     Sergeant Wesley helped Officer Linn get Michael's left hand behind his back, and heard Sergeant Luebkin and someone else yelling for Michael to quit fighting, quit resisting, and to put his hands behind his back, but Michael continued "growling" and making "animalistic noises." (Id. at COP_ERI000982.)

**OBJECTION.** Violates LRCiv 56.1(a).  Defendants' "Statement of Fact" relies on inadmissible hearsay.

82.     Sergeant Wesley then tried to help Sergeant Luebkin place Michael's right arm behind his back; but as he did this, he saw an opening and attempted a single knee strike to Michael's side to gain compliance; without much room to maneuver, Sergeant Wesley was unable to pull it back far enough to deliver a solid strike, and it had no effect on Michael. (Id. at COP_ERI000968-970 and COP_ERI000982-983.)

**UNDISPUTED**

83.     As Sergeant Wesley struggled to assist the other officers handcuff

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

1  Michael, Sergeant Wesley's back pushed against the railing, causing Lieutenant Hoover

2  to yell from the ground that a bolt between the landing and the stairwell was coming

3  loose from the railing, because he was afraid it would break and the officers would fall

4  and seriously hurt themselves. (Id. at COP_ERI000984-985.)

5  **OBJECTION.** Violates LRCiv 56.1(a). Defendants' "Statement of Fact" relies on

6  inadmissible hearsay.

7  84. One of the screws attaching the staircase landing to the staircase was

8  missing and another one was rusty and very loose. (Exhibit 4 at COP_000504.)

9  **UNDISPUTED**

10  85. Officer Camarillo did not apply a carotid hold until near the end of the

11  encounter, only after the offers tried unsuccessfully for several minutes to restrain and

12  handcuff Michael, and the attempts to use a Taser on Michael were unsuccessful. (Doc.

13  99-4, Exhibit 13, Camarillo Depo. at 69:6-12; 92:8-20; 103:19-23; 107:20-23; Doc. 99-

14  4, Exhibit 17 at COP_ERI001028-1029; Exhibit 5 at COP_ERI001095-1096.)

15  **DISPUTED.** See ¶54

16  86. Near the end of the struggle, Michael's body appears to relax and, almost

17  simultaneously, the officers were finally able to secure his legs, and Sergeant Luebkin

18  and Officer Linn moves both his wrists into position behind his back to link their two

19  handcuffs together. (Exhibit 5 at COP_ERI001096-1098; Exhibit 7 at COP_ERI001005;

20  Exhibit 6 at COP_ERI001074.)

21  **UNDISPUTED WITH QUALIFICATION** See ¶54

22  87. Officer Camarillo did not know if his attempt to apply the carotid control

23  technique on Michael was ever effective. (Doc. 99-4, Exhibit 17 at COP_ERI001026 and

24  COP_ERI001046-1047; Exhibit 6 at COP_ERI001072.)

25  **UNDISPUTED**

26  88. After Michael was handcuffed, Officer Camarillo was still afraid that

27  Michael was just "playing possum" and would resume a fight if the handcuffs were

28

removed. (Doc. 99-4, Exhibit 13, Camarillo Depo. at 142:25-143:14.)

**OBJECTION.** Violates LRCiv 56.1(a). Officer Camarillo's fears are immaterial and argument.

89.    At the end of the encounter, Sergeant Wesley's hands were still shaking, because he exerted so much effort to handcuff Michael, explaining that everyone was "spent" and "gassed," and that the situation was "exhausting." (Doc. 99-4, Exhibit 16 at COP_ERI000986.)

**OBJECTION.** Violates LRCiv 56.1(a). Officer's subjective feelings are argument. As stated in Plaintiffs' response to Camarillo's Motion for Summary Judgment, Officer Camarillo's conduct was objectively unreasonable.

90.    As Michael was carried down the stairs, Sergeant Wesley saw that Michael's body had gone limp and told one of the paramedics that he believed "this was going to be one of those excited delirium, in-custody death kind of things." (Id. at COP_ERI000983.)

**OBJECTION.** Violates LRCiv 56.1(a). Defendants' "Statement of Fact" relies on inadmissible hearsay and lacks foundation. Moreover, Officer Camarillo did not think Mr. Ruiz suffered from exited delirium during the incident. (PSOF, Camarillo's Depo, 154:19 – 154:25, 155:2 – 155:6, attached as Exhibit B.)

91.    The paramedics recorded Pulseless Electrical Activity ("PEA") and high body temperature. (Exhibit 9, Medical Examiner's Report at COP_ERI000167.)

**UNDISPUTED WITH QUALIFICATION.** During the struggle, Mr. Ruiz was tased at least four (4) times before he died. [Segundo video at 4:41, attached as Exhibit G. ]

### C. All Officers Believed Michael Was Drug Impaired, Dangerous to Himself and Others, and Had Committed Numerous Crimes.

92.    During the entire encounter, Sergeant Luebkin and the other officers gave Michael orders to stop resisting, but Michael did not comply, grunting and making noises for several minutes as he continuously resisted until he was eventually

handcuffed. (Exhibit 5 at COP_ERI001093; Exhibit 7 at COP_ERI001011 and COP_ERI001017.)

**DISPUTED WITH QUALIFICATIONS.** Officer Camarillo did not give Mr. Ruiz any commands until he had already placed his hands around Mr. Ruiz' neck. [Camarillo Depo. At 137:07-09, attached as Exhibit B]

93.     Sergeant Luebkin described Michael as having "crazy strength" and that the incident, which he estimated to have lasted approximately five minutes, felt like "an eternity"-the longest struggle he ever had in his 25-year career as a law enforcement officer. (Exhibit 7 at COP_ERI001010 and COP_ERI001014.)

**DISPUTED WITH OBJECTION.** Violates LRCiv 56.1(a). Defendants' "Statement of Fact" relies on inadmissible hearsay. Furthermore, this paragraph does not contain a statement of fact. Rather, it is Defendants' witness' opinion recast as a fact. Officer's subjective feelings are argument.  As stated in Plaintiffs' response to Camarillo's Motion for Summary Judgment, Officer Camarillo's conduct was objectively unreasonable.

94.     Sergeant Luebkin believed that if there had been fewer officers or smaller officers trying to restrain Michael, the situation would have escalated into a lethal force situation, because Michael had super strength and felt no pain, and nothing that they had tried on Michael worked. (Id. at COP_ERI001015-1016.)

**DISPUTED WITH OBJECTION AND QUALIFICATION**. Violates LRCiv 56.1(a). Defendants' "Statement of Fact" relies on inadmissible hearsay. Furthermore, this paragraph does not contain a statement of fact. Rather, it is Defendants' witness' opinion recast as a fact. Officer's subjective feelings are argument.  As stated in Plaintiffs' response to Camarillo's Motion for Summary Judgment, Officer Camarillo's conduct was objectively unreasonable.

 (See¶ 54, ¶93.)

95.     Sergeant Wesley believed that everything the officers tried on that second floor landing to stop Michael was reasonable given the risks and dangers, and that they

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

1  could not have done anything different, because Michael did not react to pain

2  compliance or the Taser, and nothing else they tried on him was working. (Doc. 99-4,

3  Exhibit 16 at COP_ERI000987-988.)

4  **DISPUTED WITH OBJECTION AND QUALIFICATION.** Violates LRCiv 56.1(a).

5  Defendants' "Statement of Fact" relies on inadmissible hearsay. Furthermore, this

6  paragraph does not contain a statement of fact. Rather, it is Defendants' witness'

7  opinion recast as a fact. Officer's subjective feelings are argument.  As stated in

8  Plaintiffs' response to Camarillo's Motion for Summary Judgment, Officer Camarillo's

9  conduct was objectively unreasonable.  (See ¶93.)

10  96.  Based on Michael's actions before he even made contact on the second-

11  floor landing, Officer Camarillo believed that he had probable cause to arrest Michael

12  for criminal damage given the extent of the damage he observed in Michael's

13  apartment. (Doc. 99-4, Exhibit 17 at COP_ERI001030; Doc. 99-4, Exhibit 13, Camarillo

14  Depo. at 158:16-2-.)

15  **DISPUTED WITH AN OBJECTION.** Violates LRCiv 56.1(a). Officer Camarillo's

16  subjective beliefs and self serving statements are argument and immaterial.  As set

17  forth in Plaintiffs' response to Camarillo's Motion for Summary Judgement, Officer

18  Camarillo's conduct was objectively unreasonable.  Furthermore, when asked if he had

19  any indication or inclination on who could have damaged the apartment he said no.

20  [Camarillo Depo. At 58:3-6, attached as Exhibit B]

21  97.  Officer Camarillo also believed that Michael had committed several other

22  crimes, including criminal damage, trespass, disorderly conduct, aggravated assault on

23  a police officer, and resisting arrest. (Doc. 99-4, Exhibit 17 at COP_ERI001030.)

24  **DISPUTED WITH AN OBJECTION.** Violates LRCiv 56.1(a).  Defendants'

25  "Statement of Fact" relies on inadmissible hearsay. Furthermore, this paragraph does

26  not contain a statement of fact. Rather, it is Defendants' witness' opinion recast as a

27  fact. Officer's subjective feelings are argument.  As stated in Plaintiffs' response to

28

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

Camarillo's Motion for Summary Judgment, Officer Camarillo's conduct was objectively unreasonable. See ¶96

98.     Officer Camarillo additionally believed that Michael's strange behavior demonstrated mental illness, or impairment by drugs or alcohol. (Id. at COP_ERI001030.)

**OBJECTION.** Violates LRCiv 56.1(a). Defendants' "Statement of Fact" relies on inadmissible hearsay. Furthermore, this paragraph does not contain a statement of fact. Rather, it is Defendants' witness' opinion recast as a fact. Officer's subjective feelings are argument.  As stated in Plaintiffs' response to Camarillo's Motion for Summary Judgment, Officer Camarillo's conduct was objectively unreasonable. See ¶ 90 and ¶96

99.     Officer Camarillo believed Michael was a danger to himself and others based on his destructive behavior on the roof, and that Officer Camarillo's life was in danger when he tried to hold Michael down on the second floor landing to prevent Michael from "steamboating" the officers down the stairwell. (Doc. 99-4, Exhibit 13, Camarillo Depo. at 61:6-62:2, 111:5-12, 113:9-15.)

**DISPUTED WITH OBJECTION AND QUALIFICATION.** Violates LRCiv 56.1(a). Defendants' "Statement of Fact" relies on inadmissible hearsay. Furthermore, this paragraph does not contain a statement of fact. Rather, it is Defendants' witness' opinion recast as a fact. Officer's subjective feelings are argument.  As stated in Plaintiffs' response to Camarillo's Motion for Summary Judgment, Officer Camarillo's conduct was objectively unreasonable.  Moreover, Officer Camarillo stated that Mr. Ruiz could have posed a danger to himself or others however, Officer Camarillo never tried to protect any of the civilians around the area watching the incident nor did he attempt to clear the apartment on the second floor prior to Mr. Ruiz sliding off of the roof.  (See Camarillo Depo, 62:8 – 62:25, 63:1 -63:14, ¶96.)

100.     Officer Linn also believed Michael had committed criminal damage. (Exhibit 6 at COP_ERI001070.)

**OBJECTION.** See ¶93

101.   Officer Linn also believed Michael was drug impaired because he exhibited superhuman strength. (Id. at COP_ERI001070 and COP_ERI001074.)

**OBJECTION.** See ¶93

102.   Officer Matthews believed that Michael had committed extensive criminal damage to his apartment, the A/C unit on the roof, and the apartment below it. (Exhibit 5 at COP_ERI001089.)

**OBJECTION.** See ¶93

103.   Officer Matthews believed that Michael was drug-impaired based on his bizarre behavior, aggression, and apparent hallucinations. (Id. at COP_ERI001089-1090.)

**OBJECTION.** See ¶93

104.   Officer Schmidt believed that Michael had committed criminal damage and resisting arrest. (Exhibit 1 at COP_ERI001106.)

**OBJECTION.** See ¶93

105.   Officer Schmidt also believed that Michael was drug-impaired based on the 911 call, what the property manager told them about Michael's drug history, and Michael's erratic, strange, and apparent paranoid behavior on the roof. (Id. at COP_ERI001106-1107 and COP_ERI001110-1111.)

**OBJECTION.** See ¶93

106.   Sergeant Wesley believed from information that Carthen provided, that he had probable cause to arrest Michael for criminal damage to his apartment and to the roof, and after the struggle, for aggravated assault on an officer and resisting arrest. (Doc. 99-4, Exhibit 16 at COP_ERI000971-972.)

**OBJECTION.** See ¶93

107.   Sergeant Luebkin likewise believed Michael had committed aggravated assault on an officer and resisting arrest based on the incident on the landing, and he

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

was aware that the officers had probable cause to arrest Michael for the excessive property damage to his apartment and the damage on the roof before the incident. (Exhibit 7 at COP_ERI000999.)

**OBJECTION.** See ¶93

108.    Sergeant Luebkin also believed that Michael was drug impaired based on Michael's abnormal behavior on the roof, and guessed from his 25 years of experience, that it was probably methamphetamine use. (Id. at COP_ERI001000 and COP_ERI001007.)

**OBJECTION.** See ¶93

109.    Sergeant Luebkin began video-recording the incident, because he knew that Sergeant Wesley was a skilled negotiator and believed that he would be able to successfully talk Michael into the bucket and bring him safely off the roof. (Id. at COP_ERI001008.)

**OBJECTION.** See ¶93

110.    Sergeant Luebkin stopped recording and ran to the stairwell when he saw Michael scoot down the roof toward the second floor landing and prepare to jump down. (Id. at COP_ERI001002-1003.)

**UNDISPUTED**

V.    **VIDEO AND AUDIO RECORDINGS.**

   **A. Witness Jose Segundo Video**

111.    Jose Segundo witnessed the incident and recorded it from an elevated position behind a fence near the roof of the neighboring home. (Exhibit 8 at 04:35-4:59.)

**UNDISPUTED**

112.    In Segundo's video, Michael is seen sitting at the apex on the edge of the roof for approximately 4 ½ minutes as Sergeant Wesley and the other officers continued to talk to him from the bucket. (Id. at 00:01-04:25.)

**BLACKWELL LAW OFFICE, PLLC**
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

**UNDISPUTED**

113.    Michael looks over the edge of the roof and began scooting down toward the second-floor landing by the entrance to Unit 6. (Id. at 04:36-04:40.)

**UNDISPUTED**

114.    Michael dangles his legs off the edge and looks down at the second floor landing and prepared to jump. (Id. at 04:40.)

**UNDISPUTED**

115.    Officer Camarillo was first to reach the landing just as Michael jumps off the roof and lands with his back turned toward the officers in the stairwell. (Id. at 04:41-04:42.)

**UNDISPUTED WITH QUALIFICATION.** Officer Camarillo did not give Mr. Ruiz any orders prior to physically engaging Mr. Ruiz around the neck. He also did not attempt to use any lessor applications of force upon Mr. Ruiz.  Furthermore, Officer Camarillo states that upon landing and prior to his engagement, Mr. Ruiz does not make an attempt to get up.  [Camarillo depo. At 53:8-12, 65:17-22 attached as exhibit B; Segundo video at 4:41 – 4:48, attached as Exhibit G; See ¶ 54.]

116.    From behind Michael's left side, Officer Camarillo reaches his left arm around Michael and places his hand on Michael's right shoulder and neck area; Officer Camarillo then grabs his left hand with his right hand and holds Michael down. (Id. at 04:42-04:43)

**DISPUTED WITH QUALIFICATION.**  From behind Officer Camarillo places his left hand on Mr. Ruiz' head, takes a knee next to Mr.  Ruiz' seated body, places his left arm around Mr. Ruiz' neck, utilizes the CCT by applying force to Mr. Ruiz' neck using his left forearm and bicep and locks the CCT in place around Mr. Ruiz' neck by grasping his left hand with his right. During this timeframe, Mr. Ruiz' arms are raised with his palms facing Officer Camarillo.  (Segundo video at 4:41 – 4:48, attached as Exhibit G; See ¶54.)

34

1    117.   Michael grabs the railing with his right hand, as Officer Linn tries to
2    squeeze behind Officer Camarillo. (Id. at 04:44-04:46)

3    **DISPUTED WITH QUALIFICATION.**   Defendants have mischaracterized the
4    video footage.  Mr. Ruiz does not grab the railing until Officer Camarillo places his right
5    hand on Mr. Ruiz' face and attempts to pull him down the stairs with the CCT fully
6    engaged with his left arm around Mr. Ruiz' neck.   (Segundo video at 4:41 -4:48,
7    attached as Exhibit G; See ¶54.)

8    118.   Officer Camarillo releases his grip and tries to pull Michael's hand off the
9    railing while directing Michael to put his hands behind his back. (Id. at 04:47-04:52)

10    **DISPUTED WITH QUALIFICATION.** Officer Camarillo did not release the
11    application of the CCT around Mr. Ruiz' neck until he stopped breathing.  See ¶54

12    119.   Sergeant Luebkin grabs Michael's right arm to try to pull it back, but
13    Michael overpowers them all and grabs onto the railing again. (Id. at 04:53-5:16.)

14    **DISPUTED WITH QUALIFICATION.** Mr. Ruiz did not over power the officers,
15    Officer Camarillo was blocking a direct path to Mr. Ruiz and there were too many
16    additional officers on the railing for either one of them to properly effect an arrest.  (See
17    Segundo video at 4:52 – 5:26, attached as Exhibit G; ¶54.)

18    120.   Michael pushes back against Officers Camarillo and Linn, and Sergeant
19    Luebkin, and lifts himself off the ground, twists his body around, places his right knee
20    on the ground and plants his left foot, then pushes himself almost to a standing position
21    before slipping onto the top step of the stairwell. (Id. at 05:17-05:27.)

22    **DISPUTED.** See ¶54

23    121.   Officer Matthews deploys his Taser at Michael's legs and stomach area,
24    but it appears to have no effect, and Officer Linn and Sergeant Luebkin continue to
25    struggle with Michael's arms. (Id. at 05:28-06:00)

26    **DISPUTED.** See ¶54

27    122.   At the 05:55 mark of the video, approximately 1 minute and 15 seconds

28

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

into the encounter, Lieutenant Hoover looks up at Michael and asks Officer Camarillo, "Is he breathing?"; Officer Camarillo responds by nodding his head and moving his elbow around to show that his arm is loose around Michael's neck and not choking him, and that Michael could breath. (Id. at 05:53-06:08.)

**DISPUTED WITH QUALIFICATION.** Even if Officer Camarillo was asked "is he breathing?", Officer Camarillo could not see the Mr. Ruiz' face to determine whether or not he was having difficulty breathing due to the incorrect application of the CCT. (See See Segundo video at 5:26 – 6:08, attached as Exhibit G; ¶54.)

123.   Michael places his legs onto the railing again for leverage, and Officer Matthews drive-stuns him with the Taser while two other officers ascend the stairs and grabs his legs; together, they struggle to place Michael's legs in RIPP restraints as Michael continues to kick and move his legs. (Id. at 06:01-08:16)

**DISPUTED WITH QUALIFICATION.** Mr. Ruiz was not placing his leg onto the railing to gain leverage, he was trying to live because Officer Camarillo's application of the CCT was preventing him from being able to breathe. (See Camarillo Depo, 129:17 – 129:23, ¶54.)

124.   Approximately 3 ½ minutes into the physical struggle, Witness Segundo is heard saying, "Damn, that [racial slur] is not giving up!" (Id. at 08:18-08:21)

**DISPUTED AND OBJECTION.** Violates LRCiv 56.1(a).  Defendants' "Statement of Fact" relies on inadmissible hearsay.

125.   Michael continues tensing and moving his legs and body for approximately another 30 seconds. (Id. at 08:21-08:56.)

**DISPUTED WITH QUALIFICATION.**  Mr. Ruiz is starting to succumb to the prolonged lack of oxygen due to Officer Camarillo's improper application of the CCT. For example, prior to this Mr. Ruiz' face turned multiple colors during the time Officer Camarillo employed the CCT which deprived him of oxygen.  Mr. Ruiz was seen going into spasmodic convulsions which the officers improperly alleged were signs of

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

resisting, his body was constantly squirming, his feet kicked up and down, and his arms move about wildly. (See Segundo video at 4:42 – 9:10, attached as Exhibit G; ¶ 54.)

126. At approximately 4 minutes and 15 seconds into the struggle, Michael's legs straight by the RIPP restraint and his limbs appear to relax; he is handcuffed and turned onto to a prone position. (Id. at 08:57-09:11)

**DISPUTED WITH QUALIFICATION.** The time was actually 4 minutes and 28 seconds after Mr. Ruiz landed on the 2nd floor landing when he was handcuffed and turned into a prone position. It is important to note that Officer Camarillo had engaged the CCT for over four (4) minutes. (See Segundo video at 4:42 – 9:10 attached as Exhibit G; ¶ 54.)

**B. Witness Cunningham Video**

127. In a video taken by Cunningham from the ground at approximately 10-30 feet away, Michael is seen moving around the roof with his shirt off and draped over his head; Cunningham comments that Michael "is tripping" (referring to his drug impairment) and told someone to "go call [the police] and tell them this [racial slur] has a ninja mask on and he's going to jump off the roof . . . ." (Exhibit 10, Cunningham Video at 01:17-01:28.)

**OBJECTION.** Violates LRCiv 56.1(a). Cunningham's statements are hearsay. Furthermore, Defendants' opinion regarding the interpretation of Cunningham's statements are argument, immaterial and pure speculation.

128. A police officer approaches, and Cunningham tells him that he lives in the upstairs apartment (Unit 6) and that "water's coming down through [the roof]." (Id. at 01:50-02:10.)

**OBJECTION.** See ¶127

129. The officer shouts up to Michael asking him if he knows how to get down; Cunningham tells the officer, "he's not getting down." (Id. at 02:10-02:25.)

**OBJECTION.** See ¶127.

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

130. The property manager walks over and speaks to the officer, explaining that the owner of the apartment complex wants Michael to come down and prosecuted for trespass and criminal damage to the A/C unit. (Id. at 02:26-53.)

**OBJECTION.** Violates LRCiv 56.1(a). The property manager's statements are double hearsay. Furthermore, the owner has never confirmed this statement.

131. The officer then asks Cunningham to not go back to his apartment, because he did not want the kids out there "just in case this turns ugly"; Cunningham understood immediately and agrees, and takes the children away. (Id. at 02:54-3:28.)

**UNDISPUTED**

132. Cunningham walks back behind the fire truck and continues filming, as he tells another person (presumably Carthen) that water was going through the bedrooms and living room of his apartment and that he was worried the roof is going to cave in with additional weight, that the ceiling already came in and the drywall was ruined, that roof repairs were not done yet, that Michael caused water to flood down the other side of the roof, and that he would probably have to pay "restitution." (Exhibit 11, Cunningham Video 2 at 00:58-01:51.)

**OBJECTION.** Violates LRCiv 56.1(a). Cunningham's statements are hearsay. Furthermore, Cunningham's statements lack the proper foundation to be factual and are argument.

133. Cunningham continues filming the officers being raised to the edge of the roof in the bucket Michael stepping onto bucket platform (but not inside the bucket) Michael pulling away and stepping back, and the Taser immediately being deployed without any apparent effect on Michael, who just pulls the Taser prongs off. (Id. at 02:01; 03:56-04:17 & 04:45-47).

**DISPUTED.** See ¶32

134. Michael then walks away and up the roof, as Cunningham comments with concern, "Don't do it dawg, don't do it Mike. Mike might take a dive, man!" (Id. at 04:48-

04:50.)

**DISPUTED WITH OBJECTION.** violates LRCiv 56.1(a). Defendant's "Statement of Fact" is inadmissible hearsay asserted as fact. See ¶32

135. Michael sits down on the apex of the roof, as Cunningham, Carthen, and other witnesses yell: "Just go to them, man", "Go ahead man!", 'JUST GO THEM, MAN!" gesturing and encouraging Michael to get inside the basket. (Id. at 04:48-05:05.)

**OBJECTION.** See ¶127

136. Michael looks over the edge of the roof, as Officer Camarillo and Sergeant Luebkin stand in the parking lot looking up at Michael. (Id. at 05:20)

**UNDISPUTED.**

137. For more than four minutes, Sergeant Wesley continues negotiating with Michael. (Id. at 04:56-09:15.)

**UNDISPUTED.**

138. Michael peers over the edge and looks at the stairwell, prompting Cunningham, Carthen, and another witness to comment that Michael "is gone if he falls off that building . . . especially right there, ON THEM STAIRS!" (Id. at 09:15-19.)

**OBJECTION.** See ¶127

139. Michael then raises his hands in the air, and Carthen comments that Michael believes he is Superman and is thinking about jumping off the roof. (Id. at 09:20-09:30)

**OBJECTION.** See ¶127

140. Officer Camarillo takes a step toward Sergeant Luebkin to tell him something while pointing to the stairwell; he then walks toward the stairwell as Michael starts scooting down the roof. (Id. at 09:15-9:38.)

**UNDISPUTED.**

141. Michael stops above the landing at Unit 6 and dangles his feet off the edge; Officer Camarillo runs up the stairwell. (Id. at 09:39-9:40.)

**UNDISPUTED.**

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

142. Michael jumps down to the second floor land, but slips and falls on his bottom with his back turned towards Officer Camarillo, who reaches around Michael's left side and grabs Michael's right neck and shoulder area and holds him down. (Id. at 09:41-42.)

**DISPUTED.** See ¶32, ¶54 and ¶116.

143. Officer Linn is right behind Officer Cunningham and rushes to assist; Sergeant Luebkin stops recording and runs toward them. (Id. at 09:42)

**UNDISPUTED**

144. For approximately the next four minutes, Michael is seen physically resisting and moving his arms and legs, and heard grunting and yelling; and the officers are seen trying to restrain his arms and legs, and heard repeatedly telling him to "Put your hands behind his back!" and to "Just relax and we'll stop!" (Id. at 09:43-13:50)

**DISPUTED.** (See ¶54 and ¶125.)

**C. Plaintiffs' Admission There Was No Chokehold**

145. Plaintiff admitted that a "choke hold" and a "carotid hold are two different holds," and that "Officer Camarillo did not apply a chokehold, he applied a carotid hold." (Doc. 94-1, Exhibit 3, Plfs' Supp. Resp. No. 17 to COP Def 2nd RFA at 2.)

**UNDISPUTED WITH QUALIFICATION.** Plaintiff asserts that Officer Camarillo's incorrect application of the Carotid Hold, Carotid Restraint Hold, Carotid Artery Constraint Technique, and/or CCT had the blocked the flow of oxygen for over 4 minutes and had same affect as if Officer Camarillo used an unsanctioned choke hold. (See ¶54; Ruth Downing Report, attached as Exhibit J; Ruth Downing Affidavit at pg 2-3, attached as Exhibit Q.)

**D. Nurse Downing's Opinion That Michael's Injuries Were Consistent With Strangulation from a Four-Minute Long Chokehold**

146. Plaintiff's medical expert is Ruth Downing, a certified nurse practitioner. (Doc. 99-7, Exhibit 22, Downing Expert Report.)

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

**1** **UNDISPUTED. (**See also Ruth Downing's report, attached as Exhibit J; Ruth

**2** Downing's affidavit, attached as Exhibit Q.)

**3** 147. Nurse Downing formed her opinions based on photographs and videos "taken

**4** during the incident February 25, 2012",[1] referring to clips of Brown's and

**5** Cunningham's videos and some photographs from the autopsy and a "USA Forensic

**6** Screen Capture."[2] (Doc. 99-7, Exhibit 22 at 4 & Appendix 1 at 9.)

**7** **DISPUTED WITH OBJECTION,** violates LRCiv 56.1(a). For purposes of a

**8** statement of facts in connection with a motion for summary judgment, it is immaterial

**9** what materials an expert has reviewed. This is an argument. **(**See also Ruth Downing's

**10** report, attached as Exhibit J; Ruth Downing's affidavit, attached as Exhibit Q.)

**11** 148. Nurse Downing opined that Michael's death was consistent with strangulation

**12** from a "chokehold" that Officer Camarillo applied continuously for "4 minutes and

**13** appeared continuous prior to loss of consciousness." (Id. at 7.)

**14** **OBJECTION**, violates LRCiv 56.1(a). This "statement of fact" is an argument and

**15** immaterial. Expert Downing's opinions are set forth in her report, which is attached to

**16** Defendants' statement of facts, and her testimony, which is only selectively reproduced

**17** above. (See also Ruth Downing's affidavit, attached as Exhibit J.)

**18** 149. Nurse Downing cited no medical evidence to support her opinion, but relied

**19** solely on her observation from Brown's and Cunningham's videos that Officer

**20** Camarillo appeared to apply a continuous chokehold for four minutes.) (Id. at 7.)

**21** **DISPUTED WITH OBJECTION**, violates LRCiv 56.1(a). It is immaterial what

**22** opinions an expert has not offered. **(**See also Ruth Downing's report, attached as

**23** Exhibit J; Ruth Downing's affidavit, attached as Exhibit Q.)

**24** 150. Nurse Downing did not give any opinion to a reasonable degree of medical

**25**

**26** [1] This incident occurred on July 28, 2013. (*See supra* ¶ 1)
[2] Defendant City objects to the admissibility of the USA Forensic Screen Capture photographs, because Plaintiffs have not laid
**27** proper foundation. Plaintiffs have not disclosed any witness who could authenticate them, *see* Fed.R.Evid. 901, or any testimony
regarding how these screen captures were created and whether they were calibrated correctly to the original. *See* Fed.R.Evid. 1001
**28** and 1002.

certainty that the alleged "chokehold" actually caused Michael's death, but rather that it "*could* potentially result" in anoxic brain injury and "most likely" caused the thyroid fracture, hemorrhage and blood vessel ruptures in the eye described in the medical report. 9Id. at 7-8).

**DISPUTED WITH OBJECTION**, violates LRCiv 56.1(a). It is immaterial what opinions an expert has or has not offered.  (See also Ruth Downing's report, attached as Exhibit J; Ruth Downing's affidavit, attached as Exhibit Q.)

151. Nurse Downing gave no opinion regarding the use of a Taser or carotid hold maneuver alleged in this case. (Id. at 1-8.)

**DISPUTED WITH OBJECTION.** (See ¶150; See also Ruth Downing's report, attached as Exhibit J; Ruth Downing's affidavit, attached as Exhibit Q.)

152. Nurse Downing is not, in any event, a police procedures expert, police officer, and does not have the requisite experience to render such opinions. (Id. at 10-11.)

**OBJECTION**, violates LRCiv 56.1(a). This "statement of fact" is an argument. Expert Downing's opinions are set forth in her report which is attached to Defendants' statement of facts, and her testimony, which is only selectively reproduced above. Furthermore, this is an argument attempting to impeach Expert Downing's credibility. Such determinations are clearly matters for a jury to determine.

### E.  Dr. Vilke's Medical Opinions That Michael Dies from Excited Delirium Caused by Methamphetamine Intoxication

153. The City's medical expert, Dr. Gary Vilke, is an emergency department physician and independent researcher regarding the effects of TASER use on human physiology, excited delirium syndrome, and in-custody cardiac arrests and death. (Doc. 99-7, Exhibit 20, Vilke Report at COP_ERI004262.)

**UNDISPUTED**

154. Dr. Vilke is also a published medical expert in the field of neck holds. (Id. at COP_ERI004262)

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

**UNDISPUTED**

155. Dr. Vilke opined that the Taser use did not contribute to Michael's death.[3] (Id. at COP_ERI004269.)

**OBJECTION**, violates LRCiv 56.1(a). This paragraph does not contain a statement of fact. Rather, it is Defendants' expert opinion recast as a fact. As set forth in Plaintiffs' Response to Officers Camarillo's Motions for Summary Judgment, Officer Camarillo's use of force against Mr. Ruiz was objectively unreasonable.

156. Dr. Vilke explained that the carotid hold technique is ***not*** a chokehold, but a safe technique without significant or long-term effects when properly applied, and that research shows use of a carotid hold cannot result in notable brain damage, cardiac arrest, or sudden death, even when applied for 100 seconds. (Id. at COP_ER0004272-73.)

**OBJECTION,** See ¶155

157. Dr. Vilke opined that the minor soft tissue injuries Michael sustained to the neck and right sternum muscles were not the result of a carotid hold, but ordinary results of a pressure hold to the neck during movement and a struggle; and although there was a fracture of the thyroid cartilage with local bleeding, it was a fragile piece of cartilage that is easily damaged and does not imply significant force was used or trauma. (Id. at COP_ERI004273).

**OBJECTION,** See ¶155

158. Dr. Vilke concluded, the carotid constraint did not contribute to Michael's death, and opined that Michael died of Excited Delirium Syndrome ("ExDS') caused by stimulant drugs, such as methamphetamine. (Id. at COP_ERI004274.)

**DISPUTED WITH AN OBJECTION.** Defendant's expert witness Dr. Vilke did not state that EXDS caused Michael's death his opinion says it was the probable cause of Mr. Ruiz' cardiac arrest.  See ¶155; City Defendant's SOF, Exhibit 20, page 15, Vilke

---

[3] Plaintiff's medical expert Nurse Downing has offered any opinion or testimony that Michael's death was caused by the Tasers. Nor has Palintiff offered any other evidence to rebutt Dr. Vilke's opinion that the use of Tasers did not cause Michael's death.

Report at COP_ERI004262

159. Dr. Vilke explained that ExDS is characterized as follows:

> Classically, people suffering from ExDS are delusional often hallucinating or paranoid, are hyperactive, may be violent despite threats or overwhelming force, fight inappropriately, may be inappropriately dressed for the conditions or take off their clothes or do actions to cool themselves down, may be sweaty, have elevated body temperatures, and are often breathing fast. They are also often destructive and described as having superhuman strength. Some have reported an attraction to glass or mirrors. The subjects who tend to suffer sudden death are commonly noted to have elevated body temperatures.

(Id. at COP_ERI004274.)

**OBJECTION,** See ¶155

160. Dr. Vilke explained ExDS has a mortality rate of 75% and is a significant cause of sudden death syndrome by cardiac arrest. (Id. at COP_ERI004274-75.)

**OBJECTION,** See ¶155

161. Dr. Vilke opined that Michael died of ExDS based on the symptoms Michael exhibited in the videos and based on witness reports, and on the medical evidence:

> Mr. Ruiz demonstrated many of the signs of ExDS. He was agitated, not following commands and kept on fighting despite being held. He was also described as having significant "superhuman" strength requiring multiple officers to get him restrined. He was not wearing a shirt and was noted to be very sweaty. He also kept on trying to fight and kick and resisting despite multiple uses of the TASER ECD, demonstrating tolerance to pain.
>
> The body temperature of Mr. Ruiz in the emergency department was 101.0 degrees within an hour after the altercation. Patients who go into cardiac arrest and undergo resuscitation tend to have temperatures that are low because of the lack of blood flow and the exposure of CPR. In this case, Mr. Ruiz had an elevated temperature despute the cardiac arrest with CPR and the exposure. His core body temperature was more likely than not even higher initially. This is also

consistent with ExDS. Not all people suffering from ExDS go into cardiac arrest and die, but when they do, they commonly have an elevated body temperature. Finally, the initial cardiac rhythm of PEA is also classic for ExDS. Overall, this clinical presentation by Mr. Ruiz is consistent with ExDS.

Finally, to conclude that a person was actually suffering from ExDS and make the diagnosis, there needs to be inciting etiology a cause. The two main recognized etiologies are active drug use of a stimulant drug, like cocaine, or an untreated or under treated psychiatric disorder, Mr. Ruiz had methamphetamine noted in his drug screen. Mr. Ruiz was demonstrating the classic presentation of ExDS caused by his methamphetamine use, and this drug-induced ExDS is the probable cause of his sudden cardiac arrest.

(Id. at COP_ERI004275-76; *see also* at 10, COP_ERI004271 regarding Pulseless Electrical Activity recorded by paramedics).

**OBJECTION,** See ¶155

162. Dr, Vilke also rebutted Nurse Downing's opinion that Michael's death was consistent with a four-minute long chokehold, explaining that the opinion is completely contradicted by the video recordings that showed Michael was awake and blood was getting to his brain, because he was yelling and growling; and that his airways were not obstructed, because paramedics were able to insert an endotracheal tube easily, and the laryngoscopy, CT scan, and autopsy revealed no evidence of an obstructed airway. (Id. at COP_ERI004276-77.)

**OBJECTION,** See ¶155

**F. Dr. Beckson's Unrebutted Medical Opinions that Was Suffering From Methamphetamine Intoxication**

163. Dr. Mace Beckson is a Board certified physician in Psychiatry, Forensic Psychiatry, and Addiction Medicine. (Doc. 99-3, Exhibit 12, Beckson Report at

45

COP_ERI004437.)

**UNDISPUTED**

164. Dr. Beckson has practiced in drug abuse treatment, postmortem toxicology of drugs and drug abuse, and conducted independent scientific research with peer reviewed publications in the field. (Id.)

**UNDISPUTED.**

165. Based on evidence from the videos, witness reports, and the medical evidence, Dr. Beckson opined that Michael was under the influence of methamphetamine, which he had likely binge-used for several months before his death, and that he was likely suffering a psychotic disorder from methamphetamine use when he damaged his apartment, destroyed the A/C unit on the roof, and interacted with the officers. (Id. at COP_ERI004496-502.)

**DISPUTED AND OBJECTION.** See ¶155

166. Further, Dr. Beckson opined that toxicology tests at the hospital showed the presence of Citalopram, an antidepressant medication, and Valproic acid, a mood stabilizer, demonstrating that Michael had suffered from a mental disorder that aggravated the effects of methamphetamine on his brain and made him a danger to himself and others. (Id. at COP_ERI004503.)

**DISPUTED WITH AN OBJECTION AND WITH QUALIFICATION,** violates LRCiv 56.1(a). This is an argument and mischaracterizes the admissible evidence in this case. Due to this Court's Order as to Plaintiff's Motion In Limine to Preclude all witnesses and evidence disclosed for the first time in Defendant's 8th Supplemental Disclosure Statement, Mr. Ruiz' toxicology report is no longer admissible as evidence as to the presence of controlled substances in blood because any witness that could have laid the proper foundation to the existence of a controlled substance in any toxicology report has been precluded. Dr. E. Smith Collum was named for the first time in Defendant's 8th Supplemental Disclosure Statement. Dr. Collum was expected to lay

foundation for Mr. Ruiz's toxicology screen taken on July 28, 2013, at St. Joseph's Hospital. Because the Court has precluded Dr. Collum as a witness for this case, any evidence related to Mr. Ruiz' toxicology screen has been precluded as well. Moreover, Dr. Kimberlie A. Grame was named for the first time in Defendant's 8th Supplemental Disclosure Statement. Dr. Grame was expected to lay foundation for and testify consistent with her medical records regarding her evaluation of Mr. Ruiz on October 8, 2011 for bath salt toxicity, toxicology reports indicating that Mr. Ruiz had bath salts in his system, and his appearance, behavior as well as her evaluation of him on October 8, 2011. Because the Court has precluded Dr. Grame as a witness for this case, any evidence related to Dr. Grame's expected testimony has been precluded as well. See ¶155; See Court's March 17, 2016, Order.

## VI.    PHOENIX POLICE DEPARTMENTS USE OF FORCE POLICY

167. The Phoenix Police Department's Use of Force guidelines is reflected in Operations Order 1.5 (Exhibit 12, Operations Order at COP_ERI000288-310.)

**UNDISPUTED.**

168. Generally, Operations Order 1.5(3)(B) provides that the Department's policy is to "use a reasonable amount of force to conduct lawful public safety activities" and that the proper use of a particular level of force depends on totality of circumstances, taking into consideration: (1) the severity of the crime; (2) whether the suspect poses an immediate threat to the safety of officers or others; and (3) whether the suspect is actively resisting or attempting to evade arrest by flight." (Id. at 2.)

**UNDISPUTED.**

169. In conjunction with those factors, the policy provides that officers "need" to consider whether the suspect has the ability and opportunity to carry out the act and, if so, whether the suspect created jeopardy to the officer or others. (Id. at 2.)

**UNDISPUTED.**

170. The policy defines "reasonable belief," "excessive force," "types of resistance,"

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

and gives force "options," which are to be determined based upon the "totality of the circumstances." (Id. at 1.)

**UNDISPUTED WITH QUALIFICATION.** Operations Order 1.5(2) defines defensive resistance as physical actions that attempt to prevent an officer's control, but does not involve attempts to harm the officer. However, the Operations Order defines "active aggression" as physical actions of assault. In this case, there was no evidence that Mr. Ruiz' displayed and/or used active aggression when he encountered the police on the second floor landing. (See PSOF Operations Order 1.5(2), page 1, attached as Exhibit H; ¶54.)

171. Under the definitions for "Use of Force Restrictions," Operations Order 1.5(2) provides that "Tasers [and] carotid control techniques" may not be used on a person who is handcuffed or restrained "unless such force is reasonable based on the totality of circumstances." (Id. at 2).

**UNDISPUTED WITH QUALIFICATION.** The operations order states in pertinent part that "Employees will not strike persons who are restrained by [the] hand, foot, or leg. Mr. Ruiz was struck while he was restrained by a number of Officers to include Officer Camarillo in a setting of knee strikes, closed fist strikes, Taser deployments, and Officer Camarillo's use of the CCT. Here, none of the officers stated that Mr. Ruiz utilized active aggression. Moreover, based on the video, Mr. Ruiz utilized passive resistance and/or defensive resistance. (See PSOF Operations Order 1.5(2), page 2, attached as Exhibit H; ¶54)

172. Operations Order 1.5(4) provides the levels of force that may be used depending on the totality of those circumstances, including Taser (Id. at 5-9) and the Carotid Control Technique (Id. at 11-12.)

**UNDISPUTED WITH QUALIFICATION.** The operations order states that the Taser and Carotid Artery Technique should not be used at the same time on a suspect that is restrained. Operations Order 1.5(5)(E) says in pertinent part that the Taser

should be used when it is objectively reasonable on subjects who are displaying active aggression but not on subjects who would be in danger of falling from a significant height, hanging onto a railing or prodding. The Operations orders do not provide guidance as it pertains to the effect of Tasers on a restrained person who is being struck by Officers and simultaneously subdued by the use of the CCT.

Operations Order 1.5(G) states that the Carotid Control Technique should not be used on persons who are demonstrating passive resistance. Employees will not use the technique more than once on the same suspect because of the possibility of progressive physical injury. (See PSOF Operations Order 1.5(G), attached as Exhibit H; ¶54.)

173. The Carotid hold technique guidelines are clear and comprehensive regarding, providing as follows:

Carotid Control Technique Guidelines

• The carotid control technique is designed to reduce the flow of oxygenated blood to the brain.

• If oxygenated blood flow to the brain is cut off for four to six minutes, irreparable brain damage may occur.

When to Use the Carotid Control Technique

• The carotid control technique should only be used on subjects who are using active aggression, aggravated active aggression, or who are a threat to themselves or others.

Improper Applications of the Carotid Control Technique

        • This technique will not be used to render a suspect unconscious for the following situations:

            * Administrative reasons, such as obtaining fingerprints or photographs.

            * If a suspect demonstrates passive resistance, such as refusing to enter a police vehicle or holding room.

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

Post-Use Care

If a suspect is rendered unconscious as a result of the application of this technique, officers will comply with the following:

* Immediately handcuff the suspect.

* Roll the suspect onto their side and check for vital signs. Recovery time will vary, but usually takes 20 to 30 seconds.

* Paramedics will be summoned to the scene immediately in all cases.

* If cardiopulmonary resuscitation (CPR) is necessary, officers will remove the handcuffs immediately.

Notifications

• A supervisor will be notified immediately that the carotid control technique was applied and respond to the scene.

• Employees will advise receiving officers (including detention personnel who may assume custody of the suspect) the suspect was rendered unconscious by the use of the carotid control technique.

• The use of the carotid control technique will also be reported on relevant PACE reports, booking slips, referrals etc.

Restrictions

• Employees will not use the technique more than once on the same suspect because of the possibility of progressive physical injury.

• The suspect will remain handcuffed or restrained, as necessary, to avoid subsequent applications of the carotid control technique.

• Officers will not restrain suspects who have had the carotid control technique applied with their legs behind their back (hog-tying).

(Id. at 11-12.)

**UNDISPUTED WITH QUALIFICATION.** The operations order for the carotid

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

control technique does not provide the user with a restriction as it pertains to how long the technique should not be applied.  In this case, the operations order states that the average person should be rendered unconscious within 5 to 15 seconds.  Saying that in 4 to 6 minutes "inoperable brain damage could occur" does not instruct the user of this technique that they should not utilize the technique for more than 15 seconds, 30 seconds, 60 seconds, 90 seconds, 180 seconds, or more.  In both Officer Camarillo's specific training plan for the Carotid Control Technique and the Operations orders, he was not instructed on the restrictions on the duration of the application of the technique. The Operations Order 1.5(G) and Section III of the Carotid Control Technique specific training plan does not inform Officer Camarillo that he should not utilize this technique in the setting of an individual who is restrained or contemporaneously while the suspect is being Tased, or while the suspect is being struck with blunt force blows by open fists or knew strikes.  Moreover, neither training plan informs Officer Camarillo that the CCT can be utilized on a person who is already in a seated position who is passively and/or defensively aggressive. (See PSOF Operations Order 1.5(G), attached as Exhibit H; ¶54; City DSOF Police Lesson Plan, Exhibit 18.)

174. Operations Order 1.5(4)(E) expressly prohibits Taser use in drive-stun mode in the head, neck, and groin area. (Id. at 7.)

**UNDISPUTED WITH QUALIFICATION.**   Although the Operations Order prohibits Taser use in drive-stun mode in the head, neck, and groin area, an Officer did use his Taser in drive-stun mode on or near Mr.  Ruiz' groin at the same time Officer Camarillo was utilizing the CCT. See ¶54

175. If deadly force is used, Operations Order 1.5(4)(H) instructs that "when the circumstances justifying the use of deadly force no longer exist, deadly force will immediately be discontinued." (Id. at 12.)

**UNDISPUTED.**

51

176. Operations Order 1.5(5) requires all employees to "receive annual training on the use of force options by Department authorized instructors, who are certified through Arizona Peace Officers Standards and Training Board (AzPOST)." (Id. at 13.)

**UNDISPUTED.**

177. Regarding training in the use of the carotid control technique in particular, Operations Order 1.5(5) provides:

E. Carotid Control Technique

• In order to use the carotid control technique an employee must satisfactorily complete the basic training course for carotid control.

• Employees will only use the carotid control technique taught by Department defensive tactics instructors.

• Employees must pass a proficiency test administered by a Department certified defensive tactics instructor.

• Employees must pass a proficiency test administered by a Department certified defensive instructor.

• Officers will receive this training while attending post academy.

• Employees not previously trained in the basic carotid control technique must receive carotid control technique training and will demonstrate proficiency prior to utilizing it.

• Employees who are authorized to use the carotid control technique will demonstrate proficiency in its use annually.

• No other type of neck restraint/hold is authorized.

(Id. at 14.)

**UNDISPUTED.**

178. Operations Order 1.5(6) further outlines the reporting requirements for every use of force and subjects it to review by the Use of Force Review Board. (Id. at 15-16.)

**UNDISPUTED.**

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

179. The City of Phoenix Use of Force Review Board independently reviewed the officers' use of force in this incident and determined that the force used by all the officers was appropriate.

**UNDISPUTED.**

180. Greg Meyer, Defendants' police practices and policy expert, is a former Los Angeles Police Department captain and current member of its Tactics Training Review Committee. (Doc. 99-5, Exhibit 19 at COP_ERI004013.)

**UNDISPUTED.**

181. Meyer has drafted and tested use-of-force tactical training plans, and conducted research on the subject matter, including an internationally recognized study regarding the use of Taser as opposed to other hands-on tactics. (Id. at COP_ERI004031.)

**UNDISPUTED.**

182. Meyer opined that the tactics used by the officers were sound and appropriate, and Officer Camarillo's efforts to overcome Michael's resistance and arrest him were reasonable actions that any officer on the scene would have taken under the circumstances showing: (1) Michael had jumped off the roof to try to evade arrest; (2) Michael was physically resisting the other officers' attempts to handcuff him and trying to get on his feet; (3) the uncertain risks of him barricading himself inside Apartment 6, harming any occupants, or retrieving a weapon; (4) his being sweaty and slippery to grasp; (5) his altered mental state and violent demonstration of "superhuman strength" typical of stimulant drug use; and (6) the dangers to the officers from falling down the narrow staircase. (Id. at COP_ERI004029-30.)

**OBJECTION,** violates LRCiv 56.1(a). This paragraph does not contain a statement of fact. Rather, it is Defendants' expert opinion recast as a fact. As set forth in Plaintiffs' Response to Camarillo's Motions for Summary Judgment, Officer Camarillo's use of force against Mr. Ruiz was objectively unreasonable.

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

183. Meyer additionally reviewed the City's use of force policy and its guidelines regarding use of the carotid hold technique, and opined that they meet or exceed nationally publishes standards/practices:

> PPD Use of Force policies (which I have reviewed on other occasions) meet or exceed nationally published standards/practices. I have reviewed use of force (UOF) policies and training programs from agencies all over the country. The PPD policy is well articulated and comprehensive, with definitions and response options clearly stated. It is based upon the law of the land as espoused by the landmark United States Supreme Court case, which established *objective reasonableness* as the criteria for evaluating police use of force. In particular with respect to the use of the Carotid Control Technique (CCT), the PPD policy and lesson plan are clear and comprehensive. The lesson plan specifically denotes time parameters for the application of the CCT. The lesson plan specifically denotes time parameters for the application of the CCT. It is clear that Officer Camarillo operated within these trained parameters.

(Id. at COPERI004031.)

**OBJECTION,** See ¶150, ¶171, ¶172, ¶173, ¶182.

184. Meyer noted that Plaintiffs have not presented any evidence to the contrary regarding the alleged *Monell* violations. (Id. at COP_ERI004031.)

**OBJECTION,** See ¶150, ¶171, ¶172, ¶173, ¶182

185. Regarding the use of Tasers, Meyer opined: "There is a plethora of documentation in the form of court decisions and research studies that show that TASER produces fewer and less severe injuries to subjects and officers, compared to conventional tools and tactics, especially when dealing with a determined, resisting subject as was the case in this incident." (Id. at COP_ERI004031.)

**DISPUTED WITH AN OBJECTION,** Defense expert Myers did not opine as to the additive effect of Taser and/or drive-stun deployment in the setting of a fully

engaged CCT around the neck of a person who was being restrained and pummeled. (See ¶54, ¶150, ¶171, ¶172, ¶173, ¶182¶182.)

## VII. THE POLICE OFFICER'S USE OF FORCE TRAINING HISTORY AND AZ POST CERTIFICATION

186. In addition to the Academy Training requirements, the Phoenix Police Department has a two-hour training lesson in Carotid Control Technique, which instructs the officers on how to: (1) "identify when the carotid control technique may be utilized"; (2) "demonstrate the proper application of the carotid control technique"; and (3) "properly demonstrate the escapes from the carotid control technique." (Doc. 99-4, Exhibit 18, Carotid Lesson Plan at COP_ERI001402.)

**DISPUTED WITH QUALIFICATION.** Officer Camarillo stated during his deposition that he had just completed CCT recertification training and he did not remember if he was told (1) how long to apply the CCT on a suspect, (2) how long it takes for the average person to become unconscious, (3) whether the technique should be used on a person that is sitting when approached by an officer, and (4) if he could use the CCT on a person that was being tased contemporaneously with being struck by blunt force blows to the body. See Camarillo Depo, 27:23 – 27:25, 28:1 – 28:14, 30:24 – 30:25, 31:1 – 31:16, 34:15 – 34:25, 35:01 – 35:25, 36:01 – 36:01, attached as exhibit B.

187. This Carotid Control Technique Lesson Plan was based on the AZPOST Defensive Tactics Instructors lesson plan and outline and Phoenix Police Department Operations Orders 1.5 governing Use of Force. (Id. at COP_ERI001402.)

**DISPUTED.** Based on Officer Camarillo's answers during the deposition, it is

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

difficult to substantiate the statements in ¶187. See Camarillo Depo, 27:23 – 27:25, 28:1 – 28:14, 30:24 – 30:25, 31:1 – 31:16, 32:02 – 32:13, attached as exhibit B

188. The Carotid Control Technique Lesson Plan further instructs, "It is the policy of the department to use a reasonable amount of force to conduct public safety activities" and explains the types of resistance and levels of force that may be used depending on "the totality of the circumstances." (Id. at COP_ERI001404-06.)

**UNDISPUTED WITH QUALIFICATION.** In his deposition, Officer Camarillo testified that Officers are allowed to deviate from policy stating, "policy is one thing on paper, but you might need to do something different on the streets". Also when asked if an officer did not follow the CCT training would that be a violation of policy, Officer Camarillo stated "no". [ Camarillo Depo. At 43:15-25, Attached as Exhibit B].

189. The Carotid Control Technique Lesson Plan explains "the carotid control technique be used on subjects who are using active aggression, aggravated active aggression or are a threat to themselves." (Id. at COP_ERI001405).

**UNDISPUTED WITH QUALIFICATION.** See ¶188.

190. The Carotid Control Technique Lesson Plan explains what the carotid hold technique is and expressly states that it is not a type of chokehold, which are not permitted.

> The carotid control technique is designed to reduce
> oxygenated blood flow to the BRAIN; it is NOT A CHOKE
> HOLD. A choke hold is any hold that restricts airflow through
> the throat. The use of the carotid control technique is
> governed by departmental orders, and is the only neck
> restraint hold to be used. The "choke" type holds are restricted
> to deadly force type incidents. Unauthorized holds include;
>  arm bar choke, bar choke, front choke, or any hold that does
> not follow the guidelines included in the carotid control

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

> technique. The application of a carotid control technique should be restricted to those situations where violent resistance is encountered or where death or serious bodily harm will result to the officer.

(Id. at COP_ERI001407.)

**UNDISPUTED WITH QUALIFICATION.** See ¶188; Camarillo Depo, 22:15-22:23, attached as Exhibit B.

191. The Carotid Control Technique Lesson Plan further explains how the carotid technique works medically, explaining that it causes fainting by diminishing the flow of blood to the brain. (Id. at COP_ERI001408.)

**UNDISPUTED WITH QUALIFICATION.** See ¶188.

192. The Carotid Control Technique Lesson Plan instructs that, "[s]igns of unconsciousness may occur in as little as three to four seconds after application", and the carotid hold technique "takes five (5) to fifteen (15) seconds to render the average person unconscious if properly applied." (Id. at COP_ERI001408.)

**UNDISPUTED WITH QUALIFICATION.** See ¶188.

193. The Carotid Control Technique Lesson Plan further explains that incorrect application of the carotid hold technique could result in injury to the trachea or larynx, breathing impairment and/or possible neck fracture, and/or cervical strain or soft tissue injury; and excessive application could result in a potential stroke. (Id. at COP_ERI001408.)

**UNDISPUTED WITH QUALIFICATION.** See ¶188.

194. The Carotid Control Technique Lesson Plan additionally instructs on the proper method of applying the carotid hold technique, explaining among other things,

to "[h]andcuff and check for pulse and breathing (ABC's). Lift the subject into a seated upright position or lay them on their side to avoid any breathing difficulties. (Id. at COP_ERI001410.)

**UNDISPUTED WITH QUALIFICATION.** See ¶188.

195. Officer Camarillo's Academy and Post-Academy training records show that he successfully completed all AZPOST certification requirements, including specific training in the carotid control technique training on June 26, 1015, June 12, 2011; he also completed additional training in use of force on June 25, 2010, June 12, 2011, July 28, 2012. (Exhibit 13, Camarillo Training History at COP_ERI001365-70).

**UNDISPUTED WITH QUALIFICATION.** See ¶188.

196. In addition, Officer Camarillo testified that he was trained at the Academy in 2007 regarding proper use of the carotid control technique, (Doc. 99-4, Exhibit 13, Camarillo Depo. at 14:23-15:8; 18:19-23) and again as recently as January 2016. (Doc. 99-4, Exhibit 13, Camarillo Depo. at 17:20-18:4.)

**UNDISPUTED WITH QUALIFICATION.** See ¶188.

197. Officer Camarillo explained that officers are not taught to use chokeholds and are expressly prohibited from using such holds. (Doc. 99-4, Exhibit 13, Camarillo Depo. at 23:16-24:4.)

**UNDISPUTED WITH QUALIFICATION.** See ¶188.

198. According to their Academy and Post-Academy Training records, Lieutenant Hoover, Sergeants Wesley and Luebkin, and Officers Schmidt, Matthews, Linn and Hessner also completed all training requirements for AZPOST certification. (Exhibit 14, Officer Training Histories at COP_ERI001342-64; COP_ERI001371-01.)

**UNDISPUTED WITH QUALIFICATION.** Lieutenant Hoover, Sergeants Wesley and Luebkin, and Officers Schmidt, Matthews, Linn and Hessner's actions in this case substantiate Plaintiffs' claim that City of Phoenix Defendants as well as Defendant Chief Garcia are liable for Plaintiffs' damages pursuant to Monell. In this case, all of the officers at the scene saw that Officer Camarillo was applying the CCT around Mr. Ruiz' neck. All of the officers were involved in either restraining Mr. Ruiz, delivering blunt force strikes to Mr. Ruiz' body, or deploying a Taser to his upper and lower torso. All of this was done simultaneously with Mr. Ruiz' arms and legs being restrained and while Officer Camarillo was applying the CCT around his neck. The Professional Standards Bureau ruled that none of the officers violated any of the operational orders, even though the operational orders as well as officers specific training proscribes the contemporaneous striking, tasing and applying the CCT to a restrained person, neither PSB or the Chief came to a determination that the use of force in this case was unreasonable in light of the totality of circumstance. (See Professional Standards Board Ruling, attached as Exhibit S; ¶54, ¶188.)

**RESPECTFULLY SUBMITTED** this 4th day of April, 2016.

BLACKWELL LAW OFFICE, PLLC


By: */s/Jocquese L. Blackwell SBN 023588*
JOCQUESE L. BLACKWELL
GILLMORE B. BERNARD
420 W. Roosevelt St., Suite 106
Phoenix, AZ  85003
Attorney for Plaintiff

BLACKWELL LAW OFFICE, PLLC
420 W. Roosevelt St., Suite 106
PHOENIX, AZ 85003

**CERTIFICATE OF SERVICE**

I hereby certify that on May 4, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to the following CM/ECF registrants:

Gillmore B. Bernard          Gill@azjustice.com

Kathleen L. Wieneke:          kwieneke@swlfirm.com

Christina Retts          cretts@swlfirm.com

John T. Masterson          jmasterson@jshfirm.com

I hereby certify that on this same date, I served the attached document by U.S. Mail, postage prepaid, on the following, who is not a registered participant of the CM/ECF System:

N/A

/s/    *Jocquese L. Blackwell* SBN 023588