**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Yolanda Ericson, et al., | No. CV-14-01942-PHX-JAT |
| Plaintiffs, | **ORDER** |
| v. | |
| City of Phoenix, et al., | |
| Defendants. | |

Before the Court are Defendants City of Phoenix and Daniel Garcia's ("City Defendants'") Joint *Daubert* Motion to Exclude Plaintiffs' Expert Witness Nurse Practitioner Ruth Downing ("Motion to Exclude"), (Doc. 94), Defendant Officer Camarillo's Motion for Summary Judgment, (Doc. 98), and City Defendants' Motion for Summary Judgment, (Doc. 101). The Court now rules on the motions.

## I.    FACTUAL BACKGROUND[1]

---

[1] The Local Rules of Civil Procedure for the District of Arizona ("Local Rules") require a party opposing a summary judgment motion to file a controverting statement of facts either agreeing with or disputing each of the moving party's statements of fact. LRCiv. 56.1(b). If a non-movant disputes a statement of fact, the non-movant must point to admissible evidence showing that a genuine dispute exists. *Id.* If a non-movant does not properly address a statement of fact, the Court may consider that fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). Here, Plaintiffs failed to file a controverting statement of facts for either of Defendants' Motions for Summary Judgment. Instead, Plaintiffs responded to Defendants' factual assertions with long-winded (at times, over four pages in length for one response) narrations of facts rather than clearly stating a dispute with Defendants' factual assertion. (*See, e.g.*, Doc. 119 at ¶ 37). The Court has attempted to interpret when Plaintiffs have raised a genuine factual dispute and will cite to Plaintiffs' Response Re: Defendants City of Phoenix and Daniel Garcia's Statement of Facts is [*sic*] Support of Their Motion for Summary Judgment, ("PRCP") (Doc. 117), and Plaintiffs' Response to Officer Camarillo's

On the morning of July 28, 2013, an individual called Phoenix Police Department ("PPD") Dispatch to report a shirtless man damaging an A/C unit located on the roof of his apartment, causing water to leak through his ceiling. (PROC at ¶ 6; PRCP at ¶¶ 1, 5; City Ex. 2, 911 Call Audio Recording at 00:08–00:41, 2:10–2:15). Consistent with the 911-call, PPD dispatched officers, including Officer Abraham Camarillo, to the apartment complex regarding a shirtless man on the rooftop attempting to "mess with" an A/C unit. (City Ex. 3, Dispatch Audio Recording at 00:02–27; PROC at ¶ 7). Upon arrival, PPD officers noticed that Miguel[2] Ruiz ("Decedent") was on the apartment complex's roof. (PRCP at ¶¶ 9, 12). Officer Camarillo was then informed, either by the apartment property manager or another officer, that the property manager wanted to press charges against Decedent for criminal trespass and criminal damage. (Doc. 99-4 at 159–60; PRCP at ¶¶ 6, 8).

After the property manager directed Officer Camarillo to Decedent's apartment unit, Camarillo noticed that the door was open, the sound of running water was coming from inside, there was an odor of something actively or recently burnt, and water was flowing out of the opened door onto the pavement below. (PROC at ¶ 10). After knocking on the open door and receiving no answer, Officer Camarillo entered Decedent's empty apartment. (*Id.* at ¶ 11). He noticed that the bathtub was running, the toilet seat had been torn off, and the pipe connected to the toilet was exposed with water shooting up from it. (*Id.* at ¶ 12). He also observed residue from small fires on the floor and in the kitchen. (PRCP at ¶ 21).

Outside, PPD officers were unable to communicate successfully with Decedent while he was on the roof and attempted to reach him using an aerial ladder bucket. (*Id.* at ¶¶ 10, 26). Because the apartment's roof was "structurally not sound," the officers made a decision to "minimize" their time on the roof. (Docs. 99-4 at 238:21–26; PROC

Statement of Facts in Support of Their [*sic*] Motion for Summary Judgment, ("PROC") (Doc. 119), in recounting the factual background of this case.

[2] The Court notes that the parties have referred to Miguel Ruiz as "Michael" throughout their correspondence and briefing with the Court.

at ¶ 17). Three officers ascended to the apartment roof but remained in the bucket, attempting to convince Decedent to also get into the bucket. (PRCP at ¶¶ 29, 30).

On the roof, officers had a "circular" conversation with Decedent, who stated he could not see them and was afraid to come off the roof because "they" (apparently individuals other than the officers) were trying to kill him.[3] (*Id.* at ¶ 33). After a few minutes, Decedent walked over to the bucket and officers "grabbed both of his wrists." (*Id.* at ¶ 37; PROC at ¶ 18). In this position, officers explained to Decedent that he would be handcuffed for everyone's safety.[4] (PROC at ¶ 22). Decedent thereafter backed away and an officer attempted to tase Decedent, but it is unclear whether both Taser probes struck Decedent; nevertheless, the parties agree that the Taser had no incapacitating effect on Decedent. (PRCP at ¶ 42; PROC at ¶¶ 24, 25). Decedent then sat down on the apex of the roof for approximately 4.5 minutes while officers again attempted to encourage Decedent to return to the bucket. (PRCP at ¶¶ 43, 44).

On the ground floor, Officer Camarillo watched as Decedent began to scoot towards a second-floor landing outside the front door of an apartment unit. (*Id.* at ¶ 47). After noticing that the unit's front door was open behind the screen door, Officer Camarillo positioned himself near the stairwell in case Decedent jumped onto the landing

---

[3] While Plaintiffs object to the officers' characterization that the "they" Decedent referred to was not the officers, Plaintiffs do not provide any controverting evidence. Instead, Plaintiffs speculate that because one of the officers would later attempt to tase Decedent *following* their conversation on the roof, Decedent must have meant that the officers were trying to kill him. This speculation does not create a genuine factual dispute. *See Nelson v. Pima Cmty. Coll.*, 83 F.3d 1075, 1081–82 (9th Cir. 1996) ("[M]ere allegation and speculation do not create a factual dispute for purposes of summary judgment.").

[4] Citing to a video filmed by PPD Officer Christopher Luebkin, Plaintiffs dispute whether officers actually explained the need for handcuffs to Decedent because they "do not believe" the officers could have done so "in such a short period" of time. (PROC at ¶ 22; PRCP at ¶ 14; Plaintiffs Exhibit C "Luebkin Video"). Defendant Camarillo argues, however, that this video is inadmissible for lack of an affidavit by Officer Luebkin. (Doc. 133 at 15–16). The Court need not rule on the admissibility of this video because, even if admissible, it would not raise a genuine dispute of fact. In the video, Decedent stands on the ledge of the bucket for nearly 40 seconds. (Plaintiffs Exhibit C, 00:12–00:50). The Court finds that 40 seconds is ample time for officers to inform Decedent of the need for handcuffs. Thus, Plaintiffs' conjecture does not present controverting evidence for this fact.

1  to access the unit.[5] (*Id.* at ¶¶ 48, 50). After Decedent jumped nearly 10 feet to the second-
2  floor landing, Officer Camarillo grabbed him and secured a carotid hold around his
3  neck.[6] (PRCP at ¶¶ 51, 54, 65; PROC at ¶¶ 29, 37, 39). Within a few seconds, other
4  officers attempted to restrain Decedent by his arms and legs. (PRCP at ¶ 54;
5  PROC at ¶ 37). Another officer also tased Decedent multiple times, but, although
6  Decedent continued to struggle, the parties dispute the actual effects of the Taser on
7  Decedent. (*See* PRCP at ¶¶ 54, 71; PROC at ¶¶ 37, 43, 44).

8      After over three minutes from when Officer Camarillo first engaged Decedent,
9  officers were able to handcuff him. (PRCP at ¶ 86; PROC at ¶ 73). After over five
10 minutes into the struggle, officers carried Decedent down a stairway to EMS personnel,
11 who determined that Decedent was pulseless. (PROC at ¶¶ 75, 77). Although EMS
12 resuscitated Decedent, he was taken off life support five days later due to an anoxic brain
13 injury. (*Id.* at ¶¶ 78, 79).

14 **II.   CITY DEFENDANTS' MOTION TO EXCLUDE**

15     Federal Rules of Evidence 702, 704, and 705 concern the testimony of expert
16 witnesses. In their Motion to Exclude, City Defendants challenge the admissibility of
17 nurse practitioner Ruth Downing's expert testimony regarding strangulation. (Doc. 94
18 at 1; *see also* Doc. 94-1, "Report Regarding Expert Witness on Strangulation").

19     **A.    Timeliness of City Defendants' Motion to Exclude**

20     Plaintiffs contend that City Defendants' Motion to Exclude is actually a discovery
21 dispute and, thus, should be dismissed as untimely. (Doc. 111 at 2–3). Plaintiffs are

22 ─────────────────

23     [5] While Plaintiffs insist "there [was] no evidence that the front door to the
24 apartment was ajar," they cite to no admissible evidence indicating this fact and, thus,
   this statement does not controvert Officer Camarillo's deposition testimony. (*See*
25 PRCP at ¶ 48).

26     [6] The parties dispute when Officer Camarillo actually applied the carotid hold to
   Decedent's neck and whether he released the hold intermittently. Plaintiffs argue that the
27 hold was applied almost immediately, (*see* PRCP at ¶ 54; PROC at ¶ 37), and Plaintiffs'
   medical expert opined that the video evidence and level of injury to Decedent suggested
28 the hold lasted "[four] minutes and appeared continuous prior to loss of consciousness,"
   (Doc. 94-1 at 8). Because the videos in the record do not clearly controvert this disputed
   fact, the Court must resolve the dispute in Plaintiffs' favor.

correct that the Rule 16 Scheduling Order states that "the Court will not entertain discovery disputes after the close of discovery barring extraordinary circumstances." (Doc. 14 at 2 n.2). However, the present dispute, though obviously related to matters produced in discovery, is not a "discovery dispute" of the sort contemplated by the Court's Scheduling Order. Rather, a *Daubert* challenge, like that involved here, is in the nature of a motion *in limine* directed to the use and admissibility of expert testimony. As a result, the Court will not deny City Defendants' Motion to Exclude as untimely.

### B.    Requirements for Expert Testimony

Federal Rule of Evidence 702 ("Rule 702") provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

In *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993) ("*Daubert I*"), the Supreme Court held that Rule 702 imposes a special gatekeeping obligation upon a trial judge to make a preliminary assessment of the admissibility of expert scientific testimony. Specifically, the Court held that under Rule 702, "the trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Id.* at 589. Whether the expert is appropriately qualified, whether her testimony is relevant, and whether her testimony is reliable are all distinct inquiries under Rule 702. *See id.* at 591; *see also Mukhtar v. Cal. State Univ.*, 299 F.3d 1053, 1066 (9th Cir. 2002) (indicating that reliability of an expert's testimony is a distinct inquiry from whether an expert is qualified).

### 1.   Ms. Downing's Qualifications as an Expert

City Defendants first argue that Ms. Downing, a nurse practitioner, is not qualified to offer an opinion about the role of strangulation in Decedent's death because she lacks particular training. (*See* Docs. 94 at 4–5; 112 at 4).

Rule 702 "contemplates a broad conception of expert qualifications . . . [and] is broadly phrased and intended to embrace more than a narrow definition of qualified expert." *Thomas v. Newton Int'l Enters.*, 42 F.3d 1266, 1269 (9th Cir. 1994). "As the terms of the rule state, an expert may be qualified either by 'knowledge, skill, experience, training or education.'" *Id.* (quoting Fed. R. Evid. 702). To satisfy this requirement, only a "*minimal foundation* of knowledge, skill, and experience" is required. *Hangarter v. Provident Life & Accident Ins. Co.*, 373 F.3d 998, 1016 (9th Cir. 2004). As a result, a deficiency in one qualification parameter, such as training, is not necessarily dispositive as to whether the expert is qualified overall. For example, courts have held that specialized experience is sometimes of equal or greater importance than medical training in qualifying an expert to opine about some medical causation issues. *See Watkins v. Schriver*, 52 F.3d 769, 771 (8th Cir. 1995) (determining no abuse of a trial court's discretion to exclude a neurologist's testimony regarding head injuries because the doctor lacked experience in accident reconstruction and forensic medicine); *see also Heck v. City of Lake Havasu*, No. CV 04-1810-PCT-NVW, 2006 WL 2460917, at *7–8 (D. Ariz. Aug. 24, 2006) (finding that a professor who lacked training in forensic pathology and was not a medical doctor was nevertheless qualified to testify on the medical effects of carbon monoxide because of his "knowledge, skill, and experience").

Ms. Downing meets the above qualification standard with respect to her knowledge and experience related to the mechanics and effects of strangulation. Ms. Downing is a nurse practitioner and has been a forensic nurse since 1999. (Doc. 94-1 at 4). She is a member of both the Advisory Team for the Strangulation Training Institute and the Strangulation Task Force for the International Association of Forensic Nurses. (*Id.*). Additionally, Ms. Downing in an active member of the Ohio Chapter of the

International Association of Forensic Nurses and served as the Chapter's president in 2008. (*Id.*). In 2006, Ms. Downing authored an article entitled "Manual and Ligature Strangulation" for the *On the Edge* publication. (*Id.* at 14). She has also taught classes and previously testified in criminal cases on the topic of strangulation. (*Id.* at 14–15). Overall, Ms. Downing has nearly 40 years' experience as a nurse. (*Id.* at 11–12). In short, Ms. Downing's knowledge and experience related to strangulation and its effects are extensive.

City Defendants nevertheless argue that the Court should not permit Ms. Downing to testify about the potential effects of Officer Camarillo's carotid hold on Decedent's death, given that Ms. Downing is not an emergency room doctor, forensic medical examiner, forensic pathologist, toxicologist, biomechanical or human factors expert, or police officer. (Doc. 94 at 4–5). City Defendants also compare the expertise of their expert, a board-certified emergency department physician, to that of Ms. Downing, noting that Ms. Downing "has not conducted any independent research regarding asphyxiation or Excited Delirium (while Defendants' expert, Dr. Vilke, has)." (*Id.* at 4). However, while these differing areas of expertise are perhaps germane to the weight and allowed scope of Ms. Downing's testimony, they do not bar admissibility. *See Bergen v. F/V St. Patrick*, 816 F.2d 1345, 1352 n.5 (9th Cir. 1987) ("The weakness in the underpinnings of [expert] opinions may be developed upon cross-examination and such weakness goes to the weight and credibility of the testimony." (alteration in original) (quoting *Polk v. Ford Motor Co.*, 529 F.2d 259, 271 (8th Cir. 1976))); *see also Kannankeril v. Terminix Int'l*, 128 F.3d 802, 809 (3d Cir. 1997) ("If the expert meets liberal minimum qualifications, then the level of the expert's expertise goes to credibility and weight, not admissibility."). Ms. Downing has the expert qualifications to provide testimony regarding her area of expertise—strangulation.

### 2. Relevance of Ms. Downing's Testimony

Once qualified, an expert may testify within her area of expertise so long as the expert's testimony "is both relevant and reliable." *Cooper v. Brown*, 510 F.3d 870, 942

(9th Cir. 2007); *see also Daubert I*, 509 U.S. at 589. Expert testimony is relevant if it assists the trier of fact in understanding evidence or in determining a fact in issue. *Daubert I*, 509 U.S. at 591. Thus, the party proffering such evidence must demonstrate a valid scientific connection, or "fit," between the evidence and an issue in the case. *Id.* A court therefore examines whether the proffered expert testimony is "sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute." *Id.* (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985)). Expert knowledge also assists the trier of fact when it provides knowledge beyond the trier of fact's common knowledge. *Id.*; *United States v. Finley*, 301 F.3d 1000, 1008 (9th Cir. 2002).

City Defendants argue that the Court should exclude Ms. Downing's testimony because it is unhelpful to a jury for two reasons. First, City Defendants argue that Ms. Downing's "expert opinions are unhelpful as they are not expressed to any quantifiable level of medical probability." (Doc. 94 at 11). Second, and relatedly, City Defendants argue that Ms. Downing should have performed a differential diagnosis.[7] City Defendants assert that because Ms. Downing cannot rule out (or rule in) methamphetamine abuse, a cardiac event, or excited delirium as potential causes of Decedent's death, her testimony is irrelevant. (*Id.* at 12–13).

Ms. Downing's opinion states that she "find[s] the photographs and evidence provided . . . consistent with strangulation, based on the facts of the case provided, and on [her] experience, education and training." (Doc. 94-1 at 8). Ms. Downing never conclusively links Decedent's injuries to strangulation but, rather, uses phrases like "[t]he thyroid cartilage fracture with associated hemorrhage . . . is *most likely* the result of the choke hold" and "[t]he subconjunctival hemorrhage is *most likely* the result of the choke hold." (*Id.* at 8–9 (emphasis added)). While the Court recognizes that Ms. Downing does

---

[7] A differential diagnosis is a two-step process. Under the first step, an expert compiles "a comprehensive list of hypotheses that might explain the set of salient clinical findings under consideration." *Clausen v. M/V New Carissa*, 339 F.3d 1049, 1057 (9th Cir. 2003). Under the second step, the expert engages in "a process of elimination, eliminating hypotheses on the basis of a continuing examination of the evidence so as to reach a conclusion as to the most likely cause of the findings in that particular case." *Id.* at 1058.

not postulate to a medical certainty, such certainty is not a requirement for admissibility. *See, e.g.*, *United States v. Rahm*, 993 F.2d 1405, 1412 (9th Cir. 1993) ("Certainty is an unreasonable expectation in the realm of expert opinion. [An expert's] use of the conditional 'could' in expressing her conclusion is neither unusual nor disqualifying as to her testimony. . . . Experts ordinarily deal in probabilities, in 'coulds' and 'mights.'" (citations omitted)); *Stanley v. Novartis Pharms. Corp.*, 11 F. Supp. 3d 987, 1001 (C.D. Cal. 2014) ("[T]o the extent Defendant argues that Dr. Sung did not adequately rule out additional factors, this is a credibility determination that goes to the weight . . . of his opinions. Defendant can cross-examine Dr. Sung regarding additional factors that he did not rule out during trial."). To demand such certainty could render her testimony inadmissible as she does not purport to have expertise in methamphetamine abuse or other potential causes of Decedent's death, which is what City Defendants ultimately seek to accomplish.

Thus, City Defendants argue that because Ms. Downing cannot rule out other causes of Decedent's death through a differential diagnosis, her testimony should be excluded. While "a reliable differential diagnosis passes muster under *Daubert*," *Clausen*, 339 F.3d at 1058, City Defendants cite to no case law indicating that *Daubert* requires a reliable differential diagnosis. While a differential diagnosis may muster more credibility, general causation testimony regarding a potential cause of death may still be helpful to a jury in certain cases—and, therefore, be admissible. As relevant here, Ms. Downing will opine that certain forms of strangulation are capable of causing the injuries suffered by Decedent. The Court finds Ms. Downing's testimony to be helpful and, thus, relevant.

### 3.      Reliability of Ms. Downing's Testimony

Generally, to satisfy Rule 702's reliability requirement, "the party presenting the expert must show that the expert's findings are based on sound methodology." *Daubert v. Merrell Dow Pharms., Inc.*, 43 F.3d 1311, 1316 (9th Cir. 1995) ("*Daubert II*"). Factors for a trial court to consider in determining reliability include: (1) whether the theory,

technique, or method used by the expert to form her opinion can or has been tested; (2) the known or potential rate of error in the expert's theory, technique, or method; (3) whether the theory, technique, or method has been subjected to peer review and publication; (4) whether there are standards controlling the theory, technique, or method's operation; and (5) the general acceptance of the theory, technique or method within the relevant community. *Cooper*, 510 F.3d at 942–43; *United States v. Prime*, 431 F.3d 1147, 1152 (9th Cir. 2005). In engaging in this analysis, the trial court should be mindful that:

> The inquiry envisioned by Rule 702 is . . . a flexible one. Its overarching subject is the scientific validity and thus the evidentiary relevance and reliability – of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate.

*Daubert I*, 509 U.S. at 594–95 (footnotes omitted).

It is also well-settled that the five *Daubert* factors—testing, peer review, error rates, standards, and acceptability in the relevant scientific community—are merely illustrative, not exhaustive, and may be inapplicable in a given case. *Daubert II*, 43 F.3d at 1317. For instance, the Ninth Circuit Court of Appeals ("Ninth Circuit") has advised that a trial court may also question whether the expert is proposing to testify about matters "growing naturally and directly out of the research they have conducted independent of the litigation, or whether they have developed their opinions expressly for the purposes of testifying" as another significant inquiry weighing on reliability. *Id.* "That the testimony proffered by an expert is based directly on legitimate, preexisting research unrelated to the litigation provides the most persuasive basis for concluding that the opinions he expresses were 'derived by the scientific method.'" *Id.*

Ms. Downing examined bystander videos from the incident, the medical examiner's report, and autopsy photographs of Decedent, among other materials, in forming her opinion. (Doc. 94-1 at 5, 10). City Defendants attack the reliability of Ms. Downing's testimony because she failed to review the police report, fire department

records, hospital records, police training outlines, PPD's Use of Force Policy, and audio interviews of the officers involved in the incident. (Doc. 94 at 9). City Defendants claim that as a result of Ms. Downing's failure to review these records, Ms. Downing reached a faulty opinion—or at least an opinion contrary to that reached by City Defendants' expert.

Ms. Downing's opinions and inferences were based on her review of the medical examiner's report, autopsy photographs, and bystander videos, as well as her knowledge, experience, training, and education. The primary thrust of City Defendants' argument is that Ms. Downing's testimony must be excluded because she did not consider materials that City Defendants' expert did consider. These arguments go to weight, not the admissibility, of Ms. Downing's testimony, and a jury can decide how much weight it deserves. *See, e.g.*, *Nomo Agroindustrial Sa De Cv v. Enza Zaden N. Am., Inc.*, No. CV 05-351-TUC-FRZ, 2009 WL 211085, at *5 (D. Ariz. Jan. 29, 2009) ("The jury is entitled to hear expert testimony and decide whether to accept or reject it after considering whether predicate facts on which the expert relied were accurate." (citing *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239 (11th Cir. 2002))). At bottom, City Defendants' opposition to Ms. Downing's report is that they disagree with her conclusions. This is not a basis for exclusion under *Daubert. See, e.g.*, *Kennedy v. Collagen Corp.*, 161 F.3d 1226, 1230 (9th Cir. 1998) ("Judges in jury trials should not exclude expert testimony simply because they disagree with the conclusions of the expert.").

Because Ms. Downing qualifies as an expert and her opinion is both reliable and relevant, her testimony regarding the potential effects of strangulation is admissible.

### C.    City Defendants' Rule 403 Concerns

Given the admissibility of Ms. Downing's testimony, City Defendants also argue that, under Federal Rule of Evidence 403 ("Rule 403"), the Court should preclude her from applying "inflammatory" characterizations to the neck hold used by Officer Camarillo on Decedent. (Doc. 94 at 6–8). Specifically, City Defendants object to the use of the terms "choke hold" and "strangled" when describing a carotid hold. (*Id.*). To the

extent City Defendants are asking the Court to rule on a motion *in limine*, the Court finds that this is not the appropriate time to make such a ruling. Unlike objections to foundation and hearsay, objections that evidence is not relevant or is misleading are superfluous at the summary judgment stage. These objections are unnecessary at the summary judgment stage because Rule 403 provides for the exclusion of evidence that may "mislead the *jury*," not the Court. *See* Fed. R. Evid. 403 (emphasis added); *see also Bafford v. Travelers Cas. Ins. Co. of Am.*, No. Civ. S-11-2474 LKK/JFM, 2012 WL 5465851, at *8 (E.D. Cal. Nov. 8, 2012).

## III.    DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A party asserting that a fact cannot be or is genuinely disputed must support that assertion by "citing to particular parts of materials in the record," including depositions, affidavits, interrogatory answers or other materials, or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of pointing out to the Court the basis for the motion and the elements of the causes of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* A material fact is any factual issue that might affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'"

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 248. The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. However, in the summary judgment context, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

At the summary judgment stage, the trial judge's function is to determine whether there is a genuine issue for trial. There is no issue for trial unless there is sufficient evidence favoring the non-moving party for a jury to return a verdict for that party. *Liberty Lobby, Inc.*, 477 U.S. at 249–50. If the evidence is merely colorable or is not significantly probative, the judge may grant summary judgment. *Id.*

### A.    Admissibility of Evidence at the Summary Judgment Stage

The Ninth Circuit applies a double standard to the admissibility requirement for evidence at the summary judgment stage. *See* 10B Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2738 (3d ed. 1998).

With respect to *non-movant's* evidence offered in opposition to a motion for summary judgment, the Ninth Circuit has stated that the proper inquiry is not the admissibility of the evidence's form but rather whether the *contents* of the evidence are admissible. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003); *see also* Fed. R. Civ. P. 56(c)(2) ("A party may object that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence."); *Celotex Corp.*, 477 U.S. at 324 ("We do not mean that the *nonmoving party* must produce evidence in a form that would be admissible at trial in order to avoid summary judgment." (emphasis added)). Accordingly, the Ninth Circuit has held, albeit sometimes implicitly, that a non-movant's hearsay evidence may establish a genuine issue of material fact precluding a grant of summary judgment. *See Fraser*, 342 F.3d at 1036–37; *Carmen v. S.F. Unified*

*Sch. Dist.*, 237 F.3d 1026, 1028–29 (9th Cir. 2001); *Beyene v. Coleman Sec. Servs., Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988). Thus, "[m]aterial in a form not admissible in evidence may be used to *avoid*, but not to *obtain* summary judgment, except where an opponent bearing a burden of proof has failed to satisfy it when challenged after completion of relevant discovery." *Tetra Techs., Inc. v. Harter*, 823 F. Supp. 1116, 1120 (S.D.N.Y. 1993).

The Ninth Circuit has required, however, that evidence offered in *support* of a motion for summary judgment be admissible both in form and in content. *See Canada v. Blains Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987); *Hamilton v. Keystone Tankship Corp.*, 539 F.2d 684, 686 (9th Cir. 1976). Accordingly, unauthenticated documents cannot be considered in ruling on a motion for summary judgment because authentication is a condition precedent to admissibility. *Orr v. Bank of Am.*, 285 F.3d 764, 773; *see also Canada*, 831 F.2d at 925 ("[D]ocuments which have not had a proper foundation laid to authenticate them cannot support a motion for summary judgment."). A document authenticated through personal knowledge must be supported with an affidavit "[setting] out facts that would be admissible in evidence and show[ing] that the affiant or declarant is competent to testify on the matters stated."[8] Fed. R. Civ. P. 56(c)(4).

Similarly, evidence containing hearsay statements is admissible only if offered in opposition to the motion. "Because [v]erdicts cannot rest on inadmissible evidence and a grant of summary judgment is a determination on the merits of the case, it follows that the *moving* party's affidavits must be free from hearsay." *Burch v. Regents of the Univ. of Cal.*, 433 F. Supp. 2d 1110, 1121 (E.D. Cal. 2006) (quoting *Gleklen v. Democratic Cong. Campaign Comm., Inc.*, 199 F.3d 1365, 1369 (D.C. Cir. 2000)).

Defendant Camarillo motions to strike Plaintiffs' Exhibits C ("Luebkin Video"),

---

[8] A party may comply with the affidavit requirement by offering a declaration complying with 28 U.S.C. § 1746 (2012). Evidence may also be authenticated by other means other than personal knowledge, such as any of the approaches enumerated in Federal Rule of Evidence 901. *See, e.g.*, *Orr*, 285 F.3d at 774; Fed. R. Civ. P. 56(c)(4).

D ("Hessner PSB Audio Interview"), G ("Segundo Video"), I ("Segundo Video Still Photographs"), O ("Additional Luebkin Video"), and P ("Camarillo Interview—Audio") from the Court's Summary Judgment Record because Plaintiffs failed to authenticate all of these exhibits. Defendant Camarillo, however, misreads *Orr v. Bank of America* to hold that the Court may not consider unauthenticated documents to support an argument to *overcome* summary judgment. (Doc. 133 at 15). Although *Orr* held that a non-movant's exhibits were inadmissible for purposes of opposing a motion for summary judgment, 285 F.3d at 773, the Ninth Circuit later clarified that it is the admissibility of the *contents* of evidence—not its *form*—that determines whether evidence is admissible for purposes of avoiding summary judgment, *Fraser*, 342 F.3d at 1036–37. The fact that Plaintiffs' exhibits are unauthenticated does not bar their consideration for the limited purpose of opposing Defendants' Motions for Summary Judgment.

Nevertheless, the Court need not rule on the admissibility of each of Plaintiffs' exhibits at the summary judgment stage because the Court has only relied on Plaintiffs' Exhibit G, which City Defendants' have already submitted into evidence as Exhibit 8. (*See* Doc. 107-1). As a result, Defendant Camarillo's arguments are moot.

City Defendants believe Ms. Downing's expert report is inadmissible at the summary judgment stage because "Plaintiffs did not submit an affidavit of [Ms.] Downing as it relates to the content of the report" and, thus, the report is hearsay. (Doc. 132 at 5). Although "[c]ourts in this circuit have routinely held that unsworn expert reports are inadmissible," *Harris v. Extendicare Homes, Inc.*, 829 F. Supp. 2d 1023, 1027 (W.D. Wash. 2011), Ms. Downing has submitted a separate affidavit indicating the statements contained in her report were made under the penalty of perjury, (*see* Doc. 117-10 at 6). Thus, the Court is satisfied that Plaintiffs' subsequently filed sworn statements of Ms. Downing adequately remedied the procedural deficiencies of the original filing. *See Volterra Semiconductor Corp. v. Primarion, Inc.*, 796 F. Supp. 2d 1025, 1038–39 (N.D. Cal. 2011) ("'[S]ubsequent verification or reaffirmation of an unsworn expert's report, either by affidavit or deposition, allows the

court to consider the unsworn expert's report on a motion for summary judgment.'" (quoting *Maytag Corp. v. Electrolux Home Prods., Inc.*, 448 F. Supp. 2d 1034, 1064 (N.D. Iowa 2006))); *see also Sch. Dist. No. 1J, Multnomah Cty., Or. v. ACandS, Inc.*, 5 F.3d 1255, 1261 (9th Cir. 1993) ("When a party opposing summary judgment fails to comply with the formalities of Rule 56, a court may choose to be somewhat lenient in the exercise of its discretion to deal with the deficiency." (citations omitted)).

### B.    Section 1983 Claims

#### 1.    Officer Camarillo

Plaintiffs allege that Defendant Camarillo violated Decedent's rights under the Fourth Amendment by using excessive force and unreasonably seizing Decedent. Plaintiffs also allege that Defendant Camarillo's conduct violated their rights to familial association under the Fourteenth Amendment. By seeking a remedy for violations of constitutional rights, Plaintiffs allege a violation of 42 U.S.C. § 1983 (2012). A plaintiff asserting a claim for relief under § 1983 must prove that: "(1) the conduct complained of was committed by a person acting under color of state law; and (2) the conduct deprived the plaintiff of a constitutional right." *L. W. v. Grubbs*, 974 F.2d 119, 120 (9th Cir. 1992). State officials or municipalities are liable for deprivations of life, liberty, or property that rise to the level of a "constitutional tort" under the Due Process Clause of the Fourteenth Amendment. *Johnson v. City of Seattle*, 474 F.3d 634, 638 (9th Cir. 2007).

Here, it is undisputed that Officer Camarillo acted under color of law. At issue then is whether his actions deprived Decedent and/or Plaintiffs of rights, privileges, or immunities secured by the Constitution or laws of the United States. Defendant Camarillo contends that he did not deprive Decedent or Plaintiffs of any constitutional or legal right, and, even if he did, he is entitled to qualified immunity. Defendant Camarillo also asserts that Plaintiffs cannot prove that he caused Decedent's injuries.

##### a.    Count II: Unreasonable Seizure[9]

---

[9] Although both parties refer to this claim as an "unreasonable seizure" claim, most courts have used the term "false arrest" because, as both parties agree, Defendant Camarillo arrested Decedent. (*See, e.g.*, Docs. 98 at 14 ("Officer Camarillo had probable

1    Plaintiffs allege and argue that Officer Camarillo unreasonably seized Decedent by

2    arresting him without probable cause. (Doc. 118 at 14). Under the Fourth Amendment,

3    "[t]he right of the people to be secure in their persons, houses, papers, and effects, against

4    unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but

5    upon probable cause." U.S. Const. amend. IV. "The Fourth Amendment does not

6    proscribe all state-initiated searches and seizures; it merely proscribes those which are

7    unreasonable." *Florida v. Jimeno*, 500 U.S. 248, 250 (1991) (citations omitted). A

8    warrantless arrest is lawful only if there is "probable cause to believe that the arrestee has

9    committed, or is committing, an offense." *Torres v. City of L.A.*, 548 F.3d 1197, 1207 n.7

10   (9th Cir. 2008); *see also United States v. Chan-Jimenez*, 125 F.3d 1324, 1326

11   (9th Cir. 1997) ("For purposes of the Fourth Amendment, a seizure occurs when a law

12   enforcement officer, by means of physical force or show of authority, in some way

13   restrains the liberty of a citizen.").

14   Here, because the right to be free from a warrantless arrest was clearly established

15   on the date in question, and Decedent was arrested without a warrant following the

16   incident at his apartment complex, Defendants must show that there was probable cause

17   to arrest Decedent. Probable cause exists when "the facts and circumstances within [the

18   officers'] knowledge and of which they had reasonably trustworthy information were

19   sufficient to warrant a prudent man in believing that the [plaintiff] had committed or was

20   committing an offense." *Bailey v. Newland*, 263 F.3d 1022, 1031 (9th Cir. 2001) (quoting

21   *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *see also Devenpeck v. Alford*, 543 U.S. 146, 153–

22   55 (2004). An officer with probable cause to believe that even a very minor criminal

23   offense has been committed in his presence may arrest the offender without violating the

24   Fourth Amendment. *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001) (holding

25   that an arrest where an officer had probable cause to believe that a driver was not wearing

26

27   cause to arrest [Decedent]."); 118 at 14 ("Defendant wrongly asserts that Officer

     Camarillo . . . had probable cause to arrest [Decedent].")); *see also, e.g.*, *Elkins v. Wash.*

28   *Cty.*, Civil No. 06-448-ST, 2007 WL 1342155, at *5–8 (D. Or. May 3, 2007); *Darraj v.*
     *Cty. of San Diego*, Civil No. 11cv1657 AJB (BGS), 2013 WL 1796990, at *10 (S.D. Cal.
     Apr. 29, 2013).

her seatbelt in violation of a state statute was constitutionally permissible). However, probable cause must be present based on the "facts and circumstances known to the officers *at the moment of the arrest.*" *United States v. Newman*, 265 F. Supp. 2d 1100, 1106 (D. Ariz. 2003) (citing *United States v. Delgadillo-Velasquez*, 856 F.2d 1292, 1296 (9th Cir. 1998)).

Here, the Court's inquiry is whether Officer Camarillo, at the moment of Decedent's arrest, had probable cause to believe Decedent had committed a crime. At the time of Decedent's arrest, Officer Camarillo possessed the following information: (1) he was responding to a 911-call indicating that a man was tampering with an A/C unit and causing water damage to an apartment unit;[10] (2) the apartment property manager wanted to press charges against Decedent for criminal trespass and criminal damage for the damage done to the A/C unit;[11] (3) a disconnected pipe was flooding Decedent's apartment, which also had an odor of something recently burnt; (4) Decedent was failing to cooperate with officers attempting to rescue him from a roof; and (5) Decedent jumped from the roof of the apartment rather than joining officers in the aerial ladder bucket.

Plaintiffs present a few arguments as to why a reasonable officer would not have found probable cause in this situation. First, Plaintiffs argue that Camarillo "at most . . . had reasonable suspicion that a crime had been committed not knowing who committed it." (Doc. 118 at 14). This argument is puzzling. Plaintiffs concede that

---

[10] Plaintiffs object on hearsay grounds to the Court's consideration of the 911-phone-call recording, police dispatch recording, police officer deposition testimony and affidavits recalling discussions with individuals, including the apartment property manager and Decedent, and officer deposition testimony and affidavits discussing their observations of events that occurred on July 28, 2013. (*See, e.g.*, PROC at ¶¶ 6, 17, 22, 30; PRCP at ¶¶ 1, 5, 6, 12, 13, 15, 24, 33, 81, 130). Each of these pieces of evidence is not hearsay because it is not offered for the truth of the matter asserted but rather the fact that officers were informed of such information. Here, this evidence is offered for a non-hearsay purpose, namely the totality of the circumstances and the facts within Officer Camarillo's knowledge when arriving to the scene as well as events leading up to Decedent's arrest. Thus, the Court may consider the aforementioned evidence for the limited purpose of evaluating whether Officer Camarillo had probable cause to arrest Decedent. *See* Fed. R. Evid. 801(c).

[11] The Court notes that, at this time, it was unclear to officers whether Decedent was actually the individual who damaged the A/C unit, but Decedent was the only individual on the roof.

officers were investigating "a report about a man on a roof who was possibly stuck after he damaged an A/C unit." (*Id.* at 7). There was only one shirtless man on the roof when officers arrived and the property manager specifically told officers that he wanted to press criminal charges against Decedent. Plaintiffs fail to identify any evidence that would have negated a reasonable officer's belief that Decedent was the same individual trespassing.

Second, Plaintiffs seemingly contend that because the individual who made the 911-call was an "untrustworthy convicted murderer[]," Officer Camarillo could not have had probable cause. (*Id.* at 14). However, Plaintiffs fail to connect this fact to Officer Camarillo's knowledge at the time of the incident. Further, even if Officer Camarillo had knowledge of the caller's conviction background, he relied on additional facts besides the 911-call in arresting Decedent. Plaintiffs unsurprisingly fail to cite to any case law indicating how the conviction history of a 911-caller would negate a probable cause determination.

Third, Plaintiffs argue that because Decedent *could have been* repairing the A/C unit, probable cause could not have existed. (*Id.* at 14–15). However, Plaintiffs cite to no evidence to support this conjecture and fail to indicate how this would negate the facts known by Officer Camarillo in arresting Decedent. *See Blankenhorn v. City of Orange*, 485 F.3d 463, 475 (9th Cir. 2007) ("Ultimately, however, our inquiry is not whether [the plaintiff] *was* trespassing. Rather, it is whether a reasonable officer had probable cause to think he could have been.").

Thus, the Court concludes that the totality of the circumstances, the information available to Officer Camarillo from his own observations and discussions at the time of the arrest, are sufficient to warrant a prudent officer in believing that Decedent had committed a crime. As there was probable cause to support the arrest, the Court need not inquire into whether Officer Camarillo would be entitled to qualified immunity on this claim. *See Hutchinson v. Grant*, 796 F.2d 288, 290 (9th Cir. 1986) ("A police officer has immunity if he arrests with probable cause.").

1    Thus, with regard to Count II, the Court grants Defendant Camarillo's Motion for

2    Summary Judgment.

3    **b.    Count IV: Familial Association**

4    Plaintiffs allege on their own behalf—as Decedent's mother and son—that they

5    have been deprived of a familial relationship with Decedent in violation of their

6    Fourteenth Amendment right to substantive due process. The Ninth Circuit has

7    recognized:

> The United States Supreme Court [has] considered the
> standard of culpability applicable to substantive due process
> claims arising from the unintentional killing of an individual
> by law enforcement officers. *See Cty. of Sacramento v. Lewis*,
> 523 U.S. 833 (1998). Noting that the plaintiffs in *Lewis*
> contended only that the officers had acted in "conscious
> disregard" of the individual's life, the Supreme Court held
> this allegation did not rise to the level of culpability necessary
> to implicate a substantive due process theory of relief. *Id.*
> at 854. Instead, the Court held that "in such circumstances
> only a purpose to cause harm unrelated to the legitimate
> object of arrest will satisfy the element of arbitrary conduct
> shocking to the conscience, necessary for a due process
> violation." *Id.* at 836.

16   *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 372 (9th Cir. 1998). Thus,

17   under its decision in *Lewis*, "[t]he Supreme Court has made it clear . . . that only official

18   conduct that 'shocks the conscience' is cognizable as a due process violation." *Porter v.*

19   *Osborn*, 546 F.3d 1131, 1137 (9th Cir. 2008) (quoting *Lewis*, 523 U.S. at 846).

20   The Supreme Court has described such conscious-shocking conduct as that which

21   is "arbitrary," *Collins v. Harker Heights*, 503 U.S. 115, 126 (1992), "egregious,"

22   "deliberate," and "unjustifiable by any government interest," *Lewis*, 523 U.S. at 846–49.

23   Negligent conduct and conduct constituting a "conscious disregard," on the other hand,

24   does not shock the conscience. *Id.* at 849, 854. Conduct that falls somewhere between

25   negligent and intentional action, "such as recklessness or gross negligence, is a matter for

26   closer calls." *Id.* at 849 (citation and quotations omitted). Whether a defendant's conduct

27   shocks the conscience thus turns on the facts of the particular case. *See, e.g.*, *Moreland*,

28   159 F.3d at 372. "Deliberate indifference" may shock the conscience, provided the

- 20 -

defendant had a practical opportunity for actual deliberation. *Lewis*, 523 U.S. at 851. "But if the defendant law enforcement officers were forced to take 'fast action' in a 'quickly evolving and escalating' situation and were required to make 'repeated split-second decisions,' a showing of deliberate indifference is essentially impossible as a practical matter." *McGowan v. Cty. of Kern*, No. 1:15-cv-01365-DAD-SKO, 2016 WL 2770663, at *3 (E.D. Cal. May 13, 2016) (quoting *Porter*, 546 F.3d at 1138–40). In such situations, a court must evaluate whether the defendants acted with a "purpose to harm" and "for reasons unrelated to legitimate law enforcement objectives." *Porter*, 546 F.3d at 1137 (emphasis omitted).

Defendant Camarillo argues that the Court should grant summary judgment because "the fast-evolving nature of the roughly five minute struggle between Camarillo and [Decedent] . . . did not leave time for considered deliberation and that the force he used was plainly pursuant to a legitimate law enforcement purpose." (Doc. 133 at 13). Plaintiffs respond that summary judgment is inappropriate because "what is conscience shocking is best left for a [j]ury to decide given the facts of this case." (Doc. 118 at 15). However, Plaintiffs fail to identify any particular facts that make Officer Camarillo's conduct "conscience shocking."

Here, Officer Camarillo is entitled to summary judgment on Plaintiffs' Fourteenth Amendment claim because a reasonable jury could not find that Officer Camarillo's use of force shocks the conscience. Once the situation escalated as Decedent jumped onto the second-floor landing, it is undisputed that Officer Camarillo had seconds to react in subduing Decedent. (PROC at ¶ 29). Therefore, he "did not have time to deliberate," and his "use of force shocks the conscience only if the officers had a 'purpose to harm' [Decedent] for reasons unrelated to legitimate law enforcement objectives." *See Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014).

Plaintiffs further cannot satisfy the "purpose to harm" requirement here. They provide no evidence that Officer Camarillo had a purpose to harm Decedent for reasons unrelated to legitimate law enforcement objectives. For example, Plaintiffs neither argue

nor provide evidence that Officer Camarillo used the carotid hold to "bully" Decedent or to "get even." *See Wilkinson v. Torres*, 610 F.3d 546, 554 (9th Cir. 2010). Moreover, Plaintiffs fail to rebut Defendant Camarillo's claim that the safety of fellow officers and the public is a legitimate government purpose.

Consequently, because Plaintiffs provide no evidence that Officer Camarillo's use of force shocks the conscience, Defendant Camarillo is entitled to summary judgment on this claim. *See Gonzalez*, 747 F.3d at 797 (holding that the district court properly granted summary judgment on the plaintiffs' Fourteenth Amendment claim where "[t]he plaintiffs produced no evidence that the officers had any ulterior motives for using force against [the decedent]"). Because Officer Camarillo's conduct did not shock the conscience, the Court need not inquire into whether Officer Camarillo would be entitled to qualified immunity on this claim. *See Bingue v. Prunchak*, 512 F.3d 1169, 1170 (9th Cir. 2008) ("[A] police officer . . . is entitled to qualified immunity unless his behavior 'shocks the conscience.'" (citing *Onossian v. Block*, 175 F.3d 1169, 1171 (9th Cir. 1999)).

Accordingly, with regard to Count IV, the Court grants Defendant Camarillo's Motion for Summary Judgment.

### c.   Count V: Excessive Force

Defendant Camarillo moves for summary judgment on Plaintiffs' excessive force claim on the grounds that the force he used was reasonable. Plaintiffs rejoin that Officer Camarillo exercised excessive force when he held Decedent in a carotid hold for over four minutes, leading to Decedent's anoxic brain injury and death. (*See* Doc. 7 at ¶¶ 162–65).

Fourth Amendment claims of excessive or deadly force are analyzed under an objective reasonableness standard. *Scott v. Harris*, 550 U.S. 372, 381 (2007). To determine if a Fourth Amendment violation has occurred, a court must balance the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests to determine whether the officer's conduct was objectively reasonable based on

the totality of the circumstances. *Espinosa v. City & Cty. of S.F.*, 598 F.3d 528, 537 (9th Cir. 2010) (citing *Graham v. Connor*, 490 U.S. 386, 396–97 (1989)). The Ninth Circuit has set forth a three-step test to determine objective reasonableness:

> First, we must assess the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted. Next, we must evaluate the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. Third, we balance the gravity of the intrusion on the individual against the government's need for that intrusion. Ultimately, we must balance the force that was used by the officers against the need for such force to determine whether the force used was greater than is reasonable under the circumstances.

*Id.* (citations and quotations omitted).

Excessive force claims are generally questions of fact for the jury. *Hervey v. Estes*, 65 F.3d 784, 791 (9th Cir. 1995). However, the court may decide such claims as a matter of law if, after resolving all factual disputes in favor of the plaintiff, the court concludes that the officer's use of force was objectively reasonable under the circumstances. *Scott v. Henrich*, 39 F.3d 912, 915 (9th Cir. 1994).

### i.      Nature and Quality of Intrusion

The first of the three steps is to evaluate the severity of the intrusion on the individual's Fourth Amendment rights by assessing "the type and amount of force inflicted." *Miller v. Clark Cty.*, 340 F.3d 959, 964 (9th Cir. 2003). Such details provide the foundation of the analysis and must be set forth "because the 'factors articulated in *Graham*, and other factors bearing on the reasonableness of a particular application of force are not to be considered in a vacuum but only in relation to the amount of force used to effect a particular seizure.'" *Davis v. City of Las Vegas*, 478 F.3d 1048, 1055 (9th Cir. 2007) (quoting *Chew v. Gates*, 27 F.3d 1432, 1441 (9th Cir. 1994)).

In a carotid hold, an officer places his arm around the victim's neck to constrict blood flow through the carotid artery, which supplies oxygenated blood to the brain. *See Knapps v. City of Oakland*, 647 F. Supp. 2d 1129, 1143 (N.D. Cal. 2009). The victim

loses consciousness, but breathing continues uninterrupted. *Id.* There is little case law evaluating—as a matter of law—the nature and quality of the force exerted from a carotid hold. Rather, Plaintiffs and Defendants cite to opposing case law that show courts have found a carotid hold *might* or *might not* lead to a finding of excessive force. *Compare id.* ("[T]he Court finds . . . the escalation to the use of a carotid hold was unreasonable."), *with Elkins*, 2007 WL 1342155, at *10 ("Although Elkins claims that he was being strangled [and] may have suffered some injury, . . . the record does not reveal that it was severe."). However, in evaluating the type and amount of force inflicted, the Court observes that a carotid restraint or hold can result in great bodily injury if the hold is in place long enough. (PRCP at ¶ 173) ("If oxygenated blood flow to the brain is cut off for four to six minutes, irreparable brain damage may occur."). As a result, the Court finds that a carotid hold held for over four minutes is a sufficiently serious intrusion upon liberty, and it must be justified by a commensurately serious government interest.

### ii.    Government Interests

The second step requires the court to evaluate the government's interests by assessing the three *Graham* factors: (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape. *Glenn v. Wash. Cty.*, 673 F.3d 864, 872 (9th Cir. 2011) (citing *Graham*, 490 U.S. at 396).

### (a)    Severity of the Crime

The first *Graham* factor takes into account the severity of the crime at issue. As noted above, Officer Camarillo had probable cause to arrest Decedent for criminal trespass and criminal damage, both of which are felonies under Arizona law. *See* Ariz. Rev. Stat. § 13-1602 (2015) ("A person commits criminal damage by . . . [i]ntentionally tampering with utility property."); Ariz. Rev. Stat. § 13-1504 (2015) ("A person commits criminal trespass by . . . by knowingly . . . [e]ntering or remaining unlawfully in or on a residential structure."). However, the Ninth Circuit has directed courts to determine whether the crime committed was an "inherently dangerous crime" rather than simply

categorizing the crime as a felony or misdemeanor. *Lowry v. City of San Diego*, 818 F.3d 840, 851–53 (9th Cir. 2016). In *Lowry*, the Ninth Circuit noted that:

> [E]ven if the officers were investigating a felony, this label is not dispositive. Although the government's interest in apprehending criminal suspects is certainly stronger when the suspect is suspected of having committed a felony, we have noted that a wide variety of crimes, many of them nonviolent, are classified as felonies.

*Id.* at 852 (citations and quotations omitted). The *Lowry* court went on to note that because "a non-residential burglary is not an inherently dangerous crime, . . . this factor weighs only slightly in favor of finding that the City's countervailing interest rendered its use of force objectively reasonable." *Id.* at 853.

Here, as in *Lowry*, while both criminal trespass and criminal damage can be punished as felonies, they are not inherently dangerous felonies. Just because a man is trespassing on a residential structure and tampering with property located on that structure does not make him inherently dangerous. As a result, the Court concludes that this factor is of minimal weight in justifying Officer Camarillo's use of force.

### (b)   Imminent Harm

Of the *Graham* factors, the "most important" is whether the suspect posed an "immediate threat to the safety of the officers or others." *Bryan v. MacPherson*, 630 F.3d 805, 826–28 (9th Cir. 2010) (citing *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir. 2005)). For a court to find justification for the use of significant force, "the objective facts must indicate that the suspect poses an immediate threat to the officer or a member of the public." *Id.* at 826. "A simple statement by an officer that he fears for his safety or the safety of others is not enough; there must be objective factors to justify such a concern." *Deorle v. Rutherford*, 272 F.3d 1272, 1281 (9th Cir. 2001). The Ninth Circuit has made clear that "the 'desire to resolve quickly a potentially dangerous situation is not the type of governmental interest that, standing alone, justifies the use of force that may cause serious injury.'" *Glenn*, 673 F.3d at 876–77 (quoting *Deorle*, 272 F.3d at 1281); *see also Mattos v. Agarano*, 661 F.3d 433, 451 (9th Cir. 2011).

Defendant Camarillo argues that Decedent presented an imminent threat to the public and his fellow officers by jumping in front of an apartment unit with an open front door. (Doc. 133 at 7–8). While officers had evacuated the building, Officer Camarillo was unsure as to whether residents of the apartment listened to officer orders and/or whether Decedent, who was unarmed, could access weapons in the unit. (PROC at ¶ 32; Doc. 133 at 7–8). After Officer Camarillo applied the hold on Decedent's neck, however, six or seven officers gathered to restrain Decedent's arms and legs—yet, Camarillo continued his hold around Decedent's neck. (PROC at ¶ 37). Defendant Camarillo also argues that subduing Decedent quickly was a priority for officer safety because of the "structural integrity" of the stairway railing, as evidenced by a bolt coming loose during the struggle. (Doc. 98 at 10).

While Camarillo may have been justified in applying a carotid hold initially in the encounter, this necessity subsided as more officers restrained Decedent. This observation is bolstered by the fact that a carotid hold's severity increases as the length of time the hold is applied increases. Resolving factual disputes in favor of Plaintiffs, the Court must assume that Camarillo applied the carotid hold for nearly four minutes. (PROC at ¶ 37). Despite concerns regarding the stairway railing, responding officers significantly mitigated the imminent threat presented by Decedent when they restrained him. As a result, the Court concludes that this factor is of minimal weight in justifying Officer Camarillo's use of force.

(c)     **Resisting Arrest or Attempting Escape**

The final *Graham* factor is whether the suspect resisted arrest or attempted flight. The Court's analysis of this factor is complicated by the dispute over whether Decedent was voluntarily resisting arrest or flailing in response to the tasings. The Court is mindful that Decedent died as a result of the confrontation and is not present to testify. Cases in which the victim of alleged excessive force has died pose a particularly difficult problem in assessing whether the police acted reasonably, because the witness most likely to contradict the officers' story is unable to testify. *Gregory v. Cty. of Maui,*

523 F.3d 1103, 1107 (9th Cir. 2008). Accordingly, courts must carefully examine all of the evidence to determine if the officer's account of the events is credible and should deny summary judgment where a jury might find an officer's testimony that he used restraint in his use of force not credible. *Id.*

The evidence reflects that there was, at times, an active struggle between the officers and Decedent. However, it should be noted that Plaintiffs do not allege that the officers knew that Decedent was uncontrollably flailing in response to the Taser and yet continued to apply pressure to Decedent's neck. (PROC at ¶ 37) ("Officer Camarillo does not realize that the tasing is causing [Decedent's] body to stiffen and tense up . . . ."). Additionally, when Officer Camarillo told Decedent to "stay down," Decedent replied, "okay." (Doc. 117-4 at 6). Plaintiffs also note that in the struggle, Decedent did not "hit, kick or spit on any officer" and that Decedent's "body squirming" was him fighting for his life. (PROC at ¶ 50). At most, this factor is inconclusive and weighs neither in favor nor against a finding that Officer Camarillo's use of force was excessive.

### (d)    Other Factors

The foregoing *Graham* factors are not exclusive. *Lowry*, 818 F.3d at 853. Instead, courts must "examine the totality of the circumstances and consider whatever specific factors may be appropriate in a particular case whether or not listed in *Graham*." *Glenn*, 673 F.3d at 872 (quotations omitted). One pertinent factor to this case is the availability of other tactics to subdue the suspect. *See Bryan*, 630 F.3d at 831; *see also Smith*, 394 F.3d at 701 (explaining that police officers must consider less intrusive alternatives). While officers "are not required to use the least intrusive degree of force possible," *Forrester v. City of San Diego*, 25 F.3d 804, 807 (9th Cir. 1994), the availability of "clear, reasonable and less intrusive alternatives" to the force employed "militate[s] against finding [the] use of force reasonable," *Bryan*, 630 F.3d at 831.

Defendant Camarillo argues that PPD officers used many lesser intrusive methods to no avail before he resorted to use of the carotid hold. (*See* Doc. 133 at 10 n.8). For example, officers attempted to use or used Tasers, handcuffs, verbal commands, and

physical strikes all prior to application of the carotid hold. However, because Plaintiffs dispute when Officer Camarillo first applied the carotid hold, the Court must assume that Camarillo first applied the carotid hold upon first engagement with Decedent. Thus, officers only had used a Taser (which was ineffective) and verbal commands prior to the carotid hold. As a result, the Court concludes that the availability of other tactics is of minimal weight in justifying Officer Camarillo's use of force.

### iii.     Weighing the Conflicting Interests

Whether Officer Camarillo's use of a carotid hold for an extended period of time was "objectively reasonable" turns on "whether the degree of force used was necessary; in other words, whether the degree of force used was warranted by the governmental interests at stake." *Deorle*, 272 F.3d at 1282 (citing *Liston v. Cty. of Riverside*, 120 F.3d 965, 976 (9th Cir. 1997); *Graham*, 490 U.S. at 396). Because the reasonableness balancing test "nearly always requires a jury to sift through disputed factual contentions, and to draw inferences therefrom," courts should grant summary judgment in excessive force cases "sparingly." *Glenn*, 673 F.3d at 871 (citing *Smith*, 394 F.3d at 701). "This is because police misconduct cases almost always turn on a jury's credibility determinations." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (citing *Santos v. Gates*, 287 F.3d 846, 853 (9th Cir. 2002)). However, a court may decide reasonableness as a matter of law if, "in resolving all factual disputes in favor of the plaintiff, the officer's force was 'objectively reasonable' under the circumstances." *Jackson v. City of Bremerton*, 268 F.3d 646, 651 n.1 (9th Cir. 2001) (citing *Henrich*, 39 F.3d at 915).

Here, the Court is not compelled to find the balance of competing interests in favor of a specific party because of two genuine disputes of material fact: (1) the length of time Officer Camarillo applied a carotid hold on Decedent; and (2) whether Decedent was actually resisting arrest or, rather, reacting to the officers' use of Tasers. Because a jury could reasonably find that Decedent did not pose a threat great enough to justify a prolonged use of a carotid hold, the Court must leave the credibility determinations on

1    this disputed material fact to the jury. *Deorle*, 272 F.3d at 1281. As a result, the Court

2    cannot conclude that Officer Camarillo's used of a carotid hold was objectively

3    reasonable as a matter of law.

### d.    Qualified Immunity

5    The doctrine of qualified immunity insulates government agents from liability for

6    actions taken in good faith while exercising discretionary authority in their official

7    capacity. *Sonoda v. Cabrera*, 255 F.3d 1035, 1042 (9th Cir. 2001). In a suit against a

8    police officer under § 1983, the court's initial inquiry is whether, "[t]aken in the light

9    most favorable to the party asserting the injury," the facts alleged show that the officer's

10   conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If such

11   a deprivation is shown, the court must then determine whether the right violated was so

12   clearly established that the officials are not entitled to qualified immunity. *Id.*

13   A right is "clearly established" when "the contours of the right [are] sufficiently

14   clear that a reasonable official would understand that what he is doing violates that right."

15   *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). The relevant, dispositive inquiry in

16   determining whether a right is clearly established is whether it would be clear to a

17   reasonable officer that his conduct was unlawful in the situation he confronted. *Saucier*,

18   533 U.S. at 202 (citing *Wilson v. Layne*, 526 U.S. 603, 615 (1999)). The issues are

19   evaluated for objective reasonableness based upon the information officers had when the

20   conduct occurred, not upon the subjective intentions of the officers. *Id.* at 207. "Officials

21   can still be on notice that their conduct violates established law even in novel factual

22   circumstances." *Hope v. Pelzer*, 536 U.S. 730, 731 (2002) (citing *United States v. Lanier*,

23   520 U.S. 259, 271 (1997)).

24   Assuming, for purposes of this qualified immunity analysis, that Officer Camarillo

25   violated Decedent's Fourth Amendment right to be free from excessive force, the next

26   inquiry is whether the right was clearly established on the date of the incident. *Pearson v.*

27   *Callahan*, 555 U.S. 223, 229–30 (2009). Defendant Camarillo argues that he is entitled to

28   qualified immunity because his "uncontroverted expert on police procedures opined that

'Officer Camarillo's only deliberate attempt to apply a [carotid hold] was reasonable given the totality of circumstances, and any reasonable officer would have done the same thing.'" (Doc. 98 at 12–13). If true, Defendant Camarillo might be correct; however, his expert based his opinion on facts that are in dispute in this motion for summary judgment. (*See* Doc. 99-5 at 20 ("Several minutes into the prolonged struggle . . . *for the first and only time* since physically contacting the felony suspect, Officer Camarillo attempted to apply a [carotid hold]; he maintained the pressure for [between] 10 to 30 seconds, then relaxed to conserve his own strength." (emphasis added))). Because at the summary judgment stage, the Court must resolve all genuine factual discrepancies in favor of Plaintiffs, the Court must assume that Officer Camarillo applied a carotid hold to Decedent upon first physical contact. As a result, Defendant Camarillo's expert's opinion on police procedures is inapposite at this stage of litigation.

In addition, a police department's "training materials are relevant not only to whether the force employed in this case was objectively unreasonable . . . but also to whether reasonable officers would have been on *notice* that the force employed was objectively unreasonable." *Drummond*, 343 F.3d at 1062. PPD's Use of Force Guidelines ("Guidelines") state that "[i]f oxygenated blood flow to the brain is cut off for four to six minutes, irreparable brain damage may occur." (Doc. 107-5 at 21 (emphasis omitted)). The Guidelines also prohibit the use of "Tasers, carotid [holds,] or deadly force" on a person who is handcuffed or restrained "unless such force is reasonable based on the totality of circumstances." (PRCP at ¶ 171). As to deadly force, the Guidelines state that "[w]hen the circumstances justifying the use of deadly force no longer exist, deadly force will immediately be discontinued." (Doc. 107-5 at 22).

Examining the available training materials, Officer Camarillo was on notice of the lethal—or nearly lethal—ramifications of a carotid hold held for four minutes or longer. The Guidelines also informed Officer Camarillo to use non-deadly force when a suspect is already restrained. Plaintiffs' expert report indicates that Officer Camarillo ignored the Guidelines by using deadly force—namely, a carotid hold for over four minutes—while

officers were both tasing and physically restraining Decedent. The Guidelines gave Officer Camarillo fair warning of the risk of death in using such significant force on a restrained individual. *See Atkinson v. Cty. of Tulare*, 790 F. Supp. 2d 1188, 1206–07 (E.D. Cal. 2011) (denying summary judgment on grounds of qualified immunity, in part, because "training materials put [the officer] on notice that a carotid restraint or deadly force cannot be used unless there is imminent threat of death or serious bodily injury to the officers or others").

Defendant Camarillo next argues that qualified immunity is appropriate because "[n]o case published by July 28, 2013 would have put Officer Camarillo on notice that his conduct was prohibited in this case." Defendant Camarillo further cites to cases that he says "validate[] the use of a carotid [hold] when an officer's safety is at issue." (Doc. 98 at 13). He first cites to *Gregory v. County of Maui*, in which an individual, who threatened officers with a pen, died of a heart attack after officers "used a hold around [the individual's] head and neck to restrain him." 523 F.3d at 1105. In *Gregory*, unlike the present case, there was no sign that the head and neck hold contributed to the decedent's death. *Id.* at 1107 n.4. Consequently, there was "no medical or circumstantial evidence that could support the conclusion that the use of force by the officers was excessive." *Id.* at 1108. Here, however, Plaintiffs have presented medical testimony linking Decedent's anoxic brain injury to the Officer Camarillo's use of a carotid hold. Further, unlike the unarmed Decedent here, the individual in *Gregory* was armed. *See id.* at 1107–08 ("While the pen is not always mightier than the sword, a properly wielded writing instrument may inflict lethal force."). As a result, the Court does not find *Gregory* to "validate" the use of a carotid hold (especially for over four minutes) in this case.

Defendant Camarillo next cites *Barnes v. McLellan*, which simply states that an officer's "use of a carotid hold to restrain [the plaintiff] was [not] objectively unreasonable *under the circumstances*." 54 Fed. App'x 283, 284 (9th Cir. 2003) (emphasis added). However, as the Court has noted earlier, a carotid hold held for four minutes is objectively more unreasonable than a carotid hold held for a few seconds.

Without more information regarding the underlying facts in *Barnes*, the Court finds that it also does not "validate" the use of a carotid hold in this situation.

Finally, Defendant Camarillo cites to *Elkins v. Washington County*, in which a district court recognized that resisting arrest provided an officer with a valid justification for "the use of force and/or a [pre-carotid hold] to subdue the arrestee and effectuate the arrest." 2007 WL 1342155, at *10. This statement, however, is inapplicable to the current case because there is a factual dispute as to whether Decedent was actively resisting arrest or responding to being tased. Additionally, the timing of the pre-carotid hold in *Elkins* was much shorter than what is alleged here. *See id.* at *3 ("The entire incident from the time [the officer] approached [the arrestee's] car to the time [the arrestee] was arrested took less than three minutes."). As a result, while there is no factually analogous case that Plaintiffs have cited to, there is also no case law that "validates" the manner in which Officer Camarillo applied the carotid hold.

However, "[e]ven where there is no federal case analyzing a similar set of facts, a plaintiff may nonetheless demonstrate that a reasonable officer would have known that the force he used was excessive." *Davis*, 478 F.3d at 1056. The Supreme Court has clearly stated the rule applicable to the use of deadly force to prevent a felony suspect's escape:

> The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable. It is not better that all felony suspects die than that they escape. Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so.

*Tennessee v. Garner*, 471 U.S. 1, 11 (1985). Additionally, "[i]n assessing the state of the law at the time of [the] arrest, we need look no further than *Graham's* holding that force is only justified when there is need for force." *Blankenhorn*, 485 F.3d at 481. Given Officer Camarillo's notice of the potentially lethal ramifications of a lengthy use of a carotid hold and viewing the facts in the light most favorable to Plaintiffs, a reasonable

1    officer in Officer Camarillo's position would be on notice that a carotid hold held for four

2    minutes was unnecessary and excessive.

3           As a result, Defendant Camarillo's Motion for Summary Judgment on the issue of

4    excessive force on the grounds of qualified immunity is denied.

5                       **e.**        **Causation**

6           Defendant Camarillo also argues that Plaintiffs have failed to show that the carotid

7    hold actually caused Decedent's death. (Doc. 98 at 17–18). Plaintiffs dispute this

8    proposition by pointing to the Medical Examiner's Report, which acknowledges that

9    Decedent died from an anoxic brain injury, and Ms. Downing's expert report, which

10   connects the hold Officer Camarillo applied with Decedent's injuries. (Doc. 118 at 15–

11   16). Defendant Camarillo's causation arguments, however, appear to rely on the Court

12   excluding Ms. Downing as an expert, as he classifies his own medical expert's testimony

13   as "uncontradicted." (*See* Doc. 133 at 15). As the Court discussed earlier, however, Ms.

14   Downing is qualified as an expert and her testimony is both relevant and creates a

15   genuine factual dispute as to whether the carotid hold caused Decedent's injuries. As a

16   result, Defendant Camarillo's Motion for Summary Judgment for Plaintiffs' excessive

17   force claim on the grounds of causation is denied.

18         Accordingly, with regard to Count V, the Court denies Defendant Camarillo's

19   Motion for Summary Judgment.

20                **2.**       **Chief Garcia**

21                     **a.**       **Official Capacity**

22           Plaintiffs' Amended Complaint names Phoenix Police Chief Garcia both

23   individually and in his "official capacity." (Doc. 7 at ¶ 12). Actions for damages against a

24   party in his or her official capacity are, in essence, actions against the government entity.

25   *Monell v. Dep't of Soc. Servs. of City of N.Y.*, 436 U.S. 658, 690 (1978). Thus, "[t]here is

26   no longer a need to bring official-capacity actions against local government officials, for

27   under *Monell*[,] . . . local government units can be sued directly for damages and

28   injunctive relief." *Kentucky v. Graham*, 473 U.S. 159, 167 (1985). "[P]ersonal capacity

suits seek to impose personal liability upon a government official for acts he takes under color of state law." *Id.* at 165. Official capacity suits, on the other hand, "generally represent only another way of pleading an action against an entity of which the officer is an agent" and are, in all respects other than name, to be treated as a suit against the entity. *Id.* at 165–66 (citing *Monell*, 436 U.S. at 690 n.55).

Here, Plaintiffs sue City of Phoenix for the same claims and damages as Defendant Garcia. Plaintiffs also agree with the above analysis. (*See* Doc. 120 at 4 ("Plaintiffs concede that an action against a municipal officer in his or her official capacity [alongside] the municipality is duplicitous [*sic*].")). Thus, the Court grants City Defendants' Motion for Summary Judgment as to Plaintiffs' claim against Defendant Garcia in his "official capacity."

### b.      Individual Capacity

Plaintiffs also name Chief Garcia as a defendant in his individual capacity. Although § 1983 does not allow for *respondeat superior* liability, *Chavez v. United States*, 683 F.3d 1102, 1109 (9th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009)), a defendant may be liable as a supervisor under § 1983 "if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (citing *Hansen v. Black*, 885 F.2d 642, 646 (9th Cir. 1989)). To be held liable, the supervisor defendant need not be "directly and personally involved in the same way as are the individual officers who are on the scene inflicting constitutional injury." *Id.* at 1205. Rather, the Ninth Circuit has recognized that a supervisor may be held liable based on the following theories: (1) by "setting in motion a series of acts by others, . . . or by knowingly refusing to terminate a series of acts by others, which [the supervisor] knew or reasonably should have known would cause others to inflict a constitutional injury"; (2) for the supervisor's "own culpable action or inaction in the training, supervision, or control of his subordinates"; (3) for "his acquiescence in the constitutional deprivations" of which the complaint is

made; or (4) for conduct that "showed a reckless or callous indifference to the rights of others." *Id.* at 1205–08 (citations and quotations omitted). Moreover, because of qualified immunity protection, "a supervisor faces liability under the Fourth Amendment only where it would be clear to a reasonable [supervisor] that his conduct was unlawful in the situation he confronted." *Chavez*, 683 F.3d at 1110 (quotations omitted).

Here, Plaintiffs name Chief Garcia as a defendant solely on the basis that he was in charge of the PPD at the time of Decedent's alleged injuries, but fail to set forth any specific allegations that Chief Garcia personally participated in the underlying alleged violations of Decedent's constitutional rights. Nor do Plaintiffs set forth any factual allegations that Chief Garcia either personally promulgated any policy that had a direct causal connection with the constitutional injuries of which Plaintiffs complain or knowingly acquiesced to the other Defendants' alleged conduct. Thus, the Court dismisses the individual-capacity claims against Defendant Garcia.

In sum, Chief Garcia is entitled to summary judgment under Count VI in all capacities. Accordingly, with regard to Count VI, the Court grants City Defendants' Motion for Summary Judgment as to Defendant Garcia.

### 3.   City of Phoenix

#### a.   Officer Camarillo's Conduct

Plaintiffs also bring a claim against the City under 42 U.S.C. § 1983 (2012) and *Monell*, 436 U.S. 658. Under *Monell*, municipalities may not be held liable under § 1983 "unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell*, 436 U.S. at 691. Ordinarily, a single constitutional deprivation "is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Okla. City v. Tuttle*, 471 U.S. 808, 824 (1985).

Thus, in order to establish that the City is liable under § 1983, Plaintiffs must prove: (1) that Decedent or Plaintiffs possessed a constitutional right of which he or they

were deprived; (2) that the City had a policy; (3) that this policy amounts to deliberate indifference to the constitutional right; and (4) that the policy is the moving force behind the constitutional violation. *See Dougherty v. City of Covina*, 654 F.3d 892, 900 (9th Cir. 2011). "A policy can be one of action or inaction." *Long v. Cty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006) (citing *City of Canton v. Harris*, 489 U.S. 378, 388 (1989)). Further, the policy at issue may be either formal or informal. *See City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988). An informal policy exists when a plaintiff can "prove the existence of a widespread practice that, although not authorized by written law or express municipal policy, is 'so permanent and well settled as to constitute a custom or usage' with the force of law." *Id.* (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 167–68 (1970)).

Here, Plaintiffs claim that the City is liable under three distinct theories of municipal liability: (1) deliberate indifference to the proper training and supervision of PPD personnel; (2) fostering a custom of allowing officers to depart from PPD policies and violate constitutional rights; and (3) ratifying Officer Camarillo's conduct by not enforcing adequate discipline.[12] (Docs. 120 at 5–8; 7 at 23–29).

### i.      Failure to Train

Complete inadequacy of training may amount to a policy giving rise to *Monell* liability. However, "adequately trained officers occasionally make mistakes; the fact that they do says little about the training program or the legal basis for holding the city liable." *City of Canton*, 489 U.S. at 379. Consequently, a claim for inadequate training under *Monell* is only sufficient "where that city's failure to train reflects deliberate indifference to the constitutional rights of its inhabitants," and that deliberate indifference

---

[12] Plaintiffs also attempt to argue that PPD fostered a culture of subjective discretion among officers and mention PPD Operations Order 1.2 as the source for this custom. Plaintiffs did not allege this theory in their Amended Complaint and never disclosed this provision as a basis of liability. Plaintiffs also failed to cite to this Operations Order in their Response to both Defendants' Statement of Facts and did not submit their own statement of facts. Moreover, this document is not in the Court's Record. The Court cannot consider any responses, statements of fact, or evidence that is not in its Record. *See D'Agnese v. Novartis Pharms. Corp.*, 952 F. Supp. 2d 880, 885–86 (D. Ariz. 2013).

was the moving force of the violation of the plaintiff's federally protected right. *Id.* at 388, 392. To establish a "policy" of inadequate training, a plaintiff must offer "proof of facts evidencing the local government's awareness of a high probability of harm if the government failed to act." *Redman v. Cty. of San Diego*, 942 F.2d 1435, 1453 (9th Cir. 1991). "A 'pattern of similar constitutional violations by untrained employees is ordinarily necessary to demonstrate deliberate indifference for purposes of failure to train[.]" *Flores v. Cty. of L.A.*, 758 F.3d 1154, 1159 (9th Cir. 2014). After all, "[w]ithout notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights." *Connick v. Thompson*, 563 U.S. 51, 62 (2011).

There does exist, however, "a narrow range of circumstances [in which] a pattern of similar violations might not be necessary to show deliberate indifference." *Flores*, 758 F.3d at 1159 (citing *Connick*, 563 U.S. at 63–64). In this "narrow range of circumstances," a single incident may suffice to establish deliberate indifference where the violation of constitutional rights is a "highly predictable consequence" of a failure to train because that failure to train is "so patently obvious." *Connick*, 563 U.S. at 64. In explaining this "narrow range of circumstances," the Supreme Court hypothesized that where a municipality "arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force," a pattern of similar violations would not be necessary to show deliberate indifference. *Id.* at 63 (citing *City of Canton*, 489 U.S. at 390 n.10).

Plaintiffs argue that PPD's training policy on the carotid hold is deficient because it fails to specify a "maximum application time" for the hold. (Doc. 120 at 6). City Defendants rebut Plaintiffs' claim by noting that PPD's policy instructs officers that the average person will be rendered unconscious in approximately "5 to 15 seconds" and that "inoperable brain damage" could occur if the hold is in place for "4 to 6 minutes." (PRCP at ¶ 173). In essence, Plaintiffs are arguing that because the PPD policy "does not

instruct user[s] of [the carotid hold] that they should not utilize the technique for more than 15 seconds, 30 seconds, 60 seconds, 90 seconds, 180 seconds, or more," the policy amounts to a failure to train. (*Id.*).

Applicable to the allegations in this case, in addition to specific academy training requirements, officers for PPD are required to take a two-hour training lesson in the carotid hold. (*Id.* at ¶ 186). This lesson is based on the AZPOST Defensive Tactics Instructors lesson plan and outlines PPD's use of force policies. (*Id.* at ¶ 187). Plaintiffs dispute the efficacy of this training program based on Officer Camarillo's inability to recall whether he was trained in "how long to apply the [carotid hold] on a suspect," among other specific recollections. (*Id.* at ¶ 186).

Because Plaintiffs have not argued that Plaintiffs' and/or Decedent's injuries are part of a "pattern of constitutional violations" by PPD officers, Plaintiffs must proceed on a single incident theory.[13] Plaintiffs do not allege that PPD failed to provide *any* training; instead, Plaintiffs argue that PPD's carotid hold training was deficient because it failed to specify a maximum application time. *See Mendez v. Cty. of San Bernardino*, 540 F.3d 1109, 1123–24 (9th Cir. 2008), *overruled in part on other grounds by Arizona v. ASARCO LLC*, 773 F.3d 1050 (9th Cir. 2014) (affirming summary judgment in favor of a municipality, in part, because plaintiff "presented no evidence . . . that the County negligently failed to comply with the POST regulations on training"). Taking Plaintiffs' facts as true, Officer Camarillo caused the injury here by applying a carotid hold for over four minutes. However, PPD's training materials explicitly warn officers that "irreparable brain damage may occur" if a proper carotid hold is in place for longer than four minutes. As a result, even if the training materials had indicated a particular maximum time for application of a carotid hold, Officer Camarillo was already on notice of the dire—and potentially lethal—consequences of a carotid hold applied for over four minutes. Thus, this is not a situation where Decedent's injuries were "so obvious" and "so likely to

---

[13] Plaintiffs mention that the use of carotid holds past their maximum application time was "so persistent and widespread" at PPD. (Doc. 120 at 6). However, this claim is conclusory and cites to no incident besides the one in this case.

result" from PPD's failure to specify a maximum application time for a carotid hold in its training materials that the City is subject to *Monell* liability on this theory. *See City of Canton*, 489 U.S. at 388.

### ii.      Adopted Custom or Policy

To prevail on a theory that a government entity adopted an unconstitutional custom or policy, a plaintiff must prove "the existence of a widespread practice that . . . is so permanent and well settled as to constitute a 'custom or usage' with the force of law." *Gillette v. Delmore*, 979 F.2d 1342, 1349 (9th Cir. 1992) (quoting *Praprotnik*, 485 U.S. at 127). Plaintiffs appear to argue that Officer Camarillo's failure to follow PPD written procedure amounted to an unconstitutional custom or policy. (*See, e.g.*, Doc. 7 at ¶ 201 ("Phoenix [O]perations [O]rder 1.5(G) states that after the technique is used and the subject is rendered unconscious, officers are to immediately roll the suspect onto their side and check for vital signs. As stated above, none of the officers checked for [Decedent's] vital signs on the second floor landing.")). Although Plaintiffs allege that PPD officers deviated from policy by tasing Decedent, they fail to cite to any other *incidents* in which PPD officers failed to follow PPD guidelines. Without reference to other incidents, it is impossible for the Court to discern a custom of failing to follow PPD guidelines from any "widespread practice." *See, e.g.*, *Hulstedt v. City of Scottsdale*, 884 F. Supp. 2d 972, 1016 (D. Ariz. 2012) ("At most, some individual officers were not thoroughly familiar with the material that Plaintiffs acknowledge [the Department] used to train its officers. Even if true, this fact does not give rise to municipal liability.").

### iii.      Ratification

While a policymaker's ratification of a subordinate's actions can give rise to municipal liability, the plaintiff must prove both that the policymaker had knowledge of the violation and that "the policymaker approved of the subordinate's act." *Christie v. Iopa*, 176 F.3d 1231, 1239 (9th Cir. 1999). "For example, it is well-settled that a policymaker's mere refusal to overrule a subordinate's completed act does not constitute approval." *Id.* (citing *Weisbuch v. Cty. of L.A.*, 119 F.3d 778, 781 (9th Cir. 1997)). Here,

Plaintiffs argue that the City "ratified" Officer Camarillo's unconstitutional conduct by not disciplining him.[14] (*See* Doc. 7 at ¶¶ 186, 205). However, Plaintiffs cite no authority for the proposition that a single failure to reprimand, without more, is sufficient to support a finding of ratification. Furthermore, the authority is to the contrary. *See, e.g.*, *Gillette*, 979 F.2d at 1349 ("A section 1983 plaintiff may attempt to prove the existence of a custom or informal policy with evidence of *repeated* constitutional violations for which the errant municipal officials were not discharged or reprimanded." (emphasis added)); *Collender v. City of Brea*, No. SACV 11-0530 AG (MLGx), 2013 WL 11316942, at *15 (C.D. Cal. Mar. 4, 2013) (granting summary judgment in favor of a municipality where plaintiffs did not provide "sufficient evidence showing that the ratification was a 'conscious, affirmative choice' or that the failure to reprimand officers was part of systematic problems" (quoting *Haugen v. Brosseau*, 339 F.3d 857, 875 (9th Cir. 2003))).

Because Plaintiffs have not presented sufficient evidence under any *Monell* theory, City Defendants' Motion for Summary Judgment on the *Monell* claim (Count VI) is granted as to Officer Camarillo's conduct.

### b.      Dismissed Officers' Conduct

Plaintiffs' Amended Complaint asserts that the City is liable under *Monell* for the conduct of Lieutenant Hoover, Sergeants Wesley and Luebkin, and Officers Matthews, Schmidt, Linn, and Hessner, each of whom have been dismissed with prejudice. (*See* Docs. 7, 48). City Defendants argue that the City cannot be liable for the conduct of the dismissed officers because "the underlying conduct of the officers" was not unconstitutional. (Doc. 101 at 12). City Defendants further argue that "Plaintiffs have not disclosed any expert to opine on the dismissed officers' conduct, or the City's training, supervision and/or discipline as it relates to these officers." (*Id.*). Moreover, the Court notes that Plaintiffs do not even mention the conduct of any of these officers (with the exception of Officer Matthews, whom Plaintiffs mention twice) in the "Relevant Facts"

---

[14] Plaintiffs failed to clarify (or mention) this ratification theory in their Response.

portion of their Responses to Defendants' Motions for Summary Judgment. Thus, it appears that Plaintiffs have abandoned these claims against the City. *See Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008) ("[A] plaintiff has 'abandoned . . . claims by not raising them in opposition to [the defendant's] motion for summary judgment.'" (quoting *Jenkins v. Cty. of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005))); *see also Estate of Shapiro v. United States*, 634 F.3d 1055, 1060 (9th Cir. 2011) ("[Plaintiff] abandoned this claim by failing to raise it in opposition to the [defendant's] motion for complete summary judgment.").

In sum, the City is entitled to dismissal of Count VI for all underlying officers' conduct. Accordingly, with regard to Count VI, the Court grants City Defendants' Motion for Summary Judgment.

## C.   State Law Gross Negligence and Wrongful Death Claims[15]

Plaintiffs assert a wrongful death claim against Officer Camarillo and, both a *respondeat superior* and negligent supervision theory, against the City.[16] Defendants first argue that Plaintiffs failed to put forward any evidence that Officer Camarillo breached the standard of care (which would be required to prove a negligence claim) because Plaintiffs failed to disclose a standard of care expert. (Doc. 101 at 20–21). Defendants' second argument is that Officer Camarillo's use of force was justified under Ariz. Rev. Stat. § 13-413. (Doc. 98 at 16).

Defendants raise a novel argument regarding expert testimony to establish a standard of care. "Ordinarily, the standard of care to be applied in a negligence action focuses on the conduct of a reasonably prudent person under the circumstances," *Sw. Auto Painting & Body Repair, Inc. v. Binsfeld*, 904 P.2d 1268, 1272 (Ariz. Ct.

---

[15] City Defendants also argue for summary judgment on Count I of Plaintiffs' Amended Complaint—the simple negligence claims. (Doc. 101 at 20). However, the Court has already dismissed those claims. (*See* Doc. 31).

[16] Although Plaintiffs assert this claim against "all Defendants," they fail to present any legal or factual argument that would implicate Chief Garcia. (Doc. 7 at 17). As a result, the Court will construe this claim against only Defendants Camarillo and the City.

App. 1995), and the jury may rely on its own experience in determining whether the defendant acted with reasonable care, *Bell v. Maricopa Med. Ctr.*, 755 P.2d 1180, 1182 (Ariz. Ct. App. 1988). "However, when a person holds himself out to the public as possessing special knowledge, skill, or expertise, he must perform according to the standard of his profession." *Binsfeld*, 904 P.2d at 1272. In such cases, expert testimony is required to educate the jury regarding that standard. *Naki v. Hawaii*, No. CV-13-02189-PHX-JAT, 2015 WL 5954823, at *2 (D. Ariz. Oct. 14, 2015) ("[U]nder Arizona law, when 'the alleged lack of care occurred during [a] professional or business activity, the plaintiff must present expert witness testimony as to the care and competence prevalent in the business or profession.'" (quoting *St. Joseph's Hosp. & Med. Ctr. v. Reserve Life Ins. Co.*, 742 P.2d 808, 816 (Ariz. 1987))); *see also Porter v. Ariz. Dep't of Corrs.*, No. 2:09-cv-2479-HRH, 2012 WL 7180482, *2–5 (D. Ariz. Sept. 17, 2012). However, where negligence is "so grossly apparent" that it would be obvious to a lay person, expert testimony establishing a standard of care may not be necessary. *Bell*, 755 P.2d at 1183 n.1.

Defendants contend that "[b]ecause police training in the use of force involves highly technical matters, and the supervision and retention of police officers involve administrative, personnel, and professional matters well beyond the common knowledge of a lay person, Plaintiffs' failure to provide expert testimony establishing the applicable standard of care is fatal to their claim." (Doc. 101 at 20). Arizona courts have yet to decide whether expert testimony is necessary to establish a standard of care in situations involving more technical uses of force—like the carotid hold. In their Responses to Defendants' Motions for Summary Judgment, Plaintiffs make no argument as to these questions of law. Plaintiffs also fail to explain how Officer Camarillo's negligence could be "so grossly apparent" and do not respond to Defendants' justification defense. In fact, Plaintiffs fail to even mention their state-law claims in either Response. Thus, it appears that Plaintiffs have abandoned these claims against Defendants. *See Shakur*, 514 F.3d at 892 (citing *Jenkins*, 398 F.3d at 1095 n.4).

1    Accordingly, with regard to Count III, the Court grants both Defendant Camarillo
2    and City Defendants' Motions for Summary Judgment.

3    **D.    Punitive Damages**

4    Defendant Camarillo seeks summary judgment on Plaintiffs' request for punitive
5    damages. (Doc. 7 at ¶ 175). Defendant Camarillo argues that "the record is utterly devoid
6    of any evidence that Officer Camarillo acted with requisite 'evil motive' or 'callous
7    indifference' to warrant punitive damages under § 1983." (Doc. 98 at 18). Plaintiffs
8    respond that such motives could be inferred by a jury through various actions taken by
9    Officer Camarillo. (Doc. 118 at 16–17).

10    "[A] jury may be permitted to assess punitive damages in an action under § 1983
11    when the defendant's conduct is shown to be motivated by evil motive or intent, or when
12    it involves reckless or callous indifference to the federally protected rights of others."
13    *Smith v. Wade*, 461 U.S. 30, 56 (1983). As discussed above, the Court grants summary
14    judgment on all claims against City Defendants, Chief Garcia, and Officer Camarillo,
15    with the exception of Plaintiffs' § 1983 excessive force claim against Officer Camarillo.
16    Given that Plaintiffs have raised triable issues as to the constitutionality of Officer
17    Camarillo's carotid hold, the Court finds that the evidence is sufficient to create a triable
18    issue as to whether Officer Camarillo's conduct meets the federal standards for an award
19    of punitive damages.

20    Accordingly, with regard to punitive damages, the Court denies Defendant
21    Camarillo's Motion for Summary Judgment.

22
23
24
25
26
27
28

1

## IV.    CONCLUSION

2        Based on the foregoing,[17]

3        **IT IS ORDERED** that City Defendants' Motion to Exclude (Doc. 94) is
4    **DENIED**.

5        **IT IS FURTHER ORDERED** that Defendant Camarillo's Motion for Summary
6    Judgment (Doc. 98) is **GRANTED** in part and **DENIED** in part, consistent with the
7    reasoning above.[18] Defendant Camarillo is entitled to summary judgment on Counts II,
8    III, and IV. Summary judgment for Defendant Camarillo is denied on Count V.

9        **IT IS FURTHER ORDERED** that City Defendants' Motion for Summary
10   Judgment (Doc. 106) is **GRANTED**. Defendant Garcia is entitled to summary judgment
11   on Counts II, III, and V. Defendant City of Phoenix is entitled to summary judgment on
12   Counts III and VI.

13       Dated this 2nd day of November, 2016.

14

15

16       _____
17       James A. Teilborg
         Senior United States District Judge
18

19

20

21

22

23

24       _____

25       [17] As stated before, to the extent City Defendant's Motion seeks summary
26   judgment on Count I of Plaintiffs' Amended Complaint, the Court has already dismissed
     these claims. (*See* Doc. 31). Therefore, the Court denies that portion of City Defendants'
27   Motion for Summary Judgment as moot.

28       [18] Defendant Camarillo's Motion to Strike, embedded within Defendant
     Camarillo's Reply in Support of his Motion for Summary Judgment (Doc. 133 at 15–16),
     is ruled on as specified above.