## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Yolanda Erickson, individually and as personal representative of the Estate of Miguel Ruiz, Canon Ruiz and minor A.R., | ) ) ) ) ) |
| Plaintiffs, | ) ) ) **CV14-01942-PHX-JAT** |
| vs. | ) Phoenix, Arizona ) May 30, 2017 ) 9:01 a.m. |
| City of Phoenix, et al., | ) ) |
| Defendants. | ) ) |

BEFORE:  THE HONORABLE JAMES A. TEILBORG, JUDGE
REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY #7

APPEARANCES:

For the Plaintiffs:
            BLACKWELL LAW OFFICE, PLLC
            By:  **Jocquese L. Blackwell, Esq.**
                 **Gillmore Bernard, Esq.**
            420 West Roosevelt Street, Suite 106
            Phoenix, AZ  85003

For the Defendants:
            JONES, SKELTON & HOCHULI, PLC
            By:  **John T. Masterson, Esq.**
                 **Joseph J. Popolizio, Esq.**
                 **Justin M. Ackerman, Esq.**
            40 North Central Avenue, Suite 2700
            Phoenix, AZ  85004

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC. 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

1                              <u>**INDEX**</u>

2

   **SUMMARY OF COURT PROCEEDINGS**                    **PAGE:**

3
   Defendant Rests                              Page 161
4  Plaintiff Rests                              Page 161
   Renewed Rule 50 Motion by Defense            Page 165
5  Final Jury Instruction Conference            Page 162

6

7                      <u>**INDEX OF WITNESSES**</u>

8  **GARY MICHAEL VILKE, M.D.:**

9  Direct examination by Mr. Popolizio       Page   4
   Cross examination by Mr. Blackwell        Page  80
10 Redirect examination by Mr. Popolizio     Page 153

11

12                      <u>**INDEX OF EXHIBITS**</u>

13
   **EXHIBIT NO.:**         **DESCRIPTION:**              **RECEIVED:**
14

15                          **(none)**

16

17

18

19

20

21

22

23

24

25

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
 1              P R O C E E D I N G S

 2        (Called to the order of court at 9:01 a.m.)

 3              THE COURT:  Thank you.  Please be seated.

 4              The record will reflect the presence of the parties

 5     and counsel, ladies and gentlemen of the jury.  Good morning.

 6              And the defense may call its next witness.

 7              MR. BLACKWELL:  Your Honor, if I may, I would just

 8     like to announce to the Court that Mrs. Erickson could not be

 9     here due to family business for today and tomorrow.

10              THE COURT:  All right.

11              MR. BLACKWELL:  If that's okay.

12              THE COURT:  All right.  Thank you.  I appreciate

13     that.

14              MR. BLACKWELL:  Thank you, Judge.

15              MR. POPOLIZIO:  Good morning, Your Honor.

16              The defense calls Dr. Gary Vilke.

17        (Witness duly sworn)

18              THE CLERK:  Can you please state your name for the

19     record, spelling your first and last name.

20              THE WITNESS:  Gary Michael Vilke.  G-A-R-Y.  V as in

21     Victor I-L-K-E.

22              THE COURT:  You may proceed.

23              MR. POPOLIZIO:  Thank you, Your Honor.

24

25     /////
```

1              **GARY M. VILKE, M.D., WITNESS, SWORN**

2                       **DIRECT EXAMINATION**

3     BY MR. POPOLIZIO:

4     Q    Good morning.

5     A    Good morning.

6     Q    Please introduce yourself to the jury.

7     A    Hi.  My name is Gary Michael Vilke.

8     Q    And are you a medical doctor?

9     A    I am, yes.

10    Q    And what type of medical doctor, if you have a specialty?

11    A    Yes.  I'm board certified in emergency medicine.

12    Q    Okay.  What is emergency medicine, Doctor?

13    A    Sure.  Emergency medicine, you know, basically are the

14    doctors who work in the emergency department.  We're trained

15    to take care of anything, everything from pediatrics to

16    geriatrics, obstetrics, anything that really comes in

17    emergently.

18    Q    In addition to the letters "MD" after your name, you have

19    two more groups of letters.  I would like to explore those,

20    okay.

21    A    Sure.

22    Q    Okay.  First, what is F-A-C-E-P?

23    A    Sure.  FACEP is a Fellow of the American College of

24    Emergency Physicians.

25    Q    And, well, two things there.

1              First of all, what is a Fellow of the College of

2    Emergency Physicians?

3    A    Sure.  A fellow is a -- I guess a status that you can

4    obtain if you do certain requirements for that organization.

5              So for the American College of Emergency Physicians,

6    that's the emergency medicine's largest national group.

7              And so a fellow is somebody that that organization

8    recognizes has sort of done above and beyond the standard

9    person in the emergency medicine.

10   Q    And how long have you been a fellow with that

11   organization?

12   A    Jeez.  It's probably close to 20 years now.

13   Q    Another set of letters after your name.  F-A-A-E-M.  What

14   does that stand for?

15   A    Sure.  That's a Fellow of the American Academy of

16   Emergency Medicine.  And that's the other large emergency

17   medicine organization that's in the United States that

18   represents emergency physicians.

19   Q    And, again, how long have you been a fellow for that

20   organization?

21   A    The same duration, probably close to 20 years.

22   Q    And is it the same or similar to be selected as a Fellow

23   for that organization as it is for the American College of

24   Emergency Physicians?

25   A    It's similar, yes.  You have to be board certified and

1    recognized by the organization.

2    Q    Okay.  Where do you work, Doctor?

3    A    I work at the University of California San Diego Medical

4    Center in San Diego.

5    Q    And any particular part of that Medical Center?

6    A    I work in the Emergency Department as my primary clinical

7    function.  That's where I take care of my patients.

8    Q    Okay.  So let's go back a little bit.  Go back a few years

9    for your education.

10    A    Sure.

11    Q    Where did you go to college?

12    A    I graduated my undergraduate at Cal Berkeley.

13    Q    Okay.  And what did you study at Cal Berkeley?

14    A    I was a zoology major.

15    Q    And so is your degree in zoology?

16    A    Yes.  I was pre-med practicing, but my degree was in

17    zoology.

18    Q    And then you went to med school thereafter?

19    A    I did go, yes.

20    Q    Was it immediately after college?

21    A    Correct.  I went right into medical school after I

22    graduated.

23    Q    And where did you go to medical school?

24    A    University of California San Diego, School of Medicine.

25    Q    Now, after medical school, did you do an internship?

CV14-01942-PHX-JAT     JURY TRIAL - DAY #7     5-30-17

1    A    I did, yes.

2    Q    In what?

3    A    I did general surgery for a year.  Internship is basically

4    your freshman year out of medical school and so my first year

5    was doing surgery.

6    Q    And then after your internship, did you do a residency?

7    A    Yes, I did.

8    Q    And where was that?

9    A    That was also at the University of California in San

10   Diego.

11   Q    And what was your residency in?

12   A    It was my emergency medicine training, so that's where I

13   got my training to become board certified in emergency

14   medicine.

15   Q    And how many years were you in the emergency medicine

16   residency program?

17   A    That was an additional three years after internship.

18   Q    Okay.  Now, are you board certified?

19   A    I am board certified, yes.

20   Q    In what?

21   A    In the field of emergency medicine.

22   Q    I notice you want to take a drink of water.  Go ahead.

23   A    I do.  Just a little bit more here.

24   Q    And how does one become board certified in emergency

25   medicine?

```
 1   A    You have to obviously finish your medical school training

 2   and become a physician.  You have to train at a

 3   board-certified program.  So you have to go and complete a

 4   residency, meet all the requirements, and then you have to

 5   take a full-day written exam and pass that.

 6            And then they make you take a two-day oral

 7   examination.  So basically, two days of questions and

 8   scenarios and how you would handle patients and certain

 9   different types of things.  And you have to pass that.

10            And when you do, then you are now board certified.

11   Q    And how long have you been board certified?

12   A    Since I finished residency, so since 1997.

13   Q    Is that something you have to renew periodically?

14   A    Every ten years, yes.

15   Q    Are you affiliated with the American Heart Association?

16   A    I am, yes.

17   Q    Okay.  And in what way?

18   A    I ran their Training Center in San Diego for about eight

19   years.  So all the CPR, cardiac arrest training, the advanced

20   cardiac life support, pediatric advanced life support, so all

21   the training of physicians and paramedics and nurses went

22   through my Training Center.

23   Q    Did that cover resuscitation science?

24   A    It does, yes.

25   Q    Okay.  What is resuscitation science?
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    A    So it's basically an evidence-based way of doing

2    resuscitation.  We learn the methods to resuscitate people,

3    but we also train the science behind it.

4            What's the data that says we should do things in

5    certain patterns?  Why to do chest compressions at a hundred

6    beats per minute?  Why do we use certain medications?

7            That's the science behind it.

8    Q    And you instruct in that also?

9    A    Correct.

10   Q    Do you have any teaching experience?

11   A    I do, yes.

12   Q    Okay.  Could you share with us your teaching experience?

13   A    Sure.  I mean as part of being an academic medical center,

14   our job is to teach the medical students, teach the residents,

15   and teach the fellows.

16           So I do lectures.  We do bedside teaching at the

17   patient's bedside teaching them diagnoses, overseeing their

18   care.  Doing research with them.  So it's basically day-to-day

19   we're teaching the future doctors of America.

20   Q    And how long have you been teaching, Doctor?

21   A    You start in residency when you're teaching medical

22   students, but I have been teaching for 25 years now.

23   Q    Now, do you also do some independent research?

24   A    Yes, I do.

25   Q    And in what?

1    A    I do research in the fields of resuscitation as well as

2    in-custody death issues.

3    Q    Have you done any research in the area of excited delirium

4    syndrome?

5    A    I have, yes.

6    Q    Are you a published author?

7    A    I am, yes.

8    Q    And on what subjects have you been published?

9    A    I have been published -- I have about 220 peer-reviewed

10   publications and about 65 textbook chapters in the field of

11   medicine.

12           The areas I tend to focus on are cardiac arrest and

13   resuscitation, excited delirium syndrome, neck holds,

14   restraints, restraint physiology, and I did work with tasers

15   as well.  So most of the law enforcement "uses of force" is my

16   area of specialty.

17   Q    What is "restraint physiology"?

18   A    Restraint physiology is what happens to the body in

19   certain body positions.

20           So if you have your hands handcuffed behind your back

21   and you're on your stomach on the ground, how does that impact

22   your breathing or does it impact it at all?

23           Does it impact your heart?  Does it impact certain

24   aspects of things?  And so we've done research looking at does

25   it have any impact or not.  And the answer is really "no."

1          And then we look at things like does weight on your

2     back have an impact on your breathing or your ability to

3     ventilate?  So that's the physiology aspect.  What's

4     happening.  How it impacts one's physiology; their breathing,

5     their heart rate, their blood pressure.

6     Q    Thank you.  Now, these publications, these 220

7     publications, were they peer reviewed?

8     A    They were, yes.

9     Q    Okay.  What is a peer-reviewed publication?

10    A    So a peer-reviewed publication means it was reviewed by

11    peers.  To get published in a medical journal, you need to

12    submit it to a journal.  They send it out to reviewers, people

13    basically who have expertise in your field or in that area.

14          They review it.  They give it critical analysis.

15    They make comments.  Sometimes you'll get six or seven

16    reviewers looking at a single paper.

17          They then send that back to the Editorial Board who

18    will add more comments.  Send it back to me.  I have to

19    address those comments.  Send it back to them.  And they may

20    have more comments.  And eventually, the paper will -- you

21    know, if it's deemed acceptable by that journal, will get

22    published.

23          Basically, a lot of journals accept fewer than 50

24    percent of submissions.  So to get a peer-reviewed paper

25    published is challenging and very rewarding in the end.

1    Q    Have you written any textbook chapters on the topic of

2    neck holds?

3    A    I have, yes.

4    Q    In what publications?

5    A    I have written textbook chapters on that in an in-custody

6    death book a number of years ago and I have done some

7    publications in the peer-reviewed process as well for

8    journals.

9    Q    Have you lectured on the topic of neck holds?

10   A    I have, yes.

11   Q    Now, do you have any specialized training with regard to

12   neck holds; and if you do, what?

13   A    Sure.  I mean, I have been trained by law enforcement --

14           MR. BLACKWELL:  Objection, Judge.

15           THE COURT:  I'm sorry?

16           MR. BLACKWELL:  Objection.  I'm sorry.  This subject

17   goes outside the scope of this individual's report.  It's not

18   been disclosed.

19           THE COURT:  And your response?

20           MR. POPOLIZIO:  My response is this is the background

21   of this expert who is testifying.  And I believe that the

22   defense has a right to bring out his background in the salient

23   areas of his report, including neck holds.

24           THE COURT:  Overruled.

25           THE WITNESS:  So I got trained by law enforcement

1   with regards to neck holds and how they are trained to do it.

2          But I have also had personal experience with neck

3   holds during my -- I am a Second Degree Black Belt in

4   Taekwondo.  And so I work with my sensei to learn how to do a

5   neck hold.  And I actually had one placed by him on me.

6   Q   Have you also been published on the subject of excited

7   delirium?

8   A   I have, yes.

9   Q   Now, was that publication on excited delirium requested by

10  any particular organization?

11  A   I have been requested to write an article on excited

12  delirium, yes.

13  Q   For whom?

14  A   The American College of Emergency Physicians.  That's our

15  largest organization for emergency physicians.

16         They put a panel together, basically, of experts,

17  international experts put together a review on the topic.  And

18  then I was asked to be the lead author on publishing that

19  paper for the journal.

20  Q   Did you do that --

21         Well, strike that.

22         Do you also study patients with excited delirium?

23  A   I do, yes.

24  Q   And how do you go about doing that, Doctor?

25  A   Sure.  We were funded almost a half-million dollars from

1      the National Institute of Justice to look into features,

2      biochemical markers in subjects who present with excited

3      delirium syndrome and comparing them to people who don't have

4      it who are agitated but don't have the classic extreme signs

5      of excited delirium syndrome.

6               And so we were evaluating blood draws, biomarkers,

7      and presentations in these two population.

8      Q    What is the National Institute for Justice?

9      A    The National Institute of Justice is a sub-group, I guess,

10     in the Department of Defense.  And they do a lot of work in

11     trying to promote research in the field of law enforcement,

12     looking for safety of subjects and police officers.

13               So they actually fund research to look for things

14     that -- to make sure the practices are safe and appropriate

15     and looking for cutting-edge ways of trying to better take

16     care of people in the field.

17     Q    Have you lectured on the topic of excited delirium?

18     A    I have, yes.

19     Q    And have you done that nationally?

20     A    I have done it nationally.  And I guess if you count

21     Mexico and Canada, I have lectured internationally.  I have

22     been invited to a number of places to talk about the topic.

23     Q    Doctor, have you testified in courts in the United States

24     as an expert witness?

25     A    I have, yes.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1   Q    Doctor, what is cardiac arrest?

2   A    Cardiac arrest in its simplest form is the heart stopping,

3   you know, "cardiac" and then the arresting is the heart

4   stopping its function.

5   Q    And what is sudden cardiac death?

6   A    Sudden cardiac death is a term that we use when we feel

7   that it was a cardiac arrest to the heart.  And I guess when I

8   say "stopping," it means it's not beating the way it's

9   supposed to beat.

10        It may have an irregular rhythm or something else.

11   But that's a cardiac arrest.  If that's not corrected and

12   somebody dies from it, that would be a sudden cardiac death.

13   Q    Do you have experience as an Emergency Department

14   physician in the areas of sudden cardiac arrest and sudden

15   cardiac death?

16   A    I do, yes.

17   Q    And how so?

18   A    I mean, my daily clinical practice is taking care of

19   patients who present with cardiac arrest.  I also do a lot of

20   training with paramedics.

21        I was the former Medical Director for San Diego

22   County's EMS System.  And so a lot of the EMS work is for

23   cardiac arrest, taking care of those subjects.  And then I

24   have been funded by the National Institute of Health, one of

25   our government agencies, over $5 million to research the

1   specifics of cardiac arrest and how to improve patient

2   outcomes from that -- you know, from that fatal disease if

3   it's not treated correctly.

4   Q   Do you also have experience --

5           Well, strike that.

6           In this case, Doctor, you were retained as an expert,

7   correct?

8   A   Yes, I was.

9   Q   And you were retained to review materials and provide

10  expert opinions to a reasonable degree of medical certainty,

11  correct?

12  A   That's correct.

13  Q   And specifically, you were retained to give your expert

14  opinions to a reasonable degree of medical certainty with

15  regard to whether the neck hold or carotid control technique

16  caused or contributed to Mr. Ruiz' cardiac arrest?

17          MR. BLACKWELL:  Objection.  Leading.

18          THE COURT:  Sustained.

19  BY MR. POPOLIZIO:

20  Q   Doctor, what were you retained to provide opinions on in

21  this case?

22  A   Sure.  I was asked to review a large amount of material

23  and provide opinions as to whether the neck hold that was

24  placed on Mr. Ruiz in this case caused or contributed to his

25  death.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

 1              And if that did not, was there something else that

 2   may have caused or contributed to his death that I could opine

 3   on.

 4   Q   Okay.  Also, in front of you, Doctor, you have Exhibit 108

 5   which is your report.  If you need to refer to that, be my

 6   guest.

 7   A   Okay.  Thank you.

 8   Q   Now, did you provide any opinions -- and I'm not asking

 9   for the opinions right now -- on the issue of excited

10   delirium?

11   A   Yes, I did.

12   Q   You were asked to do so?

13   A   I was asked to review the case and determine if there was

14   any cause of death that I have expertise in and billed to

15   provide in this case.

16              Excited delirium was something that I was reviewing.

17   Q   And were you asked to review the opinions of Nurse Ruth

18   Downing?

19   A   I was asked to review those as well.

20   Q   And were you asked to provide your opinions with regard to

21   what Ruth Downing opined?

22   A   Yes, I was.

23   Q   Okay.  Now before you arrived at your opinion, did you

24   review any materials?

25   A   Yes, I did.

1    Q    Okay.  Now, with regard to what you reviewed, do you have

2    any idea of the number of materials that you reviewed?

3    A    Basically, two boxes of materials.  I guess if you list

4    them out as individual items, there's 60-some items to review;

5    depositions, police reports, EMS reports, hospital records,

6    autopsy findings, reports of -- the report of Ruth Downing,

7    videos.

8              So, basically, anything that happened with this case

9    from a law enforcement perspective as well as a medical

10   perspective I had the opportunity to review to make -- to make

11   a determination of my opinions.

12   Q    Did you also review photographs?

13   A    Yes, I did.

14   Q    When you said you were retained, you were retained by the

15   defense, correct?

16   A    That's correct.

17   Q    Are you paid for your testimony and opinions?

18   A    I'm paid to make opinions and then I'm paid to provide

19   them here.  So, yes, I'm a paid expert.

20   Q    Do you have an hourly rate?

21   A    I do.

22   Q    What is that?

23   A    I get paid $500 an hour to review materials and I get $600

24   an hour to provide testimony.

25   Q    And to date, do you have any idea how much you have been

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    paid by defense in this action for your opinions?

2    A    I have been paid, I think, about $8,000 for the reviews

3    thus far; and I think I have another several thousand dollars

4    pending to be paid.

5    Q    Doctor, does the fact that you're paid as an expert in

6    this case affect the opinions that you render?

7    A    Absolutely, not.

8    Q    Why not?

9    A    My -- part of my work is doing expert review.  I have

10   built a career on looking at data and research.

11           I'm asked to review things.  I will give an honest

12   opinion of if I think a case has merits or if it doesn't have

13   merits.  And many times I will tell people that I don't think

14   it has merit.  And then they thank me for my time and they

15   don't use me in trial.

16           But if my review shows that there is -- there is

17   merit to the case or there is something that I should be

18   opining on, then they will continue to use me.

19           So I basically have to keep credibility.  Otherwise,

20   if you don't have credibility, you don't stay and have the

21   ability to actually work and do expert opinions.  So it's all

22   basically just I don't get paid for what I say.  I get paid

23   for the opinions based on the science and the data behind it.

24   Q    Doctor, over the past 20 years, have you evaluated

25   patients who have used methamphetamines?

1    A    Oh, thousands of them, yes.

2    Q    Over the past 20 years as an ER physician or an emergency

3    medical physician, have you evaluated patients who have gone

4    into cardiac arrest?

5    A    Yes, I have.

6    Q    How many?

7    A    Hundreds of them.  We see them on a regular basis.  And

8    then I oversee the base hospital for paramedics.  So if you

9    count those, then, basically, thousands of cardiac arrests.

10   Q    How about patients who have had neck restraints used on

11   them?  Have you evaluated any of those?

12   A    Yes.  Over my career, hundreds of those as well.

13   Q    Now, Doctor, let's turn to whether the neck hold or

14   carotid control technique caused or contributed to Mr. Ruiz'

15   cardiac arrest.  Okay?  It's the topic I want to turn to

16   first.

17           Before we start, in your report I notice that you

18   refer to a lateral vascular neck restraint carotid hold.

19   A    Correct.

20   Q    What is that?

21   A    It's a -- there's a number of terms that can be used to

22   define a carotid restraint.

23           The lateral vascular neck restraint is one term.

24   Basically, it's -- well, they're all referring to the same

25   thing where you're trying to apply pressure to the carotid

CV14-01942-PHX-JAT       JURY TRIAL - DAY #7       5-30-17

1    arteries.  At the same time, to block blood flow to the brain

2    so it renders them unconscious, basically.

3            It used to be known as a "sleeper hold."  You put

4    them to sleep for 15, 20, 30 seconds and they wake back up.

5    And that's the referral.  It's basically pressure to the

6    carotid arteries.

7    Q   So the lateral vascular neck restraint carotid hold, is

8    that the same as a carotid control technique?

9    A   Yes, it is.

10   Q   Is it also referred to as a carotid hold?

11   A   It is, yes.

12   Q   Is it also referred to as a carotid neck restraint?

13   A   Yes, it is.

14   Q   Okay.  So these terms are interchangeable?

15   A   Correct.  They're all referring to the same thing.

16   Q   Okay.  Doctor, what is the application of the carotid

17   control technique supposed to do?

18   A   Sure.  The intention of it really is to render the subject

19   that you're putting it on unconscious.

20           It's to basically stop blood flow to both carotids at

21   the same time and then blood flow to the brain stops.  They

22   basically go to sleep.  They pass out.  And then you release

23   it and blood flow comes back but it takes, you know, 15, 20,

24   30 seconds to happen.

25           In the meantime, you get -- well in martial arts, you

```
 1    win the fight.  In the police world, you have the opportunity
 2    to get handcuffs on or get them restrained or into a position.
 3           So the intent really is to give you a little time to
 4    take care of what you need to take care of.
 5    Q   So a little while ago, I believe you touched on how you're
 6    familiar with the carotid control technique.  And how are you,
 7    again, familiar with the carotid control technique, Doctor?
 8    A   Sure.  Both from research from training from the police
 9    officers and from my own personal experience in Taekwondo.
10    Q   Because you had it applied on you?
11    A   I actually had my sensei render me unconscious with it
12    because I wanted to understand what it felt like.  And so I
13    have actually had it placed and a successful carotid restraint
14    placed on me, yes.
15    Q   Now, could you explain, how does one administer a carotid
16    control technique to render a subject unconscious?
17    A   Sure.  It seems easy when you watch TV that people seem to
18    put it on and it works instantaneously.  It's actually a
19    relatively challenging position to play in somebody who is
20    moving around and wiggling.
21           But the intent really is to get -- you can't do it on
22    yourself, obviously, but to get the bicep over the one side of
23    the carotid, get the forearm over the other side.  And so
24    basically, you're making a V in the front of the body.
25           The crook of the arm here is over the front portion
```

1    of the neck which is the airway.  That's the part that we want

2    to protect and that's the idea of the fulcrum there to support

3    that.

4              And then basically, once you get it in position, you

5    put pressure on laterally, so that's why they call it a

6    "lateral vascular."  Put pressure on that way.

7              Putting pressure on the carotid with one side.

8    Putting pressure on the carotid with the other side.  And if

9    you get them both simultaneously, which is sometimes a

10   challenge, then blood flow through both major arteries stops

11   or is severely blocked.

12             And you need blood flow to your brain to stay awake.

13   And then basically, once enough blood flow is blocked, you

14   pass out.  You go to sleep.

15   Q   And how long would it take if -- for a subject to go

16   unconscious if the carotid control technique is successfully

17   applied?

18   A   Sure.  Once you get both carotids occluded, it takes a

19   matter of seconds, actually, for somebody to pass out.

20             The challenge always is to get both covered at the

21   same time.  Because the carotids are tucked away back behind

22   muscles.  They're sort of a protected vessel, because the way

23   they're created is not to be standing out.

24             So it is hard to get that bicep -- bicep and forearm

25   in the grooves here to push it on.  So it does -- but once

```
 1    it's in, it takes about, you know, two or three seconds for
 2    somebody to go unconscious once those carotids are blocked.
 3    Q    So in the successful application of the carotid control
 4    technique, what is the elbow area doing?  What's it supposed
 5    to do?
 6    A    So the elbow is basically in the front.  And so it's
 7    making that V and it's protecting that airway.  So pressure,
 8    pressure, and then an open space here so that there is no
 9    compression of that airway.
10    Q    So there's -- with the carotid control technique you said
11    there is no pressure on the airway?
12    A    Correct.
13    Q    Okay.  And why is that?
14    A    Because, one, it's I not needed.  That's not the intent.
15    The intent is to put pressure on the carotids.  We're not
16    trying to put pressure on the airway.
17          To put pressure on the airway, one, it's painful.  If
18    you've ever had somebody push or hit you in the neck, it
19    hurts.
20          The carotid restraint actually is painless.  When I
21    had mine done, I didn't even feel it coming in a sense.  And
22    the next thing you know you're passed out.  But the idea is
23    we're trying to protect that airway.  The idea is not to block
24    the airway because that is not the mechanism to which you make
25    somebody unconscious.  It's the blood flow blocking.
```

1   Q    What if there is pressure only on one side, one carotid of

2   a person?

3   A    And that is some of the challenge.  When people are trying

4   to place it, whether it's martial arts or law enforcement,

5   it's difficult to get both at the same time.  Wriggling,

6   moving, pressure here, pressure there, you sometimes get one

7   side or the other.

8        And so pressure to one side is not going to block

9   enough blood flow to make somebody unconscious.  You have to

10  have both simultaneously for a few seconds and then that

11  works.

12       So that's why I say it's a challenging position to

13  put on to make it successful, and particularly in somebody who

14  is resisting.

15  Q    Doctor, is the carotid control technique the same as a

16  chokehold?

17  A    No.  It's not.

18  Q    Okay.  Could you explain to us what the difference between

19  the two is.

20  A    Sure.  A chokehold, classically, or also called a bar hold

21  comes across the front of the neck.  And so that's where

22  you're putting a bar or choke across.

23       And they call it "chokehold," because if you have

24  ever, again, had somebody pushing on your airway, it hurts a

25  lot and it gags you and will make you choke in a sense.  It's

1    a painful hold.

2           And that's the type of hold that's -- if you put too

3    much pressure on, you can hurt an airway.  You're not going to

4    render somebody unconscious from it, but it will cause you to

5    choke and gag.

6    Q    Now, does a properly-placed carotid control technique

7    obstruct the airway?

8    A    It does not, no.

9    Q    Is that the main difference between the two?

10   A    That is the main difference.  It doesn't block the airway.

11          But also, a chokehold isn't going to render somebody

12   unconscious.  You're not going to put pressure on the carotids

13   from back here by putting a bar across the front.

14   Q    Doctor, what happens when a carotid control technique is

15   released after rendering an individual unconscious?

16   A    So, that's the goal.  All right?  You render somebody

17   unconscious.  You release it.  Blood flow starts back to the

18   brain.  And basically, the person wakes back up 15, 20, 30

19   seconds later.

20          So it's basically just restoring the blood flow back.

21   And physiologically, there's nothing that happens to them.

22   There's no brain damage or anything else.  It's just restoring

23   of the blood flow and then they wake back up.

24   Q    Are there any short-term effects of a successfully applied

25   carotid control technique?

```
 1   A    There are no short-term or long-term effects.  It doesn't
 2   cause brain damage or brain injury.
 3   Q    So let's turn to Officer Camarillo's attempt to apply the
 4   carotid control technique, Doctor.
 5            You mentioned a number of things you reviewed earlier
 6   in your testimony.  Do you recall that?
 7   A    Yes.
 8   Q    Did you review video tapes of the subject incident?
 9   A    I did, yes.
10   Q    Did you review documentation, including police reports?
11   A    Yes, I did.
12   Q    How about medical records?  Did you review any medical
13   records?
14   A    I did, yes.
15   Q    Medical records for whom?
16   A    For Mr. Ruiz, the pre-hospital paramedic reports, as well
17   as the hospital records once he arrived to the Emergency
18   Department.
19   Q    And did you say that you reviewed the Medical Examiner's
20   report?
21   A    Yes, I did.
22   Q    In what you reviewed, did you see any indication of an
23   inappropriate neck hold on Mr. Ruiz by Officer Camarillo?
24   A    No, I didn't.
25   Q    Okay.  Did you look for that?
```

1    A    That's what I do.  I'm looking for evidence of --

2         When I review a case, I'm looking for evidence of

3    something that didn't look right.  You know, whether it's

4    damage or findings or clinical presentation and then to

5    explore that.

6         So my -- I guess it's a detective role in looking

7    through all this material, I was looking for something that

8    was a problem, was an issue.  And I didn't see anything in any

9    of the records that implied or showed any application of

10   pressure to the anterior portion of the neck.

11   Q    Okay.  So with regard to the videos that you reviewed of

12   this incident, could you generally describe what were on those

13   videos?

14   A    Sure.  I mean, the videos basically showed the incident,

15   as many saw him on the roof and jumping off onto the balcony.

16   And then the police response, including basically a restraint

17   to the neck area by -- that's the area I was focusing on.  But

18   I reviewed the whole case.

19        There is clearly an arm around the front of the neck.

20   And for the most part, it was in the appropriate position.

21   It's a dynamic case, right, so head movement, wriggling back

22   and forth will happen.  So it's not always going to be dead

23   center.

24        But there was never any evidence of a true bar hold

25   coming across or pressure on the airway from the front.  So

1   that's what I was looking for in the video to see if that

2   happened.  I didn't see that.  It was always an appropriately

3   located neck hold; not obviously always successful because he

4   was awake and not falling asleep.

5        But basically, movement back and forward is typical

6   in these types of case.

7   Q   So from the videos that you reviewed, do you recall what

8   Mr. Ruiz was doing during his struggle with Officer Camarillo

9   on the stairs?

10  A   First, he was struggling, so that -- and yelling or

11  grunting and making noises.

12       That's basically implying when he's awake.  He's not

13  unconscious.  So whatever was being attempted at those times,

14  if there was pressure being attempted on the carotids, wasn't

15  working because he was not being rendered unconscious.

16       The other thing you could hear is air moving back and

17  forth.  He was grunting and making sounds.  In order to make

18  sounds, you have to get air in so you can blow it back out.

19       If you had a collapsed or crushed airway, no air goes

20  in.  No air goes out.  So you can't make noises.

21       And the other thing you see on the videos, he's

22  clearly breathing.  He's alive and struggling, which, again,

23  if there's an appropriately placed carotid restraint, he would

24  be unconscious.

25  Q   Now, from what you reviewed, Doctor, do you have any

1    indication as to how long Officer Camarillo may have applied

2    the carotid control technique to Mr. Ruiz?

3    A    So I'm going to define things.

4          There was certainly a neck hold in position, meaning

5    he was holding him with an arm in position to apply a carotid

6    control technique.  The technique itself is the applying of

7    pressure on the carotids to try to render somebody

8    unconscious.

9          Based on the video, there is, you know,

10   three-and-a-half, four minutes of a neck position being held

11   in there.

12         Based on testimony, there was intermittent attempts

13   to try to render him unconscious by putting pressure on it.

14   But it wasn't a constant application basically.  It was a

15   dynamic situation.  The head moving back and forth.  There was

16   attempts to squeeze and put pressure on, but it wasn't the

17   entire four minutes.  Most of the time it was holding him

18   down.

19         But even if he had been trying to put pressure on the

20   carotid the whole four minutes, we know it didn't work because

21   he never passed out.  So he never got both carotid restraints

22   blocked.

23   Q    So to be clear, Doctor, did it appear to you from the

24   videos that you reviewed that Officer Camarillo was able to

25   apply the carotid control technique to Mr. Ruiz for four

1    minutes?

2    A    No.

3    Q    More than four minutes?

4    A    No.

5    Q    And why not, again?

6    A    Because, if he was successfully applying it, he would have

7    lost consciousness.  That didn't happen till the very end of

8    the restraining process.

9            The whole time he was there, he was struggling and

10   kicking and moving and grunting.  So he was clearly not

11   receiving a successful application of a carotid control

12   technique.

13   Q    In reviewing the videos, did it appear to you in all the

14   videos that you reviewed regarding this incident that Officer

15   Camarillo was able to apply constant pressure across Mr. Ruiz'

16   airway for four minutes?

17   A    Across the airway?  I didn't see any pressure across the

18   airway at all during the time I was looking at the videos.

19           The airway was always at some level within the crook

20   of the neck or crook of the arm, moving left to right.  I

21   never saw evidence of a bar hold or evidence of compression

22   whatsoever, let alone for four minutes, no.

23   Q    Did you review the Medical Examiner's report?

24   A    I did.

25   Q    Now, do the findings in the Medical Examiner's report that

1    you reviewed tell you anything about whether Officer

2    Camarillo's hold was applied improperly --

3            Let me strike that.  Let me strike that question.

4            Do the findings in the Medical Examiner's report tell

5    you anything about whether the hold that Officer Camarillo

6    applied was improperly placed?

7    A    It does tell me something, yes.

8    Q    What does it tell you?

9    A    When you're evaluating a case like this, you're looking

10   for evidence of damage to the anterior portions of the neck.

11   If somebody placed a bar hold on the neck enough to crush an

12   airway to cause asphyxia to cause blockage of air flow, there

13   will be damage.

14           You'll see it on autopsy is one place.  The cartilage

15   pieces are very firm.  And so you'll see a crushing of the

16   airway, bleeding, swelling and that's over the anterior

17   portions of the neck.

18           That's what I'm looking for; everything from here to

19   here (indicating).  I looked at that on the autopsy.  I didn't

20   see any evidence of injury or damage to the anterior portions

21   of the neck.

22   Q    Did the findings in the Medical Examiner's report tell you

23   anything about whether Officer Camarillo applied an

24   inappropriate amount of pressure when attempting to apply the

25   carotid control technique?

1    A    There was no evidence of inappropriate pressure with the

2    carotid control technique.  There was some findings on autopsy

3    that would be consistent with placing the carotid control

4    technique but not an appropriate amount of pressure or weight.

5    Q    Okay.  Now, are there any -- is there anything in specific

6    in the Medical Examiner's report that would tell you these

7    things?

8    A    There are and could be.

9    Q    Okay.  What's the hyoid bone?

10   A    So, the hyoid bone is a small little bone that sits right

11   under the tongue area here.  It's sort of protected by the jaw

12   and the thyroid cartilage.  So it's a very fragile bone.

13          Basically, it's one of those bones that we tend to

14   see in the Emergency Department when somebody gets strangled.

15   Somebody grabs them by the neck and squeezes because it's a

16   fragile little bone.

17          In the autopsy there was no damage to the bone.

18   That's something you would expect to see if somebody is

19   putting a bar hold or crush injury across the front of the

20   airway.  That wasn't here in the autopsy.

21   Q    So the hyoid bone was intact?

22   A    Was intact.  There was no bleeding, no bruising, no

23   swelling around it.

24   Q    How about the laryngeal cartilages.  Was there any

25   indication in the Medical Examiner's report regarding the

1    laryngeal cartilages of Mr. Ruiz?

2    A    So the laryngeal cartilage is basically the next part

3    down.  So if you -- actually, if you ever feel your neck and

4    the Adam's apple, that's your thyroid cartilage.

5    Q    Okay.

6    A    Just inside that is the laryngeal cartilage.  So that's

7    where your airway is.  That's where your vocal cords are

8    housed and that's inside the thyroid cartilage.

9         The laryngeal cartilage, if you're going to block

10   somebody's airway, if you are going to asphyxiate them by

11   crushing it, that's the part that gets crushed because that's

12   the tube of air that goes into your lungs.

13        On the autopsy, no damage, no bleeding, no bruising,

14   no fracture of it, no edema, no swelling.

15   Q    Now, we'll probably come back to those two in a few

16   moments, but was there any indication in the Medical

17   Examiner's report of a soft tissue injury to one of the neck

18   muscles of Mr. Ruiz?

19   A    Yes, there was.

20   Q    And could you share with us what that was?

21   A    Sure.  There was a little term hemorrhage, a little

22   bruise, basically.  So if you get hit in the arm, you get a

23   little purple spot.  That's a hemorrhage or that's a bruise.

24        There was a small hemorrhage in the

25   sternocleidomastoid muscle, which is this big set of strap

1      muscles that we have on either side of our neck that help us

2      turn our head.   There was a small hemorrhage in one of those

3      on the right-hand side.

4      Q    And that muscle on the right-hand side is called what?

5      A    The sternocleidomastoid.

6      Q    Now, this hemorrhaging to the sternocleidomastoid muscle,

7      does that necessarily mean an obstructed airway?

8      A    Actually, it implies that there was pressure on the side

9      of the neck, not over the airway.   So to see a bruise in the

10     sternocleidomastoid, basically says that there was pressure on

11     the side where all the testimony was that's where the pressure

12     was being placed by the carotid restraint.

13            So it would actually, I guess, collaborates or

14     validates the fact that there was a carotid restraint pressure

15     being pushed on the side muscle, not the airway.

16     Q    After watching these videos of the incident -- we're

17     focusing on the stairs -- were you surprised that there was a

18     soft tissue injury to Mr. Ruiz' neck muscle?

19            MR. BLACKWELL:   Objection.   Foundation and

20     speculation, Judge.

21            THE COURT:   Overruled.

22            THE WITNESS:   So these types of struggles where their

23     head's moving and they're being -- you know, people trying to

24     pull things and hold things and restrain things, it's not

25     uncommon to get a little bruising or a little bit of

1    hemorrhage.

2            Basically, the same term on neck muscles when putting

3    a carotid restraint on.  The more resistance, the more

4    struggle, the more likely there is to be a little bit of a

5    bruise there.  So, no, I'm not surprised.

6            This would be a typical finding that we would see in

7    the Emergency Department.

8    Q    Now, from your review of the materials and the videos and

9    from the standpoint of an emergency medical physician, could

10   this soft tissue injury to the sternocleidomastoid muscle of

11   Mr. Ruiz have resulted from anything other than the

12   application of the carotid control technique?

13   A    Sure.

14   Q    Okay.  From what?

15   A    Anything that causes contact for a bruise.  So an

16   inadvertent hand or bumping something or something happening

17   predating the arrival of police, anything that hits the side

18   of the neck, running into a doorknob, some contact can create

19   a bruise over there.

20           You can't define a pattern of the bruise that would

21   say "this is clearly done by that" based on the autopsy

22   findings.

23   Q    Now, was there a fracture of the -- was there any fracture

24   found in Mr. Ruiz' neck area?

25   A    There was, yes.

1   Q    Okay.  And to what in particular?

2   A    It was the cornu of the thyroid cartilage.

3         MR. POPOLIZIO:  Your Honor, at this time may I, for

4   demonstrative and illustrative purposes, show the witness and

5   the jury Exhibit 29, only page 19, which is a diagram provided

6   by Nurse Downing?

7         THE COURT:  You may.

8   BY MR. POPOLIZIO:

9   Q    Now, do you recall in the Medical Examiner's report what

10  the injury to the cornu was?

11  A    It was a fracture of the cornu.

12  Q    Now, this screen is kind of neat because you can touch it

13  and indicate where you're pointing to or seeing and they can

14  see the same thing.

15        So could you show on this picture that's in front of

16  us, this diagram, where the right cornu would be.

17  A    Is it possible to blow this up a little bit?  Easily or

18  not?  I have big fingers.

19        MR. POPOLIZIO:  I believe the answer is yes.  There

20  we go.

21        THE WITNESS:  So the cornu is --

22  BY MR. POPOLIZIO:

23  Q    Now, would that be the left or the right?

24  A    That would be the left cornu, yes, that is the cornu,

25  correct.  The right cornu would be this piece right over here,

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    the matching set.

2    Q    Okay.  And according to the Medical Examiner, what was

3    fractured?

4    A    The tip of the cornu.  So that little piece right at the

5    very end there, basically where my line is showing the -- that

6    real narrow portion of it was fractured.

7    Q    Could you circle that, Doctor?

8    A    Sure.  (Indicating)

9             I sort of missed but that general area there.

10   Q    Now, I believe you might have just said this, but I have

11   already forgotten.

12            What's the cornu made of?

13   A    The cornu is made out of cartilage.

14   Q    And how much force does it take to fracture a cornu?

15            MR. BLACKWELL:  Objection.  Foundation.

16            THE COURT:  Sustained.

17   BY MR. POPOLIZIO:

18   Q    The cornu is made out of cartilage?

19   A    Correct.

20   Q    Okay.  Could cartilage fracture?

21   A    Yes, it can.

22   Q    Is cartilage always malleable?

23   A    So, no, cartilage is not malleable.  There's different

24   types of cartilage in our body.  This is cartilage.  This is a

25   real floppy cartilage.  The Adam's apple.  The thyroid is a

1    cartilage.

2           So there's different types of firmness, I think it's

3    important to understand.  Just like plastic, there is elastic

4    plastic, so it springs back and there's that firm plastic that

5    if you squeeze it, it just cracks.

6           So this is the elastic plastic or elastic cartilage.

7    The stuff in the neck is a firm -- I think of it as hard

8    plastic cartilage -- as is the cornu which are those little

9    bars that come up the top there.

10          So it's a firm, thin piece of plastic.  It's in an

11   area that's not intended to be struck or hit, so it doesn't

12   take much force at all to actually break that piece off.

13          MR. BLACKWELL:  Objection.  Goes outside of the scope

14   of the question.

15          And that last statement, I will ask the Court to

16   strike for foundational purposes.

17          Thank you, Judge.

18          THE COURT:  Overruled.

19   BY MR. POPOLIZIO:

20   Q   Have you actually touched a cornu?

21   A   I have touched all aspects of the neck anatomy on live

22   patients and on cadavers.

23   Q   Have you actually felt it in your hand?

24   A   I have, yes.

25   Q   How much force does it take to fracture the cornu?

```
 1              MR. BLACKWELL:  Objection.  Foundation, Judge.

 2              THE COURT:  Overruled.

 3              THE WITNESS:  It's such a thin piece of material that

 4    it doesn't take much force at all to push it and break it.  It

 5    just has to be the right location.

 6    BY MR. POPOLIZIO:

 7    Q   Now, looking at this diagram here, does it indicate to you

 8    as an emergency medical physician, that there is a fracture on

 9    this individual?

10    A   There is a fracture noted in this picture, yes.

11    Q   Could you circle it?

12    A   Sure. (Indicating)  In the middle of the thyroid cartilage

13    there is a fracture.

14    Q   Is that consistent with the findings of the Medical

15    Examiner?

16    A   No.  That's called the body of the thyroid cartilage.

17    That is the actual Adam's apple.  There was no fracture.

18    There was no bruising, no swelling, no injury to this portion

19    of the thyroid cartilage.

20              The only injury was to the piece of the right cornu

21    which is up tucked closer to the carotids.

22    Q   And aside from where you indicated the right cornu is, do

23    you see any other fracture --

24              Well, strike that.

25              Besides what you just circled near the Adam's apple
```

UNITED STATES DISTRICT COURT

 1   area, is there any other indication of a fracture on this

 2   diagram?

 3   A   I don't see any other indication of fractures, no.

 4   Q   Now, the cornu, when it's broken, can it bleed?

 5   A   Yes.

 6   Q   Can the cornu break and bleed without Mr. Ruiz being

 7   strangled?

 8   A   Without being strangled?  Sure, yeah.

 9   Q   And why is that?

10   A   Strangulation is when you truly grab the neck.  And that's

11   sort of a term that we use for grabbing and squeezing and

12   putting pressure over all the structures of the neck.  The

13   cornu is sort of, again, more lateral, up by the jaw line,

14   closer to the carotids.

15        And so clearly, if you put a carotid restraint on and

16   there's wriggling and struggling, you could potentially

17   fracture that piece of thin plastic, thin cartilage-like

18   plastic.

19   Q   Now, could a cornu be fractured in an instant?

20   A   Yes.

21   Q   Does it require prolonged pressure to fracture the cornu?

22   A   It's actually more likely to happen in an instant.  You

23   can, you know, push on pieces of plastic and sort of hold it

24   for a bit.  It's not the constant pressure.  It's usually just

25   a sudden turn or jerk or movement that will cause that to

1    fracture.  So it's not a constant pressure-building-up type of

2    thing.

3    Q   Now, as an emergency room physician who's actually touched

4    a cornu and seen it, does the cornu fracture in Mr. Ruiz

5    necessarily imply significant force was applied?

6    A   No.  It doesn't.

7    Q   Now, as an emergency room physician, emergency medical

8    physician, what does the fact that the Medical Examiner noted

9    injury to the right cornu and the sternocleidomastoid muscle

10   imply to you?

11   A   The injuries themselves and the lack of injuries imply two

12   things to me.

13           One, is the location of the cornu and the

14   sternocleidomastoid implies lateral neck pressure.  And so in

15   evaluating a case, that's what you're looking for; what's

16   found on autopsy and other evaluations.  So it implies lateral

17   neck pressure.

18           The lack of findings -- and you go through a neck

19   dissection -- the hyoid bone, the hyothyroid cartilage, the

20   laryngeal cartilages, the thyroid cartilage body, the tracheal

21   rings, all those were not injured.  No bleeding.  No swelling.

22   No collapsing.  No fractures.  Nothing over the anterior

23   airways.

24           So the lack of injury to the front and the findings

25   on the side would be consistent with lateral neck pressure and

1    an absence of anterior neck pressure.

2    Q    According to what you reviewed, Doctor, what area of

3    Mr. Ruiz' neck did Officer Camarillo report that he was

4    applying pressure?

5    A    He reported that it was on his lateral neck in the attempt

6    to put a restraint, that carotid restraint on.

7    Q    Is that consistent with the injuries as cataloged by the

8    Medical Examiner?

9    A    Absolutely.

10   Q    Now, Doctor, is the finding of hemorrhaging near an injury

11   to the cornu consistent with Officer Camarillo's contention

12   that he attempted to apply a carotid control technique?

13   A    Yes.

14   Q    How is that consistent?

15   A    The location of the injury is consistent with the report

16   of where the pressure is being placed.  And looking at the

17   video, it sort of validates what the testimony is is that

18   there's pressure over the two sides.  The injury happened on

19   one side.

20        And, again, with the crook of the arm being over the

21   airway, the lack of anterior airway injury on autopsy, amongst

22   other things, is consistent with lateral pressure.

23        The injury is consistent with lateral pressure and

24   the lack of injury is consistent with the appropriate

25   placement of the crook of the arm.

1    Q    And, Dr. Vilke, taking into account all that you reviewed

2    and all that you have just shared with us this morning, do you

3    have an opinion to a reasonable degree of medical certainty as

4    to whether the carotid control technique applied by Officer

5    Camarillo caused or contributed to the cardiac arrest or

6    ultimately to the death of Mr. Ruiz?

7    A    I do.

8    Q    And what is that opinion?

9    A    That based on the autopsy findings that we just discussed,

10   the hospital findings, CAT scan that was done that showed no

11   injuries, the paramedic findings that showed no injuries when

12   they were trying to put an airway in, all those things put

13   together, plus the video and the testimony demonstrate that

14   there was lateral pressure being placed in an attempt to place

15   a carotid restraint, no anterior pressure being placed.

16         And, therefore, for the three-and-a-half to four

17   minutes of time that he was awake and struggling and alive, in

18   a sense that he was breathing, not unconscious, there was no

19   carotid restraint successfully applied.

20         So at the very end he lost consciousness.  That

21   didn't cause or contribute to the cardiac arrest.  That was --

22   if it was a carotid restraint that caused that -- that's what

23   it's supposed to do.  Put you to sleep.  You release it.  But

24   it didn't cause or contribute to the death.

25   Q    Now, Doctor, would your opinion change if Officer

 1    Camarillo attempted multiple applications of the carotid

 2    control technique during his struggle with Mr. Ruiz?

 3    A    In my assessment I assumed that was the case.  I assumed

 4    that he had tried several times to apply it and it wasn't

 5    successful.  So my opinion is based on that assumption

 6    already.

 7    Q    Now, I want to turn to Nurse Downing's opinions.  Okay?

 8              First, Nurse Downing opined that the chokehold was

 9    applied to Mr. Ruiz.

10              Do you agree with her contention?

11    A    I do not.

12    Q    And why not?

13    A    Multiple reasons.  First of all, the video didn't

14    demonstrate a chokehold.  There was no bar arm across the

15    front of the airway that I could see for any period of time.

16              But secondly, and more importantly, there is no

17    findings at any level, whether it was the paramedic assessment

18    of the airway, whether it was the ER evaluation of the patient

19    by CAT scan and direct evaluation, and probably the most

20    important, the layer-by-layer dissection of the Medical

21    Examiner looking at all these structures for injury, nothing

22    showed any evidence of anterior airway pressure, compression,

23    or anything that could cause asphyxiation.

24    Q    And in addition to those things that you just shared,

25    after watching the videos, did you conclude that a chokehold

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    had been continuously applied for four minutes as Ms. Downing

2    contends?

3    A    There was no chokehold placed.  There was no choking

4    across the front.  No.  Not for four minutes.  I didn't even

5    see it at all, let alone for four minutes, no.

6    Q    Okay.  And based on the videos and Officer Camarillo's

7    report of the incident, did you see or read anything that

8    would indicate that Officer Camarillo was attempting to render

9    Mr. Ruiz unconscious for over four minutes as Ms. Downing

10   notes?

11   A    No.

12   Q    And, again, what did these videos indicate to you what was

13   going on?

14   A    They indicated a dynamic situation where there is a hold

15   being placed.  You can hold somebody in position with your arm

16   around your neck.

17        The carotid restraint is when you're actually trying

18   to apply pressure to render them unconscious.

19        A chokehold goes across the front.  There was no

20   chokehold.  There is certainly a hold in place to try to keep

21   him in position.  And based on testimony and looking at the

22   video, there are certainly times where the crook was in the

23   right place and pressure was reportedly being attempted to put

24   pressure on the carotids to render him unconscious.

25   Q    Now, Ms. Downing also claims that this chokehold that she

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    said lasted four minutes continuously could potentially result

2    in anoxic brain injury as described in the Medical Examiner's

3    report.

4           Do you agree with Ms. Downing's contention in this

5    regard?

6    A   No.

7    Q   Why not?

8    A   He was awake.  He was struggling.  He was making noises.

9    He was fighting and resisting.  He was never unconscious

10   during that whole four-minute period until the very end.

11          To have an anoxic brain injury from asphyxiation,

12   from blocking of air flow, you know, to the -- well,

13   asphyxiation is blocking air flow to your lungs and decreasing

14   the oxygen to your brain.  That takes a long time.  That

15   takes, first, more than four minutes.

16          And secondly, there was no loss of consciousness.

17   There was no lack of blood flow to the brain.  We know that

18   because he didn't fall asleep.  He didn't pass out.

19          So the contention that this was being blocked from

20   the brain for four minutes is wrong.  And it takes a long time

21   to create an anoxic brain injury.  It just doesn't happen in a

22   moment or two.  It takes a while.

23          From our cardiac arrest research and somebody goes

24   and drops with cardiac arrest and the paramedics come back

25   eight minutes later and shock them and revive them, they don't

1    get anoxic brain injuries from that short period of time.

2         So for her to say four minutes of a hold would do it,

3    she's wrong.  And the circumstances in this case are even, I

4    guess, in my mind, more wrong because he was awake and had air

5    flow and blood flow that was obviously based on his resistance

6    and able to kick and move.

7    Q   Okay.  So then when you watched the videos, could you tell

8    whether Mr. Ruiz is getting blood flow to the brain during the

9    struggle before he goes limp?

10   A   Yes.

11   Q   Okay.  And how can you tell that?

12        MR. BLACKWELL:  Objection, Judge.  Outside the scope

13   of his report and foundation.

14        Thank you.

15        THE COURT:  Your response?

16        MR. POPOLIZIO:  In response, Your Honor, is that on

17   page 108 -- excuse me -- exhibit 108, page 15, this expert

18   covers anoxic brain injury and whether he agrees with the

19   opinions of Nurse Downing.

20        THE COURT:  Overruled.

21        MR. POPOLIZIO:  Do you need the question again?

22        THE WITNESS:  Yes, please.

23        MR. POPOLIZIO:  So if I can get it to you.

24   BY MR. POPOLIZIO:

25   Q   From your review of the videos, can you tell whether

1   Mr. Ruiz, during the struggle before he goes limp is getting

2   blood to the brain.

3   A   Yes, I can.

4   Q   Okay.  And how could you tell that?

5   A   Because he was struggling.  If you don't have blood to

6   your brain, you pass out.

7           Again, that's the jujitsu martial arts technique.

8   You render them unconscious.  They stop struggling and

9   fighting.

10          That's how you know that you got blood going to your

11   brain that you body works.  If you have no blood going to your

12   brain, you can't fight.  You can't struggle.  You can't turn

13   your head.  You can't kick your legs.  You can't vocalize.

14   You're basically unconscious.

15   Q   So if all those things are happening, these things that

16   you just listed, are they symptoms of someone developing

17   anoxic brain injury?

18   A   Absolutely, not.

19   Q   Now, Doctor, do you have an opinion, within a reasonable

20   degree of medical certainty, as to what would be the most

21   likely cause of Mr. Ruiz' anoxic brain injury?

22   A   Yes.

23   Q   Okay.  And what is that opinion?

24   A   The cardiac arrest that he had, secondary to the excited

25   delirium syndrome that he was suffering from, secondary to his

1    methamphetamine use.

2    Q    Now, Doctor, Nurse Downing also opines that the chokehold

3    closed off the airway and caused bleeding of the surrounding

4    tissues.

5         Do you agree with her opinion in that regard?

6    A    I do not.

7    Q    And why not?

8    A    Again, these are all very firm pieces of material.

9    They're firm cartilages.  If you are taking a circle and

10   crushing it to the point where you're blocking off an airway,

11   it doesn't spring back.

12        It will collapse.  It will crush.  You have bleeding

13   in the airway.  You have bleeding around the airway.  You'll

14   have fractured tracheal rings or thyroid cartilage body or

15   larnyx.

16        You can't block an airway and cause asphyxia without

17   causing a flattening of a tube.  And this tube is not a

18   slinky.  It doesn't bounce back.  It breaks, just like bones

19   do.  Just like the cornu did.  It could break.  But it would

20   be in the anterior airway.

21        There was no collapsing of the anterior breathing

22   tube as she opines because you would have to see something at

23   all of these levels.

24        The paramedics didn't see it when they put a

25   breathing tube in.  The CT at the hospital didn't show

1    anything.  And, again, the autopsy, layer by layer, didn't

2    show any bleeding, bruising, swelling, fractures, collapsing,

3    anything of the anterior airway.

4            So you couldn't have a crushed airway that blocked

5    off the air flow to cause asphyxiation.

6    Q    Now, you reviewed medical records?

7    A    Yes.

8    Q    And these were medical records of Mr. Ruiz, right?

9    A    Yes.

10   Q    Now, was an endotracheal tube placed in Mr. Ruiz?

11   A    It was.

12   Q    Could you tell us what an endotracheal tube is?

13   A    Sure.  An endotracheal tube is one of those breathing

14   tubes.  If you ever watch a medical show that they put in or

15   in anesthesia, you put it through the mouth.  It goes down and

16   into between the vocal cords.  So that's what we call a

17   breathing tube.  An endotracheal tube is just a fancy name for

18   that.

19   Q    Okay.  Now, in your review of the medical records, did you

20   see anything that noted that there was difficulty in placing

21   the endotracheal tube in Mr. Ruiz?

22   A    No.

23   Q    And as an emergency medical physician, what does this

24   imply to you?

25   A    Sure.  I have seen many injuries to the anterior neck;

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1   motorcycles hitting wires, people getting punched,

2   strangulations.

3          When that happens, you get swelling.  You get edema.

4   You get bleeding in the anterior airway.  So that when you're

5   looking through the mouth with your -- you're looking in there

6   to take a look and put this breathing tube between the cords,

7   there's swelling, there's bleeding, there is collapsing of the

8   airway.

9          Many of these cases, it's almost impossible to put a

10  breathing tube into that because of the crushing of that

11  tubular structure, the trachea and the cords.  So a lot of

12  these patients end up getting surgical airways where you cut

13  below the area that's crushed.

14         That was not reported in the paramedic record.  They

15  had an easy intubation.  There was no evidence of bleeding.

16  You know, the tube went right in.  So there couldn't have been

17  a crush injury in the front there because you would see

18  something.

19         And if it was truly a crush injury that caused

20  asphyxia enough to collapse that airway so no air was moving

21  in, you would not be able to get that tube in.

22  Q   What's a laryn -- a laryn -- a laryngoscopy?

23  A   Laryngoscopy is the scoping of the area.  So you're

24  putting a laryngoscope in, sort of a lighted piece, to see as

25  you're passing the tube through the airway.  So we're looking

UNITED STATES DISTRICT COURT

1    directly at the airway.

2            We see vocal cords and we put the tube between them.

3    Again, I have seen cases in which there have been anterior

4    airway crushes or injuries.  There's swelling and there's a

5    decreased ability to put that in, to the point where sometimes

6    I've said we have to do a surgical airway below because you

7    can't get a tube through.

8            That was not here in this case.

9    Q   Was one done on Mr. Ruiz?

10   A   The endotracheal tube was passed by paramedics easily,

11   yes.

12   Q   Did it show any evidence of a closed airway?

13   A   None whatsoever.

14   Q   Now, in the other records that you reviewed, was there any

15   indication of a closed airway?

16   A   No.

17   Q   Was a CT scan done?

18   A   At the hospital it was, yes.

19   Q   What's a CT scan?

20   A   It's a computed tomography scan.  So it's a more high-tech

21   imaging study to look at bones and soft tissue and the

22   surrounding organs and parts like that.  So they had a CT scan

23   of the neck that was done at the hospital.

24   Q   And what did that indicate?

25   A   It showed no injuries, no evidence of fracture, no

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
1    swelling, no airway issues.
2    Q    Now, I believe several times today you told us you
3    reviewed the Medical Examiner's report, right?
4    A    Correct.
5    Q    In the Medical Examiner's report and the autopsy report,
6    was there any indication of a closed airway of Mr. Ruiz?
7    A    None, whatsoever.
8    Q    Now, would you be able to see in the laryngoscopy -- if I
9    said that correct -- the trachea?
10   A    You will see the trachea -- you will see the laryngeal
11   rings.  The trachea is further down.  So sometimes you can see
12   it.  Sometimes you can't.
13         But if there's a damage to the trachea, so you're
14   putting the tube through the cords, that's the part you're
15   seeing.  The tube passes into the trachea.
16         So if there's tracheal collapse or damage, the tube
17   won't pass.  It gets stuck.  And that did not happen in this
18   case.
19   Q    Okay.  Have you actually touched a trachea?
20   A    Oh, yes.
21   Q    How many times?
22   A    Well over a hundred times.  That's the piece of cartilage
23   just below your Adam's apple.
24   Q    Can you describe the physical qualities or consistency of
25   a trachea?
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

 1   A   Sure.  It's like hard plastic.  So if you feel your Adam's

 2   apple, you go further down, these hard pieces down here,

 3   that's your tracheal -- your first tracheal ring.

 4           And then they go down with the little notches.

 5   They're all very hard and firm.  They're not pliable.

 6   Q   Now, Nurse Downing made mention of an Adam's apple and I

 7   believe you did earlier.  So where would the Adam's apple be

 8   on your neck?

 9   A   Sure.  The easiest way to find it is to start at your

10   sternal notch and work your way up until you find that first

11   big thing that sticks out.

12           And then it's easier to see.  You can probably see

13   mine right here.  Women's are hard.  That's why I have to

14   slide up.  But it's that firm piece of cartilage.  It's the

15   thyroid cartilage, the body of the thyroid.  So it's commonly

16   called the Adam's apple.

17   Q   Now, if Mr. Ruiz' neck was compressed to cut off air flow,

18   would you see signs in the Adam's apple?

19   A   You would see signs somewhere in the anterior airway,

20   either up here at the hyoid bone, the thyroid membrane, the

21   thyroid cartilage, the larynx, the tracheal rings.

22           You would have to see something somewhere.  It

23   depends.  If it was a full arm going across, you would see it

24   at all places because it's a big piece.  But if it was just a

25   karate chop or a wire, you might just see a single layer.

1              There was -- at no level in his autopsy was there any

2      evidence of injury in the anterior airway.

3      Q   And when you're talking about signs of injury, what would

4      you be looking for?

5      A   Looking for fractures, looking for bleeding, looking for

6      bruising, looking for swelling or edema.  That's the mildest

7      sign.  Basically tissues swelling up.  There was none of that

8      here.

9      Q   And none were found here?

10     A   None were found here.

11     Q   Now, let's go back to something we mentioned before the

12     laryngeal cartilages?

13     A   Yes.

14     Q   The M.E. noted they were intact?

15     A   Correct.

16     Q   So, first, Doctor, what's the larynx made of?

17     A   The larnyx is also made out of firm cartilage.  That's the

18     holding of your -- they hold your vocal cords so you can talk

19     and they move back and forth.  The cartilage is the capsule

20     around those vocal cords.

21     Q   Did the Medical Examiner note any damage to the larnyx?

22     A   None, whatsoever.

23     Q   You reviewed Nurse Downing's report, right?

24     A   Yes.

25     Q   If, as Nurse Downing believes, there was enough pressure

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    crushing Mr. Ruiz' airway to cause it to collapse and impede

2    air flow, would you expect to see damage to Mr. Ruiz' larnyx?

3    A   Not only expect to see, you have to see it.

4         You can't have a crushed airway to the point of

5    asphyxiation without creating damage.  You have to see it and

6    it wasn't there.

7    Q   Does the larynx bleed if it's damaged?

8    A   Absolutely.

9    Q   Was there any damage noted on the larynx by the Medical

10   Examiner?

11   A   None.

12   Q   Is that significant to you?

13   A   Very significant, yes.

14   Q   Why?

15   A   Because, again, I'm looking for evidence of an improper

16   placed hold.  That's part of my role.  Looking for both the

17   proper and improper placement.

18        There is no evidence of improper placement.  The lack

19   of injury means there was not something crushing this airway.

20   Q   Did the Medical Examiner note any bleeding immediately

21   around the larynx?

22   A   No.

23   Q   Is that significant to you?

24   A   For the same reasons.

25   Q   Okay.  Did the Medical Examiner note any bleeding around

1   the anterior portion of the airway?

2   A   No.

3   Q   Again, the anterior portion is what part?

4   A   The front part of the neck.  So it's the part that we're

5   worried about with an airway.

6   Q   And why is that significant to you that there was no

7   indication of injury to the anterior portion?

8   A   For the same reasons I'm looking to see if there was an

9   improper bar hold or chokehold placed.  There was no evidence.

10  Q   Despite what Nurse Downing's diagram may show with regard

11  to fracture, was there any damage noted to the anterior

12  portion of the thyroid cartilage of Mr. Ruiz by the Medical

13  Examiner?

14  A   No.

15  Q   Now, let's return back to the hyoid bone for a second.

16         Again, could you point to it?  I think it's labeled

17  on Nurse Downing's diagram, but could you point to it for us,

18  Doctor?

19  A   Sure.  The hyoid bone is this bone right up there.

20  (Indicating)

21  Q   Again, have you seen the hyoid bone up close and personal

22  as an emergency medical physician?

23  A   I have.

24  Q   Have you touched them?

25  A   I have, yes.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    Q    How many?

2    A    Probably about a hundred of them.

3    Q    How much force is required to fracture a hyoid bone?

4              MR. BLACKWELL:  Objection.  Foundation.  Goes outside

5    the scope of his report, Judge.

6              THE COURT:  Overruled.

7              THE WITNESS:  The hyoid bone is a very thin bone at

8    the top there, not intended for being pressured or weight on.

9    That's why it's sort of hidden up here.  It doesn't take much

10   pressure at all to break it.

11             You know, we see it in, you know, sort of punches to

12   the neck it can happen.  It doesn't have to be that hard.

13   It's just basically putting pressure on it.  Or, again, just

14   grabbing that way as part of the strangulation evaluation we

15   sometimes see it.  It doesn't require a lot of pressure to

16   break it.

17   Q    Is the hyoid -- in your experience as an emergency medical

18   doctor, is the hyoid bone commonly fractured during

19   strangulation?

20   A    Yes, it is.

21   Q    From what you reviewed, was the hyoid bone fractured in

22   Mr. Ruiz?

23   A    It wasn't fractured or injured, no.

24   Q    Does that tell you anything as an emergency medical

25   doctor?

CV14-01942-PHX-JAT     JURY TRIAL - DAY #7     5-30-17

1   A    Again, it supports that there was no anterior airway

2   pressure.  There was no chokehold or pressure on this portion

3   of the airway.

4   Q    Was there swelling noted around the hyoid bone by the

5   Medical Examiner?

6   A    No.

7   Q    Okay.  Is that significant?

8   A    Correct.  Yes.

9   Q    And why, again?

10  A    Same reason.  There was no evidence of pressure or damage

11  to that portion of the airway.

12  Q    Now, if the airway of Mr. Ruiz, according to Nurse

13  Downing, was collapsed, then how come the only injury is

14  located on the lateral portion of the neck rather than the

15  portion that had to be collapsed and crushed to block off the

16  air flow?

17  A    How come?  How come?  It didn't happen.  There was no

18  air -- You can't have an airway collapse without physical

19  findings.  It doesn't happen.

20        So I can't explain why she would claim that with the

21  findings that you have on autopsy.

22  Q    So if Nurse Downing opines that Mr. Ruiz died due to an

23  airway obstruction from a chokehold applied for four minutes,

24  is she right?

25  A    I hate to being mean, but, no, she's wrong.

UNITED STATES DISTRICT COURT

1           Again, that's what I do.  I take care of patients

2    with airways.  I intubate them.  I evaluate them.  I CAT scan

3    them.  I assess them.  And that's what I do when I review a

4    case.

5           There the zero evidence of any anterior airway injury

6    at all, let alone enough pressure to collapse an airway long

7    enough and deep enough to cause asphyxiation.

8           And we see people get hit in the airway all the time.

9    They don't asphyxiate.  To actually asphyxiate someone, you

10   have to crush this airway.  You have to collapse a circle,

11   flap, hold it there, and keep the air from going into the body

12   and asphyxiate somebody.  That can't happen without injury.

13   Q   Does the data in this case support Nurse Downing's opinion

14   that Mr. Ruiz died due to an airway obstruction from a

15   chokehold applied for four minutes?

16   A   Not at all.

17           MR. POPOLIZIO:  Your Honor, may we take the morning

18   break?

19           THE COURT:  We will for 15 minutes.

20           Please remember the admonition.

21       (Recess taken at 10:14 a.m.; resumed at 10:34 a.m.)

22           THE COURT:  Thank you.  Please be seated.  The record

23   reflects the presence of the parties and counsel and ladies

24   and gentlemen of the jury.

25           You may continue.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    BY MR. POPOLIZIO:

2    Q    Thank you, Your Honor.

3              Now, Doctor, Nurse Downing talked about

4    strangulation.  What is strangulation?

5    A    Strangulation is either a ligature, something around the

6    neck, or grabbing the structures of the neck and squeezing.

7    Basically, it's putting pressure either all the way around or

8    grabbing onto the front.

9    Q    Is a chokehold a type of strangulation?

10   A    A chokehold is not classically a type of strangulation.

11   You're not really grabbing.  It's really putting pressure over

12   the anterior portions of the neck.

13   Q    Well, what's asphyxia?

14   A    Asphyxia is when you block an airway and then you

15   basically block the amount of oxygen that one gets in their

16   bloodstream.

17   Q    So, Doctor, how long does it take to asphyxiation with a

18   complete airway obstruction?

19   A    You know, the best data we have, it takes -- if you do a

20   complete airway obstruction, it will take about five minutes

21   to truly asphyxiate somebody.  It doesn't happen

22   instantaneously.

23   Q    And the data is based on what?

24   A    It's based on drowning evaluations.

25             You don't asphyxiate people and study them.  You

UNITED STATES DISTRICT COURT

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    can't do that type of study.

2           But based on downings when people actually have

3    complete loss of airway, right, because you can't breath, it

4    takes about five minutes for the whole process from the

5    initiation to cardiac arrest to occur.

6    Q    So what is, Doctor, the physiologic process in which

7    somebody dies through airway obstruction?

8    A    Sure.  If you block somebody's airway, if I put a hand

9    over the mouth or I collapse an airway completely and zero air

10   is moving, the first thing that happens is you still have a

11   lot of oxygen in your blood already, right.  The blood is

12   still oxygenated from your previous breathing.  And we have a

13   large reserve of oxygen in our lungs to start with and the

14   blood.

15          So as soon as you block the airway, nothing

16   immediately happens physiologically other than the whole

17   traumatic part of not being able to breath.  At some point the

18   blood goes through your system, takes up the residual oxygen

19   that's in the lungs and is using that through your metabolic

20   processes.  Your carbon dioxide levels start to build up

21   because you're not ventilating out.  You're not breathing out.

22   So part of the ventilation process is to bring oxygen in; part

23   is to get carbon dioxide out.

24          As the carbon dioxide levels rise and go higher and

25   higher, eventually you'll get to the point where you'll

1   actually pass out.  Elevated $CO_2$ levels will cause somebody to

2   pass out.

3        But your heart is still beating.  Your brain is still

4   getting blood flow to it.  And then as the oxygen levels start

5   to drop off, as your body starts to use that left-over

6   oxygen -- this is over a time of minutes -- eventually, the

7   heart starts to slow down.

8        And we see this in the ER when you have somebody with

9   a bad airway, bad lung disease, and you're trying to put a

10  breathing tube into them.  When you paralyze them, if you wait

11  a couple minutes, their heart rate will start to slow down.

12  And if you don't start oxygenating them soon, then the next

13  step is that they'll go from slower heart rate to no heart

14  rate.

15       But for an asphyxiation, that process takes about

16  five minutes to do.

17  Q   Can someone go into cardiac arrest and then die like that

18  from a partial airway obstruction?

19  A    It would take a fairly significant obstruction to do that.

20  You would have to actually be able to inhibit the carbon

21  dioxide levels.

22       And, again, the carbon dioxide level's building up is

23  the first thing that happens in an airway blockage.  And then

24  that causes a loss of consciousness.  And, again, that didn't

25  happen here because then it takes a number of more minutes for

1   the heart to stop after that.

2          So a partial obstruction will inhibit some of the

3   oxygen, inhibit some of the ventilation and it could cause it

4   if it's significant enough.  But that would take a much longer

5   time to do.

6   Q    Okay.  Do you have any idea how much longer?

7   A    It's based on physiology.  All right.  You can't say a 25

8   percent blockage it's going to take 25 minutes.  There's other

9   factors that are in place.

10          But a young, healthy person, it's probably going to

11  take, if ever, because we have such residual lung volume -- we

12  have two to three times the amount of space in our lungs than

13  we need.  That's why you can take somebody's lung out and they

14  don't die.  Right.  They can't breath as well, but they don't

15  die.

16          So, you know, 20, 30, 40 minutes.  But it depends on

17  the degree of blockage.  It depends on the degree of impaction

18  on their ventilation.  So I think it's very difficult to give

19  a number, but it's certainly a long time.

20  Q    And, again, from what you reviewed, Doctor, the videos and

21  whatnot, the documents of this incident, did Officer Camarillo

22  apply a neck hold on Mr. Ruiz that was constant and complete?

23  A    There was no evidence of a -- of a chokehold or a neck

24  hold that was constant and complete on the video, no.

25  Q    Was there anything that impeded Mr. -- Officer Camarillo's

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1   application of a carotid control technique?

2   A    The movement, obviously, the wriggling and the moving of

3   the head back and forth is something that makes it more

4   difficult to place because there's movement and struggling.

5        So that certainly would come into play.

6   Q    And, Doctor, where would Officer Camarillo's arm have to

7   be in contact with Mr. Ruiz in order to cut off his airway?

8   A    It would have to be over the front part of the neck and

9   putting pressure straight back, not in a V-shaped position.

10  So it would have to be direct pressure over the front of the

11  neck.

12  Q    Okay.  Is that the anterior portion of the neck?

13  A    Correct.

14  Q    In your review of the materials for this case, was Officer

15  Camarillo's arm across the anterior portion of Mr. Ruiz' neck?

16  A    No.

17  Q    Now, what is conjunctival hemorrhage?

18  A    Conjunctival hemorrhage is a little bleeding in the whites

19  of the eye or the conjunctiva of the eye.

20  Q    Is it blood in the white of the eye?

21  A    Yes.

22  Q    What's the common cause of -- or is there a common cause

23  of conjunctival hemorrhage?

24  A    We see this in the Emergency Department quite frequently

25  because you wake up in the morning.  You got a big, red,

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1   bloody spot in your eye.  It makes you very nervous when you

2   see it in the mirror and they come to the ER thinking

3   something bad is going on.

4          So it's a fairly common presentation for us.  It's

5   basically something that came in contact with the eye.  It's

6   felt to be some sort of trauma.  People often wake up with it.

7   You know, they rolled over the pillow -- we don't know exactly

8   what happened.  But it's basically direct trauma to the eye

9   itself, you know, bumped it.  We see it with kids hitting it.

10  But it's not indicative of any pressure build-up or anything

11  along those lines.

12  Q   Now, Doctor, do you agree with Nurse Downing that

13  Mr. Ruiz' conjunctival hemorrhage is most likely caused by the

14  chokehold caused -- closing off the jugular veins?

15  A   No.

16  Q   Why not?

17  A   A couple reasons.

18         One, is if you block off the jugular veins, the

19  theory behind that is if you block off the jugular veins but

20  not the carotids, the head will truly blow up.

21         I have seen cases where it's basically you've got

22  more blood flow going in and it's not coming out.  And you'll

23  see a big, purple, grape-like head.  It's kind of bizarre but

24  it's a reality.  It just puffs out.

25         The first thing is the weakest vessels in our face or

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    anywhere on our body are little capillaries, the small, little

2    vessels that go between the veins and the arteries.  Those

3    will be the first to rupture.

4          So if there was really a blockage of the vessels to

5    the point where it would actually cause the vessels to break,

6    the first things you would see would be called petechiae,

7    ruptures of the capillary beds, little dots.

8          Sometimes people get them when they vomit real

9    forcefully, a couple dots on their face.  Sometimes we see it

10   with blood pressure cuffs.  But that's the first thing to go

11   are the little capillary beds that are the most sensitive.

12         The other pieces, you wouldn't see an isolated,

13   one-sided eye bleed, no petechiae, and the other side be

14   normal because the pressure is going to be the same on both

15   sides.

16         So a unilateral conjunctival hemorrhage isn't caused

17   by pressure build-up.  It's caused by trauma.  Petechiae are

18   caused by pressure build-up.

19         And the Medical Examiner is very detailed in his

20   report and looked at all portions of the face; the

21   conjunctiva, the face, the mucous membranes.  No evidence of

22   petechiae.

23         So that was very specific in his report, probably

24   because that's what they were looking for.

25   Q    Okay.  Doctor, let's turn to the issue of excited delirium

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

 1   syndrome.  Okay?

 2          MR. BLACKWELL:  Objection, Your Honor.  I'm sorry.

 3   Strike that.

 4   BY MR. POPOLIZIO:

 5   Q   Okay.  You provided an opinion with regard to excited

 6   delirium syndrome in this case, correct?

 7   A   Correct.

 8   Q   Okay.  Now, first, what is excited delirium syndrome?

 9          MR. BLACKWELL:  Objection, Judge.  403.  Cumulative

10   based on Dr. Wetli's previous testimony on excited delirium.

11          Thank you.

12          THE COURT:  Overruled.

13          THE WITNESS:  Excited delirium syndrome is something

14   we see in the Emergency Departments not infrequently.

15          It is, basically, an -- in general, a drug-induced

16   state that is more than just tripping on drugs or using drugs

17   or being a little jittery.  It is sort of the next level up.

18          It's the brain has stopped having a breaking system,

19   the mechanism there, and everything just gets revved up and

20   revved up and revved up.  And so it has certain clinical

21   features that present with it.

22          You'll see them sweaty and hot.  You'll see elevated

23   temperatures.  You'll see them breathing hard.  They're

24   delirious.  They're not acting normal.  They're acting

25   bizarre.  They'll have superhuman strength.  They'll have

```
 1   agitation.  They'll have lack of tiring.
 2          The report says they have attraction to shiny things
 3   or glass.  It's just a whole revving up.  And it's felt to be
 4   a central nervous system process, something in the brain
 5   that's -- I liken to a switch being flipped.
 6          And then the neurotransmitters don't get reabsorbed
 7   and there's lots of data that shows why that happens.  But,
 8   basically, the features are everything just starts turning on
 9   and on and on and you don't stop.  It just keeps on revving
10   up.
11   BY MR. POPOLIZIO:
12   Q   Are there certain types of drugs that are associated with
13   the excited delirium syndrome?
14   A   There are, yes.
15   Q   What types of drugs?
16   A   Como sympathomimetics, basically stimulant drugs; so
17   methamphetamine, cocaine, PCP, the upper-type medications --
18   drugs.
19   Q   And here in your review of the Medical Examiner's report
20   was there any indication of a drug in Mr. Ruiz' system?
21   A   Yes.
22   Q   And what was that?
23   A   There was methamphetamine and amphetamine.  So both were
24   in there.  They break down to each other.
25   Q   Okay.  Now, Doctor, excited delirium syndrome, what you
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
1    just described to us, is this recognized by any medical

2    associations?

3    A   It is, yes.

4    Q   Okay.  Which ones?

5    A   Basically, the medical associations whose physicians see

6    these types of disorders.  So, you know, the classic

7    presentation is crazy, wild, sweaty, running around naked in

8    public type of thing.

9            The police get called.  Their organizations recognize

10   it.  Pre-hospital organizations, so the EMS community

11   recognizes it as a disorder.  And then also the American

12   College of Emergency Physicians, the ER docs receive these

13   patients.  And when they die, certain percentages of these

14   people will have a cardiac arrest and die and end up in the

15   autopsy.  The medical examiner organizations all recognize it

16   as a clinical diagnosis.

17   Q   Now, do you know what the DSM-V is?

18   A   I do, yes.

19   Q   What is it?

20   A   It's the Diagnostic and Statistical Manual.  It's

21   basically a book of psychiatric diagnoses.

22   Q   Is the specific diagnosis of excited delirium syndrome

23   contained in the DSM-V?

24   A   It is not.

25   Q   Okay.  So how would it be diagnosed, excited delirium
```

1    syndrome?

2    A    Sure.   The psychiatrists don't make this diagnosis.

3            When somebody is tripping on methamphetamine and then

4    trigger into an excited delirium phase and they're sweating

5    and temperatures are high and they're crazy and wild and

6    screaming and all that, they don't go to their psychiatrist's

7    office and lay down on the chair and talk about their history,

8    right.

9            They end up being picked up by police and EMS and

10   brought to an emergency department.   We treat them.   They

11   either get admitted to the hospital, they die, or they get

12   turned around and they go home.

13           Psychiatry doesn't see these patients in the throws

14   of excited delirium, so they don't need to put that in their

15   diagnostic book.

16           You go to a dermatology book, it's not in there.

17           You go to a rheumatology book, it's not in there.

18           You go to a psychiatric book, it's not in there.

19           However, they do have phrases that will represent it.

20   "Meth-induced" or "methamphetamine-induced delirium,"

21   "methamphetamine-induced agitation," they have those things in

22   there that describe the physiology.   But the words "excited

23   delirium syndrome" isn't in that book.

24   Q    Now, what about the American Medical Association?   Does it

25   recognize excited delirium syndrome?

1   A   So the AMA, it represents all physicians and they take --

2   tend to take stances on big things like --

3            MR. BLACKWELL:  Objection, Judge.  Nonresponsive to

4   the question.  It was a yes-or-no question.

5            THE COURT:  Let's let him finish his answer first.

6            THE WITNESS:  All right.  So they take global things,

7   obesity, the opioid overdose epidemic that are hitting the

8   country, things that affect global pieces, this is a focused

9   area.  So excited delirium syndrome is a very focused

10  specialty and they don't recognize it because it doesn't

11  impact all their physicians.

12           MR. BLACKWELL:  Objection, Judge.  Move to strike the

13  answer outside of saying "it's not recognized by the American

14  Medical Association."

15           THE COURT:  Sustained.  And it's ordered striking the

16  answer.

17  BY MR. POPOLIZIO:

18  Q   Does the American Medical Association recognize

19  specifically excited delirium syndrome?

20  A   They do not.

21  Q   Do you know why that is?

22  A   Yes.

23  Q   Could you please tell us.

24  A   Sure.  They recognize global issues.  They represent all

25  physicians.  They, you know, from everything from pediatrics

1   to geriatrics, and this is a disorder that is fairly focused.

2           And so then tend to go and recognize things like

3   obesity.  They recognize the opioid overdose epidemic.  They

4   work with things like diabetes and things like that,

5   obviously.  But those are very generalized types of diagnoses.

6           They don't get into a lot of specifics as far as

7   recognizing very focused areas.  They let the specialty areas

8   recognize those like emergency medicine, like the medical

9   examiners.

10  Q    Now, Doctor, is there a link between excited delirium and

11  sudden cardiac arrest?

12  A    There is, yes.

13  Q    And what is that link?

14  A    That's the original reports of this back in the 1800s, 75

15  percent of the people who had what was basically presented

16  with excited delirium syndrome symptoms would die.  Nowadays,

17  it's probably closer to 10 or 11 percent.

18          But it's basically revving, revving, revving,

19  everything is going off.  Temperatures are high.  Heart rates

20  are high.  Breathing is high.  Sweating, fighting, exertional,

21  they don't sort them.

22          So it's like revving your car up.  Keep revving it,

23  keep revving it, keep revving it and you're going to blow your

24  engine if you don't break that cycle.  And so it is associated

25  with sudden cardiac arrest.  The heart just gives out and

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
 1    stops.

 2    Q    Now, Doctor, in all that you reviewed for this case, did

 3    Mr. Ruiz exhibit signs of excited delirium syndrome?

 4    A    Yes, he did.

 5    Q    Okay.  Could you tell me what signs he did exhibit?

 6    A    Sure.  So he was agitated.  He was, you know,

 7    demonstrating superhuman strength as reported.  He was

 8    non-fatiguing, kept fighting and fighting and fighting.  He

 9    was sweating.  He was hot.  He had a temperature of 101 when

10    he arrived to the hospital after cardiac arrest which is

11    significant.  He also had the inciting issue which is the use

12    of methamphetamine which can trigger the excited delirium

13    syndrome.

14              Ironically, he also had, you know, they talked about

15    the glass and breaking things that are shiny.  He, apparently,

16    actually broke a toilet, to which I have seen in other cases.

17    It's a bizarre finding, but there seems to be something

18    triggered inside their brain that they are attracted to glass

19    and mirrors and things like that.  But in this case he

20    actually fell in that category as well.  He was really

21    exhibiting almost every sign of excited delirium that are on

22    the lists of diagnostic.

23    Q    With regard to the glass, how did he fall into that class?

24    A    He broke up a toilet, a porcelain toilet.  It was a shiny

25    object.
```

1   Q   Now, did -- according to what you reviewed for this case

2   and in arriving at your opinions, did Mr. Ruiz exhibit any

3   resistance to pain?

4   A   He didn't show that he was having -- you know, painful

5   compliance and painful techniques are something used or, you

6   know, jumping off a roof can be painful.  He wasn't showing

7   any signs or symptoms of having pain.

8           So basically increased pain tolerance is one of the

9   signs of excited delirium.  People break bones and keep

10  fighting and things like that.  And so he was -- you know, he

11  had some taser activations and he jumped off a roof but it

12  didn't slow him down.  He just kept on going.

13  Q   Now, you noted body temperature a few moments ago.

14  A   Yes.

15  Q   Do you recall that.

16          What is the significance, if any, of body temperature

17  with those who tend to suffer from excited delirium syndrome?

18  A   Sure.  So not everybody who has excited delirium syndrome

19  dies.  And not everybody with excited delirium syndrome

20  actually has a significantly elevated body temperature.

21          However, those who tend to go into cardiac arrest and

22  have sudden death almost always have an elevated body

23  temperature.  And Mr. Ruiz' body temperature at the arrival of

24  the hospital was 101.

25          Now, the interesting part about that, it doesn't seem

 1    that high, but in cardiac arrests -- and this is one of my

 2    areas of study -- people's temperatures drop off.  You know,

 3    you go into cardiac arrest, your heart stops, your breathing

 4    stops, we're doing CPR on you.  But when we expose you

 5    secondly, you're really not creating body heat anymore, right.

 6    You're not, you know, moving blood through your system other

 7    than what we're helping you.

 8              So when people come to the emergency department after

 9    cardiac arrest, their body temperatures are usually a few

10    degrease lower than normal.  So when you see somebody coming

11    in in a cardiac arrest and their temperature 101 almost an

12    hour after the cardiac arrest, you can safely assume that the

13    body temperature is probably 102 or 103 at the time of the

14    arrest, that it was much higher.

15              That would be consistent with somebody with excited

16    delirium syndrome and somebody who's at much higher risk for

17    going into cardiac arrest from that syndrome.

18    Q    Does asphyxia cause elevated body temperature?

19    A    No.  Asphyxiation would have no impact on body

20    temperature.  So that would not -- and asphyxiation would not

21    explain a temperature of 101 at the hospital after cardiac

22    arrest.

23    Q    So, again, what about Mr. Ruiz' body temperature, if

24    anything, from your review of the records is indicative of

25    excited delirium syndrome?

1          MR. BLACKWELL:  Objection.  Asked and answered,

2    Judge.

3          THE COURT:  Overruled.

4          THE WITNESS:  Can you ask it one more time?

5    BY MR. POPOLIZIO:

6    Q   Sure.  What about Mr. Ruiz' body temperature that you

7    reviewed in the records is indicative of excited delirium

8    syndrome?

9    A   All right.  So, again, the body's brain breaking system is

10   shut down.  And so everything sort of revs up and temperature

11   is one of those areas.  The temperature regulation system in

12   our brain stops.  The heart rate keeps going up.  Breathing

13   goes up.

14         So an elevated temperature is very consistent with

15   excited delirium syndrome; even more consistent with somebody

16   who is going to die and have a cardiac arrest from excited

17   delirium syndrome.

18   Q   Now, is there any reason, specifically, medically, for

19   elevated body temperatures of people suffering from excited

20   delirium syndrome?

21   A   Is there a reason?

22   Q   Yeah.

23   A   Yeah.  The feeling is that the -- going into sort of

24   metabolic details, there are changes in the brain and in the

25   receptor sites.  And so neurotransmitters that are normally

1    reabsorbed stay turned on, stay turned on, stay turned on.

2          And so instead of having a constant flow of

3    neurotransmitters in our brain, it just keeps revving up.  And

4    so it's basically creating things; heat, shock, proteins.

5    There are lots of biochemical markers you can measure.

6          But, basically, I think of it as an ER doctor, things

7    just keep getting turned on, turned on, turned on, and it

8    doesn't turn off.  The braking system is stopped.  And so one

9    of those areas is our thermal regulation area, the temperature

10   control and it just keeps going up and up.

11   Q   What's a dopamine transmitter?

12   A   A dopamine transmitter is basically -- dopamine is a

13   neurotransmitter, a chemical agent that goes from one cell to

14   another cell and creates some sort of function.

15         In patients like this, we'll see a regulation of the

16   dopamine and the transmitters are actually down-regulated.  So

17   it just stays in your system and continuing to fire what that

18   neurotransmitter does.  And so that's a change that you see on

19   excited delirium subjects.

20   Q   Doctor, do all people who suffer from excited delirium go

21   into cardiac arrest and die?

22   A   No.

23   Q   When they do, what's the one thing that they have in

24   common?

25   A   Yeah.  Almost all of them have an elevated body

1    temperature at the end.  There are -- we see them very

2    regularly in the Emergency Department.  Most of those don't

3    die.  Most of those get treated.  We sedate them.  We, you

4    know, sort of really take them down a notch.  Most of them

5    don't have significantly elevated body temperatures.

6          But those who tend to die in the field, before

7    getting to the hospital, or those who die in the hospital,

8    almost invariably have a significantly elevated core body

9    temperature, basically implying how messed up the system is,

10   how revved up the system is, how bad the brain is not doing

11   what it's supposed to be doing in stopping this from

12   happening.

13   Q   Now, Doctor, for a person to suffer excited delirium, must

14   there be some sort of a trigger?

15   A   There has to be, yes.

16   Q   Okay.  And what types of things could be a trigger?

17   A   The most common things we see nowadays are the stimulant

18   drugs; use of methamphetamine, cocaine, PCP, bath salts.  We

19   see all those things that can cause sudden cardiac -- or

20   excited delirium syndrome.

21   Q   With regard to Mr. Ruiz, what was the trigger?

22   A   His methamphetamine use.

23   Q   Now, Doctor, based on all that you've reviewed and you've

24   shared with us here today, do you have an opinion to a

25   reasonable degree of medical certainty, whether Mr. Ruiz was

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
 1    suffering signs and symptoms of excited delirium syndrome?

 2    A    I do.

 3    Q    And what is that opinion?

 4    A    That he was, indeed, suffering signs and symptoms

 5    consistent with excited delirium syndrome.

 6    Q    Now, Doctor, do you have an opinion to a reasonable degree

 7    of medical certainty as to the cause of Mr. Ruiz' excited

 8    delirium?

 9    A    Yes.

10    Q    And what is that?

11    A    That is his use of methamphetamine.

12    Q    And, Doctor, in all that you reviewed and shared with us

13    today, do you have an opinion to a reasonable degree of

14    medical certainty, as to whether Mr. Ruiz' cardiac arrest

15    resulted from excited delirium syndrome?

16    A    I do.

17    Q    And what is that opinion?

18    A    That his sudden cardiac arrest, and ultimately, his death

19    was due to the excited delirium syndrome.

20              MR. POPOLIZIO:  Thank you, Doctor.  No further

21    questions at this time, Your Honor.

22              THE COURT:  Cross-examination.

23              MR. BLACKWELL:  Thank you, Judge.

24                        CROSS EXAMINATION

25    BY MR. BLACKWELL:
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
 1    Q    Dr. Vilke.  It's Dr. Vilke not Vilke?

 2    A    Most people say Vilke, but it is Vilke.  You're correct.

 3    Q    Thank you.  Now, do you know Dr. Wetli?

 4    A    I do know, yes.

 5    Q    Excuse me?

 6    A    I do, yes.

 7    Q    Is he a respected member of the medical profession?

 8    A    Yes.

 9    Q    Did you review his report in this matter?

10    A    You know, if I did, it was a while back but it would have

11    been after my report was written.

12    Q    And you wouldn't disagree with him if he stated that not

13    having oxygen to the brain for eight minutes could cause

14    anoxic brain injury?

15    A    Not having any oxygen to the brain?

16    Q    For eight minutes would cause anoxic brain injury.

17         Would you disagree with that statement from

18    Dr. Wetli?

19    A    That you can have no oxygen to the brain for eight minutes

20    and not have anoxic brain juror?

21         I'm having trouble understanding what you're asking.

22    I apologize.

23    Q    Would you agree with Dr. Wetli's statement that not having

24    blood flow to the brain for eight minutes would cause anoxic

25    brain injury?
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    A    It can, yes.

2    Q    Okay.  Now, for whatever reason, please correct me if I'm

3    wrong, you stated that you could be out without any oxygen to

4    the brain for eight minutes and did not -- there wouldn't be a

5    problem with that -- with your brain?

6    A    I said that can happen too, yes.

7    Q    And you said you reviewed the training manuals, police

8    report, and stuff like that for this case?

9    A    I reviewed two boxes of materials about three years ago,

10   yes.

11   Q    And did you know -- isn't it true that in the training

12   manual for the carotid control technique it states that a lack

13   of blood flow to the brain for four to six minutes could cause

14   irreparable brain damage?

15   A    If I reviewed that, it was about two-and-a-half years ago

16   and I don't remember the specifics of it but --

17   Q    Would you disagree with that statement?

18   A    You can have --

19   Q    Yes or no?  Would you disagree with the statement?

20          MR. POPOLIZIO:  Your Honor, could the witness answer?

21          MR. BLACKWELL:  It's a yes-no question, Judge.

22          MR. POPOLIZIO:  He cut him off.

23          THE COURT:  If he can answer it "yes" or "no," it is

24   a yes-or-no question.

25          THE WITNESS:  Can you repeat that please?  I'm sorry.

```
1    Can you repeat the question, please.

2            MR. BLACKWELL:  We'll move to the next question.

3    BY MR. BLACKWELL:

4    Q   Now, in this particular case you watched the videos,

5    correct?

6    A   Yes.

7    Q   You looked at the police report, correct?

8    A   Yes.

9    Q   And you looked at -- I mean, you read it, correct?

10   A   Yes.

11   Q   And you specifically read Officer Camarillo's statements

12   to Detective Champion in the report?

13   A   I did, yes.

14   Q   All right.  And in that particular report Officer

15   Camarillo informed Detective Champion that he had never

16   attempted to use the carotid control technique; isn't that

17   true?

18   A   I don't recall that.

19           MR. BLACKWELL:  All right.  Could we give the witness

20   Exhibit 28.

21   BY MR. BLACKWELL:

22   Q   Look at page 29 of Exhibit 30 -- I'm sorry -- of Exhibit

23   28, page 29.  We're going to be looking at pages 29 and 30.

24   A   Okay.

25   Q   On the top of page 29, do you see the name "Officer
```

1    Camarillo"?

2    A   Yes.

3    Q   All right.  Does it say "Interview of Officer Camarillo"?

4    A   It does, yes.

5    Q   All right.  Turn to page 30.

6    A   Okay.

7    Q   Do you see -- look at the fourth paragraph down.

8        Read that to yourself.

9    A   Okay.

10   Q   Do you recall reading that paragraph, sir?

11   A   I read about 10,000 pages of material.  I don't recall

12   this specific paragraph.

13   Q   Right.  But this particular paragraph would be something

14   that you would note in your report had you read it as it

15   pertains to whether or not Officer Camarillo attempted to use

16   the carotid control technique, correct?

17   A   This would be one piece of information that I would

18   review, including depositions and other reports, and his own

19   report, not just interview.  So I would review all of that,

20   yes.

21   Q   Right.  But in your report you specifically speak about

22   Officer Camarillo's actions, correct?

23   A   Correct.

24   Q   All right.  And what I'm saying is:  It would be important

25   to note what Officer Camarillo initially stated as it pertains

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
 1    to whether or not he even applied the carotid control
 2    technique, correct?
 3    A   It is one portion where it was reported and I would have
 4    read it, yes.
 5    Q   Right.  But I'm saying it would be important to put this
 6    in your report as it pertains to your analysis in this case
 7    whether or not he applied it on this particular day, back on
 8    July 28, 2013, correct?
 9    A   It is a piece of information.
10        If there are conflicting comments and he also said he
11    had tried to apply it.  And so worst case scenario is he tried
12    to apply it.
13        So even though this says he never attempted it,
14    details came out in his reports and the depositions that he
15    did.  So that is what I was working on in evaluating this
16    case.
17        I assumed he tried to apply a carotid restraint and I
18    evaluated the case based on that.
19    Q   Okay.  So --
20    A   One line in 10,000 pages doesn't negate the fact that he
21    says he did.  And I think it was appropriately applied.
22    Q   So it would be inconsistent if he stated he never applied
23    it, then stated he did apply it, correct?
24        An inconsistent statement?  Yes or no.
25    A   It would be inconsistent, sure.
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1   Q   Okay.  All right.  Now, in your analysis -- well, your

2   testimony today -- you stated that Officer Camarillo said he

3   only applied it -- the carotid control technique or the

4   lateral vascular neck restraint to the right side of his neck,

5   of Mr. Ruiz' neck, correct?

6   A   That he said that?

7   Q   Yes, sir.

8   A   No.  He tried to apply the carotid technique.  You don't

9   apply it to one side.

10  Q   Okay.  All right.  And when you testified, didn't you

11  state that he only applied it to the right side?

12  A   I did not.

13  Q   The pressure?

14  A   I did not.

15  Q   And so in this case he applied it to both sides of his

16  neck?

17  A   He attempted to, yes.

18  Q   All right.  And he applied pressure?

19  A   That's how you attempt to apply it, yes, you put pressure

20  on with both sides.

21  Q   All right.  And in this case, you cannot determine by

22  looking at the videos how much pressure Officer Camarillo

23  applied, correct?

24  A   I can't give you millimeters of mercury, no.

25  Q   Okay.  All right.  You can't even tell the jury how much

1   force he used, can you?

2   A   I can tell them it wasn't enough to cause the carotids to

3   be obstructed, so --

4   Q   Well, you get paid to say that.

5   A   No.  I'm paid to give my opinions based on the information

6   I review.

7   Q   So you cannot tell this jury if you weren't there with

8   your arms around Mr. Ruiz' neck how much pressure Officer

9   Camarillo applied to his neck, can you?

10  A   I can tell you how much pressure is being applied to both

11  carotids.

12  Q   You cannot determine, looking at a video, how much

13  pressure was applied; isn't that true?

14  A   I can tell you it wasn't above the amount you need to

15  compress a carotid artery because he would have lost

16  consciousness otherwise.

17  Q   Again, my questions are "yes" and "no."

18      You cannot determine looking at the video whether or

19  not -- I mean the amount of pressure that was applied to

20  Mr. Ruiz' neck by Officer Camarillo, can you?

21      MR. POPOLIZIO:  Objection.  Asked and answered.

22      THE COURT:  Overruled.

23      THE WITNESS:  I just said I can give you a range, so

24  the answer is yes, I can tell you.  I can't tell you the exact

25  number, but I can give you a range.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
 1    BY MR. BLACKWELL:

 2    Q    So you can't give us an exact number, correct?

 3    A    Nobody can give you an exact number without a monometer

 4    being placed between the neck and the arm.

 5    Q    Now, you would agree that the typical injury associated

 6    with strangulation is a fracture of the cornu?

 7    A    I would not agree with that, no.

 8    Q    So you would -- now, in this particular case, Dr. Wetli

 9    testified not too long ago, and Dr. Wetli testified that a

10    typical injury for strangulation is a fracture of the cornu.

11          Do you disagree with Dr. Wetli's statements?

12    A    I didn't say that.  I said you can have a cornu fracture.

13    It's not a typical injury.

14    Q    Okay.  And Dr. Wetli also testified that a typical injury

15    for strangulation includes hemorrhaging to the strap muscles

16    or, in this case, the sternocleidomastoid muscle.

17          Would you disagree with Dr. Wetli?

18    A    If he's saying that in isolation, then, yes.  But in a

19    strangulation injury, there's usually much more injury than an

20    isolated punctate lesion on the side there.

21          So I would -- you know, you're giving me out of

22    context of what his comment was.  But in isolation I would

23    disagree with that.  But you can have a fracture and you can

24    have a bruise in strangulation.

25    Q    And in this case we had a fracture of the right cornu,
```

1    correct?

2    A    That is correct.

3    Q    And the typical way it's injured or fractured is that when

4    you push back on it so hard it touches or presses against the

5    cervical spine.  Is that how it breaks, sir?

6    A    No, not necessarily.

7    Q    Okay.  Would you disagree with Dr. Wetli if Dr. Wetli

8    actually testified and stated that the typical injury results

9    in the cornu being pressed against the cervical spine and

10   fracturing as it presses against the cervical spine?

11   A    That is one mechanism.  I wouldn't disagree with that

12   mechanism.

13   Q    Okay.  Now, you also testified that there was a CT scan of

14   the neck.  Do you recall saying that?

15   A    Yes, I do.

16   Q    All right.  One brief moment.

17            Dr. Vilke, this is Exhibit 86.

18   A    Okay.

19   Q    And this is the medical report from St Joe's.

20            Did you review it?

21   A    I did, yes.

22   Q    Okay.  Now, turn to page -- I think in that report it

23   should be 57 -- and you'll see -- you should see "COP."  Do

24   you see "COP-ER 1001-8" and then a couple of numbers?

25   A    Yes.

1    Q    Look for 59.

2    A    Okay.

3    Q    There should be a listing of the results from the

4    testing -- the tests that were ordered, do you agree, or at

5    least what they did based on the order of tests.  Thank you.

6    A    It's a list of tests that were ordered, yes.

7    Q    Now, look for "CT."  Do you see "CT of spine without

8    contrast"?

9    A    Yes.

10    Q    All right.  That was in progress, right?

11    A    Correct.

12    Q    How about the "CT of the neck"?

13    A    Yes.

14    Q    What does it say?

15    A    It says "cancelled."

16    Q    Okay.  Now, you testified that there was a CT of the neck,

17    am I correct?

18    A    Yes.

19    Q    All right.  When was it reinstated?  When did they do a CT

20    of the neck?

21    A    The C-spine is the neck.  So you wouldn't order two

22    different CTs of the same anatomic region.

23         It's done -- when you look at ordering in a medical

24    record or if I order something in the Emergency Department, I

25    can order multiple different types of studies to look for the

1    same anatomic region.  They just call them different things.

2              So if somebody ordered a CT -- a C-Spine without

3    contrast and a CT soft tissue of the neck without contrast,

4    which is basically looking at the same anatomic area, so the

5    radiologist will cancel the duplicate order and just go with

6    the one that was there.

7    Q   But you don't know if that actually happened.  You don't

8    know if it was cancelled because it was a duplication or if it

9    was cancelled because they couldn't do it, do you?

10             MR. POPOLIZIO:  Objection.  Foundation.

11             THE COURT:  Overruled.

12             THE WITNESS:  So this is a typical pattern, but I did

13   not speak with the radiologist or the emergency physician to

14   figure out why it was cancelled.

15   BY MR. BLACKWELL:

16   Q   All right.  And, again, with that backdrop, this document

17   states that the CT scan of the soft tissue for the neck, that

18   particular order was cancelled, correct?

19   A   Yeah.  On this page it was, yes.

20   Q   All right.  Now, as a matter of fact, based on all the

21   records you reviewed, there was no MRI of the neck, correct?

22   A   There would be no indication of doing an MRI of the neck

23   with a normal CT of the C-Spine which shows all the neck

24   anatomy.

25   Q   That may be how you do it, but my question is:  In this

1    particular case, there was no indication in any of the medical

2    records, to include the Medical Examiner's report, that an MRI

3    was performed on Mr. Ruiz' neck, correct?

4    A    There was no MRI done of the neck, if that was the

5    question you're asking.

6    Q    That was the question.  And, as a matter of fact, there

7    was no dissection of the carotid arteries performed by the

8    Medical Examiner's office, correct; dissection of the carotid

9    arteries?

10   A    I have never seen that occur, but as far as that goes,

11   yeah, I didn't see them dissecting the carotid arteries as

12   part of the autopsy.

13   Q    All right.  If you dissected the carotid arteries, you

14   would be able to determine if there was any internal injuries

15   to the carotid artery itself, correct?  Yes or no?

16   A    If you dissected it?

17   Q    Yes, sir.  As a Medical Examiner.

18   A    As a Medical Examiner?

19        MR. POPOLIZIO:  Objection.  Foundation.

20        THE COURT:  Overruled.

21        MR. BLACKWELL:  It's either yes or no.

22        THE WITNESS:  You can see through a dissection of the

23   carotid artery, not through it, dissecting down to it, whether

24   there's injury.  You don't need to transect it and cut into it

25   to see if there's injury to the carotid.  You see that

1    externally is what medical examiners typically do.  They don't

2    cut into it.

3    Q    Well, in this particular case there was no dissection of

4    the carotid artery, correct?

5    A    Because there was no indication for it, correct.

6    Q    Well, my question was either "yes" or "no," sir.

7    A    I said correct.

8    Q    And you've testified before, correct?

9    A    Yes, I have.

10   Q    And you know the difference between cross-examination and

11   direct examination?

12   A    Yes, I do.

13   Q    You know on cross-examination mostly we ask yes-or-no

14   answered questions?

15   A    Yes.

16   Q    And if we want you to explain, we ask you to explain,

17   correct?

18   A    Yes.

19   Q    But we ask you an open-ended question, correct?

20   A    Correct.

21   Q    All right.  Now, Dr. Wetli testified that there has not

22   been a lot of research on methamphetamine-induced excited

23   delirium.  Would that be a correct statement or incorrect

24   statement?

25   A    There has been research on it.  I don't know how you

1   quantify "methamphetamine-induced" -- quantify "much," right.

2   There's certainly been research on it though.

3   Q   All right.  And would you agree that it's been more

4   research on cocaine-induced excited delirium?

5   A   The original publications came out with cocaine.  The more

6   recent ones, because methamphetamine has become more, I guess,

7   popular, more user-friendly for cost reasons, there is more

8   recent research on methamphetamine-associated excited delirium

9   syndrome.

10  Q   But there is no average core body temperature for an

11  individual under the influence of meth that comes into the

12  hospital after an altercation with the police, is there?

13  A   There's no average for really anybody.  We know that it's

14  elevated.

15  Q   Oh.

16  A   But they don't average.  There's no reason to average the

17  temperatures.

18  Q   Well, Dr. Wetli testified that the average core

19  temperature for an individual under the -- who's experienced

20  excited delirium under the influence of cocaine is 105.

21          So would you disagree with Dr. Wetli's statement?

22  A   There are publications --

23          MR. POPOLIZIO:  Objection.  Relevance.

24          THE WITNESS:  The answer is:  No, I wouldn't.

25          THE COURT:  The relevance of his agreement or

1    disagreement.  Sustained.

2    BY MR. BLACKWELL:

3    Q   So, there are publications out there in the world as it

4    pertains to the average body core temperature or core body

5    temperature of an individual under the influence of cocaine

6    that's experienced excited delirium, correct?

7    A   There are, yes.

8    Q   And it's 105, correct?

9    A   I would have to relook at those studies, but there are

10   case series of subjects, multiple subjects who came in with

11   cocaine induced and they just take all their average

12   temperatures.

13          So I know there's studies out there, but it's a case

14   series, not really prospective research in the sense of

15   research that I think of.

16   Q   And 101 temperature could be due to -- in this case could

17   be due to a cold, could be to being out in the heat, heat

18   exhaustion or heat stroke, correct?

19   A   If -- no.  It wouldn't be.  I disagree.

20   Q   Say again?

21   A   I disagree.

22   Q   Okay.  All right.  Do you have the Medical Examiner's

23   report up there with you?

24   A   I don't believe so.

25   Q   It's Exhibit 29.

```
 1    A    Oh, this looks like 29.  Yes.

 2    Q    Okay.  Now, you have the full report -- or we'll see.  Go

 3    to page 7.

 4              MR. POPOLIZIO:  Your Honor, I believe Exhibit 29 is

 5    Nurse Downing's report.

 6              MR. BLACKWELL:  I'm sorry.  He's absolutely right.

 7    BY MR. BLACKWELL:

 8    Q    Well, looking at page -- Exhibit 29, while we're there

 9    since you have it in front of you, go to page 7.

10              And there was testimony initially -- and I don't know

11    if defense counsel stated or you stated that Ms. Downing

12    claimed that Mr. Ruiz' neck was crushed.

13              Do you see that written in her opinion, sir?

14              Read pages 7 and 8 and see if you see where

15    Ms. Downing says Mr. Ruiz' neck was crushed.

16    A    I don't think she used the word "crushed."  I think she

17    said he was asphyxiated.  And I referred to in order to

18    asphyxiate somebody, you would have to crush the airway.  So

19    she didn't use those words, I used them.

20    Q    You have to crush the airway to asphyxiate somebody.  You

21    can't just push on it without crushing it, Doctor?

22    A    Exactly.

23    Q    So I could potentially -- in a potential case, not me, but

24    an individual who is obstructing the individual's airway, it

25    has to be crushed for it to be obstructed?
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1   A   If we're talking about a neck held not cover their mouth,

2   obviously.

3          So for a asphyxiation caused by pressure to the

4   anterior portion of the neck, you would have to crush the

5   underlying tissue to the point where you're flattening out the

6   hard cartilaginous portions.

7   Q   So crushing, in that sense that you just explained, is

8   that forever -- would that be a permanent injury to the

9   outlying cartilage if somebody pressed on an individual's

10  airway to the point where they couldn't breath and then they

11  pass out or die and they let go.  Are you saying that the

12  cartilage wouldn't bounce back?

13  A   Correct.

14  Q   Okay.  All right.  So all the cases where you have seen an

15  individual that has been strangled by pressing on their

16  airway, their airway and the trachea has been obliterated in

17  every case, totally damaged?

18  A   I didn't use the word "obliterated."

19  Q   I did.  I'm asking you.

20  A   Then the answer is "no."

21  Q   All right.  And in this case, you would agree that

22  Mr. Ruiz wasn't resuscitated for at least eight minutes after

23  the altercation with the police out there on the second-floor

24  landing?

25  A   I would have to relook at the timing of the actual return

1   of spontaneous circulation, but it's probably in that range.

2   Q   All right.  And you would agree that Mr. Ruiz wasn't even

3   brought downstairs for almost -- well, at least two minutes

4   after he was handcuffed only the second-floor landing?

5   A   One to two minutes, I think, it took them to get him down

6   the stairs but it's in that range, sure.

7   Q   Well, we can show you on the video and we can just count

8   it if you want.

9        But would you disagree that it was at least two

10  minutes before they brought him down the stairs?

11  A   Again, I wouldn't -- you know, I don't want to run through

12  the video, but I'll say two minutes, but I don't remember

13  specifically, because I wasn't trying for that timing of part

14  of my evaluation of the case.

15  Q   Okay.  All right.  So you do agree that part of your

16  evaluation of this case is whether or not the actions of Mr.--

17  or at the time Officer Camarillo caused the anoxic brain

18  injury?

19  A   It's part of, I guess, the evaluation.

20  Q   Okay.  And by looking at the training in this particular

21  case, you would agree that the training states for the carotid

22  control technique or the lateral vascular neck restraint, it

23  tells the user of this technique to check for pulse after a

24  certain amount of seconds if the person doesn't regain

25  consciousness, correct?

1              MR. POPOLIZIO:  Objection.  Beyond the scope of this

2    expert's opinions and my direct examination.

3              MR. BLACKWELL:  Your Honor, for whatever reason in

4    their direct examination they talked about all the information

5    that this doctor, young Dr. Vilke, looked at.

6              THE COURT:  Okay.  If I need a response to an

7    objection, I'll ask for it.

8              MR. BLACKWELL:  Thank you, Judge.

9              THE COURT:  Overruled.

10             THE WITNESS:  I'm sorry.  Can you please repeat the

11   question?

12             MR. BLACKWELL:  I forgot the question.

13             Can I have the question repeated.

14        (Whereupon, the court reporter read the last question.)

15             THE WITNESS:  And I can't agree at this time because

16   I reviewed those records years ago and I don't remember what

17   was in them.

18             MR. BLACKWELL:  No problem.  We'll come back to that

19   question.

20   BY MR. BLACKWELL:

21   Q    You testified you have training in martial arts, correct?

22   A    That's correct.

23   Q    I would assume you spar when you are training, correct?

24   A    I did.  I'm no longer actively training, but, yes, I

25   sparred.

CV14-01942-PHX-JAT     JURY TRIAL - DAY #7     5-30-17

1    Q    And back then it was contact sparring, correct?

2    A    Yes.

3    Q    And you never fractured your cornu when you were sparring,

4    did you?

5    A    Not that I'm aware of, no.

6    Q    All right.  And so what did --

7         And you also said something else about the cornu.

8    You called it -- with the cornu, you called it like a -- did

9    you call it a piece of like hard plastic?

10   A    I described it as such.

11   Q    All right.  And, again, you never fractured your cornu in

12   sparring with people back when you were doing your martial

13   arts, correct?

14   A    Again, not that I'm aware of, no.

15   Q    And you didn't fracture anybody else's cornu back then,

16   did you, when you were sparring with them, right?

17   A    When we spar, we never aim for the neck, so I'm confident

18   I didn't fracture anybody's cornu.

19   Q    Were you throwing people on the mat?

20   A    More kicking and punching.  And the idea is not to kick

21   and punch into the neck.

22   Q    Sorry.  Okay.  You would agree that kicking somebody or

23   punching somebody in the neck would be a lot of pressure,

24   wouldn't it?

25   A    It could cause some, sure.

UNITED STATES DISTRICT COURT

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1   Q   All right.  And it could cause some injuries to the neck,

2   could it not?

3   A   It could, yeah.

4   Q   To include fracturing the cornu?

5   A   It could, yes.

6   Q   All right.  Now, in this country there are a lot of, like,

7   hard-core contact sports like NFL football.  We've got

8   volleyball sometimes can be contact sports.  We have, I don't

9   know, wrestling, right?  MMA.  Is that "yes"?

10   A   Yes.  I was waiting for the end.  Sorry.

11   Q   And so you would agree that there are a whole bunch of

12   people running to the hospital emergency rooms with broken

13   cornus after these battles, correct?

14          MR. POPOLIZIO:  Objection.  Foundation.  Beyond the

15   scope.

16          THE COURT:  Sustained to foundation.

17   BY MR. BLACKWELL:

18   Q   You testified that you agree that the medical -- you agree

19   with the Medical Examiner's finding as it pertains to the

20   injuries found, right?

21   A   Yes.

22   Q   All right.  And do you disagree with the Medical

23   Examiner's statement that the injuries were due to

24   compression -- compression of Mr. Ruiz' neck?

25          Do you disagree with that finding?

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    A   I don't disagree with that, phrased as you put it, no.

2    Q   So you're not here to testify that Mr. Ruiz' neck was

3    injured by any other thing but Officer Camarillo's compression

4    of his neck, correct?  Yes or no.

5             MR. POPOLIZIO:  Objection.  Foundation.

6             THE COURT:  Sustained.

7    BY MR. BLACKWELL:

8    Q   Well, there was no other indication based on what you've

9    seen that Mr. Ruiz' neck was compressed by anybody else at the

10   scene, was there?

11   A   I would agree with that, yes.

12   Q   Okay.  You testified that Mr. Ruiz was moving around,

13   moving his neck, correct?

14   A   Correct.

15   Q   All right.  Now, when you watch the video, you see Officer

16   Camarillo doing a bunch of moving with his arm around

17   Mr. Ruiz' neck, correct?

18   A   There was lots of movement in that video, yeah.  Both the

19   officer and Mr. Ruiz were moving.

20   Q   Right.  Now, if officer -- in this case Officer Camarillo

21   is the one with his arm around Mr. Ruiz' neck, correct?

22   A   If that was the officer who had the arm around the neck,

23   yes.

24   Q   And -- pardon me -- Officer Camarillo is the individual in

25   control of Mr. Ruiz' neck, correct?

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    A    "Control" is a term.  I mean, he was holding him around

2    the neck.  Whether he had control is a subjective evaluation.

3    Q    Okay.  You see in parts of the video that individuals are

4    pulling on Mr. Ruiz' legs?

5    A    Yes.

6    Q    You recall them strapping his legs with a so-called RIPP

7    restraint?

8    A    Yes.

9    Q    And you see them pulling on the RIPP restraint?

10   A    I mean, there's a lot of dynamics, again, but they were

11   using the RIPP restraint to restrain the legs and there was

12   pulling back and forth to get it put in position.

13   Q    Okay.  And at the same time when you see them pulling on

14   Mr. Ruiz' legs, you also see Officer Camarillo pulling up on

15   Mr. Ruiz' neck.

16        Did you ever see that in the video?

17   A    I certainly don't see anything you're almost describing as

18   "stretching."  I saw control of the neck and upper chest area.

19   I didn't see any pulling of the head up, but it was a dynamic

20   situation.

21        MR. BLACKWELL:  Your Honor, we want to show

22   Exhibit -- can we publish Exhibit 49?

23        THE COURT:  Forty-nine.  You may.

24        MR. BLACKWELL:  To the jury.

25   BY MR. BLACKWELL:

1    Q   Now, before we play, Dr. Vilke, you stated that -- and

2    please correct me if I'm wrong -- that you didn't see where

3    Officer Camarillo had his forearm around the front part, the

4    near front part of the anterior area of Mr. Ruiz' neck,

5    correct?

6    A   I said I did not see any placement of a bar or chokehold

7    on him, correct.

8    Q   All right.  Looking directly at the picture, this is a

9    little freeze-frame here.  Do you see his arm around the

10   anterior portion, touching the anterior portion of his neck?

11   A   I see the right portion of his arm on part of it.  It's

12   off center but it's not a bar hold.  So the elbow is off a

13   little bit.

14        And that could be, again, the still footage that's

15   moving there.  But basically, it's -- no.  I don't see this as

16   a bar hold or evidence of a chokehold.  This is just a dynamic

17   movement of a carotid control technique.

18        MR. BLACKWELL:  Your Honor, is there an issue with

19   the --

20   BY MR. BLACKWELL:

21   Q   All right.  And so from your perspective looking here,

22   you're saying that this is not a direct anterior compression

23   of the -- direct anterior compression of the neck?

24   A   Correct.

25   Q   All right.  However, you would agree that if he's applying

1   pressure to that area, you could -- meaning Officer

2   Camarillo -- could obstruct the airway?

3   A   The crook of the elbow is actually over part of the front

4   anterior portion, so it would be very difficult to obstruct

5   the airway this way.

6   Q   The crook of the elbow, would you agree, is to the left

7   portion of his jawbone?

8   A   Correct, sort of pointing right at us.  But it's only

9   about a 30-degree offset.  It's not a 90-degree offset.

10  That's where you come across with a bar hold is a 90-degree

11  offset.  It's just basically with the head turned that much,

12  that's the difference.

13  Q   So if his head turns that much, then even though his --

14  even though -- let me get the question out.

15          So if Mr. Ruiz -- if his head is turned in some kind

16  of fashion to a point where Officer Camarillo's left arm is on

17  the anterior portion of his neck and he's applying pressure,

18  he's going to obstruct the airway, correct?

19  A   That would be a possibility if the forearm was crossing

20  the front, sure.

21  Q   All right.  Now, did you see the jerking that was being

22  applied -- jerking of the neck being applied by Officer

23  Camarillo?  Did you see that at all?

24  A   I didn't appreciate sudden jerking, no.  I mean, he's

25  moving.  He's opening his mouth.  It looked more like he was

1    saying things than actually jerking going on.  It looked more

2    like Ruiz was speaking and opening but --

3    Q   Are you saying you didn't appreciate that there was

4    jerking?  You didn't see the jerking?

5    A   I didn't appreciate that, no.

6    Q   Okay.

7    A   I mean, there's changing of position.  There's a

8    difference in that.  There's a change of position that can

9    happen, a moving, open the mouth and jaw up and down.  There's

10   a lot of movement but I didn't see jerking.  I just didn't

11   appreciate that.

12   Q   Okay.  We'll show it again.

13       (Playing Exhibit 49 for the jury and witness.)

14          MR. BLACKWELL:  Stop.

15   BY MR. BLACKWELL:

16   Q   Again, you're saying you don't see Officer Camarillo

17   jerking on Mr. Ruiz' neck in that video clip?

18   A   I saw Mr. Ruiz jerking when the taser is being applied to

19   his stomach, but I didn't see changes in Officer Camarillo's

20   positioning that implied jerking.  It looked like Mr. Ruiz was

21   actually jolting because of the electricity and moving there,

22   so.

23   Q   But your ability to see jerking is totally different than

24   everybody else's ability to see jerking, correct?

25          MR. POPOLIZIO:  Objection.  Argumentative.

CV14-01942-PHX-JAT     JURY TRIAL - DAY #7     5-30-17

1              THE COURT:  Sustained.

2              MR. BLACKWELL:  Next one.  What's the next one?

3    Exhibit 49.

4         (Playing Exhibit 49 for the jury and witness.)

5    BY MR. BLACKWELL:

6    Q    Did you see Officer Camarillo pulling back on his neck?

7    A    I saw one period where it looked like he was potentially

8    putting some pressure and pulling that way.  I saw him slide

9    down the stair which pulled the other direction and made it

10   look like he was moving and I saw a lot of movement.

11             But there was -- there may have been some carotid

12   pressure being pushed, but not -- I mean, I consider jerking

13   as a sudden movement, not just shifting positions in a dynamic

14   situation.

15   Q    Okay.  You do agree gravity is still at play back on July

16   28, 2013, correct?

17   A    When he slid down the stair, that's where you saw some

18   gravity actually affecting him, yeah.

19   Q    Right.  And so gravity is still being applied to --

20             Depending how you look at the theory of relativity,

21   but gravity is being applied to Mr. Ruiz' body.  At the same

22   time Officer Camarillo's is squeezing on the neck, correct?

23   A    Most certainly is holding him on the neck, whether it's

24   squeezing at the moment or not but the neck hold was in place,

25   yes.

1  Q   Are you saying that you can't determine whether or not

2  he's squeezing his neck during that particular clip you just

3  watched?

4  A   I did mention it looked like there was a point where there

5  was some closing of the crook of the elbow which would be

6  consistent with adding some pressure, but it wasn't the whole

7  time.

8  Q   Well, if there is pressure being applied to his neck the

9  entire time and gravity is still working on Mr. Ruiz' body,

10 that still could cut off the air flow, correct?

11 A   Not where the arm was positioned, no.

12 Q   If the arm isn't directly around --

13      Well, if the V isn't directly bifurcating his chin

14 where the arm is -- his left forearm, his bicep, isn't

15 directly on both carotid arteries, both sides of the carotid

16 arteries, then you could be obstructing -- Officer Camarillo

17 could be obstructing the airway, correct?

18 A   In the video that I looked at, the airway was maintained

19 within this region of the forearm and the bicep.  So I didn't

20 see where there would be any risk for him obstructing the

21 airway if there was pressure being placed at that time.

22 Q   But my question was -- I'll ask the question again.

23      You said "the video."  I said if Officer Camarillo --

24 first I said if the gravity is still being applied to Mr. Ruiz

25 and Officer Camarillo is squeezing on his neck and it's not a

1    correct application of it, meaning that the carotid arteries

2    aren't perfectly bifurcated by the forearm -- the left forearm

3    and the left bicep, then there could be an issue where

4    Mr. Ruiz' airway could be obstructed, correct?

5              MR. POPOLIZIO:  Objection.  Foundation.  403.

6    Confusing.

7              THE COURT:  Overruled.

8              THE WITNESS:  I disagree with you.

9    BY MR. BLACKWELL:

10   Q   Okay.  All right.  And so an incorrect application of the

11   carotid control technique, you would have to agree, can

12   obstruct the air flow to an individual?

13   A   In a hypothetical, is that what you're saying?  Or the

14   details in the video I just looked at?

15   Q   Just the incorrect -- first with the hypothetical.  An

16   incorrect application of the carotid control technique will

17   obstruct air flow?

18   A   An incorrect -- if you're referring to a bar hold or

19   chokehold coming across and it's putting enough pressure on

20   it, it could impact the airway, sure.

21   Q   Right.  And an incorrect application of the carotid

22   control technique can injure and fracture the cornu and injury

23   the strap muscles like in this case, correct?

24   A   I would -- I guess I need more details what you mean by an

25   "incorrect placement."

1          A true bar hold will not damage the cornu and the

2    sternocleidomastoid because they're never being in contact.

3    But if you're doing this, you could.

4          So your hypothetical, you need some more detail for

5    me to be able to say a yes-or-no answer.

6    Q   Well, in this particular case you have a situation where

7    Officer Camarillo is now testifying that he never thought --

8    he doesn't know if he actually applied it correctly.

9          So my question to you is if it's applied incorrectly,

10   you could obtain an injury like the injuries that were noted

11   by the Medical Examiner in this case?  Yes or no.

12   A   No.

13   Q   No?  Okay.  And so the Medical Examiner states in this

14   case that the injuries were due to neck compression, correct?

15   A   I agree, yes.

16   Q   All right.  And Officer Camarillo doesn't even know if he

17   applied it and/or applied it correctly in this case.

18         Two different statements, both made by Officer

19   Camarillo, do you agree with that?

20   A   I don't recall those specific statements, but if he's

21   saying -- I don't remember him saying "I didn't apply it

22   correctly."  I know he had tried to apply it.

23   Q   All right.  If you are trying to apply it and you're

24   not -- and it's not working, it means you're not applying it

25   correctly?

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    A    I disagree with you there.

2    Q    All right.  So if Officer Camarillo informed PSB that his

3    vest was getting in the way so he couldn't apply it properly,

4    then he's not applying it correctly; isn't that true?

5    A    I disagree.  It's ineffective.  It's ineffective.

6    Q    I'll move on.  You disagree.

7    A    Yes.

8    Q    All right.  You also would agree that an incorrect

9    application of the carotid control technique would lead to

10   injuries?

11   A    I need details.  Meaning, if you're trying to apply and

12   your definition of "incorrect" means it didn't render him

13   unconscious, I would disagree with that.

14        It's -- there's a difference between "incorrect,"

15   meaning in the wrong position and causing injuries than in the

16   correct position and not being successful.

17        As I explained earlier, it's very difficult to get

18   both carotids blocked at the same time.  Just because the

19   person doesn't go unconscious doesn't me it was incorrect.  It

20   just means it was unsuccessful.

21        So I think we have a -- just so we're on the same

22   definitions here.

23   Q    Well, okay.  You know, I'm going to use your definition.

24        So if you apply it correctly where the carotid

25   arteries are cut off, the individual should pass out within 10

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
 1  seconds, maybe 15 seconds, correct?
 2  A   That's not my definition.  My definition --
 3  Q   Either yes or no.
 4  A   Well, then I can't answer your question because you didn't
 5  use my definition.
 6  Q   I'll say it again.
 7          A correct application of the carotid control
 8  technique, training would dictate that the individual will
 9  pass out between 8 and 15 seconds.  Yes or no?
10  A   I disagree.
11  Q   Okay.  Next question is if an individual incorrectly
12  applies a carotid control technique to where injury results,
13  that means the person didn't apply it correctly.  Yes or no?
14  A   I disagree.  No.
15  Q   All right.  And in a situation where a person is
16  unsuccessful at applying the carotid control technique and
17  they apply it multiple times during a five-minute period, that
18  can lead to injuries, correct?
19  A   It could lead to injuries, sure.
20  Q   All right.  In this case for almost five minutes Officer
21  Camarillo attempted to apply the carotid control technique;
22  isn't that true?
23  A   He had a neck restraint on.  When I'm saying "applying,"
24  I'm talking about the pressure --
25  Q   My question is "yes" or "no."
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    A    No.   No.   Then you're incorrect.

2    Q    All right.   And you're saying that in this particular case

3    although -- I'm sorry.   Strike that.

4            You do agree that Officer Camarillo, his

5    application -- his application or attempted application of the

6    carotid control technique or the so-called lateral vascular

7    neck restraint technique, caused the injuries that the Medical

8    Examiner noted in the Medical Examiner's report?

9    A    I would agree that the injuries would be consistent with

10   an appropriately-located lateral vascular neck restraint, yes.

11           MR. BLACKWELL:   Your Honor, may we publish Exhibit

12   117?   It's been admitted.   It's the training manual.

13           THE COURT:   What exhibit?

14           MR. BLACKWELL:   Exhibit 117.

15           THE COURT:   You may.

16   BY MR. BLACKWELL:

17   Q    Now, this is the carotid control technique.   This is the

18   part where the trainers in the manual talk about post-use

19   care.   I'm sure you have seen this.

20           THE COURT:   Let me revisit.   This area was the

21   subject of an objection which I, at the time, didn't

22   understand what it was you were looking at.

23           But the objection was that this was outside the scope

24   of his direct and that's my recollection.   Do you have a

25   different recollection?

 1           MR. BLACKWELL:  Your Honor, this individual

 2    testified --

 3           THE COURT:  I'm sorry?

 4           MR. BLACKWELL:  He testified on direct about all the

 5    information he looked at to form his opinion.

 6           There was 60-plus documents that he looked at to

 7    include training.  And so I don't know how this particular

 8    document would be outside of the direct examination when he

 9    said that he looked at it.

10           THE COURT:  Well, the fact he looked at a bunch of

11    documents doesn't necessarily equate to it being covered on

12    direct examination.

13           MR. BLACKWELL:  Well, I'll use it for impeachment as

14    it pertains to how much time he's supposed to use to -- well,

15    how much time should pass before you check for a person's

16    pulse.

17           THE COURT:  What statement are you going to try to

18    impeach him with from this document?

19           MR. BLACKWELL:  I believe one of my initial

20    statements when we came to this particular --

21           THE COURT:  How does this --

22           MR. BLACKWELL:  -- training.

23           THE COURT:  This isn't something he wrote or

24    authored.  How does this impeach something he says?

25           MR. BLACKWELL:  Because it's the --

```
 1              THE COURT:  Because it was in his file?
 2              MR. BLACKWELL:  No, Your Honor.  One second.
 3              I would agree with the Court.  On that point I would
 4    agree with the Court.  He didn't write it.
 5              THE COURT:  I'll reverse my earlier ruling and
 6    sustain the objection.
 7              MR. BLACKWELL:  Thank you, Judge.
 8              MR. POPOLIZIO:  Thank you, Your Honor.
 9    BY MR. BLACKWELL:
10    Q   Is it important, Dr. Vilke, if an individual --
11              Oh, let's take your example, since you said you
12    allowed your sensei -- I think when you testified before, you
13    said you allowed your sensei to use the carotid control,
14    lateral vascular restraint technique on yourself and you were
15    rendered unconscious, correct?
16    A   Correct.
17    Q   Now, wouldn't it be important -- please tell the jury --
18    that your sensei check for your pulse if you didn't come to
19    within 30 or 40 seconds?
20    A   I don't think it's that important as long as I'm breathing
21    and have a good color.  So I don't think it's that critical.
22              People will stay unconscious for longer periods of
23    times.  As long as they're breathing and they have good color,
24    I don't expect them to check my pulse.
25    Q   Well, if you don't come to and you're not breathing,
```

1  wouldn't it be important for him to check for your pulse, sir?

2  A   If I wasn't breathing, I would want him to check for my

3  pulse, sure.

4  Q   Well, and if you're not moving and unconscious for 30

5  seconds, he has to come to your body and feel for a pulse to

6  determine if you are even breathing, correct?

7  A   No.  They're completely different.  You can see somebody

8  breathing and hear air moving in and out.  It's when you have

9  a carotid restraint, it's not blocking your breathing.  It's

10  not affecting your respirations or ventilations.  It's just --

11  and it's not even affecting your pulse.

12       It's just blocked blood flow to your brain

13  momentarily.  So there would be no reason why you would stop

14  breathing that you couldn't evaluate somebody by looking at

15  them.

16  Q   Well, and back to your case when you were rendered

17  unconscious by your sensei.  If he didn't notice that you were

18  breathing, didn't notice the sensation of your chest moving up

19  and down, you would want him to check for your pulse, wouldn't

20  you?

21  A   At some point, sure.

22  Q   At some point?

23  A   Right.

24  Q   You want him to wait two minutes -- tell the jury.

25       Two minutes?  Three minutes?  Four minutes?

```
 1              Tell me when to stop.

 2              Five minutes?  Six minutes later?  Seven minutes

 3   later?  Eight minutes later?  Ten minutes later?  Eleven

 4   minutes later?  Twelve minutes later?  Fifteen minutes later?

 5              Doctor, when do you want me to stop?  How many

 6   minutes should your sensei wait to check for your pulse if he

 7   didn't notice you breathing?

 8   A   Thank you for a break.

 9              You know, if I stopped breathing completely, then you

10   would want to watch about 30 to 60 seconds.  And if it's not

11   there, try to arouse the person.  And at that point I would

12   want to be checked.  But that's, you know, a reasonable time.

13   There is no fixed number.

14   Q   Okay.  And then for that 30 to 60 seconds how many neurons

15   have you lost with no oxygen to your brain, you're not

16   breathing, no oxygen is coming in, how many neurons have you

17   lost over that period of time?

18              MR. POPOLIZIO:  Objection.  Foundation.

19              THE COURT:  Sustained.

20   BY MR. BLACKWELL:

21   Q   So 30 to 60 seconds.  And in this particular case, based

22   on you watching the videos and based on all the reports, that

23   wasn't done, meaning nobody checked for Mr. Ruiz' pulse on the

24   second-floor landing, correct?  Correct?

25   A   Please don't rush me.  I'm trying to think back.
```

1              On the second floor they started moving him down the

2      stairs fairly quickly after he lost consciousness.  I don't

3      recall anything being checked on the second floor.  I agree

4      with you.

5      Q   All right.  So you would agree that when I said nobody

6      checked for his pulse, correct, that was a yes-or-no answered

7      question?

8      A   On the second floor, I agree with you, yes.

9      Q   All right.  And particularly the individual that was

10     squeezing on Mr. Ruiz' neck didn't check for a pulse after he

11     went limp, correct?

12     A   On the second floor?

13     Q   Yes, sir.

14     A   I don't believe that -- I believe that's the case, yes.

15     Q   All right.  And as a matter of fact, in the video you can

16     actually see Mr. Ruiz' legs moving every so gently and slowly

17     coming to a halt.

18              Do you recall seeing that in the video, sir?

19     A   I remember him moving and moving and then he stops moving.

20     You know, the movement is implying blood flow to the brain and

21     activity.  And when you stop moving, that's when it goes away.

22     But I was looking at the degree of movement, the fact that it

23     is there is what is significant.

24     Q   Well, you would have to agree that there is no indication

25     in the video that his heart just stopped suddenly, correct,

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
 1    like a switch going off or on?
 2    A   That's exactly what the video indicates.  That he's --
 3            MR. BLACKWELL:  Okay.  May we publish, Judge, Exhibit
 4    49?
 5            THE COURT:  You may.
 6            MR. BLACKWELL:  Thank you.  Sorry.
 7        (Playing Exhibit 40 for the jury and witness.)
 8    BY MR. BLACKWELL:
 9    Q   Now, in this video clip did you see Mr. Ruiz' legs moving
10    ever so gently?
11    A   I did.
12    Q   All right.  And did you -- you couldn't see --
13            Well, tell me.  Could you see Officer Camarillo?
14    A   It's hard to see because the other officers or somebody is
15    in front of him.
16    Q   It's safe to assume he was still squeezing on his neck
17    though, correct?
18    A   It's safe to assume he still had an arm in position.
19    Whether he's applying pressure or not, I don't think is safe
20    to assume.
21    Q   And you can see individuals on the other side of his body
22    pulling down on his legs?
23    A   Correct.
24    Q   All right.  So there was no point in time when you were
25    watching the video that there was indication that all of a
```

1    sudden out of the blue Mr. Ruiz' heart just stopped.  There's

2    no indication in the video, correct?

3    A    I disagree.

4              MR. BLACKWELL:  All right.  Your Honor, I have some

5    more.  I don't know if you want to take a break now or --

6              THE COURT:  Well, another four or five minutes.

7              MR. BLACKWELL:  Great.  Thank you very much.

8    BY MR. BLACKWELL:

9    Q    Now, you talked about -- oh.

10             The exhibit we were looking at before when you were

11   on direct, it was Nurse Practitioner Downing's diagram of the

12   neck.  Do you recall whether or not she indicated that this

13   particular diagram was a direct diagram of Mr. Ruiz' neck?

14   A    I don't recall that she noted that.

15   Q    Did you ever see in her report where she stated that there

16   was damage to the anterior portion of the neck in her report?

17   A    I think she said "thyroid cartilage," but I don't think

18   she actually denoted which specific portion of it.  Then she

19   supplied the picture showing a fracture over the anterior

20   portion, which was obviously incorrect.

21   Q    So do you recall -- well, you weren't here but she

22   testified that that was not a diagram of the true injuries of

23   Mr. Ruiz.

24             So is it your testimony that she somehow was trying

25   to imply that Mr. Ruiz' neck, the anterior portion of the

1    thyroid cartilage, was broken or fractured?  Is that your

2    testimony?

3    A   If that's the picture she put in her report, that would

4    definitely imply that that's where a fracture is because it's

5    hard to find a picture of the thyroid cartilage with a

6    fracture on it.

7         There's thousands on Google you can find that have no

8    fractures.  I wouldn't understand why she would put this

9    picture into her report if she wasn't implying that that's

10   where the fracture line was.

11   Q   But you know that when she testified, she testified and

12   stated that that wasn't the fracture of his neck?

13   A   Again, I don't understand why she would do that.  You have

14   to work hard to find a picture with a fracture.  It's easy to

15   find a picture without it if you're just trying to locate

16   anatomy.

17   Q   Well, did you put a picture in your report of a neck with

18   a cornu fracture?

19   A   I did.  I put a picture of my neck without a fracture over

20   the body of the thyroid.

21   Q   Did you put a picture in your report with a fracture to

22   the cornu?  Yes or no.

23   A   No.

24   Q   Okay.  All right.

25   A   They're very hard to find.

1    Q   All right.  Because it rarely happens.

2    A   Well, I'm saying it's hard to find a picture with a

3    fracture on the thyroid cartilage.  I don't know where she

4    found that at.

5    Q   Okay.  All right.

6    A   She had to work hard to find one that was incorrect and

7    could have put a correct one in.

8    Q   Well, I understand what you're saying.  But you didn't

9    even find one with a carotid -- I'm sorry -- a fracture to the

10   cornu, correct?

11   A   Exactly.

12   Q   Because it rarely happens, correct?

13   A   Well, it happens.  They're just hard to find pictures of.

14   Q   I said it "rarely happens."

15   A   Oh, I naught you said "really."

16           Yes.  It rarely happens.  Yes.

17   Q   Okay.  Now, you testified about the fact that the

18   application -- meaning how one employs the carotid control

19   technique -- is a hard thing to do, correct?

20           And I'm paraphrasing.  It's not a simple task, is it?

21   A   To make it successful, correct.

22   Q   Right.  And you would agree that it takes training to be

23   successful at applying it correctly?

24   A   Training is part of it, sure.

25   Q   Right.  And how you get it locked in is part of it as

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
1    well?
2    A    Yeah.   The correct placement and then the successful
3    application, there are two parts to it.
4    Q    Right.
5    A    It's easy to get it in the correct place.  It's hard to
6    get the successful application over both carotids
7    simultaneously.
8    Q    Right.  And if you have a lack of knowledge of that
9    training, it may be impossible for you ever to apply it
10   correctly?
11              MR. POPOLIZIO:  Objection, Your Honor.  There's no
12   training claim in this case.
13              MR. BLACKWELL:  Your Honor --
14              THE COURT:  Sustained.
15   BY MR. BLACKWELL:
16   Q    If an individual doesn't understand his training in
17   applying the carotid control technique, should they use that
18   carotid control technique?
19              MR. POPOLIZIO:  Objection.  Relevance.  Beyond the
20   scope of this expert's opinion.
21              MR. BLACKWELL:  Your Honor, this individual --
22              I'm sorry, Judge.
23              MR. POPOLIZIO:  Foundation, Your Honor.
24              THE COURT:  Sustained on all three points.
25              And we will take our break at this time.
```

1          Remember the admonition and we'll be back at 1:30.

2          MR. BLACKWELL:  Your Honor, could I make an argument

3     outside the presence of the jury?

4          THE COURT:  You may .

5          You are excused.

6       (Open court, no jury present at 11:59 a.m.)

7          THE COURT:  You may step down.  The record will

8     reflect the presence of the parties and counsel outside the

9     presence of the jury.

10         Yes, sir?

11         MR. BLACKWELL:  Well, briefly, Judge, I know you need

12    to go.

13         I believe the defense has opened the door to me

14    asking the question as it pertains to lack of knowledge of

15    training.  I understand we do not have a training claim.

16         Our opening in this case was Officer Camarillo's lack

17    of knowledge of his own training that led to the injury  and

18    so --

19         THE COURT:  I'm sorry.  You're saying the defense

20    opened the door by raising the subject of lack of training?

21         MR. BLACKWELL:  No.  The defense opened the door by

22    having this individual testify about his own experience in

23    applying the carotid control technique as well as having it

24    applied to him.  His training as a martial arts.  I'm going to

25    call it "semi-expert."

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
 1              And so based on him talking about -- or Dr. Vilke
 2    talking about his own training as it pertains to this
 3    particular technique, I should be able to ask him questions as
 4    it pertains to an individual's lack of knowledge of applying
 5    this technique and how it can lead to injuries, Judge.
 6              I believe that's a fair question based on the defense
 7    opening the door to this subject.
 8              THE COURT:  The ruling will stand.  Thank you.
 9              MR. BLACKWELL:  Thank you, Judge.
10         (Recess taken at 12:01 p.m.; resumed at 1:32 p.m.)
11         (Open court, jury present.)
12              THE COURT:  Thank you.  Please be seated.
13              The record will reflect the presence of the parties
14    and counsel, ladies and gentlemen of the jury.
15              And you may continue, Mr. Blackwell.
16              MR. BLACKWELL:  Thank you, Judge.
17                    CROSS EXAMINATION (cont'd)
18    BY MR. BLACKWELL:
19    Q    Good afternoon, Dr. Vilke.
20    A    Good afternoon.
21    Q    Did you enjoy your lunch?
22    A    Yes.  Thank you.
23    Q    Did you have a conversation with your defense counsel
24    about what you may testify during this part of the trial?
25    A    No different than in preparation for trial in general.
```

CV14-01942-PHX-JAT     JURY TRIAL - DAY #7     5-30-17

1    Q    But you did have a conversation over lunch about your

2    testimony, correct?

3    A    Well, we had lunch and we talked about things, sure.

4    Q    Talked about your testimony, correct?

5    A    Well, sure.

6    Q    All right.  Now, when you ended on direct examination you

7    went into a series of questions concerning excited delirium.

8         Do you recall that?

9    A    Yes.

10   Q    All right.  And you do agree that this excited delirium

11   syndrome isn't recognized by the American Medical Association?

12   A    I think I explained that earlier, yes.

13   Q    And it's not recognized by the -- I guess is there an

14   American Psychiatric Association?

15   A    I haven't heard of it, but it doesn't mean it doesn't

16   exist.

17   Q    But it's not recognized by psychiatrists as a whole,

18   excited delirium, correct?

19   A    I don't know of any specific organizations that recognize

20   it.

21   Q    Right.  And it's not located in the DSM-V, right?

22   A    That is correct.

23   Q    You stated -- and I guess you were being maybe somewhat

24   coy.  You said that it's -- you know, that dermatologists

25   don't recognize it, but they're not psychiatrists, correct?

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1   A   Well, no, I wasn't being coy.  I was being descriptive

2   that the DSM is the diagnosis of psychiatric disorders.

3         And it's not in there, just like you wouldn't see it

4   in a dermatologic list or a rheumatologic list, the same

5   thing.  It's where you tend to take care of patients.  That's

6   why it's recognized by emergency physicians and medical

7   examiners.

8   Q   And as it pertains to excited delirium, it's normally in

9   the setting where there has been some type of altercation with

10  the police, correct?

11  A   Oftentimes there are, yes.

12  Q   More often than not, correct?

13  A   Probably, yes.

14  Q   And in this particular case, the Medical Examiner did not

15  state that either the cause and/or manner of death included

16  excited delirium, correct?

17  A   He didn't use those words, correct.

18  Q   Didn't use any of those words.  "Excited" or "delirium,"

19  correct.

20  A   I don't think he used either of those words, yeah.

21  Q   All right.  Now, you talked about the term "chokehold" as

22  used by Nurse Practitioner Downing.

23        Do you remember that testimony earlier this morning?

24  A   Yeah.  I talked about it, yes.

25  Q   And it is true that even in the Medical Examiner's report

UNITED STATES DISTRICT COURT

1   it mentions the term "chokehold"?

2   A   I don't remember it being specifically -- it may be in

3   there, but it wasn't referring to a bar hold.

4   Q   So is there a difference between a chokehold and a bar

5   hold?

6   A   They're the same thing.

7   Q   Okay.  So if the term "chokehold" was used in the Medical

8   Examiner's report, they're talking about a bar hold?

9   A   I don't --

10          MR. POPOLIZIO:  Objection.  Foundation.

11          THE COURT:  Sustained.

12   BY MR. BLACKWELL:

13   Q   Do you have Exhibit 14 up there?  No?

14   A   I don't think so.

15   Q   Okay.  Looking at page 6 of the Medical Examiner's report,

16   there is information that the Medical Examiner used in

17   formulating his opinion.

18          In that information, in that bolded -- not bolded,

19   but that blocked-off paragraph, there are two indications

20   where two individuals stated the chokehold was utilized.

21          Do you recall reviewing the Medical Examiner's

22   report?

23   A   I have reviewed it.

24   Q   Looked at the entire report, sir?

25   A   I did, yes.

1    Q    Okay.  Do you want to read --

2              MR. POPOLIZIO:  Objection, Your Honor.  This is not a

3    part of the Medical Examiner's report.

4              MR. BLACKWELL:  This is the same part of the Medical

5    Examiner's report when we asked the same question of the

6    Medical Examiner when he testified.

7              THE COURT:  What exhibit are you talking about?

8              MR. BLACKWELL:  Exhibit 14, page 6.

9              THE COURT:  Page what?

10             MR. BLACKWELL:  Page 6, Judge.

11             THE COURT:  And is this -- is what you say when you

12   said "some part of the report" is because it's in the

13   footnote?

14             MR. POPOLIZIO:  No, Your Honor.  This is a part of

15   the file, not a part of the Medical Examiner's report.  This

16   is a Preliminary Report of Death not authored by the Medical

17   Examiner.

18             THE COURT:  Your response?

19             MR. BLACKWELL:  Thank you, Judge.

20             My response is the Medical Examiner when he

21   testified, he stated that he used all the information that

22   was -- that he gathered in formulating his opinion of how

23   Mr. Ruiz died.

24             I specifically asked him questions about a chokehold

25   being deemed used in this particular instance back on July 28

1    of 2013.  He stated that the "chokehold" term was actually

2    utilized.  And so I'm asking this individual did he see that

3    in the report as well.

4        THE COURT:  And what's the relevance of whether he

5    saw it in the report?

6        MR. BLACKWELL:  Because this individual stated that a

7    chokehold was not utilized.  And in this particular case, two

8    officers, two individuals, stated that a chokehold was

9    utilized.

10       THE COURT:  Your response?

11       MR. POPOLIZIO:  Foundation, Your Honor.

12       This is not his report.  He didn't author it.  He

13   could have asked questions about it regarding chain of custody

14   and whatnot, but this has nothing -- this is not his report

15   where he included the cause and the manner of death and

16   cataloged injuries.

17       MR. BLACKWELL:  Your Honor -- I'm sorry.  If I may?

18       Judge, in this particular case, even looking at this

19   individual's report, he used -- he utilized information that

20   he had nothing to do with, like police reports.  He used

21   photographs.  Pictures.

22       And so when he made his opinion, it was based on all

23   the information that he gathered.

24       In this particular case, Dr. Poulos, the Medical

25   Examiner in this case, used all the information that was given

1    to him.  Videos.  Information from police officers to include

2    page 6 of this report.

3              And so I believe it is germane to the question as it

4    pertains to whether or not a chokehold was used and I believe

5    this individual, Dr. Vilke, can answer the question.

6              THE COURT:  Objection will be sustained.

7              MR. BLACKWELL:  Thank you, Judge.

8    BY MR. BLACKWELL:

9    Q   Now, in the Medical Examiner's report -- I'm sorry -- in

10   the hospital records there was no indication in the hospital

11   record that some individual, any individual, thought that

12   Mr. Ruiz was in the hospital due to excited delirium, correct?

13   A   They got him after the cardiac arrest, so they didn't

14   opine to the cause of the cardiac arrest.  So you are correct.

15   They didn't use the words "excited delirium" there.

16   Q   To include the emergency medical physician at St. Joe's.

17   That individual never stated that Mr. Ruiz was there due to

18   excited delirium, correct?

19   A   He wasn't there for excited delirium.  He was there for a

20   cardiac arrest.  The excited delirium predated his arrival to

21   the hospital.

22   Q   Well, the -- you would agree that the emergency medical

23   physician had the same information that the EMS individuals

24   had when Mr. Ruiz arrived at -- Ruiz arrived at the hospital,

25   correct?

1   A    They would have some information.  The physician was not

2   at the scene watching this, so he wouldn't have all the visual

3   inspection that the EMS providers had.

4   Q    So you're saying that the EMS physician didn't have any

5   information that methamphetamine was found in his system?

6   A    The EMS physician?  The pre-hospital physician?  Or the

7   ER -- the pre-hospital --

8   Q    The emergency medical physician.  I'm sorry.  Thank you.

9   A    That's okay.  The emergency physician got the tox report

10  that showed the methamphetamine.

11  Q    And the emergency medical physician did not state that

12  Michael Ruiz exhibited or died from or had anything -- any

13  injury related to excited delirium, correct?

14  A    He couldn't.

15  Q    Well, did he is the question?

16  A    He couldn't because he -- he didn't because he couldn't.

17  He only has a cardiac arrest in front of him.  He didn't have

18  video.  He didn't have all the history of what was going on.

19  Q    But a video -- you said "video."

20         Does the video show him ingesting methamphetamine?

21  A    No.

22  Q    Okay.  Now, but the medical report that he received, while

23  he was at the hospital, there was a medical report that stated

24  that there was methamphetamine in the urine, correct?

25  A    Yes.

1   Q   All right.  And the doctor, the emergency medical

2   physician, from the time Michael got to the hospital on July

3   28th up until his life ceased on August 2nd, there's nothing

4   indicating from the emergency medical physician at St. Joe's

5   about excited delirium; is that correct?

6   A   I have already answered that.  You can't put that in --

7   Q   You say you can't.  It's either yes or no.

8   A   Well, you would expect him to put it in there if it was

9   available.  You put in cardiac arrest --

10  Q   I'm sorry, Dr. Vilke.  This is a very simple question.

11          My question is a yes-or-no answer question.

12          MR. POPOLIZIO:  May the witness answer the question?

13  He cut him off.

14          MR. BLACKWELL:  Your Honor, I don't believe I cut him

15  off.

16          THE COURT:  All right.  Ask your question.

17          MR. BLACKWELL:  Thank you, Judge.

18  BY MR. BLACKWELL:

19  Q   Was there any indication in the medical report written by

20  the emergency medical physician that stated he or she believed

21  that excited delirium was at play as it pertains to Michael

22  Ruiz' injuries and/or death?

23  A   And I answered that as "no."

24  Q   You mentioned petechiae hemorrhaging as it pertains to

25  either strangulation or some type of asphyxial-related death.

1    In this case there was none indicated by the Medical Examiner,

2    correct?

3    A    Correct.

4    Q    And you also agree that it's not always indicated in the

5    individual who may be -- who may have died due to asphyxiation

6    and/or suffocation to include using the carotid control

7    technique?  Meaning evidence of petechial hemorrhaging.  Will

8    it always be in the report?

9    A    That question was very confusing.

10   Q    All right.  I'll ask it again.

11   A    You have asphyxiation and carotid control technique.  And

12   the carotid control technique does not cause asphyxiation, so

13   there are two different things in your question to me.

14   Q    All right.  So let's start with the asphyxiation.  Does

15   petechial hemorrhaging always -- is it always an indicator of

16   some type of asphyxiation?

17   A    No.  Petechial hemorrhage can be caused by different

18   things.

19   Q    Okay.  All right.  Conjunctival hemorrhaging.  How about

20   that one?  Does it only pertain to an individual sneezing and

21   coughing or can it also be caused by an individual that has

22   been, I guess, asphyxiated?

23   A    It could be from an asphyxiation.

24   Q    Okay.  How about the carotid control technique?  Could

25   that cause conjunctival hemorrhaging?

1    A    In and of itself, I have not seen that happen.

2    Q    Okay.  Does the carotid control technique, can it also --

3    could it -- could it cause petechial hemorrhaging?

4    A    I haven't seen it do that either.

5    Q    Okay.  How many cases have you testified in as it pertains

6    to a police officer's use of force?

7    A    Testified in court, you mean?

8    Q    Yes, sir, in court.  In court.

9    A    Probably about 15 or so cases.

10   Q    Out of the 15 or so cases, how many of those cases

11   included a video of the event?

12   A    I'm guessing maybe half had some video of some sorts,

13   maybe a little less.

14   Q    Of the seven or less videos that you received, are we

15   still talking about the 15 or so --

16        Let's ask this question.  Of the 15 cases -- 15 or so

17   cases that you've testified in, how many of those cases

18   involved the use or utilization of the carotid control

19   technique?

20   A    Of the 15 cases?

21   Q    Yes, sir.

22   A    One or two, maybe three.

23   Q    So one or two, maybe three, including this one, correct?

24   A    Not including this one.  It's an estimate, right, so.

25   Q    So you don't know.  It's one or two or maybe three but not

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1   including this one.  That's your answer?

2   A   That's -- I have been involved in many cases.  I'm just

3   trying to think back of how many I have -- I have done

4   certainly a number -- two, three, maybe four neck hold cases

5   in trial.

6   Q   Where an officer was involved?

7   A   Correct.

8   Q   All right.  So two to four cases?

9   A   That's fair, yes.

10  Q   Including this one?

11  A   Sure.

12  Q   Out of the two to four cases, how many had a video?

13  A   I think this is probably the only one that had a video of

14  a neck hold.  Maybe one other one, but -- there's one other

15  one that had a video as well.

16  Q   Is the other one, is that the Atencio case?

17  A   That's not the one I was thinking of in my head, no.

18  Q   That's a case here in Arizona, correct?

19  A   That's another case here in Arizona, yes.

20  Q   Now, other than the doctors that are connected with the

21  defense in this case, other than the doctors that are

22  connected with the defense in this case, are you aware of any

23  other doctor that has concluded that the death in this case is

24  related to excited delirium?

25       MR. POPOLIZIO:  Objection.  Foundation.

UNITED STATES DISTRICT COURT

 1              THE COURT:  Sustained.

 2    BY MR. BLACKWELL:

 3    Q   Well, let's lay the foundation.

 4              You said you haven't read Dr. Vilke's -- I'm sorry --

 5    Dr. Wetli's report, correct?

 6    A   I don't recall reading it.

 7    Q   Okay.  Did you read Captain Meyer's report?

 8    A   I did not, no.

 9    Q   Okay.  You testified on direct that you reviewed

10    photographs; is that correct?

11    A   Yes.

12    Q   And I believe your report, it states that you reviewed

13    photographs by Elizabeth Brown; is that correct?

14              Do you want to look at your report?

15    A   Sure.  I am not seeing a listing of Elizabeth Brown photos

16    of the list of things I reviewed.

17    Q   Do you want me to find it for you?

18    A   Thank you.

19    Q   I'll give you some more time, Doctor.

20    A   There we go.  Incident of video and photos taken by

21    Ms. Brown, yes.

22    Q   All right.  Now, in that particular -- and those

23    particular photographs is Exhibit 31 but do you recall seeing

24    the photographs where Officer Camarillo's arm is around

25    Mr. Ruiz' neck?

1          MR. POPOLIZIO:  Objection.  Beyond the scope of

2    direct.

3          THE COURT:  Your response?

4          MR. BLACKWELL:  I'll ask the question before this

5    question, Judge.  Can I strike that question?

6          THE COURT:  All right.

7    BY MR. BLACKWELL:

8    Q   You would agree that the information that you reviewed --

9          I'm sorry.  Better question.

10         You would agree that if the information you obtained

11   wasn't analogous or important to form your opinion, you

12   wouldn't note it with any specific detail, would you?

13         Say if they gave you -- if you had, for example, you

14   had an exhibit where Officer Camarillo was at Circle K and got

15   some coffee, would that be important for your analysis?

16   A   It probably wouldn't impact my analysis but I would review

17   the material that was given to me.

18   Q   Okay.  All right.  Now, you would agree that any picture

19   and/or photograph to include video of Officer Camarillo's arm

20   around Mr. Ruiz' neck would be important for your analysis in

21   this case?

22   A   I would review it, sure.

23   Q   Would it be important for your analysis, Doctor?

24   A   It depends on the quality and the directions.  Some videos

25   are better than others.  So I may review it, but it may not be

CV14-01942-PHX-JAT     JURY TRIAL - DAY #7     5-30-17

1    as easy to see things as others.  So, yeah, I would review it

2    and definitely take it into consideration.

3    Q   All right.  And so if the photograph is of a good quality,

4    you would use that in your report, meaning you would use that

5    for your analysis in this case?

6    A   It would be part of the entirety of the 10,000 pages of

7    records I reviewed as part of my analysis, sure.  It would be

8    one piece of that.

9    Q   And in this case you reviewed the photographs presented to

10   you from the defense that were taken by Elizabeth Brown,

11   correct?

12           MR. POPOLIZIO:  Objection.  Beyond the scope of my

13   direct.

14           THE COURT:  Well, that objection is overruled.

15           THE WITNESS:  I would have reviewed it, sure.

16   BY MR. BLACKWELL:

17   Q   Okay.  All right.  Did you use the photographs that depict

18   Officer Camarillo's arm around Mr. Ruiz' neck in formulating

19   your opinion as it pertains to whether or not Officer

20   Camarillo applied the carotid control technique?

21           MR. POPOLIZIO:  Objection.  Beyond the scope of

22   direct.

23           THE COURT:  The question seems to call for a variety

24   of photographs without specifically asking him whether a

25   particular photograph was the basis for an opinion that may

1   have been expressed on direct examination, so I will sustain

2   the objection.

3   BY MR. BLACKWELL:

4   Q   Thank you.  Did you use -- if I may, I can show him the

5   picture, Judge, if I'm able to do that to see if he can opine,

6   without showing the jury, and see if he can tell us whether or

7   not he used this particular picture in coming up with his

8   opinion in this case?

9              THE COURT:  You may.

10             MR. BLACKWELL:  Thank you, Judge.

11             Only for Dr. Vilke we want to display Exhibit 31.

12  BY MR. BLACKWELL:

13  Q   Dr. Vilke, this is Exhibit 31.  These are pictures that

14  were taken by Elizabeth Brown.  This is 31, page 14.

15  A   Okay.

16  Q   Now, did you use this particular exhibit, meaning this

17  picture, in formulating your opinion as it pertains to whether

18  or not Officer Camarillo utilized a carotid control technique?

19             MR. POPOLIZIO:  Objection.  611(b).  Beyond the scope

20  of my direct examination.

21             THE COURT:  Overruled.

22             THE WITNESS:  I don't remember specifically, but it

23  looks a lot like all the videos and everything else that I

24  used as part of my analysis of this case.

25             And if I was presented it and it's part of the

```
 1    file -- I don't have an independent recollection of it, but I

 2    would have used it as part of my analysis if that's what

 3    Ms. Brown -- or the supplied picture was.  So I would use it

 4    as part of it if it was in my file.

 5              MR. BLACKWELL:  Thank you.

 6              Plaintiff requests the Court to admit this particular

 7    exhibit.

 8              MR. POPOLIZIO:  Objection.  Foundation.  Cumulative.

 9              THE COURT:  Sustained.

10    BY MR. BLACKWELL:

11    Q   Well, let's show the next picture.

12              Dr. Vilke, this is Elizabeth Brown's photographs,

13    Exhibit 31.  This is picture document No. 15 of the exhibit --

14    page 15, I should say.

15              Do you recall using this particular picture in

16    formulating your opinion on whether or not Officer Camarillo

17    utilized a carotid control technique?

18              MR. POPOLIZIO:  Objection.  Foundation.

19              THE COURT:  Overruled.

20              THE WITNESS:  I don't have an independent

21    recollection of this specific photo.  But again, if it was

22    provided to me as part of the file, I would have reviewed it

23    and it would have been part of the information that I would

24    have used to make my decision along with the videos and all

25    the other information.
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    BY MR. BLACKWELL:

2    Q    Well, in your -- I think in your testimony today is it

3    true that you stated you don't recall seeing Officer

4    Camarillo's forearm, meaning the left forearm, on the anterior

5    portion of Mr. Ruiz' neck?

6    A    For any sustained period of time, yes.

7    Q    All right.  In this particular picture, do you see Officer

8    Camarillo's forearm on the anterior portion of Mr. Ruiz' neck?

9    A    That looks more like an elbow to me in the anterior

10   portion.

11          MR. BLACKWELL:  Permission to publish for

12   demonstrative purposes, Judge.

13          MR. POPOLIZIO:  Objection.  Foundation.  Beyond the

14   scope of my direct.

15          THE COURT:  Foundation.  Sustained.

16          MR. BLACKWELL:  Your Honor -- all right.  Can we

17   approach on foundation, Judge?

18          THE COURT:  Well, I don't think it's necessary to

19   approach.  You seem to be working on the premise that if

20   something is in his file and/or that he relied on it in

21   forming his opinion, that that obviates the need to lay

22   foundation for the admissibility of that document.

23          MR. BLACKWELL:  Your Honor, I believe as it pertains

24   to whether or not in this particular case the doctor has

25   testified that he received a number of documents from his --

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    from the defense.

2              THE COURT:  I heard what he said.

3              MR. BLACKWELL:  And in this particular case, I don't

4    think the doctor is saying that this exhibit came from

5    anywhere else but the event.

6              THE COURT:  Well, my point is, point to some rule or

7    case that says the mere fact he was given it, it was in his

8    file, he relied on it, lays the foundation for it to come into

9    evidence.

10             MR. BLACKWELL:  Your Honor, I think I can -- if you

11   allow me, I think I can have this particular doctor -- I mean

12   witness, Dr. Vilke, lay a foundation that's necessary for this

13   particular picture.

14             THE COURT:  Well, I will preclude you to lay further

15   foundation if you believe you can.

16   BY MR. BLACKWELL:

17   Q    Thank you.

18             Dr. Vilke, looking at this exhibit, is this a fair

19   and accurate depiction of the video you saw or the videos you

20   saw in reference -- in relationship to Officer Camarillo and

21   the other officers out there during this incident with

22   Mr. Ruiz?

23             MR. POPOLIZIO:  Objection.  Foundation.

24             THE COURT:  Well, I think he's trying to lay

25   foundation.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
 1              MR. BLACKWELL:  Thank you, Judge.
 2              THE COURT:  So the objection is overruled.
 3              THE WITNESS:  So it is a moment in time during the
 4     event.  So I think it's -- the people who are involved in the
 5     event are here, so it's a moment in time in that event, so,
 6     yes.
 7     BY MR. BLACKWELL:
 8     Q   Okay.  And in the videos that you saw, you did see a
 9     number of individuals surrounding Mr. Ruiz on the second-floor
10     landing, correct?
11     A   Correct.
12     Q   All right.  And in the videos, this is the same --
13     thinking about the videos you saw, looking at this picture, is
14     this the same building?
15     A   Yes.
16     Q   Same flight of stairs?
17     A   Yes.
18     Q   Same officers?
19     A   Look like the same officers, yes.
20     Q   Same officer with an arm around Mr. Ruiz' neck?  Same
21     person?
22     A   Looks like it, yes.
23     Q   Same blue sky?
24     A   I didn't really look at the blue sky in the videos to
25     memorize it but if you're asking me a question if it's light
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    or dark blue.

2    Q    Same car in front of the apartment complex?

3    A    Again, I was focused more on the individuals look very

4    similar.

5    Q    All right.  All right.  Is there anything about this

6    particular embodiment of the scene, meaning the picture of the

7    scene, that makes you think it's not from the event that took

8    place on July 28, 2013?

9              MR. POPOLIZIO:  Objection.  Foundation.  Cumulative.

10             THE COURT:  Overruled.

11             THE WITNESS:  It looks like it's probably from that

12   event.

13             MR. BLACKWELL:  All right.  Your Honor, I think I

14   have laid the foundation.  I think Dr. Vilke has actually laid

15   the foundation that this particular picture is from the same

16   event that took place on July 28, 2013.

17             MR. POPOLIZIO:  Objection.  Foundation.  Cumulative.

18             THE COURT:  Well, I assume you were offering it in

19   evidence is what you're doing?

20             MR. BLACKWELL:  I would at least like to be able to

21   offer this particular picture into evidence.

22             MR. POPOLIZIO:  Objection, Your Honor.  Foundation.

23   Cumulative.

24             THE COURT:  Sustained.

25   BY MR. BLACKWELL:

1    Q    Thank you.  No. 16.

2         Dr. Vilke, do you see Officer Camarillo's arm around

3    Mr. Ruiz' neck?

4    A    I do, yes.

5    Q    All right.  Is this a fair and accurate depiction of what

6    you saw on the other -- what you saw in the other videos

7    you've seen for making your opinion in this case?

8    A    It looks like the same scene and case, individuals that

9    were in the videos.

10   Q    Same stairwell?

11   A    Yes.

12   Q    All right.  Same officers?

13   A    They look similar, yes.

14   Q    All right.  It's true that when you were watching the

15   videos and/or looking at photographs, you did see a change in

16   the color of Michael's face?

17   A    There were times when it changed colors, depending on the

18   video and cut lighting and other things, but, yes.

19   Q    Okay.  So you don't think it changed colors because he

20   was -- there was a lack of oxygen to the brain?

21   A    I don't think that, no.

22   Q    Okay.  And if Dr. Wetli stated that it was due to a lack

23   of oxygen to the brain, you would disagree with his statement

24   as it pertains to the same question about the change in color

25   of Mr. --

```
1              MR. POPOLIZIO:  Objection.  Relevance.

2              MR. BLACKWELL:  It goes to credibility, Judge.

3              MR. POPOLIZIO:  And foundation.

4              THE COURT:  Hold on a second.  The question is -- and

5    your objection is?

6              MR. POPOLIZIO:  Foundation and relevance.

7              THE COURT:  Sustained on both counts.

8              MR. BLACKWELL:  Thank you, Judge.

9    BY MR. BLACKWELL:

10   Q    You stated that the -- the use of the carotid control

11   technique didn't cause the death.

12              That's your testimony, correct?

13   A    Correct.

14   Q    All right.  You do agree that a successful application of

15   the technique normally results in an individual being

16   incapacitated?

17   A    Rendered unconscious, sure.

18   Q    All right.  So the police officers can put on the cuffs

19   and while he's out, correct?

20   A    That's usually the reason they're doing it, yes.

21   Q    I mean that's what you testified to, right?

22   A    That's exactly right.

23   Q    All right.  And you do agree that an incorrect application

24   of the carotid control technique can lead to injuries?

25   A    I want to be clear that when you mean -- I think you --
```

```
 1      "unsuccessful" versus "inaccurate."

 2              I want to make sure we're on the same page.

 3      Q   Well, I'm not on "unsuccessful."  I'm on "inaccurate."

 4              Meaning an incorrect application of the carotid

 5      control technique -- not unsuccessful -- incorrect application

 6      of the carotid control technique can lead to injuries?

 7      A   And when you say "incorrect," that would no longer be a

 8      carotid control technique because if it's incorrect, it's not

 9      a technique.

10      Q   Right.  Because the carotid control technique is specific

11      as it pertains to how it should be applied, correct?

12      A   The location and the positioning, yes.

13      Q   Location of the arm, the bicep and the forearm, correct?

14      A   Correct.

15      Q   Around the carotid arteries, correct?

16      A   Correct.

17      Q   And then you have to provide some type of pressure to

18      render the person unconscious, correct?

19      A   That's the intent, yes.

20      Q   So that's the correct application?

21      A   Correct.

22      Q   All right.  If it's applied incorrectly, the question

23      again is, it can lead to injuries, correct?

24      A   When you define "incorrectly," please --

25              Well, "incorrectly," meaning doing it backwards,
```

```
 1    putting on the back of the head --

 2  Q   That would be incorrect, right?

 3  A   Incorrect.  But also I wouldn't define it as a carotid

 4    control technique.

 5          So that's what I'm getting at.  It's not even a

 6    technique.  If it's off a little to the left or the right, it

 7    will be unsuccessful but would not be incorrect.

 8          If it's completely wrong and the forearm is the

 9    across the front, it's no longer a carotid control technique.

10          That's what I'm trying to define by what you mean by

11    "incorrect."

12  Q   Well, you didn't come up with the term "carotid control

13    technique," did you?

14  A   I did not, no.

15  Q   And it's taught a specific way, is it not?

16  A   It is basically taught a specific way.

17  Q   All right.  And if it's taught a specific way for

18    individuals who aren't doctors who use it in the field, you

19    would agree that they're supposed to apply it based on how

20    they're trained, correct?

21          MR. POPOLIZIO:  Objection.  Relevance.  No training

22    claim in this case.

23          THE COURT:  Sustained.

24          MR. BLACKWELL:  Your Honor, this is not a training

25    issue.
```

CV14-01942-PHX-JAT     JURY TRIAL - DAY #7     5-30-17

```
 1    BY MR. BLACKWELL:

 2    Q   You would agree that you have to follow --

 3            For example, when you testified earlier, you said

 4    your sensei used the technique on you, correct?

 5    A   Correct.

 6    Q   And if your sensei didn't use it correctly, he could have

 7    injured you, correct?

 8            MR. POPOLIZIO:  Objection.  Foundation.  Relevance.

 9            THE COURT:  Sustained.

10    BY MR. BLACKWELL:

11    Q   Well, in this particular case, if an individual like

12    Officer Camarillo didn't use the technique properly, it could

13    lead to injuries, correct?

14            MR. POPOLIZIO:  Objection.  Foundation.  No training

15    claim, Your Honor.

16            MR. BLACKWELL:  This is not a training question,

17    Judge, and he knows it.

18            MR. POPOLIZIO:  Your Honor, I take exception to

19    counsel's last remark and I move to strike that remark.

20            THE COURT:  It's ordered striking that remark.

21            MR. POPOLIZIO:  Thank you.

22            THE COURT:  Overruled.

23            THE WITNESS:  So please ask it again.

24            MR. BLACKWELL:  Could you repeat the question,

25    please.
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1          Judge, can I have the question repeated?

2          THE COURT:  Yes.

3          MR. BLACKWELL:  Thank you, Your Honor.

4      (Whereupon, the reporter read the last question.)

5          THE WITNESS:  If he didn't do it properly, it's not a

6   carotid restraint, so, sure, it can lead to injuries.

7   BY MR. BLACKWELL:

8   Q   With have injuries in this case, do we not?

9   A   We do.

10  Q   We have an injury to the right cornu, do we not?

11  A   We do.

12  Q   We have an injury to the sternocleidomastoid muscle, do we

13  not?

14  A   We do.

15  Q   And someone died, did he not?

16  A   Ultimately, he did die.

17  Q   Well, ultimately.  Did he die at the scene, sir?

18  A   He went into cardiac arrest at the scene.

19  Q   And when was he resuscitated?

20  A   At the scene.

21  Q   How many minutes after he went limp on the second floor

22  landing?

23  A   I didn't calculate it exactly, but eight, ten minutes.  I

24  don't know exactly.

25  Q   Eight to ten minutes.

1         Eight to ten minutes of not having any oxygen to the

2    brain could lead to anoxic brain injury?  Yes or no.

3    A    It could.

4         MR. BLACKWELL:  Nothing further.  Thank you, Judge.

5         THE COURT:  All right.  Redirect.

6         MR. POPOLIZIO:  Yes, Your Honor.

7                    **REDIRECT EXAMINATION**

8    BY MR. POPOLIZIO:

9    Q    Doctor, does it matter to you if Officer Camarillo ever

10   stated that he did not attempt a carotid control technique?

11   A    No.  It does not impact my opinion.

12   Q    And why?

13   A    Because he -- you know, I guess he never acknowledged that

14   he had tried it.  He tried to put pressure on and tried to

15   render him unconscious to help the process.

16         So I worked my opinion based on the fact that I saw

17   the video.  And his report is that he put pressure on to try

18   to render him unconscious.  So if it was stated somewhere else

19   or put in somebody else's report that he didn't put that in

20   there, it doesn't impact my opinion.  I go with what I read

21   and what I saw.

22   Q    You remember earlier in your testimony on

23   cross-examination you were shown a document with regard to

24   radiological studies?

25   A    Yes.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

```
 1   Q   And there was -- do you recall if there was an indication
 2   whether one was cancelled?
 3   A   Yes.
 4   Q   Okay.  Now, there was some discussion about whether a
 5   CT scan of the neck was cancelled.
 6   A   Correct.
 7   Q   All right.  Was there another scan which covered the neck
 8   on that document?
 9           MR. BLACKWELL:  Objection.  Foundation.
10           THE COURT:  Sustained.
11   BY MR. POPOLIZIO:
12   Q   Do you recall that document?
13   A   I do recall that document.
14   Q   Do you recall the list of studies that were on that
15   document?
16   A   I do.
17   Q   And do you recall whether one was cancelled?
18   A   Yes.
19   Q   And which one was cancelled, if you recall?
20   A   There was a CT scan that was ordered for the soft tissues
21   of the neck.
22   Q   Was there any other scan indicated on that document which
23   would cover the neck?
24           MR. BLACKWELL:  Objection.  Foundation.
25           THE COURT:  Overruled.
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1              THE WITNESS:  So they ordered a CT scan of the

2    cervical spine.  And when you order that, it basically shoots

3    a film from the lower cervical spine to the base of the skull.

4    So it covers the bones as well as the soft tissue.

5              So to order a second CT scan of the soft tissue of

6    the neck is redundant and actually extra radiation to the

7    parts you don't need.  So there would be no reason to have two

8    studies of the same anatomic area, which is not uncommon in

9    the hospital.

10             People will order -- one person orders it and the

11   second person orders it and the Radiology gets two orders and

12   they cancel one of them.

13             So that's not an uncommon thing that happens.  You'll

14   see cancelled orders not infrequently.

15             MR. BLACKWELL:  Objection, Judge.  Goes outside this

16   doctor's knowledge and experience for St. Joe's Hospital's

17   procedures.  Foundation.

18             THE COURT:  Overruled.

19   BY MR. POPOLIZIO:

20   Q   Do you remember having a discussion whether an MRI was

21   done in this case?

22   A   I do.

23   Q   Well, was one done?

24   A   There was one of the brain, but not one of the neck.

25   Q   Okay.  Was there something better, in your opinion, as an

UNITED STATES DISTRICT COURT

1  emergency medical physician, than an MRI done in this case?

2  A   There was, yes.

3  Q   What is that?

4  A   There was a layer-by-layer autopsy of the neck and that

5  gives you much more detail than an imagining study.

6       Imagining studies like an MRI will show you

7  distortions and swellings and things like that, but it won't

8  show you discolorations.  You can't break down color.

9       So if there was very thin bruising in certain

10 portions of the anatomy of the neck, an MRI is not as

11 sensitive as an autopsy.  So an autopsy actually is a much

12 better opportunity to review what the actual anatomy really

13 looked like.

14 Q   Now, there was some discussion about martial arts and

15 sparring.  Do you recall that?

16 A   Yes.

17 Q   Okay.  And I believe you testified -- and correct me if

18 I'm wrong -- that you never sustained a fracture to your cornu

19 when you sparred.

20 A   That's my knowledge, no, exactly.

21 Q   Did you ever sustain a blow to your neck during sparring?

22 A   During sparring, no.

23 Q   In this instance the videos that you reviewed of the

24 struggle and fight on the stairs, did you see any officer

25 throw Mr. Ruiz to the ground?

CV14-01942-PHX-JAT    JURY TRIAL - DAY #7    5-30-17

1   A   I did not.

2   Q   Did you see any officer punch him in the neck?

3   A   I did not.

4   Q   Did you see any officer punch him at all?

5   A   I did not.

6   Q   Did you see any officer kick Mr. Ruiz?

7   A   I did not.

8   Q   Now, Doctor, was there trauma noted by the Medical

9   Examiner consistent with the application of a chokehold on Mr.

10  Ruiz?

11  A   There was not.

12  Q   And you're sure of that?

13  A   Absolutely.

14  Q   Now, were the injuries though to the sternocleidomastoid

15  muscle and cornu consistent with an appropriately-placed

16  carotid control technique?

17  A   Yes, absolutely.

18  Q   Now, there was some discussion just a few minutes ago

19  regarding "incorrect" versus "unsuccessful" application.

20  Okay.  Can you explain to me what the difference, in your

21  opinion, is between an incorrect application of the carotid

22  control technique and an unsuccessful operation of that

23  technique.

24  A   Sure.  A correct placement is what we discussed earlier

25  with the chin and the anterior portion of the neck in the zone

1  of the crook of the arm, not a bar hold straight across, but

2  in this area. (Indicating)

3          That is an appropriate placement.  That's where

4  you're going to make the attempt to try to get a successful

5  carotid restraint.  So the placement is correct if it's like

6  this. (Indicating)

7          And then it's either successful or not successful

8  based on when you put pressure on, if you're able to get both

9  carotids at the same time.  If you get one, then the other, or

10 if there's a movement or whatnot, it's unsuccessful but still,

11 yet, a correct placement.

12         And with a correct placement, you can still see

13 injuries to the lateral aspects of the neck.  And, in fact,

14 the autopsy findings are basically consistent or, you know,

15 confirming that the placement was in the correct position on

16 the lateral aspect and not over the anterior airway.

17 Q   So the placement of the carotid control technique by

18 Officer Camarillo, would you categorize that as an incorrect

19 placement or an unsuccessful one?

20 A   It was correctly placed.  It just -- when he was applying

21 it during the video, the three-and-a-half minutes, four

22 minutes of video there, was unsuccessful.  He never lost

23 consciousness.

24 Q   Just one moment, Doctor.

25         Now, Doctor, let's go back to the whole martial arts

1    sensei putting you under conversation.  Okay?

2    A   Okay.

3    Q   When I mean "under," I mean render you unconscious as you

4    testified to.  All right?

5            Now, after you were -- well, strike that.

6            When the sensei, your instructor, applied the carotid

7    control technique, you lost consciousness?

8    A   Correct.

9    Q   Okay.  Now, when you went unconscious at that time, were

10   EMTs or paramedics present at the scene?

11   A   They were not, no.

12   Q   If they were, would you rather have the sensei check your

13   vitals or the EMTs?

14   A   Well, if I didn't wake up right away, I would rather have

15   a medical professional see me as soon as they could.

16   Q   So the EMTs?

17   A   Correct.

18   Q   After you're rendered unconscious, did your sensei have to

19   carry you down a flight of stairs?

20   A   He did not, no.

21   Q   Now, there was some examination about whether the

22   emergency medical physician stated excited delirium syndrome

23   as the cause of death.  Do you recall that?

24   A   Correct.

25   Q   Now, does an emergency medical physician treat a patient

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1   in the hospital days after an incident?

2   A   They do not, no.

3   Q   Did he here?

4   A   He did not, no.

5   Q   Now, Doctor, when it comes to excited delirium syndrome,

6   there was some discussion on cross regarding what the videos

7   revealed.

8       What did the videos show regarding Mr. Ruiz' symptoms

9   of excited delirium syndrome?

10  A   Sure.  The videos showed the bizarre, delusional behavior,

11  the resistance to painful stimuli, the ongoing struggle, the

12  lack of tiring, the lack of resistance, the lack of stopping

13  despite overwhelming forces on him, and they also showed him

14  partially clothed and sweaty.

15  Q   Doctor, in your opinion as an emergency medical physician,

16  was it necessary to dissect the carotid arteries in this case?

17  A   Absolutely not.

18  Q   Why not?

19  A   Because a cross-section of the carotid arteries isn't

20  going to show you if there was damage to the carotid arteries.

21      You would see that on the gross evaluation of the

22  outside of the arteries.  When you dissect down the neck, you

23  would see swelling, you would see bruising, and you would see

24  it in the intima, the layers of the neck on the outside.

25      You wouldn't see anything on the inside hole of the

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1    carotid arteries.  There's no reason to dissect it.

2              MR. POPOLIZIO:  Thank you, Doctor.

3              No further questions, Your Honor.

4              THE COURT:  All right, Doctor.  You may step down.

5    And is there any objection if he's excused?

6              MR. BLACKWELL:  No, Your Honor.

7              THE COURT:  Hearing none, you are excused.  Thank

8    you, sir.

9              THE WITNESS:  Thank you, Your Honor.

10             THE COURT:  Are there any other witnesses for the

11   defense?

12             MR. MASTERSON:  No, Your Honor.  We rest.

13   **DEFENSE RESTS**

14             THE COURT:  All right.  Any rebuttal case from the

15   plaintiff?

16             MR. BLACKWELL:  No, Your Honor.  Plaintiff rests.

17   **PLAINTIFF RESTS**

18             THE COURT:  All right.  Ladies and gentlemen, the

19   evidence is in.

20             You'll recall that this week we were limited to today

21   and a half a day tomorrow.  Because I want to make sure that

22   you have heard closing arguments and legal instructions just

23   before you go to deliberate, we will be in adjournment until

24   Monday, the 5th, Monday, the 5th, at nine o'clock.

25             At that time you'll here closing arguments, the legal

1    instructions from the Court, and then begin your

2    deliberations.

3         So we will be in recess until Monday, the 5th.  Have

4    a good rest of the week and be safe and remember the

5    admonition.

6         And you are excused.  I'll see counsel --

7         In fact, we'll take about a 15-minute recess,

8    counsel, and then we'll pick up on the instructions.

9       (Recess taken at 2:22 p.m.; resumed at 2:43 p.m.)

10      (Open court, no jury present.)

11   **FINAL JURY INSTRUCTION CONFERENCE**

12        THE COURT:  The record will reflect the presence of

13   the parties and counsel.

14        And when I say "parties," I should say "defendant."

15   Mrs. Erickson having been excused earlier.

16        I have issued a formal Order denying Defendant's

17   Renewed Proposed Limiting Instruction regarding Section 1983

18   causation.  That's docket 243 denying that instruction.

19        That Order attempts to bring together the various

20   arguments and cases on that subject.  So, for better or for

21   worse, that's my effort at adding to the now rather voluminous

22   literature on that subject.  So I think that takes care of

23   what needs to be said on that proposed instruction.

24        Also, I have pending the Defendant's Proposed

25   Instruction that would tell the jury that when a person

1   attempts to pull away from an arresting officer, even if it

2   only is to shift to a more comfortable position, he is

3   resisting arrest which justifies the use of force and for a

4   control hold to subdue the arrestee and effectuate the arrest.

5           That's docket 244.  That proposed instruction is

6   declined, denied.

7           And then I have also the defendant's instruction that

8   basically tells the jury that they will not consider the

9   conduct or use of force by any other officer on the scene,

10  although in more words and longer than what I just described.

11  That's docket No. 245.  That is also declined and denied.

12          I think that covers what I have in front of me.  Are

13  there any other -- and you have in front of you the final

14  version of the instructions.

15          Are there any other objections or omissions from the

16  plaintiff's standpoint, Mr. Blackwell?

17          MR. BLACKWELL:  Yes, Your Honor.  Thank you.

18          The only one that I see of note, Your Honor, would be

19  the Court's instruction No. 7 on subsection No. 4 where it

20  says "caused."

21          I would just ask the Court to use the term

22  "contributed."

23          THE COURT:  I'm sorry.  We're on instruction No. 4.

24          MR. BLACKWELL:  I'm sorry, Judge, if I misspoke.

25          Instruction No. 7, page 8.

1           THE COURT:  Page 8.

2           MR. BLACKWELL:  Yes, sir.  Subsection 4.

3           THE COURT:  No, I see now and I know what you're

4    talking about.

5           Well, what would make you think that "contributed" is

6    more legally appropriate than "caused"?  I mean, we have

7    defined "causation" on page 6, both causation-in-fact and

8    proximate causation.

9           By the request you're making, you're really

10   introducing a third concept, aren't you?

11          MR. BLACKWELL:  One second, Judge.

12          THE COURT:  I'm sorry?

13          MR. BLACKWELL:  Can I have a second to contemplate

14   that?

15          THE COURT:  Oh, sure, of course.

16          MR. BLACKWELL:  Thank you, Judge.

17          I think, Judge, the term "contributed" doesn't

18   necessitate a third instruction as it pertains to causation.

19          I think it -- it's couched in the definition of both

20   causation-in-fact and how proximate cause is defined as it

21   pertains to contributing to the injuries.

22          He contributed to -- the actions performed by Officer

23   Camarillo contributed to the death.

24          Because when you read the definition, additionally,

25   as it pertains to proximate cause, it says:

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1          Additionally, an act is a proximate cause if it was a

2    substantial factor in bringing about or actually causing

3    injuries, that is, if the injuries were a reasonably

4    foreseeable consequence of the defendant's act.

5          I think "contributed" fits there but I will take the

6    Judge's instruction on that.  I will take the Judge's

7    instruction on that as it pertains to "contributed" or

8    "caused," Judge.

9          THE COURT:  All right.  I will give some further

10   thought, but presumptively, it will stay where it is.

11         Any other errors or omissions?

12         MR. BLACKWELL:  No, Judge.

13         THE COURT:  Mr. Masterson, are you the spokesman?

14         MR. MASTERSON:  I think so, Judge.  Okay.  Let me

15   just --

16         THE COURT:  And incidentally, I think we made this

17   clear last time, but the headings -- the headings of what --

18         Well, I guess what they have -- does it still have

19   headings on it?  Yeah.  The headings will obviously come off.

20         MR. MASTERSON:  Right.

21         MR. BLACKWELL:  Right, Judge.

22   **RENEWED RULE 50 MOTION BY DEFENSE**

23         MR. MASTERSON:  First off, I'm going to reurge the

24   Rule 50 motion that I made the other day and then I will move

25   to the jury instructions.

CV14-01942-PHX-JAT     JURY TRIAL - DAY #7     5-30-17

 1            Now, the Court's ruling, is it going to be

 2    forthcoming on document 204, which is our trial brief

 3    regarding causation?

 4            THE COURT:  Yes.

 5            MR. MASTERSON:  Okay.  Is that going out today?

 6            THE COURT:  It's gone.

 7            MR. MASTERSON:  Oh, it's gone?  So it's probably in

 8    my mailbox right now.

 9            THE COURT:  In your mailbox.

10            MR. MASTERSON:  We'll take a look at that, Judge.

11    And if we need to -- if I think we need to file a Motion to

12    Reconsider or something, we'll do that.  If not, we'll just

13    move along.

14            And I think the Court just ruled on our three

15    suggested additional jury instructions which were 233 -- or

16    excuse me -- document 243, document 244 and document 245.

17            THE COURT:  Yes.  243 being the causation, right?

18            MR. MASTERSON:  Exactly.

19            THE COURT:  Yes.

20            MR. MASTERSON:  Now, with respect to the ones

21    provided by the Court, my first --

22            Well, let's call them objections -- to No. 2:

23            Plaintiff Yolanda Erickson, as Personal

24    Representative of the Estate of Miguel Ruiz brings her claim.

25            My problem with that particular instruction -- and

1    then it arises -- the language arises later on in the

2    instructions -- is that I don't want the jury to be confused

3    as to whether Mrs. Erickson is actually making a claim.

4           So my suggestion would be to change it to say:

5           The Estate of Michael Ruiz through its Personal

6    Representative Yolanda Erickson brings its claim under the

7    Federal Statute 42 U.S.C., Section 1983.

8           THE COURT:  Your point, at least in my judgment.

9           I'll get Mr. Blackwell's point on it but I think your

10   point is well taken.  It is not her claim.  There are probably

11   lots of ways we could solve it.

12          The way I was penciling out would be:

13          Plaintiff Yolanda Erickson, as Personal

14   Representative of the Estate of Michael Ruiz brings a claim on

15   behalf of the Estate.

16          MR. MASTERSON:  I like that even better than my

17   proposal.

18          THE COURT:  Brings a claim on behalf of the Estate

19   under the federal statute.

20          You can just stay right where you are, Mr. Masterson.

21          But do you have any problem with that revision,

22   Mr. Blackwell, or see a better solution?

23          MR. BLACKWELL:  I think that sounds good as well,

24   Judge.

25          I don't understand the defense's issue with it, but I

1   think this was used in the first trial.  I think we all

2   know -- I think the jury knew that she was bringing the claim

3   on behalf of the Estate.

4           I can see where if you read it enough times, you

5   could think that she's bringing her own claim, so I

6   understand.

7           THE COURT:  It's my fault.  I did not choose precise

8   enough language.

9           So then it's going to get changed to say:

10          Brings a claim on behalf of the Estate under the

11  federal statute.

12          All right.  And then the next one, Mr. Masterson?

13          MR. MASTERSON:  Page 5, Judge.  This is on

14  Instruction No. 4.  Page 5, paragraph numbered 9.

15          I don't like -- I think the language that

16  "emotionally disturbed," there is no evidence that Mr. Ruiz

17  was emotionally disturbed.  There is plenty of evidence he was

18  under the influence of methamphetamine and experienced a

19  methamphetamine psychosis.  But there is no evidence that he

20  was otherwise emotionally disturbed.

21          So I'm going to object to the "emotionally disturbed"

22  language, that particular sentence, I guess, No. 9 being

23  included in the instruction.

24          THE COURT:  Let me just -- I'm just thinking.

25          Toxicologically disturbed?

1          MR. MASTERSON:  Yeah.  I'll go with that.

2          THE COURT:  I don't know which way those cut.  Do you

3     have any other alternative, Mr. Blackwell, or do you like it

4     the way it is?

5          MR. MASTERSON:  I'm sorry.  I didn't hear that.

6          THE COURT:  I was asking Mr. Blackwell.

7          MR. MASTERSON:  Oh.

8          THE COURT:  You can stay there.

9          MR. BLACKWELL:  Your Honor, this provision,

10    subsection 9, is the same as it was in the first instruction

11    for the first trial.

12         THE COURT:  Right.

13         MR. BLACKWELL:  I don't have a problem with it.  I

14    think it relates to the facts of this case, that whether or

15    not the jury has to consider whether Officer Camarillo knew or

16    should have known, whether it was apparent that Mr. Ruiz was

17    emotionally disturbed.

18         And their witnesses talk about excited delirium and

19    what these individuals exhibit when they're under this

20    particular syndrome.  He has training in it, so.

21         THE COURT:  My inclination is that "emotionally

22    disturbed" is a broader universe and a broad enough universe

23    to include all kinds of things, including aberrant behavior of

24    a wide variety of types.

25         But so I'm inclined to leave it.  But did you finish

1   fleshing out your objection, Mr. Masterson?

2           MR. MASTERSON:  I think I stated it sufficiently,

3   Judge.  I just don't think -- the jury can't speculate as to

4   some emotional or psychological disorder other than would be

5   supported by the evidence.

6           And the only evidence for any, I guess, disturbance

7   that he might have been experiencing is due to the

8   methamphetamine in influencing his actions and the

9   physiological response of his body.

10          So I think it's asking the jury here to speculate

11  with respect to some emotional disturbance for which there is

12  no evidence.

13          THE COURT:  Are you arguing that No. 9 in any

14  iteration is simply improper or that there is some better

15  terminology that should be in there instead of "emotionally

16  disturbed."

17          MR. MASTERSON:  I think it should be eliminated in

18  its entirety.

19          THE COURT:  All right.  Your objection is noted.

20          Unless I notify counsel by way of an electronic

21  filing that I have made a change, you can assume that it will

22  remain as worded.

23          MR. MASTERSON:  The next -- well, the next section I

24  highlighted -- well, first, let's move to Instruction 5 which

25  is on page 6.

CV14-01942-PHX-JAT     JURY TRIAL - DAY #7     5-30-17

1              Judge, and I just highlighted the phrase "actionable

2     cause" in the first sentence.  And the only reason I did that

3     was I think that may play into the discussion you had with

4     plaintiff's counsel with respect to Instruction No. 7,

5     paragraph No. 4.  I think the Court has instructed on

6     causation previously, and that "cause" is the proper word to

7     use in that paragraph.

8              Now --

9              MR. BLACKWELL:  Your Honor, I missed -- I'm sorry.  I

10    missed the objection.  What was the objection?

11             MR. MASTERSON:  No.  I'm not objecting.  I guess if

12    there was some -- I did not know if the Court had made the

13    decision with respect to paragraph 4 in instruction 7 that

14    the --

15             "If you find defendant's conduct caused plaintiff's

16    death," that language is remaining in the instruction?

17             THE COURT:  That's my default at the moment.

18             MR. MASTERSON:  Okay.  I was just commenting on that

19    decision.  I think it's an appropriate one because "causation"

20    is properly instructed, I believe, in instruction No. 5 and it

21    talks about "actionable cause."  So that's further definition

22    of the term as it's used in paragraph 4 of Instruction 7.

23             Now, with respect to the remainder of Instruction 7,

24    obviously, we think that the instruction needs to be changed

25    as set forth in document 204 which is our trial brief.

1          And I do understand the Court's already ruled on

2    that.  I just wanted to raise it in the context of this

3    instruction.

4          And secondly, I think, again, this instruction needs

5    to be altered to the extent or in the same manner as the Court

6    altered instruction No. 2 in paragraph 2 with -- where it

7    says:

8          Will reasonably and fairly compensate plaintiff

9    Yolanda Erickson.  I think it needs to be The Estate of

10   Michael Ruiz.

11         However the Court worded that with respect to

12   instruction 2 should be carried forward into this instruction

13   as well.

14         THE COURT:  Yeah, I tend to agree with you.  You

15   know, we lawyers would look at it to say well, it goes on to

16   say:

17         Compensate plaintiff Yolanda Erickson, as Personal

18   Representative of the Estate.

19         But that -- but we know that in that capacity it is,

20   indeed, compensating the Estate.  So I think it deserves some

21   thought here.  I'm inclined to say:

22         That will reasonably and fairly compensate the Estate

23   of Miguel Ruiz for the injuries to decedent.

24         I just don't see a need to put Yolanda Erickson's

25   name in there.  I'm not quite sure how to do it in this

1    context.

2            Mr. Blackwell, any thoughts on that?

3            MR. BLACKWELL:  Yes, Your Honor.

4            I can see where, I guess, a nonlawyer would have an

5    issue -- may have an issue understanding the paragraph

6    perhaps.

7            And so I think the Court's inclination to remove

8    Mrs. Erickson's name after the part where it says "that will

9    reasonably and fairly compensate," I guess it could say "and

10   fairly compensate the Estate of Miguel Ruiz."

11           And then the rest should still stay there "for the

12   injuries to decedent."

13           THE COURT:  Yes.  So it will say that "will

14   reasonably" -- I think we're on the same page -- "that will

15   reasonably and fairly compensate the Estate of Miguel Ruiz for

16   the injuries to decedent that you find were caused by

17   defendant."

18           MR. BLACKWELL:  Yes, Your Honor.

19           MR. MASTERSON:  Agreed.

20           THE COURT:  Okay.

21           MR. MASTERSON:  And then my last one, Judge, is the

22   verdict form and it's the same issue.  And I think it should

23   be:

24           Find in favor of the Estate of Michael Ruiz.

25           THE COURT:  I tend to agree that that is as

1    compelling there as it is in the instructions and should also

2    be true in both -- in two places.

3              On page 2:  We, the jury, award the Estate of --

4              -- at the top of page 2.

5              We, the jury, award the Estate of Miguel Ruiz, et

6    cetera.

7              And then the same at line 15.  Those three places,

8    that's what you're suggested, Mr. Masterson?

9              MR. MASTERSON:  Yes, sir.

10             THE COURT:  And do you agree that that's appropriate,

11   Mr. Blackwell?

12             MR. BLACKWELL:  We're still on page 9?

13             Yes, Your Honor.

14             THE COURT:  No, I'm sorry.  We're at the verdict form

15   now.  We did a little shifting around here.

16             His point on the verdict form would be on the first

17   page, line 22, that it simply say:

18             The Estate of Miguel Ruiz.

19             Instead of having:

20             Plaintiff Yolanda Erickson as Personal

21   Representative.

22             And the same on page 2 at line 1 and also at line 15.

23             MR. BLACKWELL:  One second, Judge.

24             Your Honor, I think it comports with -- I think

25   changing that way does comport with the changes that have

1    already been made where we see Mrs. Erickson's name.

2          THE COURT:  Okay.  Thank you.  Anything further?

3          MR. MASTERSON:  That's all I have, Judge.

4          THE COURT:  Very well.

5          MR. BLACKWELL:  Oh, Your Honor, if I may?

6          THE COURT:  Yes, sir.

7          MR. BLACKWELL:  I would just ask the Court to deny

8    the defense's motion to -- re-renewed motion.

9          THE COURT:  Yes.  And it is denied, the Rule 50

10   motion of defendant.

11          Anything further?

12          MR. BLACKWELL:  No, Your Honor.

13          MR. MASTERSON:  Nothing further, Judge.

14          THE COURT:  Nine o'clock Monday, June 5.

15          MR. MASTERSON:  See you then.

16          THE COURT:  All right.  Thanks.

17      (Proceedings adjourned at 3:06 p.m.)

18

19

20

21

22

23

24

25

CV14-01942-PHX-JAT      JURY TRIAL - DAY #7      5-30-17

1

2                    C E R T I F I C A T E

3

4          I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8              I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13             DATED at Phoenix, Arizona, this 31st day of May,

14   2017.

15

16

17

18

19                         s/Elizabeth A. Lemke
                           ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25