CV14-01942-PHX-JAT     JURY TRIAL - DAY #8      6-5-17

## UNITED STATES DISTRICT COURT

### FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Yolanda Erickson, individually and as personal representative of the Estate of Miguel Ruiz, Canon Ruiz and minor A.R., ) ) ) ) ) | |
| Plaintiffs, ) ) | **CV14-01942-PHX-JAT** Phoenix, Arizona |
| vs. ) ) ) | June 5, 2017 9:01 a.m. |
| City of Phoenix, et al., ) ) | |
| Defendants. ) _____) | |

BEFORE:  THE HONORABLE JAMES A. TEILBORG, JUDGE
REPORTER'S TRANSCRIPT OF PROCEEDINGS
JURY TRIAL - DAY #8

APPEARANCES:

For the Plaintiffs:
        BLACKWELL LAW OFFICE, PLLC
        By:  **Jocquese L. Blackwell, Esq.**
             **Gillmore Bernard, Esq.**
        420 West Roosevelt Street, Suite 106
        Phoenix, AZ  85003

For the Defendants:
        JONES, SKELTON & HOCHULI, PLC
        By:  **John T. Masterson, Esq.**
             **Joseph J. Popolizio, Esq.**
        40 North Central Avenue, Suite 2700
        Phoenix, AZ  85004

Official Court Reporter:
Elizabeth A. Lemke, RDR, CRR, CPE
Sandra Day O'Connor U.S. Courthouse, Suite 312
401 West Washington Street, SPC. 34
Phoenix, Arizona  85003-2150
(602) 322-7247
Proceedings Reported by Stenographic Court Reporter
Transcript Prepared by Computer-Aided Transcription

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8        6-5-17

1

2

3                                    **INDEX**

4

**SUMMARY OF COURT PROCEEDINGS**                        **PAGE:**

5

CLOSING ARGUMENT:   PLAINTIFF                   Page   3
6     CLOSING ARGUMENT:    DEFENDANT                  Page  49
REBUTTAL CLOSING ARGUMENT:   PLAINTIFF          Page  87

7
FINAL INSTRUCTIONS TO THE JURY                  Page 100
8
JURY RETIRES                                    Page 114
9     JURY VERDICT                                    Page 115
JURY POLLED                                      Page 117

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CV14-01942-PHX-JAT       JURY TRIAL - DAY #8        6-5-17

```
 1              P R O C E E D I N G S

 2       (Called to the order of court at 9:01 a.m.)

 3            THE COURT:  Thank you.  Please be seated.

 4            The record will reflect the presence of the parties

 5       and counsel and ladies and gentlemen of the jury.  Good

 6       morning, all.

 7            This is the time now for closing arguments.  Because

 8       the plaintiff has the burden of proof, they will be able to go

 9       first and then last.  Because of the fact that there will be

10       three separate phases of the argument, I'm not yet sure when

11       our noon hour will be.

12            We may end up taking a bit of an early lunch or a bit

13       of a late lunch depending, on how each of the arguments -- how

14       long each of the arguments is.

15            So at this time the plaintiff may present his closing

16       argument.

17       CLOSING ARGUMENT:  PLAINTIFF

18            MR. BLACKWELL:  Thank you, Your Honor.

19            Good morning, ladies and gentlemen.  This is a very

20       hard case.  And it's not a hard case because of the facts.

21       It's not a hard case because of the evidence.  It's a hard

22       case because we are informing you that the evidence solidifies

23       that an officer, a Phoenix Police Department officer, is

24       responsible for injuries and the death of Michael Ruiz.

25            And it's hard because it is a situation where members
```

1    of our public, we, as citizens, do not want to say a police

2    officer made a mistake.  We just don't.

3              We grow up in this country with a great respect for

4    police officers, each and every one of us.  And that respect

5    is seen when we watch TV shows, when little kids go to the

6    mall and they see a police officer in the mall, they want to

7    go up and get a sticker.

8              You may see a police officer at a local ice cream

9    shop, a restaurant.  You speak to the officer.  You tell the

10   officer "Thank you for your service."  We know police

11   officers.  We have police officers that are members of our

12   family, cousins, extended family, friends.  We have people who

13   know officers that have been killed in the line of duty and

14   our heart goes out to those officers.

15             But when I spoke to you weeks ago, I told each and

16   every one of you that this case is about the equation of

17   accountability.  The equation of accountability.  And I think

18   I said it three times because it's a situation where an

19   individual, an officer who has a lack of knowledge of their

20   training and uses excessive force, it will equal injury and

21   sometimes death.

22             And in this case we believe as plaintiffs we have

23   presented that evidence.  You will get a jury instruction from

24   the judge -- and I will go over some of them today -- that our

25   burden is a preponderance of the evidence.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

 1          What that means "more likely than not" in this case

 2   Officer Camarillo's actions caused an injury to Michael Ruiz.

 3   In this case Officer Camarillo's actions caused Michael's

 4   death.  More likely than not.

 5          It's not a criminal case.  A criminal case, the

 6   burden is very high.  It's the highest burden in our land.

 7   It's proof beyond a reasonable doubt.  This is not a criminal

 8   case.  Officer Camarillo, no matter what your decision is

 9   today, he will walk out of this courtroom and live his life.

10   Nothing will happen to him.  This is a civil case.

11          Now, your job is a job that no one else but you can

12   do.  The Court, Judge Teilborg, can't say that Officer

13   Camarillo is accountable and should be held responsible for

14   his actions.  Only the jury can.  Only you.  The people we all

15   took our time in selecting for this trial.

16          We each listened to every one of your statements as

17   it pertains to how you could be fair and impartial in coming

18   to a determination of accountability in this case.

19          Each of you have the same amount of power as the

20   other juror on the panel.  So whether you're the foreperson or

21   not, your decision, sir, is as important as every one else's

22   decision on the panel.  Your decision, ma'am, is as important

23   as every one else's decision on the panel.

24          And if you are -- if you come to a conclusion that

25   Officer Camarillo is responsible for the injuries and death,

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8       6-5-17

1   based on the evidence, it would have to take a Herculean task

2   to change your determination based on the evidence alone.  If

3   you come to the conclusion that Officer Camarillo is not

4   responsible for Michael Ruiz' injuries and/or death, it would

5   take a Herculean task for you to change your decision based on

6   the evidence.

7        Your decision shouldn't be based on hyperbole,

8   conjecture or supposition.  It's based on the evidence that we

9   presented.

10       Now, looking back at the evidence -- and I don't

11  believe I have to go over every single salient point of every

12  single statement you heard, but some of the statements, we

13  believe, should resonate as it pertains to whether or not

14  Officer Camarillo, now Detective Camarillo, is responsible for

15  Michael Ruiz' injuries and his death.

16       When Officer Camarillo first spoke to anyone of

17  authority about this incident, his first statement was:

18       I never attempted to apply the carotid control

19  technique.

20       That was his first statement, ladies and gentlemen.

21  First statement around 10:00, 10:30 in the morning, speaking

22  to a detective, Detective Champion.

23       The second statement about whether or not he applied

24  or attempted to apply the carotid control technique was later

25  on that afternoon.  After the videos had been collected and

1  downloaded, individuals from PSB, Professional Standards

2  Bureau, went and spoke to him at the scene.  What did he say

3  to PSB?  He informed PSB:

4          Well, I attempted to apply it twice; once in the

5  middle after the tasing and then once at the end.

6          Two-and-a-half years later we met with him for a

7  deposition back in January of 2016.  We asked him whether or

8  not he applied the carotid control technique on July 28, 2013.

9  His answer to us was:

10          I applied it once at the end of the encounter with

11  Michael Ruiz.

12          When I asked Officer Camarillo how long did he apply

13  the hold, as you recall when we played the depositional

14  testimony, I asked him was it eight seconds, 15 seconds, 30

15  seconds, one minute.

16          And for eight seconds the answer is:  I don't know.

17          Fifteen seconds, his answer:  I don't know.

18          Thirty seconds, his answer:  I don't know.

19          One minute, his answer.  I don't know.

20          Two minutes.  His, answer:  It wasn't two minutes.

21          So on January 29, 2016, Officer Camarillo informed us

22  on that date it wasn't two minutes.

23          In 2017 when he testified before you, he informed you

24  that he only applied it once, if he applied it at all, and it

25  wasn't for more than 15 seconds.

1          So there have been four occasions for Officer

2   Camarillo to say what happened in his statements about what he

3   did on July 28th as it pertains to putting his arm around

4   Michael Ruiz' neck has been inconsistent.  It's inconsistent,

5   ladies and gentlemen.  And with inconsistency belies

6   unreliability.  Inconsistency.

7          I can't make that up.  You heard Officer Camarillo

8   testify and he told you himself that that's what he said.  He

9   told you that he told Detective Champion he never attempted to

10  apply it.  He told you that he told PSB, well, I applied it

11  twice, in the middle after the tasing and at the end.  He told

12  you he told me he applied it only once at the end.  However,

13  he didn't know how long he applied it.  And he told you that

14  he applied it once at the end or attempted to apply it once at

15  the end for about 15 seconds.

16         Now, let's say we didn't have the only true objective

17  evidence in this case which is the videos that you've seen.

18  The only objective evidence is the video.  Well, we have to

19  assume that Dr. Poulos was objective because he's the Medical

20  Examiner.  He's not tied to the case and that's what he told

21  you.

22         So, Dr. Poulos and the video, two pieces of objective

23  evidence.

24         Let's say we did not have the video, no video at all.

25  For whatever reason the individuals out there, the bystanders,

 1    weren't recording.  For whatever reason Sergeant Luebkin

 2    decided not to pull his cell phone out of his pocket and start

 3    recording.

 4          Then Officer Camarillo, knowing what you know now,

 5    would have said like he said before:

 6          I never attempted to apply the carotid control

 7    technique.

 8          That was his first statement.  Now, Detective

 9    Champion didn't ask him about whether or not he saw people

10    videotaping the incident.  He asked him what happened.

11          So without the video, Officer Camarillo, not

12    Detective Camarillo, would have said:

13          I never attempted to apply the carotid control

14    technique.

15          When he met with PSB, remember, no videos.  PSB would

16    ask him questions.  No videos were recorded.  No videos were

17    downloaded.  PSB asked him the same question.  Well, did you

18    try to apply it?  Ask yourselves what would he have said?  Ask

19    yourselves what would he have said to PSB the same day and no

20    videos?

21          When we deposed him in January of 2016, we don't have

22    any videos to bring to the deposition.  We asked him:

23          Did you apply the carotid control technique?

24          What would he have said to us in January of 2016?

25          Without the videos and we're standing here in front

1   of you and Officer Camarillo sits on the stand and we ask him:

2   Did you apply the carotid control technique?  What would he

3   have said then?  Will he say -- would he have said:

4           I did not attempt to apply the carotid control

5   technique?

6           We'll never know.  All we know is what we have before

7   us.  And what we have are inconsistent statements by Officer

8   Camarillo over a period of time, over a period of years.  He

9   has not been consistent about his statements.

10          Now, let's say a doctor, she's been delivering babies

11  for years.  Years.  This doctor is one of the best doctors in

12  Arizona, one of the best known doctors in Arizona.  She's

13  never made a mistake.  Thousands of babies.  Let's say baby

14  5,661 is born.  It's a C-section.  She pulls the baby out but

15  a little too fast and breaks the baby's arms.

16          Do we hold the doctor accountability?  You're sitting

17  here.  The evidence is the doctor pulled the baby out too

18  fast.  There's no video of it.  Just what people said.  Do we

19  hold the doctor accountable?  I think you would.  You wouldn't

20  have a problem doing that.

21          Or you have a bus driver, a bus driver who's been

22  driving kids to school for years.  Never had an accident.

23  Never had an accident.  On this day July 28, 2013, for

24  whatever reason he's looking at his cell phone.  He goes

25  through a red light.  Bam.  Crashes into a car and kills a

 1      little girl.  Do we hold the bus driver accountable?  I think

 2      we do.

 3            An architect/mechanical engineer builds or erects

 4      a -- I don't know -- an escalator in the mall down the street.

 5      For whatever reason he skips some steps.  He didn't do it

 6      right and somebody gets hurt.  Do we hold the individual

 7      accountable?  Yes, we do.

 8            In this case the competing evidence dictates that

 9      Officer Camarillo used excessive force and that excessive

10      force caused Michael Ruiz' injuries.  And the lack of

11      knowledge of his own training not only caused the injuries, it

12      caused Michael Ruiz' death.

13            What did Ruth Downing tell you?  Nurse Practitioner

14      Downing told you that his injuries were consistent with

15      strangulation.  Consistent with strangulation.

16            Who else said that?  Their own experts.  What did

17      Dr. Wetli say?  When I asked Dr. Wetli:

18            Dr. Wetli, what's a typical injury related to

19      strangulation?  What did he say?

20            Was it a fracture of the cornu?  Yes.

21            Dr.  Wetli, is a fracture of the cornu a typical

22      injury related to strangulation?

23            Dr. Wetli says:  Yes.

24            Are hemorrhaged strap muscles, the muscles around the

25      neck, to include the sternocleidomastoid muscle, is that a

1    typical injury of strangulation?

2            Dr. Wetli said:  Yes.

3            Dr. Wetli tells us that Michael wasn't resuscitated

4    for over eight minutes.  When we include the time it took for

5    the officers to get him down the stairs, he wasn't

6    resuscitated for over eight minutes.

7            Dr. Wetli told you that without oxygen for eight

8    minutes could cause anoxic brain injury.  We're in Arizona,

9    ladies and gentlemen.  It's over a hundred degrees.  We're not

10   in Alaska.  Michael Ruiz didn't fall into an ice pond where

11   the blood would slow down and the effects of not having oxygen

12   to the brain would be different than an individual not having

13   oxygen to his brain here in Arizona in the hot sun.  That's

14   not our case.  Our case is here.

15           So when Officer Camarillo didn't know he wasn't

16   supposed to utilize the technique more than once, when Officer

17   Camarillo didn't know at the time back in July 28th of 2013,

18   he didn't know how long he was supposed to apply the

19   technique, and he didn't know how long it would take for a

20   brain injury to occur on that very day, that lack of knowledge

21   caused his injuries.  The fact that he didn't know how to

22   apply it properly, the lack of knowledge caused those

23   injuries.

24           The fact that he didn't know he wasn't supposed to

25   apply it more than once on the same subject, that lack of

1   knowledge caused injuries -- excuse me.

2          The fact that he didn't know at the time when Michael

3   didn't come to on that second-floor landing that he was

4   supposed to check for a pulse, the lack of knowledge of his

5   training, the post-CCT steps caused Michael's injuries.

6          Now, ladies and gentlemen, the defense, they have to

7   get up here and tell you what was Officer Camarillo supposed

8   to do?  What were those officers supposed to do?  The steps

9   are small.  It's a small space.  They have to get him down the

10  stairs.  Well, EMS was there.  Not only EMS, the Fire

11  Department, ambulance is right on the other street on the side

12  street next to the apartments.

13         All they had to do was first Camarillo -- Officer

14  Camarillo, check for a pulse.  He notices no pulse.  He's not

15  responsive.  You yell down the stairs, "Get somebody up here

16  right now.  He's unresponsive."

17         You sit him up.  Unhandcuff him.  Somebody starts

18  performing lifesaving efforts.  That's what normally should

19  happen based on his own training manual.

20         He did not know his training.  Now, does that make

21  Officer Camarillo a bad person?  It doesn't.  It doesn't.

22  Does it take away from the things he may have done in the past

23  prior to July 28, 2013?  It does not.  Does it take away from

24  the things he may have done after July 28, 2013?  It does not.

25         We're here for that specific day.  And based on the

```
 1    lack of knowledge of his own training, he made fatal errors on

 2    that particular day.  And those fatal errors caused injuries

 3    to Michael Ruiz and caused his death more likely than not.

 4    More likely than not.

 5          The experts didn't tell you and sit here and say that

 6    Michael Ruiz hurt himself, hurt his own neck.  No.  The

 7    compression caused neck injuries.  Who said that first?

 8    Dr. Poulos in his medical examination report.  He said the

 9    compression caused the injuries.  The compression injuries

10    were a hemorrhaged sternocleidomastoid muscle and a broken

11    right cornu.

12          Dr. Wetli tells you that the way it happens, the

13    injury itself, the fractured cornu, happens when the cornu is

14    pushed back towards the cervical spine.

15          The videos show you that Officer Camarillo was

16    squeezing his neck not softly, ladies and gentlemen.  We don't

17    know how much pressure was added to his neck because you can't

18    determine how much pressure but you can see an individual

19    straining.  You could see Michael's face turning blue and red

20    and purple when you watched the video.

21          Officer Camarillo told you himself he was more buff

22    back then than he is now.  The video shows you what happened.

23          What else does the video show you?  The video shows

24    you that methamphetamine, the methamphetamine in Michael's

25    system, did not cause his injuries.
```

1          Was he acting bizarre?  Most definitely.

2          Is it illegal to ingest methamphetamine?  Most

3    definitely it's illegally.

4          Does an individual deserve to die because they have

5    methamphetamine in their system?  I think every one would say

6    no.  No one deserves to die because you use meth.

7          It's an epidemic in this country.  Officers are

8    trained.  Officer Camarillo was trained to handle situations

9    when an individual is under the influence of illegal

10   substances and individuals that may be afflicted by some type

11   of mental disease.  Trained in those areas.

12         When Officer Camarillo went into that apartment,

13   Michael's apartment, he saw that there was a problem.  And the

14   individual in there either had a problem with someone or had a

15   problem with hisself.  And when he left that apartment,

16   Officer Camarillo did not ask anyone, anyone, to make sure

17   there was no, unauthorized access.

18         And why do I say that?  Because he was not worried

19   about anything in that apartment.  There were no weapons in

20   that apartment that caused Officer Camarillo any concern.  So

21   much so that when he walked around the corner to meet with the

22   other officers, what did he say when I asked him?  Did you

23   tell the other officers about what you saw in the apartment?

24         He said:  I don't recall.

25         We talked more about it and he started to change his

1   answer over time.  Because if he didn't tell those officers

2   anything about what happened in that apartment, that means

3   that he wasn't worried about the individual on the roof to the

4   point where he would inform his brothers in arms that the

5   individual in the apartment is dangerous.  This is what I just

6   saw.  He didn't tell those officers that.

7          And when officers went up there, were they concerned

8   for their safety?  Most definitely.  Sergeant Wesley, Officer

9   Schmidt and Officer Hessner were concerned about their safety

10  and they were also concerned about Michael's safety.

11         And how did they approach the situation?  They used

12  the use of force continuum; presence and verbal commands.

13  Presence and verbal commands.

14         What did they say?  We asked Michael to come towards

15  the bucket.

16         Sergeant Wesley informed you himself.  They were

17  talking to Michael.  They got him up.  He walked over to the

18  bucket.  And when you watch the video -- I know you have seen

19  it a number of times -- you see him try to get into the

20  bucket.

21         Now, if he had problems with officers on that

22  particular day, would he have walked to the bucket?  Would he

23  have tried to get into the bucket with the officers?  If he

24  was so violent and aggressive, would he walk to the bucket and

25  try to get in the bucket where those officers?  The answer is:

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8       6-5-17

1    No.

2           Sergeant Wesley even tells you that he squeezed his

3    finger.  And he says he believed he squeezed -- Michael

4    squeezed his finger to gain some type of control of the

5    situation.  What did Sergeant Wesley do?  He continued to

6    calmly talk  to Michael on the roof while Michael was

7    squeezing his finger.  He remained calm, he said, cool and

8    collected, trying to de-escalate the situation to assure

9    Michael's safety.

10          When Michael pulled back, they tased him.  Why?  I

11   don't know.  I actually do not know why they did that.

12          Luckily, it wasn't effective and Michael sits down.

13          Now, what did Sergeant Wesley tell you Michael did

14   before he jumped down to the second-floor landing?  He told

15   you that he saw him put his hands up like this (indicating) in

16   that fashion -- that fashion, I'm sorry.

17          What did he say it meant to him?  What did Sergeant

18   Wesley say it meant to him?  You heard him say it.  I asked

19   him:  What did that mean to you?

20          I think he used the term he was supplicating himself.

21          What does that mean?  Does that mean he was giving

22   up?  Was he surrendering?

23          His answer was:  Yes.  Yes, he agreed.  He was giving

24   up.

25          In the video what do you see Michael do?  Michael

1    points down to the second-floor landing.  Now, from Sergeant

2    Wesley's position he told you he couldn't see that

3    second-floor landing.  He didn't know what was going to happen

4    if he jumped.

5          I asked him:  Didn't you hear Michael say, "I'm

6    jumping down right there"?

7          No.  He didn't say he didn't say that.  He said:  I

8    didn't hear it.

9          Ladies and gentlemen, Sergeant Wesley told you that

10   he believed Michael was giving up.  He just decided that he

11   didn't want to go back to the bucket.  I mean, they just tried

12   to tase him.  It looked a little dangerous.  It might be safer

13   if he jumps right here and lets the officers come get him.

14         Now, for a regular person, for one, it may not be a

15   safe thing to be on a roof when you don't have a reason to be

16   on the roof.  Michael wasn't in a uniform.  He had no reason

17   to be up there.

18         And so I'm not saying that Michael Ruiz had a reason

19   to be on the roof.  It was bizarre behavior in the hot Arizona

20   sun on a roof.  Okay.

21         What I'm saying is when the defense gets up here and

22   says, Oh, it was excited delirium, where's the proof?  Where's

23   the proof?  There's none.  There's no proof that Michael was

24   reacting or afflicted by a syndrome called "excited delirium."

25         Why?  Because when he was on the roof you saw that he

1    was calm.  He might have been up there and acting bizarre,

2    because who would be up there on a roof, but he wasn't cursing

3    anybody out.  He wasn't yelling like a crazy person.  He

4    wasn't charging the police.  He wasn't trying to hit the

5    police.  He didn't spit at the police.  He wasn't cussing out

6    random people.  He got up.  And you watch him calmly walk to

7    the bucket.

8         We'll never know what actually happened at the bucket

9    because there's no audio of the conversation between Michael

10   and the officers in the bucket.  We'll never know.  All we can

11   see is what we saw in the video, what each and every one of

12   you saw.

13        Now, Officer Camarillo tells you he didn't have a

14   plan.  His only plan, I guess, if there is a plan, was to make

15   an arrest.  Why?  Because; he saw what happened in the

16   apartment.  He knew that water was going into that apartment

17   below the roof.  And so from his perspective as an officer, an

18   arrest was going to be made.  We're not telling you that an

19   arrest should not have been made.  Officer Camarillo runs up

20   the steps.

21        And when I asked him:  If you would have ran up the

22   steps and not stopped or slowed down and Michael fell on top

23   of you, would that have been Michael's fault or his fault?

24        Officer Camarillo said it would have been Officer

25   Camarillo's fault if he didn't slow down.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

1           The second issue is when he got to Michael's body,

2    what was he supposed to do?  Well, could he have used the same

3    techniques that were used by the officers in the bucket?  Yes.

4    There was nothing preventing him from doing that.  We both

5    went over the use of force continuum; presence, verbal

6    commands, soft hand techniques, hard hand techniques, batons,

7    electric control devices, tasers, carotid control, lethal

8    force.

9           So in this case if you recall Officer Camarillo was

10   standing there for at least four minutes before he decided to

11   walk over to the stairs.

12          Now, maybe he didn't have any time to consider what

13   he would do if he jumped.  Maybe he didn't.  Maybe he never

14   considered it.  But when he tells you he tells Michael to not

15   move, to stay down, after putting his arm around his neck, and

16   Michael says "Okay," would a reasonable officer -- would a

17   reasonable officer -- not Officer Camarillo because you can't

18   look at him in hindsight -- would a reasonable officer at that

19   moment continue to squeeze his neck?  The answer is:  No.

20          The individual who he just saw on the roof, who

21   you've never heard say anything aggressive, do anything

22   aggressive, is now in front of you on the second-floor

23   landing.  You've heard the officers -- or at least saw the

24   officers command him to the bucket.  You now whipped this

25   person and this person has just said "Okay" to your command of

CV14-01942-PHX-JAT        JURY TRIAL - DAY #8        6-5-17

```
 1     "Don't move."
 2            The next reasonable step is not to continue squeezing
 3     the individual's neck.  Any person would think that this
 4     person is about to hurt me.  He's still squeezing my neck.
 5     You have a primal instinct to live.
 6            Now, the defense has to say at the moment Officer
 7     Camarillo came in contact with Michael Ruiz, all bets were
 8     off.  Officer Camarillo could do anything he wanted to do.
 9            Well, that goes outside of his training.  He can't
10     just do anything.  He can't just shoot him.  Because what was
11     he doing?  Officer Camarillo told you he wasn't doing anything
12     when he fell onto the second-floor landing.  Wasn't doing
13     anything.
14            So, if Officer Camarillo was -- I'm sorry -- if
15     Mr. Ruiz wasn't doing anything at the moment he landed on the
16     second-floor landing, why did Officer Camarillo continue to
17     squeeze his neck?
18            Well, the defense has to tell you, well, he was
19     fighting.  He was fighting the officers.  Well, look at the
20     video, ladies and gentlemen.  Look at the video.  You have an
21     individual that's trying to live.  You have officers on one
22     arm, on the second arm, on the legs, pulling him, pulling him
23     for minutes.  You have Officer Camarillo squeezing Michael's
24     neck for minutes.  Four minutes.  Over four minutes of
25     squeezing an individual's neck, turning his arm for over four
```

 1   minutes.

 2           If the question is was Officer Camarillo supposed to

 3   let him go; the answer is, yes, because the other officers had

 4   him.  But then they're going to say, well, you know, he had

 5   superhuman strength.  Well, nobody came tumbling down those

 6   stairs.  Mr. Ruiz didn't kick anybody down those stairs.

 7   Mr. Ruiz didn't try to punch Officer Camarillo.  Didn't try to

 8   headbutt him.  If he was so crazy and aggressive, that never

 9   happened.

10           When he was screaming "He's killing me" when you

11   listen to the video, Michael's saying "He's killing me."  He's

12   specifically talking about the officer that has an arm around

13   his neck.  "He's killing me."

14           The individual speaking to him is Sergeant Luebkin

15   saying:  "Stop resisting."

16           Michael says:  "He's killing me."

17           "Stop resisting.  I know."

18           I'm sorry -- "He's killing me."

19           "I know.  Stop resisting and he'll stop."

20           Ladies and gentlemen, you have a primal instinct to

21   live.  They want you to believe that in that instant, in that

22   moment with those officers, that Mr. Ruiz was supposed to

23   remain calm with an officer's arm around his neck, squeezing

24   the life out of him.  I don't think there is anybody in the

25   world that could remain calm in a situation like that.

1          You have the ability today, each and every one of you

2   have the ability today to tell Officer Camarillo that this

3   should not ever happen again.

4          Does it absolve Michael Ruiz of his actions that day?

5   It doesn't.  It doesn't.  But Michael Ruiz didn't do anything

6   to those officers.  He did something to himself.  He used

7   drugs.  He didn't deserve to die.

8          Officers like Officer Camarillo have calls like those

9   day-in and day-out.  If a 24-year-old girl who has autism is

10  acting out, her mom calls the police because she needs help

11  calming her down.  And Officer Camarillo shows up without the

12  proper training, what happens to her?

13         How do you tell Officer Camarillo that what he did on

14  this particular day wasn't right?  How do you tell him that?

15         Because you have the power.  Your decision today

16  can't bring Michael back.  It can't and you know it.  But your

17  decision today can help officers like Officer Camarillo, now

18  Detective Camarillo, understand that he should know his

19  training.

20         What did he tell you?  I asked him.  Why didn't he

21  remember his training?  What did he say?  And this is about

22  the training last year.  He remembered the fun stuff.  He

23  said -- he said:  Well, those are more hands on.  That's why I

24  kind of remembered them a little more.  But you're actually in

25  it, like the driving track.  You're actually in a car driving

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8       6-5-17

1    around that track which is kind of fun.  You know, things like

2    that you kind of remember.  But like I said, some of the

3    classroom training, I don't recall specifically.

4           That's what he said, ladies and gentlemen.  Now,

5    again, we have the right and we in this country grow up

6    respecting officers.  But each and every one of you took an

7    oath to be fair and impartial.  And each and every one of you,

8    although you may have the same feelings about officers as

9    everyone else in this country, the respect that people have,

10   but you still have the responsibility as jurors in this

11   courtroom, if we have proven our case, to hold Officer

12   Camarillo accountable.  That's all we're asking.

13          We're not asking you to give up on your faith and

14   hope and reverence for officers.  We're asking you to hold

15   this one officer accountable.  Each and every one of you.  And

16   it must be a unanimous decision.  Unanimous decision.

17          Listen, if you hold -- if you find by looking at the

18   evidence in this case or you go and deliberate on this matter

19   that Officer Camarillo didn't injure Michael Ruiz or you find

20   that the use of force wasn't excessive, you can't hold him

21   accountable.  You cannot.  It would be improper.  It would be

22   against the instructions the Judge is going to give you.

23          But what we have is a number of witnesses, including

24   Officer Camarillo, saying that, well, from Officer Camarillo's

25   perspective, he had his arm around his neck and shoulder area

1    and that at the end he squeezed that neck and shoulder area

2    for 15 seconds until he went limp.

3           We have Dr. Vilke saying, well, from his perspective

4    looking at the video, he didn't use a lot of pressure and that

5    he was successful in applying it but it just didn't work.

6    Successful application of the carotid control technique is

7    what Dr. Vilke said.  It just wasn't effective.

8           Dr. Wetli.  Oh, yes, he says, when I asked him, hey,

9    Officer Camarillo said that he never attempted to apply the

10   technique.  Wetli said, oh, based on my view of the video,

11   yeah, he applied it.

12          Now, you know what?  Officer Camarillo has a lot of

13   experience.  He's interviewed a number of people based on my

14   questions.  All right.  And all of us know that when you --

15   it's like a child.  You ask a child a question.  He or she

16   says one thing.  You ask a child the second question about the

17   same thing.  He says something different.  You ask the child

18   again about that same thing you asked him or her an hour ago,

19   another story about it.  And finally, you might get to the

20   truth.  You might.

21          But we all know the stories are inconsistent.  Nobody

22   in here is asking you to check off your common sense when you

23   go through that door and deliberate on this case.

24          Something happened out there.  And when Officer

25   Camarillo talks about it, he's reluctant to even say he put

1   his arm around his neck.  I mean, you all watched him.

2   Reluctant to say he was squeezing his neck.

3          Consistent statements are that he used all of his

4   might, all of his force.  But he says he was holding him down.

5   He consistently says that.  But all of his might and all of

6   his force applied to someone's neck causes injuries.  The

7   injuries we see in this case.  Not checking for a pulse in the

8   hot Arizona sun and not having oxygen going to your brain for

9   over eight minutes leads to anoxic brain injury and death.

10         Mr. Ruiz' heart didn't just stop like a light switch.

11  Remember, Dr. Wetli said, oh, you know, excited delirium, what

12  happens is your heart just stops based on either psychosis or

13  being on drugs and an altercation with the police.  Right?

14         So I asked him, well, who told you or where do you

15  see his heart just stopping?

16         Well, I read it in the reports.

17         Well, the only person that had his arm around

18  Michael's neck was Officer Camarillo.  When you look at the

19  video, you never see his heart just stopping.  One, you can't

20  see his heart; and two, you see a manifestation of what was

21  going on with his body when he was being choked out.

22         His legs slowly moving in the video.  When I asked

23  Dr. Wetli, do you recall seeing his legs slowly move and

24  flutter like a wing?

25         I don't recall that.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8        6-5-17

1          Well, we played the video.  I think we played it at

2     least twice.  And he finally agreed, he even did the same

3     motion, I believe, he saw his legs moving slowly.  At the same

4     time, the entire time, Officer Camarillo is squeezing his

5     neck.  And at that point he's squeezing and pulling back with

6     all of his might for over a minute.  You can time it yourself

7     if you watch the video again.

8          Officer Camarillo was the only person to feel

9     Michael's body go limp.  The only person that testified about

10    Michael's body going limp who was actually there and holding

11    his body.  The only person that testified was Officer

12    Camarillo.

13         Sergeant Wesley wasn't holding his body -- well,

14    holding his neck, I should say.

15         Officer Camarillo told you that he didn't stop.  He

16    didn't let go of his neck until he was handcuffed.  Until he

17    was handcuffed.  Body goes limp.

18         Officer Camarillo tells you he thought he was playing

19    possum.  He thought he was playing possum?  Okay.  Well, check

20    for his pulse.  Make sure you're right.  It's part of the

21    training.

22         But if you don't know you're supposed to do that, you

23    won't do it.  If you don't know you're not supposed to do it

24    more than once on the same subject, you'll do it more than

25    once.  And all the witnesses, even their witnesses, their own

CV14-01942-PHX-JAT    JURY TRIAL - DAY #8    6-5-17

1    experts, highly paid, told you that it was done more than

2    once.

3         And they want to look at the Operations Order and

4    tell you, well, it doesn't say if you attempt to apply it, you

5    shouldn't attempt to apply it more than once.

6         That's hogwash.  The Operations Order says don't use

7    this technique more than once on the same subject.  It says

8    please check for pulse.  It says it takes about 10 to 15

9    seconds for a person to go unconscious.  It says it takes

10   three to -- I'm sorry -- four to six minutes before

11   irreparable brain damage will occur.

12        Officer Camarillo didn't know that on July 28, 2016.

13   As a matter of fact, based on the deposition, he had had a

14   class three weeks prior to the deposition and he still didn't

15   know the salient points of that training.

16        The only individuals who spoke about excited delirium

17   were the defense experts.

18        Now, the Medical Examiner never mentioned anything

19   about excited delirium.  The hospital Emergency Physician

20   never mentioned anything about excited delirium.  Their own

21   experts tell you that that syndrome, excited delirium, doesn't

22   exist in the DSM-V which is the book, somewhat like a Bible,

23   for American psychiatrists.

24        The excited delirium disorder or syndrome is a

25   psychiatric issue and psychiatric doctors don't even recognize

1    it, except that one that was working with Dr. Wetli back in

2    the 80s.  He didn't mention anyone else.

3        The American Medical Association doesn't recognize

4    excited delirium as a true syndrome.  And the doctors that had

5    nothing to do with this case, the emergency medical physician

6    never put that in the medical record, that term "excited

7    delirium" in reference to Michael Ruiz' death and/or injuries.

8        Dr. Poulos who's used the term before didn't say it

9    in this particular case.  He didn't.

10       There were a lot of objections during this trial

11   about some of the questions I asked in relationship to

12   training.  This trial isn't about Officer Camarillo having

13   inadequate training.  That's not our claim.  That is not a

14   claim in this case.  We're informing you that Officer

15   Camarillo and his lack of training -- lack of knowledge of his

16   training, the lack of knowledge of his own training that you

17   have as an exhibit caused the injuries and Michael's death.

18       The importance of a police officer's job is so great

19   that all the time that the officers -- a lot of time is

20   devoted to training, a ton of time, year in, year out, in

21   class, on the job, in the field, training, training, training.

22   Why?  To protect individuals like ourselves, to include

23   Michael Ruiz.

24       And when you don't know what your training is,

25   certain techniques like the carotid control technique should

 1    not be utilized.  If you don't know how to do it properly, you

 2    just shouldn't use it.

 3          And, yeah, you know, officers, they have it hard.

 4    It's very hard for an officer.  I can appreciate it.  Unless

 5    you've been an officer, you couldn't appreciate it, what they

 6    go through day-in and day-out.  It's a very dangerous job, a

 7    very dangerous job.  And that's why they're trained so well.

 8          Because they understand that officers will be in a

 9    situation where their training that they have is the only

10    thing that perhaps can save your life and my life, their

11    lives.  But without the proper knowledge of that training,

12    things go wrong.

13          If I took a class in vehicle restoration, one class,

14    and then two years later somebody is asking me to help them

15    restore a car.  And I would try to restore it.  And they drive

16    away and it looks nice, looks nice on the outside.  They drive

17    away and it malfunctions.  Whose fault is that?  Is it the

18    person who trusted me and trusted my work that I knew what I

19    was doing.  Was it my fault?  Who do you hold accountable?

20          I'm a law professor.  For some reason some law school

21    hires me.  I'm in there teaching a class I know nothing about.

22    Nothing about the class.  And law students in my class can't

23    pass their exams, can't pass the bar.  Who do you hold

24    accountable?  The law school?  Me?  The student?

25          You hold the person who caused the injury

1    accountable.  Michael Ruiz is the victim in this case.  You

2    heard from Mrs. Erickson as she testified about what Michael

3    experienced in the hospital.  There's nothing you could do

4    today when you make your decision that's going to erase those

5    memories from Michael's mom's mind.

6          Nothing you can do in this case that's going to make

7    Mrs. Erickson forget the fact that she punished Michael by

8    telling him she was going back home.  Nothing.  Nothing you

9    can do that's going to erase those tears.  Nothing.

10         But as I said earlier today, there is something you

11   can do to make sure that this doesn't happen.  Officers have a

12   code as we all know.  Part of that code is in their oath which

13   is to protect and serve.

14         When that code is broken, we have to hold them

15   accountable.  We have to.  Because if we don't hold them

16   accountable, it happens again.  It happens again.  Until

17   somebody with the same authority and same power that you have

18   says, "No more."  Somebody has to say "enough is enough."  And

19   each and every one of you have the power to say that today.

20         You're going to get an instruction.  One of those

21   instructions is going to tell you that in order to prevail,

22   for us as the plaintiff to prevail, the Estate of Michael

23   Ruiz, which is represented by Mrs. Erickson, to prevail on the

24   1983 claim against defendant Abraham Camarillo, plaintiff must

25   prove each of the following elements by a preponderance of the

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

1    evidence:

2           Number one says defendant acted on color of state

3    law.

4           And number two says the acts of defendant deprived

5    decedent Miguel Ruiz of his particular rights under the United

6    States Constitution as explained in later instructions.

7           Now, in this particular case a person acts under

8    color of state law when the person acts or purports to act in

9    the performance of official duties under any state, county, or

10   municipal law, ordinance or regulation.  The parties have

11   stipulated that the defendant acted under color of state law.

12          So number one has already been satisfied.

13          If you find that plaintiff has proved each of these

14   elements -- and if you find that plaintiff has proved

15   defendant used excessive force on the decedent, as instructed

16   on pages 4 through 6 -- your verdict should be for plaintiff.

17          If, on the other hand, you find that plaintiff has

18   failed to prove any one or more of these elements, your

19   verdict should be for the defendant.

20          Now, as it pertains to the depriving Miguel Ruiz of

21   his particular rights under the United States Constitution as

22   explained in later sections, Michael Ruiz had a right to life,

23   liberty and the pursuit of happiness.  He had a right not to

24   be injured.  He had a right to live.  He didn't lose that

25   right because he was being arrested.

CV14-01942-PHX-JAT    JURY TRIAL - DAY #8      6-5-17

1              Now, the next instruction -- and I'm not going to

2    read all of these instructions to you.

3              In general, a seizure of a person is unreasonable

4    under the Fourth Amendment if a police officer uses excessive

5    force in making a lawful arrest, in defending himself or

6    others, and/or in attempting to stop a fleeing suspect.

7    Therefore, in order to prove an unreasonable seizure in this

8    case, plaintiff must prove by a preponderance of the evidence

9    that defendant use excessive force when he attempted to

10   control decedent Miguel Ruiz on July 28, 2013.

11             Under the Fourth Amendment, a police officer may use

12   only such force as is objectively reasonable under all of the

13   circumstances.  You must judge the reasonableness of a

14   particular use of force from the perspective of a reasonable

15   officer on the scene and not with the 20/20 vision of

16   hindsight.  Although the facts known to defendant are relevant

17   to your inquiry, the defendant's subjective intent or motive

18   is not relevant to your inquiry.

19             The defendant, Abraham Camarillo's subjective intent

20   or motive is not relevant to your inquiry.

21             In determining whether defendant used excessive force

22   in this case, consider all of the circumstances known to

23   defendant, including, but not limited to -- and there are a

24   number of these factors.  I won't read them all to you.  There

25   are nine of them.

1            Okay.  The Judge will read them to you.  You consider

2    all of those or some of those or one of those.  It's not an

3    exhaustive list.  But these are nine factors for you to

4    consider.

5            Probable cause exists when, under all of the

6    circumstances known to defendant at the time, an objectively

7    reasonable police officer -- not Officer Camarillo -- I added

8    that myself -- would conclude that there is a fair probability

9    that decedent has committed or was committing a crime.  For

10   purposes of your deliberation, the Court has already

11   determined that, under the totality of the circumstances, the

12   information available to defendant from his own observations

13   and discussions at the time of the arrest was sufficient to

14   warrant a prudent officer in believing that decedent had

15   committed a crime; therefore, there was probable cause to

16   support defendant's arrest of decedent.

17           There was probable cause to make the arrest.  But the

18   inquiry doesn't stop there.  Individuals get arrested every

19   single day.  A mass majority of those individuals live to see

20   the next day.

21           The issue in this case is based on the fact that

22   there was a probable cause to make an arrest, was Officer

23   Camarillo's actions -- did they rise to the level of excessive

24   force as we've claimed.

25           Was the use of force warranted based on what Michael

1    Ruiz did when he jumped down from the second floor roof -- I'm

2    sorry -- jumped off the second floor to the second-floor

3    landing -- off the roof to the second-floor landing.  I

4    apologize.

5              The answer is:  No.

6              His use of force wasn't warranted.  Well, what was he

7    doing the moment he landed?  Wasn't trying to run.  Wasn't

8    being combative with anybody.  Didn't have a weapon.  Officer

9    Camarillo had a number of minutes to look and see what he

10   wanted to do.

11             Yet they get up here and say, well, we just couldn't

12   let him go.  We don't want him to go and harm somebody.

13             Well, Officer Camarillo actually knew when he was in

14   his apartment he wasn't dangerous.  He didn't see any weapons.

15   And, yeah, maybe if individuals own weapons, they're not

16   dangerous individuals.  But in an apartment where it's in a

17   disarray, the bathroom is torn to shambles, part of the

18   apartment is blown, is in a shambles and you see weapons, the

19   bells should go off.

20             Yet the apartment was a mess.  A hot mess.  There was

21   a pole in the light fixture at the front door.  The bathroom,

22   the toilet was torn off the floor.  Shower curtain down.

23   Blood on the curtain.  Blood on chairs.

24             But Officer Camarillo didn't tell a sole about what

25   he saw before they went up into that bucket.  He wasn't

1    concerned that the individual who may have committed -- who

2    committed the situation in the apartment was a threat -- so

3    much of a threat that he needed to warn the officers.

4         He didn't do it, ladies and gentlemen.  And you can

5    see that manifested on the roof.  That the individual on the

6    roof wasn't a threat.  You can see it.  I don't care how many

7    pictures they show you.  There's a ton for you to look at.  I

8    think over 300 of that apartment, a hot mess.

9         But the person on the roof, although acting bizarre,

10   wasn't violent, wasn't acting aggressive, wasn't trying to

11   harm the officers.

12        In a 1983 action, the plaintiff must demonstrate that

13   the defendant's conduct was the actionable cause of the

14   claimed injuries.  To meet this causation requirement,

15   plaintiff must establish both causation-in-fact and proximate

16   causation.

17        This is on page 6 of your instructions.

18        An act is causation-in-fact if decedent's injuries

19   would not have occurred without that act or omission.

20        Again, you apply it to the evidence.  More likely

21   than not decedent's injuries would not have occurred without

22   that act or omission.

23        The act or omission here in this case, the act is

24   putting an arm around Michael Ruiz' neck.  The injuries to him

25   would not have happened but for Officer Camarillo's actions.

1    That's the causation-in-fact.

2          It also says "or omission."

3          Omission in this case?  Not checking for a pulse.  No

4    oxygen to the brain.  His brain is dying at that moment.  Two

5    minutes went by before they got him down the stairs.  It's

6    hot.  Over a hundred degrees in Arizona on July 28, 2013.  And

7    another eight minutes before they tried to resuscitate him.

8          Officer Camarillo had his body up on the second-floor

9    landing.  He could have checked for his pulse.  He didn't.

10   His training says he's supposed to.  And then immediately call

11   for help.  In this case he didn't have to pick up his phone,

12   get on the radio.  Help is right there.  The mobile unit was

13   right there.  Get the mobile unit.  Run up the stairs and

14   start resuscitating Michael Ruiz.

15         Additionally, an act is a proximate cause if it was a

16   substantial factor in bringing about or actually causing

17   injuries, that is, if the injuries were a reasonably

18   foreseeable consequence of defendant's act.

19         Reasonably foreseeable consequence.  If you squeeze

20   somebody's neck for a long period of time, injuries will

21   result and the person could die.  That's a reasonable,

22   foreseeable issue.  All of us can see that.  It doesn't take

23   rocket science.

24         The inquiry into causation must be individualized and

25   focus on the duties and responsibilities of the officers -- of

1    the defendant.

2          In this case, defendant, Officer Camarillo, had the

3    duty, had the responsibility before going there that day to

4    know his training, particularly in a situation where he's

5    using a carotid control technique, which is directly under

6    lethal force; and if used improperly, turns into lethal force.

7          On page 7 it says:  When a party has the burden of

8    proving any claim by a preponderance of the evidence, it means

9    you must be persuaded by the evidence that the claim is more

10   probably true than not true.  More probably true than not

11   true.

12         So when you go back and deliberate on this case, just

13   get out some paper.  If there's an easel back there -- I don't

14   know.  I have any never been back there.  But if there is one,

15   get out the easel.  Look at the evidence.  Ask yourselves when

16   you deliberate:  Is it more probably true that Officer

17   Camarillo's actions caused injury to Michael Ruiz?

18         I believe, based on the evidence we presented, to

19   include their own witnesses, yes.  His actions caused the

20   injury.

21         Is it probably true that Officer Camarillo used

22   excessive force?  Well, if you use a carotid control technique

23   properly, you don't injury the person.  The person passes out.

24   The person comes back.

25         Well, in this case that didn't happen.  One, he tells

1   you he didn't even know if he applied it correctly; two, we

2   can see it wasn't being applied correctly; and three, he

3   didn't apply it correctly for a long period of time.

4           So much so that an individual died on the

5   second-floor landing.  Michael Ruiz died on the second-floor

6   landing.  He didn't die at the hospital the first time.  He

7   died the first time at the scene under the arms -- under the

8   actions of Officer Camarillo.

9           You should base your decision on all the evidence,

10  regardless of which party presented it.

11          That's the last part of page 7.

12          Page 8.  It is the duty of the Court to instruct you

13  about the measure of damages.  By instructing you on damages,

14  the Court does not mean to suggest for which party your

15  verdict should be rendered.

16          If you find for plaintiff, you must determine

17  plaintiff's damages.  "Damages" means the amount of money that

18  will recently and fairly compensate the Estate of Miguel Ruiz

19  for the injuries to decedent that you find were caused by

20  defendant.

21          Now, ladies and gentlemen, when I opened, if you

22  remember, the opening statement that I gave, ask yourselves:

23          Did my opening, was the evidence in this case

24  presented to you?  Did it bolster the opening that I gave?

25  Ask yourselves that.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

1          You look at the opening that the defense gave.  Ask

2    yourselves, did it bolster -- did the evidence in this case

3    bolster what they said?

4          Ask yourselves that.  In this case I opened by saying

5    that there were 87 years of experience out there.

6    Eighty-seven years.

7          The defense said, well, yeah, 87 years were only for

8    the sergeants and lieutenant that was out there.  The other

9    officers rises the level of years of training and experience

10   over 100 years.  Over 100 years of training and experience out

11   there that day.  Over 100 years of training and experience.

12         It wasn't utilized properly because Michael Ruiz

13   died.  One hundred years of training.  One hundred years of

14   training.  One hundred years of training not used properly.

15   Somebody died.  Michael Ruiz is dead.  You can't bring him

16   back.

17         But if you look at the hundred years, in an average

18   salary of an officer, with a number of years of experience is

19   probably $70,000.

20         It's probably more than that with overtime depending

21   on what they do.  So, you take 70,000.  You multiply that by

22   100 years.  That gets you $7 million.

23         Seven million reasons to compensate the Estate of

24   Miguel Ruiz.  Seven million reasons to tell Officer Camarillo

25   that this should not happen again.  It shouldn't happen in

1    Phoenix.  It shouldn't happen anywhere else in our state.

2          Yeah, oh, in California they've outlawed -- and LAPD

3    outlawed the carotid control technique.

4          Well, guess what.  In Arizona it's not outlawed.

5    It's not -- the individuals who use that technique have to

6    know how to use it properly.  They have to.  Because if they

7    don't, people get injured and people die.

8          The experts told you that this case, the case that we

9    have, the experts, their experts told you.  This is a rare

10   case.  When they testify in cases when they are testifying on

11   behalf of police, a person who's been injured or died by the

12   utilization of a carotid control technique, they don't have

13   that many cases like that.  They just don't.  You remember the

14   testimony.  And they don't have videos.  Not a lot.

15         On plaintiff's claim you should consider the

16   following:

17         The loss of enjoyment of life experienced prior to

18   death.

19         Michael Ruiz was on that second-floor landing for

20   over four-and-a-half minutes with the officers.  And at that

21   time Officer Camarillo's arm was around his neck the entire

22   time.  The entire time.

23         Oh, yeah.  Did he move his elbow when Lieutenant

24   Hoover looked up and thought he was choking him out?  Did he

25   move his elbow?  He did.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

```
 1            Does that mean he released the pressure off his neck?
 2   No.  He just moved his elbow.
 3            Did he continue squeezing?  He did.  And when you
 4   watch the video, he squeezed harder, squeezed back.
 5            For whatever reason when you ask the experts when
 6   they're testifying, do you see him jerking on his neck?  What
 7   are you talking about?  I don't see the jerking.  I don't
 8   appreciate the jerking, I think, is what Dr. Vilke said.
 9            Well, ask yourselves when you watch the video, if you
10   watch it again, do you see the jerking?
11            Do you see it, ma'am?  Do you see it, sir?  Do you
12   see it, ma'am?  When you're back there, do you see it, sir?
13   Do you see it, ma'am?  Do you see it, sir?  Do you see it,
14   ma'am?  Do you see it, sir?  Do you see it, sir?
15            When you watch the video, when you watched that
16   video, do you see what's going on?  Do you see the officer
17   squeezing the life out of Michael Ruiz?
18            You can't overlook it.  You can't because you said
19   you would be fair and impartial.  That's why you can't
20   overlook it.  Each and every one of you said you would.  You
21   raised your hand.  Swore an oath to be fair and impartial.
22            And I'm asking you to find that he's accountable.
23   Not because I want you to, because the evidence says so.  If
24   we didn't have the video, if we didn't have the video, I doubt
25   seriously you would have been called to be here.  You would be
```

UNITED STATES DISTRICT COURT

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8       6-5-17

1    living your lives.  You wouldn't be here for this case.

2            And there's nothing that defense counsel when he gets

3    up here can say about that that would change that fact.  We

4    wouldn't be here.

5            You can consider the mental, physical, and emotional

6    pain and suffering experienced by the decedent prior to death.

7            You can consider the reasonable expenses of necessary

8    medical care and services for the injury caused by the

9    defendant.

10           And if you find the defendant's conduct caused

11   plaintiff's death, the reasonable expenses of the funeral and

12   burial.

13           Plaintiff has the burden of proving damages by a

14   preponderance of the evidence, and it is for you to determine

15   what damages, if any, have been proved.  Your award must be

16   based upon the evidence and not often speculation, guesswork,

17   or conjecture.

18           And your decision must be unanimous.

19           Now, I'm almost finished with my close.  There's one

20   thing I do want to cover before I sit down as it pertains to

21   the instructions, that is.  It's an award for punitive

22   damages.  It's a very long instruction.

23           I am not going to sit here and read the entire

24   instruction to you.  And if defense counsel comes up here and

25   says, you know, Mr. Blackwell is trying to hide something

 1   because he didn't read the whole instruction, I know the Judge

 2   is going to read it to you.  I'm not trying to hide anything

 3   from you, ladies and gentlemen.

 4         And if you felt I've tried to hide anything from you

 5   during this entire event -- this entire trial or Mr. Bernard

 6   tried to hide something from you, please don't take it out on

 7   the decedent's estate.  Don't take it out on Michael Ruiz.

 8         You may award punitive damages only if you find that

 9   defendant's conduct that harmed plaintiff was malicious,

10   oppressive or in reckless disregard of plaintiff's rights.

11         Now, it goes on to say:  Conduct is malicious if it

12   is accompanied by ill will or spite or if it is for the

13   purpose of injuring plaintiff.  Conduct is reckless -- is in

14   reckless disregard of plaintiff's rights if, under the

15   circumstances, it reflects complete indifference to

16   plaintiff's safety or rights, or if defendant acts in the face

17   of a perceived risk that his actions will violate plaintiff's

18   rights under federal law.

19         Reckless disregard.  We believe punitive damages is

20   warranted because Officer Camarillo recklessly disregarded a

21   known fact that day.  He knew when he was there he didn't have

22   the requisite training.  He knew when he was trying to lock

23   the CCT in he wasn't doing it right.  And he never stopped.

24   He kept trying it.  I kept trying to apply it.  I applied it

25   on multiple times.

1          Why would you keep doing something if you know you're

2     not doing it right?  If you know it's not effective?

3          Oh, well, the defense is going to get up here and

4     say, well, what was he supposed to do?  Was he supposed to

5     shoot him?

6          No.  We're not saying that.  That's hogwash.  We're

7     not say that Officer Camarillo should have shot Michael Ruiz.

8     We're saying he should not have used a technique he didn't

9     know how to use properly.  That's what we're saying because he

10    lacked knowledge of the proper technique.  That's what we're

11    saying.  He lacked knowledge of the post-CCT steps.  That's

12    what we're saying.

13         There's a verdict form you're going to receive.  It's

14    going to say:

15         We, the Jury, duly empaneled and sworn in the

16    above-entitled action, upon our oaths, do hereby:

17         As to the Estate of Miguel Ruiz' claim that defendant

18    violated decedent Miguel Ruiz' constitutional rights to not

19    have excessive force used against him.

20         Find in favor --

21         We ask that you find in favor of the Estate of Miguel

22    Ruiz.  That's what we're asking you to do.

23         And we're asking when it says:

24         We, the Jury, award the Estate of Miguel Ruiz:

25         It says "nominal damages in the amount of" and

1    there's an instruction for that.

2            It says "compensatory damages in the amount of,"

3    we're asking for $7 million.  We're asking you for $7 million.

4            That's not an easy request.  I don't stand here and

5    make that request easily.  It's a very hard thing for me to do

6    to stand in front of you and ask you to do something like

7    that.

8            Not because it's not warranted, because as I said

9    before, it doesn't bring Michael back.  But it sends a

10   message.  It sends a message that this should not happen again

11   to anyone in this state.  An officer who's trained to protect

12   and serve should know and understand his training, his or her

13   training.

14           Officer Camarillo told you he did not know the

15   requisite portions of the carotid control technique that could

16   cause injury or prevent injury, that could cause death or

17   prevent death.  He did not know them.  And you will see it

18   when you read the Exhibit 117 in the Use of Force Manual.

19           Mr. Ruiz was not posing an immediate threat to the

20   public or himself while he was on the second-floor landing.

21   He wasn't.  His actions caused water to run into the

22   apartment.  However, those actions did not warrant the use of

23   deadly force.  It didn't warrant the use of the CCT.

24           Officer Camarillo's use of force was unreasonably

25   excessive and led to Michael's injuries and his death.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

1          And because of that, ladies and gentlemen, I ask that

2    you seriously consider the evidence in this case without the

3    hyperbole, without the subjective statements, without the

4    conjecture, and hold him accountable.  Find that he is

5    responsible for Michael's injuries and Michael's death.

6          I know it's going to be hard, but the evidence speaks

7    for itself.  The evidence in this case.

8          Dr. Wetli said it himself, their own witness.  You

9    know, everybody wants to say that Michael was fighting and

10   fighting these officers.  Dr. Wetli said:  You know what, I

11   was pleasantly surprised when I read the report and the

12   officer that was at his legs said that Michael really wasn't

13   kicking at me.  He didn't try to kick me down the stairs,

14   Dr. Wetli said.  He said the officer said he was just moving

15   his legs because we were tasing his legs.  That's what

16   Dr. Wetli said.  Their own expert.  Not me.  Their own expert

17   said that.

18          Now, ladies and gentlemen, you will watch the video

19   again, hopefully.  There were some statements made on the

20   video that came from individuals who have no interest and/or

21   training in the law.  The civilians out there, the so-called

22   peanut gallery, making those comments, those rude and lewd

23   comments on the video, no training in the law.  Never been a

24   juror.  Didn't read any instructions.  Didn't get any legal

25   education of what a police officer is supposed to or not

1    supposed to do at a scene like that.

2         They made some horrendous statements.  And I know the

3    defense counsel is going to get up here and tell you:  When

4    you listen to it, you'll hear them saying he got what he

5    deserved.  That's what one of the guys says in the video.  He

6    got what he deserved.  Coming from a person without any legal

7    training.  Not a police officer.  Never been to the Academy.

8    Who's never read the manual for the CCT.

9         It's hogwash, ladies and gentlemen.  It's hogwash.

10   Those individuals out there had no legal training.  They were

11   watching something unfold.  They didn't know Michael died on

12   that second floor.  And they didn't know that Officer

13   Camarillo was supposed to check for his pulse.  They didn't

14   know Officer Camarillo wasn't supposed to use it more than

15   once.  And they didn't know Officer Camarillo was going to

16   tell the first officer he spoke to he never attempted to use

17   the carotid control technique.

18        I ask all of you to find that Officer Camarillo is

19   responsible for Michael's injuries and his death.

20        Thank you.  Thank you all.

21        THE COURT:  All right.  Ladies and gentlemen, we will

22   take a 15-minute recess.

23        Please remember the admonition.

24      (Recess taken at 10:30 a.m.)

25        THE COURT:  Thank you.  Please be seated.

1          The record will reflect the presence of the parties

2     and counsel, ladies and gentlemen of the jury.

3          The defense may now present its closing argument.

4     **CLOSING ARGUMENT:  DEFENDANT**

5          MR. MASTERSON:  Thank you, Judge.

6          Seven million reasons why.  Seven million dollars.

7     So that's what the equation of accountability is really about.

8     Money.

9          Do you see it, sir?  You see it, ma'am?

10         Money.  Equation of accountability.

11         Equation.  An equation may be that two things are

12    equal; two plus two equals four.  It may be the equality or

13    equivalents of two things or two logical expressions.  When

14    you add these up, you get this.  When you add these up, you

15    get this.  An equation.

16         Let's add some things up in this case.  Let's start

17    with methamphetamine.  And let's start with plaintiff's own

18    witness Dr. Poulos.  And you remember just a few minutes ago,

19    Mr. Blackwell told you we have to assume Dr. Poulos is

20    objective.  Mr. Blackwell likes the testimony of Dr. Poulos,

21    so let's look at what Dr. Poulos had to say.

22         Dr. Poulos testified that Mr. Ruiz had .40 milligrams

23    per liter of methamphetamine in his system.  He then testified

24    that .40 milligrams per liter of methamphetamine could be a

25    lethal level of methamphetamine.  That that level of

1    methamphetamine that was found in Mr. Ruiz' body could have

2    caused his death all by itself.

3          So let's make an equation.   .40 milligrams per liter

4    of methamphetamine plus Mr. Ruiz equals death.  Does that add

5    up?  Is that an equation?  According to Dr. Poulos, yes.

6    According to Mr. Blackwell, Dr. Poulos is objective.

7    According to Dr. Poulos, plaintiff's witness, that equation

8    adds up.  Methamphetamine equals death.

9          What else can we add into the equation?  We can add

10   irrational behavior.  We can add destructive behavior.  We can

11   add violent behavior.  Certainly, we can add all these things.

12   But let's take a look at an equation by another one of

13   plaintiff's witnesses, plaintiff's expert Ruth Downing.

14         Remember when she talked an altered level of

15   consciousness?  She wanted to talk about that altered level of

16   consciousness in connection with supposed strangulation.  She

17   certainly didn't want to mention methamphetamine.  Like

18   pulling teeth to get the word "methamphetamine" out of her.

19         Remember, she said strangulation can cause mental

20   status changes, confusion, anxiety, panic, coma, and death.

21   But when I talked with her, we talked about methamphetamine

22   intoxication.  And what did she admit?

23         That methamphetamine intoxication can cause an

24   altered level of consciousness.  So let's use Ms. Downing's

25   words.  Let's use her testimony.  And let's make another

1    equation.

2         Methamphetamine intoxication can cause an altered

3    level of consciousness.  Now, let's add to that so we have an

4    equation:  Mental status changes plus confusion plus anxiety

5    plus panic equals coma and death.

6         Plaintiff's own expert witness.  Methamphetamine

7    intoxication can cause coma and death.  Another equation,

8    another equation that adds up.

9         All right.  Enough about equations for a little bit

10   and I'll come back to them in a little while and I'll also

11   talk about accountability because I want to put those

12   together.  Equation of accountability.  But first let's talk

13   about what happened on July 28, 2013.

14        Police were dispatched to 4241 North 23rd Avenue.

15   Dispatcher informed the officers who were all listening who

16   could hear on the radio that this someone was on a roof

17   messing with the air conditioning.  And they used -- or excuse

18   me -- the dispatcher used the phrase "237 David."  And you

19   heard what that means.

20        That's a Phoenix Police Department code for the

21   person may be on dangerous drugs.  You heard that if they were

22   on marijuana, it could be "237 Mary."  Here it was "237

23   David."  And one of the primary dangerous drugs that police

24   officers face out there on the street -- and you heard about

25   this too -- is methamphetamine.

1              So officers arriving on the scene know they may be

2    faced with a subject on dangerous drugs.  They know they may

3    be faced with a subject on methamphetamine.  And what do they

4    find when they get there?  They found Mr. Ruiz on the roof.

5              And Officer Camarillo arrived on the scene and he

6    went into Mr. Ruiz' apartment.  And you heard about Mr. Ruiz'

7    apartment.  Fires had been started.  There was blood.  The

8    toilet had been ripped out of the floor.  Irrational violence.

9    Destructive behavior.

10             Let's take a look at a few photographs that are in

11   evidence.  These are Exhibit 34.  If you remember, there's 328

12   of these.  The good news is I'm not going to show you 328 of

13   them, but I am going to show you some of them.

14             So could we take a look at Exhibit 34, please, and

15   let's start with No. 228.  And I'm going to move quickly

16   through these.  I'm not going to really describe much of

17   what's in there.  You can see pretty well for yourselves

18   what's in there:

19             229, please, 230, 281, 283, 288.

20             Let's look at some photos about some of the fires

21   that had been started:  210, please, 216, 222, 225, 305.

22             Some broken furniture:  No. 236.

23             The toilet that we talked about:  240, 241, 242, 243,

24   and 245.

25             You heard about a guitar floating in the bathtub:

1    No. 244.

2          And a metal pole that had been driven into a wall:

3    284 and 286.

4          Irrational behavior.  Destructive behavior.  Violent

5    behavior.  Do you remember Dr. Beckson's testimony?  Dr.

6    Beckson was actually me for that testimony.  I read that

7    testimony for you.  Recall his testimony, I wrote it down.  We

8    have transcripts from the entire trial.  The court reporter

9    was nice enough to give those to us.

10          At page 128 on May 23rd, Dr. Beckson told you through

11    me that the state of the apartment reflects the state of

12    Mr. Ruiz' mind.

13          And you just saw the photos of the state of that

14    apartment.  Mr. Ruiz was violent.  He was irrational.  He was

15    destructive.  And he did what you saw to that apartment.

16          If you remember when Mrs. Erickson left the apartment

17    at 4:30 in the morning none of that had occurred.  There was

18    no damage at all to the apartment.

19          Let's listen to Exhibit 43, clip 5, please.

20       (Playing exhibit to the jury.)

21       MR. MASTERSON:  That's one of the witnesses

22    describing Mr. Ruiz smashing the toilet.

23          The state of the apartment reflects the state of

24    Mr. Ruiz' mind.  That is what the officers were faced with.

25          So the officers came up with a plan to get Mr. Ruiz

1    safely off the roof.  He's not responding.  He's in the

2    altered state mentioned by Ruth Downing.  He's in an altered

3    level of consciousness.  And he hasn't even been touched by a

4    police officer yet.

5         So the altered level of consciousness that caused

6    that destruction you just looked at on your screens was not

7    caused by any police officer.  It was not caused by a neck

8    restraint.  It was not caused by strangulation.

9         You can do the equation there.  Was it caused by

10   something the police officers did or was it caused by

11   methamphetamine intoxication?

12        The altered level of consciousness.  He's shirtless

13   on a very hot roof.  He's lying down on that roof.  He's

14   sweating.  He's making no sense.  He's talking in circles.  He

15   brought a bloody piece of the toilet up on the roof.  And

16   let's take a look at that:  Exhibit 34, No. 24, please, and

17   No. 42.

18        So the officers planned to get Mr. Ruiz down.  They

19   want to get him in the bucket.  They want to get him down.

20   They want to get him help.

21        The plan is to get him off the roof safely.  And you

22   were told that if they can't get him to come to the bucket,

23   they can't get him in the bucket, they're going to try to

24   negotiate.  If it fails, they're going to try to tase him and

25   pull him into the bucket.  Lieutenant Hoover approved that

1   plan.

2          We discussed why they can't go on the roof with

3   Mr. Ruiz.  And after what happens on the stairs, I think it's

4   pretty clear why they couldn't go on the roof.  It's fairly

5   obvious what might have happened had they gone on the roof.

6          He's talking in circles.  He's talking nonsense.  He

7   couldn't see.  He's talking gibberish.  He's saying "They're

8   trying to kill me."  He said "They're trying to kill me"

9   before they touched him.  He said "They're trying to kill me"

10  before they fired the taser on the roof.

11         So they can't go on the roof with Mr. Ruiz.  It's too

12  dangerous.  But remember what Sergeant Wesley told you when he

13  testified?  He told you if Mr. Ruiz became medically

14  unresponsive through heat exhaustion or heat stroke or

15  something, they would have gone on the roof.  They would have

16  taken that risk to help Mr. Ruiz in that situation.

17         Now, Mr. Ruiz finally did come over to the bucket.

18  Who knows why.  You're not going to know why.  He's not going

19  to know why.  I'm not going to know why.  But he did.  But he

20  didn't get in the bucket.  The officers told him they were

21  going to have to handcuff him for everybody's safety.  And

22  they took ahold of his wrists and that's when he grabbed

23  Sergeant Wesley's finger and started to twist it.

24         And as Mr. Blackwell just told you, Sergeant Wesley

25  stays calm, tries to negotiate, tries to get Mr. Ruiz in that

```
 1    bucket.  He's calm.  It's his job.  His job is to help

 2    Mr. Ruiz to get him off the roof to get him medical help.

 3            While Mr. Ruiz pulls away and they try the taser, it

 4    didn't work.  He just pulled the probe out.  So they tried

 5    more negotiations.  Now, if you watch the video, you can't

 6    hear what the officers are saying but you can watch them and

 7    you can see their body language.  You're not seeing any wild

 8    gestures.  Not hearing yelling.  You're not hearing orders

 9    shouted.  It's negotiations.  They're trying to get Mr. Ruiz

10    off the roof.  They can't leave him there.

11            If the officers leave?  Well, he's not coming down.

12    Let's go.  And then he dives off the roof.  Here we are with

13    all of you with the plaintiff.  Why didn't you do something?

14    Why did you leave?

15            Or the officers leave and he jumps down from the roof

16    and he hurts somebody.  He kills somebody.

17            MR. BLACKWELL:  Objection, Judge.  Improper argument.

18    I'm sorry.

19            THE COURT:  Overruled.

20            MR. BLACKWELL:  Thank you.

21            MR. MASTERSON:  Here we are.  Here you are.  And a

22    plaintiff sitting at that table.  He killed my daughter.  Why

23    didn't you do anything?

24            MR. BLACKWELL:  Objection, Judge.  Again, improper

25    argument.
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8       6-5-17

1           THE COURT:  Overruled.

2           MR. MASTERSON:  He killed my mom.  Why didn't you do

3   anything?  He was out of his mind on methamphetamine.  He was

4   dangerous.  He was dangerous to himself and he was dangerous

5   to others and you left.  You walked away.  You let him go.

6   You knew he was dangerous.  Why didn't you do something?

7           He's a danger to himself.  He's a danger to others.

8   There's absolutely no question about that.  To say otherwise

9   is wrong.  That would be hogwash.  And now he jumps down off

10  the roof.  He is going to be arrested.  That's going to

11  happen.  Judge Teilborg already ruled there's probable cause

12  to arrest him.  That's not an issue.  He's getting arrested.

13  He's getting handcuffed.  But he jumps down.  He lands on his

14  feet and goes to his butt.  And Officer Camarillo is right

15  there.  And Officer Camarillo told you why he can't let him

16  get up.

17          For one thing, there's an open door.  The screen door

18  is shut, but the front door is open.  Let's take a look at

19  Exhibit 34, page 86, please.  It's kind of difficult to see

20  but you can see the screen door shut there and the front door

21  open.  So who is in that apartment?  Kids?  Maybe.  You can't

22  let Mr. Ruiz go in there.

23          The state of the apartment is the state of his mind.

24  If he goes in there and there's kids, their parents might be

25  sitting right there.  He takes hostages.  There's weapons.  He

1    barricades himself inside.  An altered level of consciousness.

2    Methamphetamine-induced irrational, destructive and violent

3    behavior.  The photos of his apartment reflect the state of

4    his mind.

5            Officer Camarillo knows he has to control him.

6    Officer Camarillo knows he has to get him into custody.  That

7    is the plan.  I'm not sure what other plan there is supposed

8    to be.  You go up the stairs and you hold him down and you put

9    him in handcuffs.  If he needs medical help, you get him

10    medical help.  That's the plan.

11           You heard testimony.  Officer Camarillo said "Stay

12    down."  Mr. Ruiz apparently said "Okay."  But his actions did

13    not show "Okay."

14           And there's something interesting here.  If you

15    remember back during the testimony, the plaintiffs were asking

16    questions and the implication was that, well, Mr. Ruiz is

17    sitting on his butt.  He's no threat.  His hands are up.  He's

18    surrendering.  I guess that's what they're saying.  He just

19    said he's surrendering.

20           He said Sergeant Wesley said he was surrendering.

21    That is absolutely not true.  That is hogwash and he knows it.

22    There was no surrendering.  Hands up.  Don't shoot.  He

23    actually said, "Hands up.  Don't shot.  He's surrendering."

24           That's offensive.  Hands up.  Don't shoot.  He's

25    surrendering.

1          MR. BLACKWELL:  Objection, Judge.  Misstates

2     plaintiff's counsel's statements.

3          THE COURT:  Overruled.

4          MR. BLACKWELL:  Thank you, Judge.

5          MR. MASTERSON:  According to them, when he lands on

6     that landing, he's absolutely no threat.  But by their

7     questions, what did they want Officer Camarillo to do?  They

8     want him to tase Mr. Ruiz.  Tase him at the top of the stairs.

9          If he's absolutely no threat, if he's no danger to

10    himself or others, well, why tase him at the top of the

11    stairs?  Why should that be a part of the plan?  Why should

12    they tase him instead of just holding him down and put him in

13    handcuffs?

14         Officer Camarillo just used soft hand techniques,

15    soft empty hand control.  He grabbed him around the upper body

16    to hold him down and handcuff him.  That is all.

17         If you watch the video, if you want to watch it

18    again, you'll see Officer Camarillo reach up with his right

19    hand and try to grab Mr. Ruiz' wrist to handcuff him, to get

20    him under control.  You'll also hear him say "Don't move."

21    You'll also hear him say "Put your hands behind your back.

22    Put your hands behind your back."

23         They argue to you that he's no threat.  That he says

24    "Okay," that he's surrendering.  And then they say tase him.

25    Well, tasing is a higher level of force than just trying to

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

```
 1    hold him down and handcuff him.  That doesn't even make sense.
 2           So what?  Are they trying to fool you?  Are they
 3    trying to confuse you?
 4           While we're talking about levels of force, let's look
 5    at the policy for a little bit.  Exhibit 117, let's take a
 6    look at pages 1 and 2.  We'll blow that up for you here in a
 7    minute.  And I want to look down at "Response Options."
 8    You'll see:  Officer presence.
 9           And you heard testimony about sometimes when a police
10    officer just shows up in uniform at a scene, I think I used
11    the example two people fighting and a police officer shows up
12    in uniform and people stop.  That's all it takes is the cop
13    there and they stop.
14           Verbal direction:  Telling the person to do
15    something.
16           Soft empty hand control.
17           Chemical weapons.
18           ECD.  The taser.
19           The hard empty hand control such as the knee strike.
20           Impact weapons.
21           Stun bags shotgun and canine.
22           Then the carotid control technique.
23           Well, well first off, you don't have to -- and it was
24    described to you by more than one witness including Captain
25    Meyer.  You don't have to go up a staircase or up a ladder on
```

1    a continuum of force.  You don't have to try officer presence,

2    then verbal direction, then soft empty hand control, then

3    chemical weapons, then the taser, then hard empty hand

4    control, then the carotid, and then deadly force.  You don't

5    have to do that.

6         You do a traffic stop.  You've got officer presence.

7    The person in the car pulls a gun.  You've gone to deadly

8    force in the blink of an eye.  You don't have to try verbal

9    direction.  You don't have to try your taser.  You don't have

10   to try your baton.  You're at deadly force in the blink of an

11   eye.

12        And that's how the response options work.  You don't

13   have to go up a staircase.  You don't have to go up a ladder.

14   You apply what's reasonable under the circumstance.

15        So what happened here?  Officer presence.  There was

16   a lot of police officers.  When Mr. Ruiz was up on the roof he

17   could see police officers everywhere.

18        Verbal direction.  They tried that from the ground.

19   They tried that from the bucket.  That didn't work.  So

20   officer presence didn't work.  Verbal direction didn't work.

21        Up in the bucket they went hands on.  That didn't

22   work.  On the landing after he jumped, Officer Camarillo tried

23   to grab his wrist, soft empty hand control.  That didn't work.

24   Held him down with his left hand.  That didn't work.

25        Chemical weapons.  Not an option.  And you heard why

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8       6-5-17

1    on the roof, no; and on the landing, no.  For a couple

2    reasons.  If he tumbles down the stairs, if you actually get

3    him.  Remember when he first lands, his back is to Officer

4    Camarillo.  Also, if you use your pepper spray, you're going

5    to incapacitate everyone else.  So all those other officers

6    who are in contact with Mr. Ruiz, they get the effect of the

7    pepper spray.  So that's not an option.

8            The taser.  That didn't work.  They tried that on the

9    roof.  He pulled out the probes.  They tried it again on the

10   stairs.  He pulled out the probes.  They tried it in drive

11   stun mode.  It didn't work.

12           Hard empty hand control.  A knee strike.  It didn't

13   work.  Just one.  You don't have to go up that ladder.  You

14   don't have to try every response option on the list but that

15   day they did.  They tried almost every single response option

16   on the list.  It did not work.

17           I want you to look at Exhibit 117, page 5, just for a

18   minute.  And there's no claim in this case about the use of

19   the taser.  None.  Not on the roof.  Not on the stairs.

20   Remember, the lawsuit is only against one police officer and

21   that's Officer Camarillo over there and he never used his

22   taser.

23           So why do I want to look at the policy here?  Well, I

24   want to look at the policy because, apparently, at least

25   according to the questions they're asking witnesses on the

1    stand, they wanted to have Officer Camarillo shoot Mr. Ruiz

2    with his taser when he was at the top of the stairs.

3           So since they say it's okay to shoot him with the

4    taser at the top of the stairs, let's look at the policy.

5           And what we see is ECDs, that's a taser -- may be

6    used when it is objectively reasonable based on the totality

7    of the circumstances on subjects who are displaying active

8    aggression or who are placing an officer or third party in

9    reasonable apprehension of imminent physical injury or to

10   prevent a subject from harming him or herself.

11          So if it's okay to tase him at the top of the stairs,

12   then they're admitting he's actively aggressive or that he's a

13   danger to himself or others.

14          Now, maybe they realized since they asked all those

15   questions that, nah, that's probably not where we want to go

16   here, so let's drop that theory.  Maybe they did.  If they

17   did, Mr. Blackwell will tell you when he gets back up here.

18   But if they didn't, if they really think that he should have

19   been tased at the top of the stairs -- and they sure asked a

20   lot of questions about that -- then they admit Mr. Ruiz is

21   actively aggressive or a danger to himself and others.

22          All right.  Let's talk about the carotid control

23   technique.  Let's look at Exhibit 117, page 12.  Maybe we can

24   blow that up just a little bit.

25          The carotid control technique should only be used on

1   subjects who are using active aggression, aggravated active

2   aggression, or who are a threat to themselves or others.

3          I suppose you can argue about defensive resistance

4   and active aggression and you heard about both of those during

5   trial.  Witnesses described both of those.  But the "or" is in

6   there and it's a big "or."  And again, there's absolutely no

7   doubt, no doubt at all, that Mr. Ruiz was a threat to himself,

8   that Mr. Ruiz was a threat to others.

9          The officers knew he was a threat.  Officer Camarillo

10  knew he was a threat.  Dr. Beckson said he was a threat.

11  Dr. Wetli said he was a threat.  Dr. Vilke said he was a

12  threat.  And Captain Meyer said he was a threat.

13         And if they really want him to be tased at the top of

14  those stairs, then they know that he was a threat.

15         The carotid control technique was appropriate.

16         So when was it applied?  I don't know.  I don't think

17  Officer Camarillo knows.  He knows he tried it.  Back in 2013

18  he said he might have tried it in the middle.  But he tried it

19  in the end.  And now he recalls clearly that he did try it in

20  the end.  But when he tried it -- or even whether it worked --

21  doesn't really matter much.

22         He was asked questions:

23         Did you try it for eight seconds?

24         I don't know.

25         Did you try it for ten seconds?

1           I don't know.

2           Twenty seconds?

3           I don't know.

4           But not two minutes.

5           Now, Mr. Blackwell said, well, would he have said he

6    didn't apply the carotid control technique if there wasn't a

7    video?  Why?  There's nothing wrong with using the carotid

8    control technique.  It's appropriate to use it under the

9    policy.

10          They tried everything else which they don't have to

11   do and it didn't work.  He tried to use the carotid control

12   technique and he still didn't -- doesn't know if it worked.

13   Mr. Ruiz went limp.  But did the carotid control technique

14   work at that point?  Or did the excited delirium stop his

15   heart at that point?

16          I don't know.  Officer Camarillo did not apply the

17   carotid control technique for four to six minutes.  He told

18   you that almost the entire time he was only trying to hold

19   Mr. Ruiz down to get him handcuffed.  He wasn't choking him.

20   He wasn't strangling him.

21          Let's take a look at Exhibit 49, clip 1.

22      (Playing exhibit to the jury.)

23          MR. MASTERSON:  Remember the testimony from

24   Lieutenant Hoover?  That was me reading again.  He looked up

25   and you see him look up.  And he hollers up at Officer

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

```
 1    Camarillo to make sure he's not choking him.  Not choking
 2    Mr. Ruiz.  And Officer Camarillo shows him he's not choking
 3    Mr. Ruiz.
 4            Officer Camarillo testified and told you that he
 5    knows he tried to apply the carotid control technique at the
 6    very end of that struggle.  He was afraid if he lost control,
 7    then Mr. Ruiz gets up and knocks everybody down those stairs;
 8    or even that that railing finally breaks off and everybody
 9    goes over the edge.
10            Let's take a look at Exhibit 34, four more photos I
11    would like to you look at:
12            No. 73, No. 191.  I want you to take a look at the
13    bolt that's holding the railing on there.  No. 192 and No.
14    193.
15            So Officer Camarillo's out of energy.  He's done.
16    And he applies or tries to apply the carotid control
17    technique.  He can't let Mr. Ruiz go.  Sergeant Luebkin told
18    him "Don't let go."  And he tried to apply the carotid control
19    technique for ten to twenty seconds.  And what happened?
20            Mr. Ruiz let up.  And what did Officer Camarillo do
21    then?  Mr. Blackwell, I guess, wanted him to just let go at
22    that point.  He didn't let go.  Well, what did he tell you?
23    When Mr. Ruiz let up, he let up.  That's what he did.
24            And when Mr. Ruiz let up, they got him handcuffed, is
25    what they were trying to do the whole time.  The fight was
```

1    finally over and now they've got to get Mr. Ruiz down the

2    stairs.

3            Everybody is exhausted.  Officer Camarillo is

4    exhausted.  Now, when you saw Mr. Ruiz go down the stairs, his

5    head hit a couple of stairs.  It's not nice to see.  The

6    officers weren't trying to do that.  They were exhausted.

7    Officer Camarillo told you how he was trying his best to hold

8    up.  And it's a bad angle even going down stairs trying to

9    hold somebody's arms, trying not to hurt their shoulders.

10           And you'll notice -- well, you'll notice a couple

11   things.  They didn't grab Mr. Ruiz by the ankles and bam, bam,

12   bam down those stairs.  That never happened.  Watch how hard

13   they're trying to keep his head off those stairs.

14           And watch something else.  Mr. Ruiz' pants come down

15   at a point when he's going down the stairs.  And it's a small

16   thing.  It's a very small thing.  But one of the officers

17   reaches up and pulls his pants back up.  Why?  To preserve his

18   dignity.  So the guy is not coming down the stairs in front of

19   all the neighbors with his pants down.  They weren't trying to

20   hurt him.  They were trying to help him.

21           We have to talk about this theory; checking his

22   pulse.  They want Officer Camarillo to check his pulse.  And,

23   of course, it has to be Officer Camarillo.  It can't be anyone

24   else because Officer Camarillo is the one they sued.  Officer

25   Camarillo is the one that's sitting here in the courtroom.

1   And they want Officer Camarillo to check Mr. Ruiz' pulse.

2           Okay.  Well, let's think through that.  The fight is

3   over.  He's in handcuffs.  Carotid control technique was

4   applied.  Check the pulse.  I guess I better check it.

5   (Indicating)

6           Hey, paramedics, he's got no pulse.

7           Well, don't stand up there.  Bring him down here.

8   (Indicating)

9           Bring him down here so the people who are trained can

10  help him.

11          Now, I guess the paramedics could have come up.  They

12  didn't.  They're not getting sued.  But what are they going to

13  do?  If the paramedics are going to come up, all the officers

14  have to go down first.  And then the paramedics come up with

15  all their equipment.  You just looked at the photos.  How much

16  room is up there?

17          This doesn't make sense.  Check his pulse.  Officer

18  Camarillo, check his pulse.  No.  No.  Take him to the guys at

19  the bottom of the stairs who know how to treat people, take

20  him to the paramedics.

21          So why is that theory presented to you?  Confuse you?

22  Trick you?  Find you something that Officer Camarillo did

23  wrong?

24          Let's talk about the video.  You watched the video

25  and the plaintiff's lawyer showed you the video quite a number

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

1    of times.  And they showed you an awful lot of freeze frames.

2    And wouldn't it be nice if we could all sometimes stop life in

3    a freeze frame?  Wouldn't it be nice if police officers could

4    stop a violent fight in a freeze frame?

5             But we can't and they can't.

6             They're in the fight and they can't stop it while

7    they deliberate on what to do next.

8             You are in a different position.  You are in a

9    different position than Officer Camarillo.  We're in a nice

10   quiet courtroom, got air conditioning.  You got to listen to

11   all the witnesses up there on the stand.  You got to look at

12   videos.  You got to look at a stack of photos, 328 if you want

13   to.  You got to look at policies.  You got to look at other

14   exhibits.  You get to take notes.  Some of you are taking

15   notes right now.

16            And then how many days have we been here?  What?

17   Seems like forever.  Eight days maybe that you heard evidence?

18            After all that, you get to go back there.  Quiet

19   room.  Air conditioned.  You can look at the videos again if

20   you want.  You can look at the photos.  You can look at the

21   exhibits.  You can look at your notes.  You can talk to each

22   other.  You discuss this case and the evidence as long as you

23   want; as long as you want before you have to make a decision.

24            You get to deliberate.  And during your deliberation,

25   not a one of you is going to be fighting somebody in a

1    methamphetamine-induced psychosis while you deliberate and

2    decide whether Officer Camarillo did something wrong.

3          Police officers can't do that.  They can't freeze

4    frame.  They can't listen to witnesses.  They can't look at

5    exhibits.  They have to deal with violent, dangerous

6    situations every day and they've got to deal with them right

7    now.

8          You get to take as long as you want to decide if

9    Officer Camarillo did something wrong in the seconds and

10   minutes of a very violent struggle.  He could not do that.

11   And the Judge is going to give you an instruction on that and

12   Mr. Blackwell read a lot of it.

13         I'm not going to read a lot of it.  I'm going to read

14   just one part.

15         "You must judge the reasonableness of a particular

16   use of force from the perspective of a reasonable officer on

17   the scene and not with the 20/20 vision of hindsight."

18         20/20 vision is hindsight.  It's nice.  Armchair

19   quarterbacking.  That's nice too.  It's easy.  So we can't use

20   20/20 hindsight to decide what happened, maybe what should

21   have happened but we can hear a little bit about what

22   happened.

23         During the violent struggle, Mr. Ruiz is resisting

24   arrest.  Mr. Ruiz is fighting the police officers.  If he

25   stops resisting, if he stops fighting, it's over.  It's done.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

 1   He's handcuffed.  He gets help.  But he doesn't do that.

 2          So let's listen to Exhibit 47, clip 1.

 3      (Playing exhibit to the jury.)

 4          MR. MASTERSON:  Stop resisting.  Stop and we will

 5   stop.  Stop and we will stop.  Just relax and we'll stop.

 6          Mr. Blackwell mentioned this just briefly in his

 7   opening statement.  He told you maybe you'll hear a curse word

 8   and maybe it came from Michael Ruiz.

 9          Let's hear it one more time, please.

10      (Playing exhibit to the jury.)

11          MR. MASTERSON:  Stop resisting.  Stop and we will

12   stop.  Stop and we will stop.  Just relax and we'll stop.

13          "Fuck you."

14          Yeah, it was a curse word all right.  And it was from

15   Mr. Ruiz all right.

16          That is someone who's violently fighting police

17   officers.  That is not a primal instinct.  That is not someone

18   fighting to breath.  That is someone blasted out of his mind

19   on methamphetamine and resisting arrest, violently fighting

20   police officers.  He's not stopping.  He's not relaxing.

21          "Fuck you."

22          He's going to keep fighting.  He's not surrendering.

23   He's not giving up.  He's violently resisting arrest.  He's

24   violently resisting those police officers for the entire time.

25   He's not fighting for his life.  He's not fighting to breath.

1    He's not fighting because he's being choked.  He's fighting

2    because he's on methamphetamine.

3              I want to talk about the experts just for a little

4    bit, not much.  You all heard them and their testimony was

5    plenty long enough.  So let's just talk about a few things and

6    let's start with Ruth Downing.

7              She reviewed four things.  First off, she reviewed

8    enhanced and altered photographs where the colors had been

9    changed.  Remember her talking about blue faces?  Yeah,

10   altered photographs.  She was given altered photographs where

11   the colors had been changed.

12             She looked at some videos but not the Segundo video.

13   Well, she didn't list it in her report Exhibit 49, but she

14   said, well, maybe I watched it months or maybe even a year

15   before I prepared my report.  A year before she wrote her

16   report maybe she reviewed Exhibit 49.

17             She looked at the Medical Examiner's report and she

18   looked at the autopsy photos.  That's all.  She never reviewed

19   the statements of the police officers.  She never reviewed the

20   deposition of Officer Camarillo.  She never even reviewed the

21   medical records from St. Joseph's Hospital.

22             Remember, she talked about altered level of

23   consciousness?  I talked about it at the beginning.  She said

24   strangulation injuries may cause an altered level of

25   consciousness.  Now, I mentioned that earlier when I was

1    talking about the equation.

2          She did not mention that methamphetamine.  She didn't

3    want to talk about methamphetamine.  But I talked to her about

4    methamphetamine and she admitted that methamphetamine

5    intoxication can cause an altered level of consciousness.

6          And what was the equation we talked about at the very

7    beginning?  What is methamphetamine plus the human body?

8          According to Ruth Downing, it's mental status changes

9    plus confusion plus anxiety plus panic equals coma and death.

10          Then she told you the chokehold lasted four minutes

11    and appeared continuous.  But at the same time she said, well,

12    there was clearly a struggle and it was hard to maintain a

13    constant pressure.

14          So first it appeared continuous to her and then it's

15    hard to maintain a constant pressure.  Well, "continuous"

16    equals "constant."  That's not exactly an equation, but they

17    mean the same thing.

18          Now, I got out my dictionary with her.  I'm not going

19    to -- well, not yet.  I'm not going to bring it out for you

20    quite yet to talk about "continuous" and "constant" because

21    they mean the same thing.

22          So she wants to say it's continuous but not constant?

23    What is she trying to tell you?  Interestingly, she reached

24    all of her conclusions, I guess, or what seemed to be her

25    opinions from watching videos.

1          Yet another of plaintiff's witnesses, Dr. Poulos, the

2    Medical Examiner, you know, the guy that Mr. Blackwell told

3    you is objective?  The guy that apparently he really, really,

4    really wants you to believe.  Well, he said you cannot tell

5    how long a neck restraint was held by watching videos.  And

6    that's a trained Medical Examiner whose specialty is to

7    determine cause of injuries.

8          He says you can't tell by watching videos.  Ruth

9    Downing tries to say she can but she admits there's no way she

10   can identify pressure or direction of pressure in videos.  And

11   she can't.  You just can't.

12         So let's get to when I did bring out the

13   dictionary -- excuse me -- with Ms. Downing.  She said that

14   the four things she reviewed, including the altered photos,

15   showed that -- and I'm quoting her here:

16         "This could potentially result in the anoxic brain

17   injury as described in the Medical Examiner's report."

18         "Potentially."  That's her word.  Not mine.  That's

19   her word in her report and that's her word sitting right up

20   there talking to you.  And I talked with her about how

21   important the choice of words is when you're an expert

22   witness, writing reports, and talking to juries.

23         So that's when I cracked out the dictionary.  What's

24   "potential" mean, Ms. Downing?

25         It means:  Possible as opposed to actual.

1          Possible as opposed to actual.

2          Here in this lawsuit in this courtroom in your jury

3    room we deal with the actual.  What actually happened?  What

4    really happened?  Not potentially.  Not possible as opposed to

5    actual.

6           Mr. Blackwell read to you from one of the jury

7    instructions that the Judge is going to read to you and it's

8    the causation instruction.

9          And it talks about causation-in-fact and proximate

10   cause.  And I'm not going to read the whole thing, although

11   it's pretty short.  I'm still just going to read a couple of

12   paragraphs just because there's the one you really need to

13   focus on.

14          "An act is causation-in-fact if decedent's injuries

15   would not have occurred without that act."

16          Would not have occurred without that act.  That's

17   causation-in-fact.  And you have to have both of these.  You

18   have to have causation-in-fact and proximate cause.

19          "Additionally, an act is a proximate cause if it was

20   a substantial factor in bringing about or actually causing

21   injuries..."

22          So Ruth Downing, she's their only witness on

23   causation.  The only one.  And what did she say?  Potentially.

24   Possible.  Not actual.

25          An act is causation-in-fact if decedent's injuries

 1    would not have occurred without that act.

 2         What did Dr. Poulos tell you, the witness that

 3    Mr. Blackwell says is objective?  That Mr. Ruiz had enough

 4    methamphetamine onboard to kill him outright without any

 5    involvement by police officers at all.

 6            There's no evidence at all that Mr. Ruiz' injuries,

 7    Mr. Ruiz' death would not have occurred without an act by

 8    Officer Camarillo.  There's no evidence at all, no proximate

 9    cause that any act by Officer Camarillo was a substantial

10    factor in bringing about or actually causing injuries.

11         Ruth Downing, their only witness:  Possible.  Not

12    actual.

13         "Potentially," "possibly," not "actually" also

14    doesn't meet the burden of proof.  That's another instruction

15    Mr. Blackwell read to you.

16         "When a party has the burden of proving any claim by

17    a preponderance of the evidence, it means that you must be

18    persuaded by the evidence that the claim is more probably true

19    than not true."

20         And again, Ruth Downing is their only witness.  And

21    the best that she has to tell you is "potential."

22    "Potentially."  "Possibly" not "actually."  "Possible" not

23    "actual."

24         "Possible" isn't more probably true than not true.

25         You know, it's not a very big deal, but I also talked

1    to Ms. Downing about subconjunctival hemorrhage in one eye.

2    And apparently, she thought this was some indicator of

3    strangulation.  But she then admitted when I visited with her

4    a little bit that a subconjunctival hemorrhage, that's the red

5    in one eye, is most commonly caused by coughing, sneezing or

6    straining.

7          Ruth Downing apparently wanted you to believe things

8    that aren't real and that aren't actual.  So let's talk about

9    the actual.  Let's talk about the real.

10         Dr. Beckson, a board certified forensic

11   psychiatrist -- and I mentioned this earlier this morning --

12   the state of the apartment reflects the state of Mr. Ruiz'

13   mind.

14         Mr. Blackwell just told you the person on the roof

15   was not violent.  Really?  You saw the photographs of the

16   apartment.  Not violent?

17         Irrational, violent destruction, super strength,

18   super pain resistance, classic symptoms of methamphetamine.

19   Dr. Beckson testified that Mr. Ruiz was psychotic the whole

20   time, that he was a danger to himself and others.

21         Now, what did Dr. Poulos say again, the favorite

22   witness, the objective witness, the Medical Examiner?

23         The level of methamphetamine in Mr. Ruiz' system

24   could have caused his death all by itself.

25         What else did he say?

1          No evidence of external injuries to the carotid

2     arteries.

3          Mr. Blackwell asked him several questions about why

4     he didn't dissect the carotid arteries.  Well, because there

5     was no external evidence of injury.  If there were an injury,

6     it would have shown externally.  There was no evidence of

7     external injury to the carotid arteries.  There was no

8     hemorrhage to the Adam's apple area.  There was no hemorrhage

9     in the airway.  There were no problems with the airway.

10         He actually opened up the airway.  He dissected it.

11    He looked at it.  He examined the neck layer by layer and

12    there was no damage to the airway.

13         And there was no hyoid bone fracture.  He told you

14    the hyoid bone is commonly fractured in people who are

15    strangled.  No hyoid bone fracture here.  The objective

16    witness.  No injury to the airway.  No injury to the Adam's

17    apple.  No external injury to the carotid arteries.

18         And Dr. Poulos told you that the case was subject to

19    extra scrutiny because there was a police officer involved.

20    He told you that if somebody is using excessive force, we want

21    to find it.  We don't have a dog in the fight.  But the extra

22    scrutiny protects all involved.  It protects the public and it

23    protects the officer.

24         Dr. Wetli, board certified forensic pathologist,

25    signs of excited delirium:  Bizarre behavior, unexpected

1    strength, endurance, elevated core body temperature,

2    destructive behavior.

3            Another equation?  I asked him what do those add up

4    to?  The answer:  Excited delirium.

5            The elevated core body temperature, the blood pH of

6    6.8 was a harbinger of death.  I asked Dr. Wetli what caused

7    the death of Michael Ruiz.

8            The answer:  Methamphetamine-induced excited

9    delirium.

10           I asked him did anything Officer Camarillo or any

11   other police officer did on July 28, 2013, cause or in any way

12   contribute to the death of Michael Ruiz?

13           Answer:  No.

14           Dr. Vilke, board certified in emergency medicine, you

15   heard him most recently.  He talked about the fractured cornu.

16   We learned there is not much force to fracture a cornu.  Same

17   thing said by their witness Dr. Poulos.  He said he talked to

18   a forensic anthropologist who told him there was very little

19   force necessary to fracture the cornu.

20           And what else?  Not much force to fracture the hyoid

21   bone.  And the hyoid bone is commonly fractured in

22   strangulation.  And you know Mr. Ruiz' hyoid bone was not

23   fractured.  Dr. Poulos told you that.  Dr. Vilke told you

24   that.  There was not even any swelling in the area of the

25   hyoid bone.

1          The equation:  Excited delirium, super strength, hot

2    core body temperature, sweaty, fatigue-less, endurance, pain

3    tolerance, and uncontrollability.  The equation adds up.  It

4    equals excited delirium syndrome.  Mr. Ruiz was a textbook

5    case of excited delirium.

6          The core body temperature was 101 one hour after this

7    incident.  The core body temperature was not caused by a neck

8    hold.  That is excited delirium.  The elevated core body

9    temperature was not caused by a neck hold.  Not caused by

10   anything Officer Camarillo did.  And Dr. Vilke also told you

11   it doesn't matter how many times you try to apply a carotid

12   hold if you're not successful.

13         Mr. Blackwell is trying to distort the Phoenix policy

14   and Captain Meyer also told you about that.  You can try to

15   apply the carotid hold more than once.  If you're successful,

16   don't do it again.  If the person actually goes unconscious,

17   don't do it again.

18         That's what can cause -- can cause damage.  Here it

19   didn't happen.  If there was a carotid hold applied in the

20   middle sometime, it didn't work.  He didn't go unconscious.

21   You can try again.

22         Medically, it's not going to hurt you.  Dr. Vilke

23   told you that.  And the policy doesn't prohibit it.  Captain

24   Meyer told you that.

25         Dr. Vilke told you the ones that go into cardiac

1    arrest and die are those with elevated core body temperature

2    and that is not caused by a neck hold, no matter how many

3    times you try it.

4              Mr. Ruiz' death was caused by methamphetamine-induced

5    cardiac arrest.

6              Captain Greg Meyer:  Did Officer Camarillo's actions

7    and use of force comply with the standard of care, police

8    policy and training standards for law enforcement officers?

9              Answer:  Yes.

10             Question:  Using all of your experience and knowledge

11   as a police officer, a Captain and a trainer in the use of

12   force, did Officer Camarillo do anything wrong in trying to

13   hold Mr. Ruiz down and take him into custody?

14             Answer:  No.

15             Captain Meyer told you that Officer Camarillo

16   complied with the City of Phoenix Police Department policies.

17   You can try a carotid control technique more than once if it

18   doesn't work.

19             Plaintiffs had no police expert tell you anything

20   different.  Nobody.  Why?  Because it wouldn't be true?

21   There's a good reason.

22             You may hear, well, they cost a lot of money; and

23   they do cost a lot of money.  You heard testimony on that.

24   But when you're asking for $7 million, you can afford it.  But

25   maybe no credible police expert would testify differently

1    because it would not be true.

2              Mr. Blackwell talked about some other witnesses

3    right at the end of his closing.  And I guess he doesn't like

4    them much.  He says they're not trained in the law which is

5    probably a good thing.  These are people who were there.

6    People who don't have any interest in this lawsuit.  They're

7    not here asking for money.  They're not looking back with

8    20/20 hindsight.  They were there.  They watched it live.

9    They didn't watch freeze frames.  And they even knew Michael

10   Ruiz.  And what did they say?

11             Exhibit 43, clip 2.

12        (Playing exhibit to the jury.)

13        MR. MASTERSON:  Exhibit 49, clip 6.

14        (Playing exhibit to the jury.)

15        MR. MASTERSON:  Exhibit 43, clip 9.

16        (Playing exhibit to the jury.)

17        MR. MASTERSON:  What did they say?

18        He's gonna put up a fight.

19        He's not giving up.

20        That's on him.

21        They warned him.

22        He put up a fight.

23        They had the right to do that.

24             And why did they say all that?  Why did they say that

25   after they watched this whole thing happen live?  They're not

1    trained in the law, that's true.  They're not police officers.

2    That's true too.

3            Why did they say those things after everything they

4    watched live up close and in person?

5            Because they added up the equation.  They added up

6    the equation of accountability.  And who did they find

7    accountable?

8            He is going to put up a fight.

9            He's not giving up.

10           That's on him.

11           They warned him.

12           He put up a fight.

13           They had the right to do that.

14           They watched it happen.  They watched every bit of

15   this happen.  And they knew who was accountable.

16           I want to show you part of one more jury instruction

17   and Mr. Blackwell read -- I forget how much he read of this

18   one -- but I'm just going to single out a little portion for

19   you.  He told you --

20           And this isn't a checklist when you go through these

21   instructions, and particularly, this one.  It lists the nine

22   things Mr. Blackwell talked about.  You don't have to check

23   off every one.  You need to look at them all.  You need to

24   consider them all.

25           Mr. Blackwell told you you could consider one.  You

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

1   can consider some.  You can consider all.  You can do what you

2   want.  You've got to apply the law that the Judge tells you to

3   apply.  But I want you to take a look at No. 7 here on this

4   one instruction because it tells you one thing you need to

5   consider is the parties' relative culpability; that is, which

6   party created the dangerous situation and which party is more

7   innocent?

8           Equation of accountability.

9           He's gonna put up a fight.

10          He's not giving up.

11          That's on him.

12          They warned him.

13          He put up a fight.

14          They had the right to do that.

15          Who should be accountable here?  When you add it all

16  up in this case, when you add up that equation, who is the one

17  that should be accountable?  Who is the person who created the

18  dangerous situation?  Who is the person that took enough meth

19  to kill himself?  Who engaged in methamphetamine-induced

20  psychotic behavior?  Who violently destroyed his apartment?

21  Who violently resisted arrest?  Who did not stop resisting

22  when told?  Who did not relax and stop resisting?  Who said,

23  "Fuck you.  I'm going to fight"?

24          That's on him.

25          They had the right to do that.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

```
 1          The equation of accountability.
 2          Being a police officer is a difficult job.
 3   Mr. Blackwell recognizes it's a difficult job.  It's a
 4   dangerous job.  You put on a bulletproof vest to go to work.
 5          How many people put on bulletproof vests to go to
 6   work?  You go to work to help people.  You go to work to
 7   protect people.  And sometimes bad things happen, things that
 8   nobody wants to happen, but police officers can't just walk
 9   away because bad things might happen.  If police officers walk
10   away, worse things can happen.
11          Nobody wanted Mr. Ruiz to get hurt.  Nobody wanted
12   Mr. Ruiz to die.  Officer Camarillo did not want to hurt
13   Mr. Ruiz.  Officer Camarillo did not want Mr. Ruiz to die.
14          But Officer Camarillo did nothing wrong.  Officer
15   Camarillo did not cause the death of Michael Ruiz.  And not a
16   single witness, not a single one told you that Officer
17   Camarillo caused the death of Mr. Ruiz, not even Ruth Downing,
18   not even possible but not actual.
19          Consider the evidence, the real evidence, what really
20   happened.  And I ask you to find in favor of Officer
21   Camarillo.  Not to award damages.  Not to award $7 million.
22   And not to award one dollar.  Not to award any damages at all.
23          And that may sound harsh.  Mr. Blackwell tried
24   something a little crafty.  He said you can't take
25   Mrs. Erickson's tears away.  And you can't.  And I'm truly
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

1   sorry for her loss and so is Officer Camarillo.

2           MR. BLACKWELL:  Objection.  Objection.  That's facts

3   not in evidence.

4           THE COURT:  Overruled.

5           MR. MASTERSON:  One important thing to know here,

6   Mrs. Erickson is not the plaintiff.  Mrs. Erickson is not

7   seeking damages.  Mrs. Erickson doesn't get damages.  It's

8   only the Estate of Michael Ruiz, the only plaintiff.

9           And I'm asking you in the lawsuit by the Estate of

10  Michael Ruiz against Officer Camarillo to find in favor of

11  Officer Camarillo, not to award damages, not to award even one

12  dollar, and not to award punitive damages.

13          I'm asking each one of you and all of you to find in

14  favor of Officer Camarillo.  Tell him by your verdict that

15  he's a good cop.  Tell him by your verdict that he didn't kill

16  anybody.

17          Thank you.

18          THE COURT:  All right.  Ladies and gentlemen, we will

19  be in recess for lunch until 1:15.

20          Remember the admonition.

21      (Recess taken at 12:11 p.m.; resumed at 1:18 p.m.)

22          THE COURT:  Thank you.  Please be seated.  The record

23  will reflect the presence of the parties and counsel, ladies

24  and gentlemen of the jury.

25          And, Mr. Blackwell, you may make a rebuttal argument.

1    REBUTTAL CLOSING ARGUMENT:  PLAINTIFF

2              MR. BLACKWELL:  Thank you very much, Your Honor.

3         Ladies and gentlemen, if you don't have knowledge of

4    your training, you should be held accountable.

5              Now, I sat here and listened to Mr. Masterson and his

6    argument and I kept thinking back to the original argument

7    made by Mr. Popolizio.  And I apologize if I didn't say his

8    name correctly, Joe's name correctly.

9         He told us in the opening that Officer Camarillo

10   actually used the technique.  I mean, that's what he said.  I

11   don't know if you were taking notes or making mental

12   notations, but I wrote it down.

13        Now, John gets up here, Mr. Masterson gets up here

14   and says I don't know if he used it at all.  I think it was

15   one of the first things he said when he addressed you with his

16   closing argument.

17        Which one is it?  Well, if you don't have the video,

18   I guess maybe, like I said earlier, Officer Camarillo would

19   say I never attempted to use it.  That's what he would say

20   because that's what he said initially.  He said that to

21   Detective Champion.  The first thing he said.  I never

22   attempted to use it.

23        You can't take that away.  I can't make it up because

24   that's what he actually said.  And we can't forget that.

25        I guess they want you to blame Michael Ruiz.  He's to

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

1   blame.  He's the one that put Officer Camarillo's arm around

2   his neck.  That must be it.  Clearly, that can't be the case

3   because that didn't happen.  It didn't happen that way.

4   Officer Camarillo chose to put his arm around his neck.

5           He's reluctant to tell you that he did so.  He always

6   said in his neck/shoulder area.  Never wanted to say it.

7   Never wanted to say his arm was around his neck.  You all

8   watch the video and you can see that.

9           Why is that?  When an individual calls the police for

10  help and their loved one, their family member, their friend,

11  or their neighbor is in distress, it could be based on some

12  mental issue.  It could be based on the fact they used some

13  type of drug, legal or illegal.  When the police come, the

14  person who called does not expect the person that needs help

15  to die as a result of police contact.

16          We wouldn't call the police.  But based on what

17  Mr. Masterson said, remember, he played the little clip of the

18  people out there, the would-be watchers, the civilians.  And

19  what did the guy say?  He got what he deserved.

20          So Mr. Masterson wants you to believe and Officer

21  Camarillo who was inconsistent about what actually happened

22  wants you to believe that Mr. Michael Ruiz got what he

23  deserved based on what civilians said.

24          You know what he didn't play for you in that clip?

25  Was the other individual next to the person taking the video

1   footage when he says:  I think he's dead.  And then the guy

2   says:  He got what he deserved.

3           Now, ladies and gentlemen, you know what, if you

4   believe without any evidence that Michael Ruiz got what he

5   deserved, then you're not following your own oath that you

6   took because you took an oath to be fair and impartial.

7           If you believe based on the evidence that's been

8   presented to you that Officer Camarillo didn't put his arm

9   around Michael Ruiz' neck and he didn't squeeze his neck based

10  on the evidence, then you can't find that he's responsible for

11  any of the injuries Michael received on July 28, 2013.

12          Because the evidence dictates that Officer Camarillo

13  didn't use any type of neck restraint and the evidence that

14  you have before you presents that Officer Camarillo didn't

15  squeeze his neck and the evidence before you presents

16  information that Mr. Michael Ruiz didn't have any neck

17  injuries, you cannot hold Officer Camarillo accountable.  You

18  can't say he's responsible.

19          But that's not the case we have.  The case we have

20  before you today, since July 28, 2013, was that Officer

21  Camarillo actually used the carotid control technique.

22          Not once, but a number of times.  And Officer

23  Camarillo didn't know his training because he told you.

24  That's the evidence.  And the evidence is that Mr. Michael

25  Ruiz was injured.  All of the experts said that.  Ms. Downing

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8        6-5-17

1    said it.  Dr. Poulos said it.  Dr. Wetli said it.  Dr. Vilke

2    said it.  Captain Meyer said it.

3           Now, the burden is a preponderance of the evidence,

4    more probably true than not.  So when you think about it, is

5    it more probably true that Officer Camarillo had his arm

6    around his -- had his arm around Michael Ruiz' neck?  Yes.

7    It's more probably true than not.

8           Is it more probably true that when Michael was --

9    when his neck was being squeezed by Officer Camarillo, he was

10   injured?  More probably true than not because he was injured.

11          When Mr. Masterson was speaking to you, did he give

12   you any evidence?  Present any evidence that Michael Ruiz

13   wasn't injured?  No.  He didn't because he couldn't.

14          What he talked about was there's no evidence that

15   anything Officer Camarillo did caused Michael's death.  And

16   the instruction you have before you talks about acts and/or

17   omissions.  Acts and omissions.

18          When -- oh, when Mr. Masterson presented the

19   Operations Order, right, as it pertains to the carotid control

20   technique, did he ever show you the area where it says you're

21   not supposed to do it more than once?  No.

22          Did he ever show you where it says you can apply it,

23   attempt to apply it more than once if you want?  No.

24          Did he show you where it says in the Operations Order

25   for the carotid control technique do it any way you want, just

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8        6-5-17

1    get it done?  No.

2            The Operations Order is there for a reason because

3    you have to follow it.  If not followed properly, somebody

4    would be injured, somebody can die.  So we'll show Exhibit

5    117, paragraph 4, subsection G says that:

6            Employees will not use the technique more than once

7    on the same subject because of the possibility of progressive

8    physical injury.

9            The subject will remain handcuffed or restrained as

10   necessary to avoid subsequent applications of the carotid

11   control technique.

12           Employees will not restrain subjects who have had the

13   carotid control technique applied when their legs -- with

14   their legs behind their back, and in parenthesis, hogtied.

15           Now, in that paragraph and when you look at it

16   yourself when you're back there deliberating on this case, you

17   will not see any statements in the training manual as it

18   pertains to using the carotid control technique where it says

19   "attempted application," "apply it any way you want to" or

20   "apply it as many times as you can to render the subject

21   unconscious."  It doesn't say that.  It doesn't.

22           I'm not making it up.  It's there for you to read.

23           And the notion that we needed to hire an expert

24   witness on the use of force to show you that the training

25   document for uses of force for the carotid control technique

 1    dictates that you can't use it more than once would be a waste

 2    of time and resources.  Each and every one of you can read.

 3    All of us can.  And the document speaks for itself.

 4            I can't make that up.

 5            Post-use care:

 6            If a subject is rendered unconscious as a result of

 7    the application of this technique, employees will comply with

 8    the following:

 9            The first asterisk says:

10            Immediately handcuff the subject.  Roll the suspect

11    onto their side and check for vital signs.  Recovery time will

12    vary but usually takes 20 to 30 seconds.  Paramedics will be

13    summoned to the scene immediately in all cases.  If

14    cardiopulmonary resuscitation, CPR, is necessary, officers

15    will remove the handcuffs immediately.

16            Acts or omissions.

17            Now, Mr. Masterson wants you to believe that, I

18    guess, based on evidence you have never ever heard that

19    paramedics were right at the bottom of the stairs.  EMS.

20    There was firemen.  They were there.  All right.  And did any

21    paramedic, based on anything you have seen or heard, yell up

22    "Bring him downstairs"?  It never happened.

23            Oh.  Did Officer Camarillo yell down, "He doesn't

24    have a pulse"?  No, because it didn't happen.

25            Did Officer Camarillo roll him over and check for his

 1   pulse?  No.  It didn't happen.

 2          Now, the issue is if they check for his pulse,

 3   Officer Camarillo that is, and he found that there was no

 4   pulse at all, what was he supposed to do?  Well, the

 5   Operations Order, immediately call paramedics.  Where were

 6   they at?  They were either with the fire people, the firemen

 7   that were downstairs or in the ambulance.

 8          Dr. Wetli told you that he wasn't resuscitated for at

 9   least eight minutes after he was brought downstairs and it

10   took two minutes to bring him down.

11          Anoxic brain injury took place between the time

12   they -- the time Officer Camarillo choked him out until the

13   time they resuscitated him.  Eight to ten minutes in the hot

14   Arizona sun.  Your brain cannot come back without oxygen.  Not

15   in Arizona.

16          Carotid control technique, subsection E:

17          No other type of neck restraint hold is authorized

18   outside of the carotid control technique.

19          Now, if Officer Camarillo is telling you and you

20   believe that he was holding his neck and holding him down,

21   then that's not a proper neck restraint based on his own

22   training.  Officer Camarillo is telling you that, well, I did

23   apply the CCT and I applied it more than once or tried to

24   apply it.  Again, outside of his training.  He did not follow

25   his training.  He didn't.

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8        6-5-17

1              Now, it didn't surprise me that Mr. Masterson would

2     attempt to use the theory of the case, the plaintiff's theory

3     of the case, in his argument because in this particular case,

4     how do you hold Officer Camarillo accountable if you

5     believe -- believe now -- without any evidence -- he didn't do

6     anything wrong?

7              The defense has to point to other stuff.  They had

8     to.  They have to say don't look at Officer Camarillo because

9     he did what he was supposed to do.  He did.  That's what they

10    want you to believe.  He went there.  He was called.  He was

11    summoned to protect and serve.  And something horrible

12    happened, somebody died, but it wasn't his fault.

13             Well, if Officer Camarillo told you that he actually

14    knew how to use the technique back on July 28, 2013 and I

15    applied it properly and I applied it correctly, that would be

16    a whole different subject, a whole different defense.

17             His defense is:  I didn't apply it.  Well, then maybe

18    I applied it twice.  Well, maybe I only applied it once.

19    Well, maybe I did apply it but I applied it at the end.  And

20    now in their close they're saying I don't know if he ever

21    applied it.

22             That in and of itself makes no sense.

23             So when I use the term "hogwash," it's befitting of

24    their defense.  I am not asking you to punish Officer

25    Camarillo for what he did prior to July 28, 2013.

1          I'm not asking you to punish Officer Camarillo for

2     what he did after July 28, 2013.

3          Officer Camarillo, he made a mistake, ladies and

4     gentlemen.  His mistake was he used a technique without having

5     the proper knowledge.  Not that he wasn't trained.  He was

6     trained to use it.  But he didn't remember his training.  He

7     told you himself, the classroom stuff, ah, I don't recall.

8     Hands-on driving, the fun stuff, all day, I know it, all day,

9     like the back of my hand.

10         Ladies and gentlemen, when you -- we hope that you

11    look at the video again for yourselves.  I know we've played

12    it several times.  The defense, ah, they played it a few times

13    maybe.  You know, clips from their perspective.

14         Ask yourselves why didn't they show you on the roof

15    where Mr. Ruiz was acting wild, aggressive, violent.  When

16    they were up there, when Mr. Camarillo -- when Officer

17    Camarillo was testifying when they had the videos at their

18    disposal, did they ever, ever show you in any clip while

19    Mr. Ruiz was on the roof where he was acting violent towards

20    anybody on the roof?  No.  Because it didn't happen.

21         And on the second-floor landing, what they don't want

22    you to consider -- what they don't want you to remember, I'm

23    sorry, is that Officer Camarillo said himself when he was

24    speaking to PSB, the Professional Standards Bureau for the

25    City of Phoenix Police Department, that the officers could not

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

1   get Mr. Ruiz' hands behind his back because Officer Camarillo

2   was in the way.

3          That's what he said.  And I asked him about it.  He

4   agreed that that's what he told PSB on the day of the

5   incident.  He told PSB on the day of the incident when his

6   memory was fresh about what happened, that Michael couldn't

7   comply because Officer Camarillo was in the way.  Officer

8   Camarillo was in the way.

9          He -- Mr. Ruiz could not put his arms behind his

10  back.  Officer Camarillo told you that.  Not me.  I didn't

11  make it up.  It came from Officer Camarillo's mouth in trial

12  in front of you.

13         Ladies and gentlemen, they want you to believe that

14  Mr. Ruiz was fighting with the police, an out-and-out brawl

15  with the police.  You watched the videos.  Was he resisting?

16  He was.  It would be ignorant for me to sit here and say

17  Mr. Ruiz wasn't resisting.  But was he resisting the arrest or

18  was he resisting death?

19         Every one of us has that primal instinct to live.  It

20  doesn't just stop because the police has their hands on you.

21         Mr. Ruiz, what he did not do is punch at Officer

22  Camarillo, punch at Sergeant Luebkin, punch at Officer

23  Hessner, punch at Officer Schmidt, punch at Sergeant Wesley,

24  punch at Officer Linn.

25         Dr. Wetli told you that the officer in the -- in the

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

1      police report stated that he didn't believe Michael Ruiz was

2      even kicking at him.  He was moving his legs because he --

3      because of the fact that he was being tased.

4              They want you to believe that if Officer Camarillo

5      would have let him go while he had his arm around his neck

6      something terrible would have happened.  But officers had him.

7      And if he had that superhuman strength they mentioned, at any

8      moment in time while they had him, he could have kicked them

9      down the stairs.  He could have thrown them down the stairs

10     with handcuffs around his wrists.  It never, ever happened.

11     He never tried to do that.  There's nothing in the video that

12     shows Michael actively being aggressive and fighting the

13     police.

14             And in that statement that -- the statement that

15     Mr. Masterson provided to you during his close, cursing out

16     the police, it doesn't equate to the use or the excused use of

17     unreasonable and excessive force.  These officers get cursed

18     out all the time.

19             And in the colloquy, the conversation between

20     Sergeant Luebkin and Mr. Ruiz, listen to it.  Listen to it

21     yourself.  At one point in time it sounds like Sergeant

22     Luebkin says "I know" when Michael was saying "He's killing

23     me."  He's not saying "They're killing me."  "He's killing

24     me."

25             He's telling the officers around him that are

1   supposed to protect and serve, the guy with the arm around my

2   neck is killing me.

3           Now, they're telling you Sergeant Luebkin says, "Stop

4   resisting and we'll stop."

5           "He's killing me."

6           "I know.  Stop resisting and he'll stop."

7           When you watch the video and you hear that exchange,

8   see what Officer Camarillo does and look at Michael's

9   reaction.  Look as what he's doing.  Ask yourselves when you

10  watch the video:  Is Michael fighting Officer Camarillo?  Is

11  Michael fighting Sergeant Luebkin?  Is Michael fighting

12  Officer Hessner?  Is Michael fighting Officer Schmidt?  Is

13  Michael fighting Officer Mathews?

14          The answer is no.  The answer is no, ladies and

15  gentlemen.

16          Officers do have a hard life.  They do.  We all

17  agree.  Yes, when I wake up, I don't have to put on a

18  bulletproof vest.  But an officer has a great deal of power.

19  An officer has a great deal of responsibility.  And we, as

20  citizens, have to hold officers accountable.  That's what

21  makes the system work properly.

22          That's what allows a little kid to want to go and see

23  an officer and ask for that sticker badge.  That's what makes

24  us citizens tell officers day in and day out, "Thanks for your

25  service."

1          The fact that you, as a jury, have the authority and

2     the power to hold an officer accountable, the only people in

3     this room that can, you can't make or hold an officer

4     responsible and help Mr. Ruiz because he's dead.

5          But that next person who comes in contact with an

6     officer who didn't know his training, the next person that

7     comes in contact with Officer Camarillo and if he doesn't know

8     his training, that mom who calls because her son has some type

9     of problem, she can't control him, and Officer Camarillo shows

10    up.  If he doesn't know his training, would there be another

11    jury in your place with another attorney asking that jury to

12    hold Officer Camarillo accountable?

13         Ask yourselves that.  When you -- after deliberating

14    in this case, whatever decision you make, it's a decision

15    thank you make.  We have to live with it.

16         But you want to make sure that you can go home and

17    rest assured that you made the right decision.  All of us walk

18    out of this courtroom.  All of us will go back to our lives.

19    Michael Ruiz will not.

20         There's an attorney that closes his closing argument

21    with a story about a man and a young boy.  And I want to use

22    it because I think it's befitting for this particular case.

23         And the boy is kind of like a Dennis the Menace but a

24    little worse than Dennis the Menace.

25         And the boy has this bird in his hand.  He goes to

1   the old man and he says, Hey, I have a bird in my hand.  Is it

2   alive or is it dead?

3          Now, the boy in his mind, he thinks if the old man

4   says the bird is alive, then he's going to turn his back and

5   crush the bird and show him a dead bird.

6          The little boy also says, well, if he says the bird

7   is dead, he's going to show him a live bird.

8          So when the boy asks the old man is the bird alive or

9   dead, the old man says:  The bird is in your hand.

10          And, ladies and gentlemen, the case is in your hand.

11   As I stated, you have the ability, you have the power, the

12   only ones in this courtroom who have the power to hold Officer

13   Camarillo accountable, hold him responsible for his actions.

14          We presented the evidence to you.  Their own experts

15   have said that Camarillo, his actions caused injuries, the

16   injuries that the Medical Examiner himself testified about.

17   The omission of not following the Operations Orders are what

18   killed Michael Ruiz.  That's what caused the anoxic brain

19   injury and he died there at the scene.

20          More probably true than not, ladies and gentlemen,

21   officer Camarillo is accountable.  He should be held

22   responsible for his actions on July 28, 2013.

23          Thank you, all.

24   **FINAL INSTRUCTIONS TO THE JURY**

25          THE COURT:  Members of the jury, now that you have

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

 1    heard all of the evidence and the arguments of the attorneys,

 2    it is my duty to instruct you on the law that applies to this

 3    case.

 4            Each of you will receive a copy of these instructions

 5    to consult when you return to the jury room for your

 6    deliberations.

 7            It is your duty to find the facts from all the

 8    evidence in the case.  To those facts you will apply the law

 9    as I give it to you.  You must follow the law as I give it to

10    you whether you agree with it or not.  And you must not be

11    influenced by any personal likes or dislikes, opinions,

12    prejudices, or sympathy.  That means that you must decide the

13    case solely on the evidence before you.  You will recall that

14    you took an oath to do so.

15            Please do not read into these instructions or

16    anything that I may say or do or have said or done that I have

17    an opinion regarding the evidence or what your verdict should

18    be.

19            Plaintiff Yolanda Erickson brings a claim on behalf

20    of the Estate of Miguel Ruiz under the federal statute, 42

21    U.S.C., Section 1983, which provides that any person or

22    persons who, under color of state law, deprives another of any

23    rights, privileges or immunities secured by the Constitution

24    or laws of the United States shall be liable to the injured

25    party.

1           In order to prevail on her 1983 claim against

2   defendant Abraham Camarillo, plaintiff must prove each of the

3   following elements by a preponderance of the evidence:

4           One, defendant acted under color of state law; and

5           Two, the acts of defendant deprived decedent Miguel

6   Ruiz of his particular rights under the United States

7   Constitution as explained in later instructions.

8           A person acts "under color of state law" when the

9   person acts or purports to act in the performance of official

10  duties under any state, county, or municipal law, ordinance or

11  regulation.  The parties have stipulated that defendant acted

12  under color of state law.

13          If you find that plaintiff has proved each of these

14  elements -- and if you find that plaintiff has proved

15  defendant used excessive force on decedent, as instructed on

16  pages four through six -- your verdict should be for

17  plaintiff.

18          If, on the other hand, you find that plaintiff has

19  failed to prove any one or more of these elements, your

20  verdict should be for defendant.

21          In general, a seizure of a person is unreasonable

22  under the Fourth Amendment if a police officer uses excessive

23  force in making a lawful arrest, in defending himself or

24  others, and/or in attempting to stop a fleeing suspect.

25  Therefore, in order to prove an unreasonable seizure in this

1   case, plaintiff must prove by a preponderance of the evidence

2   that defendant used excessive force when he attempted to

3   control decedent Michael Ruiz on July 28, 2013.

4         Under the Fourth Amendment, a police officer may use

5   only such force as is "objectively reasonable" under all of

6   the circumstances.  You must judge the reasonableness of a

7   particular use of force from the perspective of a reasonable

8   officer on the scene and not with the 20/20 vision of

9   hindsight.  Although the facts known to defendant are relevant

10  to your inquiry, defendant's subjective intent or motive is

11  not relevant to your inquiry.

12        In determining whether defendant used excessive force

13  in this case, consider all of the circumstances known to

14  defendant, including, but not limited to:

15        One, the nature of the crime or other circumstances

16  known to the officers at the time force was applied;

17        Two, whether decedent posed an immediate threat to

18  the safety of the officers or to others;

19        Three, whether decedent was actively resisting arrest

20  or attempting to evade arrest by flight;

21        Four, the amount of time defendant had to determine

22  the type and amount of force that reasonably appeared

23  necessary, and any changing circumstances during that period;

24        Five, the type and amount of force used;

25        Six, the availability of alternative methods to take

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

1    decedent into custody or subdue decedent;

2          Seven, the number of lives at risk (motorists,

3    pedestrians, police officers) and the parties' relative

4    culpability; i.e., which party created the dangerous

5    situation, and which party is more innocent;

6          Eight, whether it was practical for defendant to give

7    warning of the imminent use of force, and whether such warning

8    was given; and

9          Nine, whether it should have been apparent to

10   defendant that the person he used force against was

11   emotionally disturbed.

12         "Probable cause" exists when, under all of the

13   circumstances known to defendant at the time, an objectively

14   reasonable police officer would conclude there is a fair

15   probability that decedent has committed or was committing a

16   crime.  For purposes of your deliberation, the Court has

17   already determined that, under the totality of the

18   circumstances, the information available to defendant from his

19   own observations and discussions at the time of the arrest was

20   sufficient to warrant a prudent officer in believing that

21   defendant had committed a crime; therefore, there was probable

22   cause to support defendant's arrest of decedent.

23         In an 1983 action, the plaintiff must demonstrate

24   that the defendant's conduct was the actionable cause of the

25   claimed injuries.  To meet this causation requirement

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8       6-5-17

1    plaintiff must establish both causation-in-fact and proximate

2    causation.

3         An act is causation-in-fact if decedent's injuries

4    would not have occurred without that act or omission.

5         Additionally, an act is a proximate cause if it was a

6    substantial factor in bringing about or actually causing

7    injuries, that is, if the injuries were a reasonably

8    foreseeable consequence of defendant's act.

9         The inquiry into causation must be individualized and

10   focus on the duties and responsibilities of defendant.

11        When a party has the burden of proving any claim by a

12   preponderance of the evidence, it means you must be persuaded

13   by the evidence that the claim is more probably true than not

14   true.

15        You should base your decision on all of the evidence,

16   regardless of which party presented it.

17        It is the duty of the Court to instruct you about the

18   measure of damages.  By instructing you on damages, the Court

19   does not mean to suggest for which party your verdict should

20   be rendered.

21        If you find for plaintiff, you must determine

22   plaintiff's damages.  Damages means the amount of money that

23   will reasonably and fairly compensate the Estate of Miguel

24   Ruiz for the injuries to decedent that you find were caused by

25   defendant.

CV14-01942-PHX-JAT     JURY TRIAL - DAY #8     6-5-17

 1              On plaintiff's claim, you should consider the

 2     following:

 3              One, the loss of enjoyment of life experienced prior

 4     to death;

 5              Two, the mental, physical, and emotional pain and

 6     suffering experienced by decedent prior to death;

 7              Three, the reasonable expenses of necessary medical

 8     care and services for the injury caused by defendant; and

 9              Four, if you find defendant's conduct caused

10     plaintiff's death, the reasonable expenses of funeral and

11     burial.

12              Plaintiff has the burden of proving damages by a

13     preponderance of the evidence, and it is for you to determine

14     what damages, if any, have been proved.  Your award must be

15     based upon evidence and not upon speculation, guesswork, or

16     conjecture.

17              The law that applies to this case authorizes an award

18     of nominal damages.  If you find for plaintiff but you find

19     that plaintiff has failed to prove damages as defined in these

20     instructions, you must award nominal damages.  Nominal damages

21     may not exceed one dollar.

22              If you find for plaintiff, you may, but are not

23     required to, award punitive damages.  The purposes of punitive

24     damages are to punish defendant and to deter similar acts in

25     the future.  Punitive damages may not be awarded to compensate

1    plaintiff.

2          Plaintiff has the burden of proving, by a

3    preponderance of the evidence, that punitive damages should be

4    awarded and, if so, the amount of any such damages.

5          You may award punitive damages only if you find that

6    defendant's conduct that harmed plaintiff was malicious,

7    oppressive or in reckless disregard of plaintiff's rights.

8    Conduct is malicious if it is accompanied by ill will, or

9    spite, or if it is for the purpose of injuring plaintiff.

10   Conduct is in reckless disregard of plaintiff's rights if,

11   under the circumstances, it reflects complete indifference to

12   plaintiff's safety or rights, or if defendant acts in the face

13   of a perceived risk that his actions will violate plaintiff's

14   rights under federal law.  An act or omission is oppressive if

15   defendant injures or damages or otherwise violates the rights

16   of plaintiff with unnecessary harshness or severity, such as

17   by misusing or abusing authority or power or by taking

18   advantage of some weakness or disability or misfortune.

19         If you find that punitive damages are appropriate,

20   you must use reason in setting the amount.  Punitive damages,

21   if any, should be in an amount sufficient to fulfill their

22   purposes but should not reflect bias, prejudice or sympathy

23   toward any party.  In considering the amount of any punitive

24   damages, consider the degree of reprehensibility of

25   defendant's conduct, including whether the conduct that harmed

1   plaintiff was particularly reprehensible because it also

2   caused actual harm or posed a substantial risk of harm to

3   people who are not parties to this case.  You may not,

4   however, set the amount of any punitive damages in order to

5   punish defendant for harm to anyone other than plaintiff.  In

6   addition, you may consider the relationship of any award of

7   punitive damages to any actual harm inflicted by plaintiff.

8        Because you must base your verdict only on the

9   evidence received in the case and on these instructions, I

10  remind you that you must not be exposed to any other

11  information about the case or to the issues it involves.

12  Except for discussing the case with your fellow jurors during

13  your deliberations:

14       Do not communicate with anyone in any way and do not

15  let anyone else communicate with you in any way about the

16  merits of the case or anything to do with it.  This includes

17  discussing the case in person, in writing, by phone or

18  electronic means, via e-mail, via text messaging, or any

19  Internet chat room, blog, website or application, including

20  but not limited to Facebook, YouTube, Twitter, Instagram,

21  LinkedIn, Snapchat, or any other forms of social media.  This

22  applies to communicating with your family members, your

23  employer, the media or press, and the people involved in the

24  trial.  If you are asked or approached in any way about your

25  jury service or anything about this case, you must respond

1    that you have been ordered not to discuss the matter and to

2    report the contact to the court.

3            Do not read, watch, or listen to any news or media

4    accounts or commentary about the case or anything to do with

5    it; do not do any research, such as consulting dictionaries,

6    searching the Internet, or using other reference materials;

7    and do not make any investigation or in any other way try to

8    learn about the case on your own.  Do not visit or view any

9    place discussed in this case, and do not use Internet programs

10   or other devices to search for or view any place discussed

11   during the trial.  Also, do not do any research about this

12   case, the law, or the people involved -- including the

13   parties, the witnesses or the lawyers -- until you have been

14   excused as jurors.  If you happen to read or hear anything

15   touching on this case in the media, turn away and report it to

16   me as soon as possible.

17           These rules protect each party's right to have this

18   case decided only on evidence which has been presented here in

19   court.  Witnesses here in court take an oath to tell the

20   truth, and the accuracy of their testimony is tested through

21   the trial process.  If you do any research or investigation

22   outside the courtroom, or gain any information through

23   improper communications, then your verdict may be influenced

24   by inaccurate, incomplete, or misleading information that has

25   not been tested by the trial process.  Each of the parties is

 1    entitled to a fair trial by an impartial jury, and if you

 2    decide the case based on information not presented in court,

 3    you will have denied the parties a fair trial.  Remember, you

 4    have taken an oath to follow the rules, and it is very

 5    important that you follow these rules.

 6         A juror who violates these restrictions jeopardizes

 7    the fairness of these proceedings.  If any juror is exposed to

 8    any outside information, please notify the court immediately.

 9         If it becomes necessary during your deliberations to

10    communicate with me, you may send a note through the bailiff,

11    signed by any one or more of you.  No member of the jury

12    should ever attempt to communicate with me except by a signed

13    writing.  I will not communicate with any member of the jury

14    on anything concerning the case except in writing or here in

15    open court.  If you send out a question, I will consult with

16    the lawyers before answering it, which may take some time.

17    You may continue your deliberations while waiting for the

18    answer to any question.  Remember that you are not to tell

19    anyone, including the court, how the jury stands, whether in

20    terms of vote count or otherwise, until after you have reached

21    a unanimous verdict or have been discharged.

22         A verdict form has been prepared for you.  After you

23    have reached unanimous agreement on a verdict, your foreperson

24    should complete the verdict form according to your

25    deliberations, sign and date it, and advise the bailiff that

1    you are ready to return to the courtroom.

2            And I will just go over that verdict with you.  It is

3    two pages in length.  And I won't read the formal caption but

4    the verdict says:

5            We, the Jury, duly empaneled and sworn in the

6    above-entitled action, upon our oaths, do hereby:

7            As to the Estate of Miguel Ruiz' claim that defendant

8    violated decedent Miguel Ruiz' constitutional rights to not

9    have excessive force used against him.

10           Find in favor of:

11           Then there's a blank next to the words "the Estate of

12   Miguel Ruiz" and there's a blank next to the words "defendant

13   Abraham Camarillo."

14           Obviously, choose one or the other of those.

15           If you find in favor of the Estate on its claim,

16   please continue to page 2 and answer the first question on

17   that page.  Otherwise, please sign and date the form on page

18   2.

19           At page 2 it says:

20           We, the Jury, award the Estate of Miguel Ruiz:

21           Nominal damages in the amount of --

22           And then there's a dollar sign with a bank or --

23           Compensatory damages in the amount of --

24           And there's a dollar sign with a blank.

25           If you awarded damages to the Estate, please answer

1    the next question on this page.  Otherwise, please sign and

2    date the form on page 3.

3             If you awarded either nominal or compensatory damages

4    to the Estate, you may also award punitive damages to the

5    Estate.  If you choose to award punitive damages, please

6    answer the following:

7             We, the Jury, award the estate of Miguel Ruiz

8    punitive damages in the amount of --

9             And then there's a blank with a dollar sign in front

10   of it.

11            And then at the bottom of page 2 there is a blank for

12   the date and a blank for the Foreperson to sign, using your

13   number.

14            And anything that is signed and any place I may

15   reference signing something, such as a note to the Court, you

16   sign it only with your juror number.

17            Before you begin your deliberations, elect one member

18   of the jury as your presiding juror.  The presiding juror will

19   preside over the deliberations and serve as the spokesperson

20   for the jury in court.

21            You shall diligently strive to reach agreement with

22   all of the other jurors if you can do so.  Your verdict must

23   be unanimous.

24            Each of you must decide the case for yourself, but

25   you should do so only after you have considered all of the

 1    evidence, discussed it fully with the other jurors, and

 2    listened to their views.

 3            It is important that you attempt to reach a unanimous

 4    verdict but, of course, only if each of you can do so after

 5    having made your own conscientious decision.  Do not be

 6    unwilling to change your opinion if the discussion persuades

 7    you that you should.  But do not come to a decision simply

 8    because other jurors think it is right, or change an honest

 9    belief about the weight and effect of the evidence simply to

10    reach a verdict.

11            Any errors or corrections on the reading of the

12    instructions from either counsel?

13            MR. BLACKWELL:  None present, Judge.

14            MR. MASTERSON:  Judge, I think we have an issue with

15    the verdict form that we need to talk about.

16            THE COURT:  All right.  Let's see counsel at sidebar.

17       (At sidebar on the record.).

18            MR. MASTERSON:  I think we all missed it.  We don't

19    have a page three in the bracketed part.  It needs to come

20    out.

21            MR. BLACKWELL:  Page 2?

22            THE COURT:  Oh, I missed that.

23            MR. POPOLIZIO:  And that's it.

24            THE COURT:  We can send them in to begin deliberating

25    and we can revise the form of verdict and send it in.

```
 1              MR. MASTERSON:  All right.  Thank you, Your Honor.

 2              MR. BLACKWELL:  Thank you.

 3              THE COURT:  All right.

 4         (End of discussion at sidebar.)

 5              THE COURT:  We have just a -- I guess you call it a

 6    "typo" on the verdict form.

 7              So in just moments we will send you to the jury room

 8    with the exhibits, with the instructions, and then as soon as

 9    we get this typo corrected on the verdict form, the verdict

10    form will be delivered to the jury room.

11              At this time I will swear the bailiffs.

12         (Bailiffs duly sworn.)

13              THE COURT:  All right.  At this time the bailiff will

14    show to you the jury room.

15              It's ten after 2:00.  I would say that if you have

16    not reached a verdict by five o'clock, then plan to go home

17    for the evening.  When you reach that point, just notify the

18    bailiff that you are ready to go home for the evening.

19              And then plan to return at 9:00 a.m. in the morning,

20    simply returning to the jury room.  Obviously, do not begin --

21    or I should say resume deliberations until all of you are

22    present.  And do not deliberate at any time unless all of you

23    are present for the deliberations.

24              I believe that's all I need to cover with you, so you

25    are now excused to the jury room and the bailiff will
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

```
 1    accompany you.

 2        (Jury retires to deliberate at 2:12 p.m.)

 3    JURY RETIRES TO DELIBERATE

 4        (Open court, no jury present.)

 5            THE COURT:  All right.  Please be seated.

 6            The record will reflect the presence of the parties

 7    and counsel outside the presence of the jury.

 8            I just want to confirm that both counsel have

 9    determined by reviewing the exhibits going into the jury room

10    that those exhibits are exhibits properly received in

11    evidence.

12            MR. BLACKWELL:  That is correct, Your Honor.

13            MR. MASTERSON:  Yes, Judge.

14            THE COURT:  All right.  Thank you.

15            All right.  If you'll -- I have the sense I'm

16    repeating myself.

17            If you will leave your cell phone numbers with the

18    courtroom deputy and we will plan, again, if we get a question

19    that we can answer or that we can decide over the phone, we

20    will take that tact.  Otherwise, we will reconvene here in the

21    courtroom.

22            And I think that's all I need to cover.

23            Either counsel?

24            MR. BLACKWELL:  No, Judge.  Thank you very much.

25            MR. MASTERSON:  No, Judge.
```

CV14-01942-PHX-JAT     JURY TRIAL - DAY #8     6-5-17

```
 1              THE COURT:  All right.  Thank you.

 2         (Recess taken at 2:14 p.m.; resumed at 3:19 p.m.)

 3         (Open court, jury present.)

 4    JURY VERDICT

 5              THE COURT:  Thank you.  Please be seated.

 6              The record will reflect the presence of the parties

 7    and counsel and ladies and gentlemen of the jury.

 8              Ladies and gentlemen, have you reached a verdict?

 9              FOREPERSON:  Yes.

10              THE COURT:  All right.  If you will hand it to the

11    bailiff, please.

12              All right.  I will ask the Clerk to please read and

13    record the verdict.

14              THE CLERK:   We, the Jury, duly empaneled and sworn

15    in the above-entitled action, upon our oaths, do hereby:

16              As to the Estate of Miguel Ruiz' claim that defendant

17    violated decedent Miguel Ruiz' constitutional rights to not

18    have excessive force used against him:

19              Find in favor of the defendant Abraham Camarillo.

20              Dated June 5, 2017.  Signed by the Foreperson Juror

21    No. 2.

22              Is this your true and correct verdict, so say you one

23    and all.

24         (Jury responds affirmatively.)

25              THE COURT:  All right.
```

```
 1          Does either counsel wish to have the jury polled?

 2          MR. BLACKWELL:  Yes, Your Honor.  Thank you.

 3          THE COURT:  All right.  If you will poll the jury,

 4   please.

 5   JURY POLLED

 6          THE CLERK:  Is this your true verdict and verdict of

 7   the jury?

 8          Juror No. 1?

 9          JUROR NO. 1:  Yes.  It is.

10          THE CLERK:  Juror No. 2?

11          JUROR NO. 2:  Yes.

12          THE CLERK:  Juror No. 3?

13          JUROR NO. 3:  Yes.

14          THE CLERK:  Juror No. 4?

15          JUROR NO. 4:  Yes.

16          THE CLERK:  Juror No. 5?

17          JUROR NO. 5:  Yes.

18          THE CLERK:  Juror No. 6?

19          JUROR NO. 6:  Yes.

20          THE CLERK:  Juror No. 7?

21          JUROR NO. 7:  Yes.

22          THE CLERK:  Juror No. 8?

23          JUROR NO. 8:  Yes.

24          THE CLERK:  Juror No. 9?

25          JUROR NO. 9:  Yes.
```

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

```
 1              THE COURT:  All right.  Thank you.

 2         Ladies and gentlemen, thank you very much for your

 3    services in this case.  And by that I mean to thank you, first

 4    of all, that you have been willing to serve and have served,

 5    but also that you have done so diligently and conscientiously.

 6         You have been here punctually and you have lived with

 7    a somewhat truncated jury schedule, so we appreciate that in

 8    every respect.

 9         And I hope that this experience has just underscored

10    in your minds the importance of trial by jury to our system of

11    government and the fair enforcement of our laws and

12    preservation of our liberties.

13         Our founding fathers understood this very well that

14    trial by jury is a necessary part of legitimate government.

15         So at this time you are released from the

16    admonitions.  You are free to discuss the case or not discuss

17    it as you may choose.

18         The lawyers are instructed not to approach you about

19    the case so you'll not feel bothered.  But you may discuss the

20    case with them if you would like.

21         And with that said, you are now dismissed with our

22    thanks.

23         We are in recess.

24      (Proceedings adjourned at 3:26 p.m.)

25                                 *  *  *
```

UNITED STATES DISTRICT COURT

CV14-01942-PHX-JAT      JURY TRIAL - DAY #8      6-5-17

1

2                        C E R T I F I C A T E

3

4           I, ELIZABETH A. LEMKE, do hereby certify that I am

5    duly appointed and qualified to act as Official Court Reporter

6    for the United States District Court for the District of

7    Arizona.

8           I FURTHER CERTIFY that the foregoing pages constitute

9    a full, true, and accurate transcript of all of that portion

10   of the proceedings contained herein, had in the above-entitled

11   cause on the date specified therein, and that said transcript

12   was prepared under my direction and control.

13           DATED at Phoenix, Arizona, this 6th day of June,

14   2017.

15

16

17

18

19                       s/Elizabeth A. Lemke
                         ELIZABETH A. LEMKE, RDR, CRR, CPE
20

21

22

23

24

25